# Kurraba Group Exposed

https://www.kurrabagroup.exposed

Printed on October 21, 2025

# Table of Contents

Questions Raised Over Ashurst's Role in Managing Online Reputation for Kurraba Group and Nick Smith

Open Letter to AusBiotech Attendees – The 100 Botany Road Mirage: Why Nick Smith's Kurraba Campus May Never Materialize

Independent Watchdogs Emerge After Nick Smith's & Kurraba Group's Censorship: Two New Sites Investigate Nick Smith's Development Network

Nick Smith, Kippax & Kurraba

Kurraba Group's Nick Smith Smears Investor Ty Dincer & MEC Global Partners (Mitsubishi Estate) Amid Funding Debacle

Intimidation, Deception, and Exploitation: Exposing Nick Smith's 44-78 Rosehill St, Redfern Development Scandal

Internal Emails Reveal Kurraba's Nick Smith Instructed Staff to Lie as Kippax Collapsed Financially

Kurraba Group Exposed Issues Media Inquiry to Kurraba Group Regarding Allegations Concerning 100 Botany Road Project

From Ambition to Ashes: How Nick Smith's Kippax Venture Imploded and Left Investors Empty-Handed

Kurraba's Insider Deals Flip Affordable Housing into Private Gain: The Carfi–Kurraba–Aqualand Scandal

Kurraba Group and Nick Smith's Legal Campaign to Silence a Community Critic

Kurraba's Sydney Affordable Housing Scandal: How Insider Deals Flipped Public Land for Private Gain

Open Letter to Trent Murno & Sydney Life Sciences Community – What You Should Know About Nick Smith & Kurraba Group

Investors and Leasing Agents Are Stepping Back from Kurraba's Botany Road (ION) Project — What That Means for Those Who Stay

Kurraba Group & Nick Smith's Lawyers Lie to Court (again): Jim Micallef Submits Knowingly False Affidavit

Judicial Review Imperils Kurraba Group's Botany Road Project as Buildcorp Wavers

Kurraba's Botany Road Debacle: A Developer's Shell Game Exposed

New Health Research Facility SSD: Legal, Planning, and Environmental Issues Review

The Trustee for Botany Road Development Trust Fund — ABN 31 744 075 878

Troubled Waters for ION's Perspective Tenants: The Mounting Crisis Threatening Kurraba Group's Flagship Life Sciences Development

Kurraba Group's Connection to Tactical Group: A Red Flag for Investors

Corrs Chambers Westgarth's Defamation Gambit: Suing the Wrong Man in Bid to Silence Kurraba Group Critics

Kurraba's Defamation Gambit: Investor Funds on a One-Way Trip to Nowhere (Wasted in Litigation)

Kurraba's Legal Attack: Kurraba's Lawyers Threaten Litigation – They Won't Silence Us

The Failure of Kippax Property and Rebranding as Kurraba Group: Nick Smith's Troubled Venture

Kurraba Group's ION Life Sciences Precinct: A Venture Riddled with Red Flags and Destined for Collapse

Nick Smith's ION Project: A Point-by-Point Critical Review

Exposing the Gaps: Kurraba's ION vs. Australia's Health Research Strategy

Kurraba Group's CEO Nicholas Smith Files Legal Action Seeking Apprehended Violence Order to Silence Community Critic

Nick Smith of Kurraba: Lavish Lifestyle Raises Investor Concerns

Legal Challenge Delays Kurraba Group's Alexandria Health Research Project – Investor Implications

How Nick Smith Appropriated the "Kurraba" Name and Rebranded It as "Kurraba Group"

Nicholas "Nick" Mark Smith – Kurraba – ASIC Personal Name Extract — Current & Historical

Legal Entity Information

Legal Entity Information – Botany Road Development Pty Ltd (ACN 667 402 397)

Legal Entity Information – Kurraba Group Pty Ltd (ACN 662 323 695)

Critical Assessment of Nick Smith and the Kurraba Group

Multiple Citizens Plan to Sue to Block 100 Botany Road / Kurraba Group

Kurraba group, which is being investigated by ICAC, engaged troubled JLL to run the leasing of its development

ThemeNcode PDF Viewer [Do not Delete]

ThemeNcode PDF Viewer SC [Do not Delete]

Reading Room

Freedom of Information documents show City of Sydney approved Kurraba development despite unanswered questions on state significance.

City West Housing, Aqualand, Kurraba referred to ICAC over Affordable Housing Sale

Despite promises Kurraba seeks buyer for 100 Botany Road development site.

Nick Smith and Proton Therapy Australia try and raise $50m.. on Facebook

Major law firm says Kurraba DA likely void – Investors at Risk

Australia's first proton therapy facility a $500,000,000 white elephant

Nick Smith and Proton Therapy Australia try to raise $50,000,000 on Facebook

Kippax investors lose entire investment

Macquarie University has no record of multiple degrees

No evidence to support Kurraba Track records – Ghost Projects never built.

News

Home

# Questions Raised Over Ashurst's Role in Managing Online Reputation for Kurraba Group and Nick Smith

October 21, 2025
[Uncategorized](#)



## Key Points

- **Lack of Public Statements from Involved Parties:** Neither Ashurst nor Kurraba Group has issued public responses addressing concerns about their involvement in online content management and transparency issues.
- **Online Content Takedown and Transparency Concerns:** Websites critical of Nick Smith and Kurraba Group have faced content takedowns in Australia, prompting debate over reputation management versus public-interest transparency.
- **Legal and Regulatory Involvement of Ashurst:** Ashurst has been engaged in handling legal and regulatory communications for property-development clients including Nick Smith and Kurraba Group, raising questions about influence and transparency.
- **Ethical and Policy Questions for Law Firms:** Ashurst's use of compliance resources to influence online discourse has raised ethical considerations, especially regarding online defamation and reputation management.
- **Public and Stakeholder Clarifications Sought:** Calls have been made for clarity on whether Ashurst's compliance team has participated in digital takedown requests, impact on whistleblowers, and how law firms balance client defense with free expression.

## Details

Recent developments have drawn public attention to the relationship between **Kurraba Group**, its director **Nick Smith**, and the **governance and compliance division of Ashurst**, one of Australia's major law firms.

According to emails provided by a whistleblower, Ashurst has been engaged in handling legal and regulatory communications on behalf of property-development clients including Nick Smith and Kurraba Group. In due course we will pubish all emails between Ashurst, Kurraba, and Nick Smith

Observers have noted that several websites critical of Mr Smith and his associated companies—most notably *KurrabaGroup.Exposed*—have faced content takedown or geo-restriction actions in Australia, prompting debate about the balance between **reputation management** and **public-interest transparency**.

Ashurst's governance and compliance team is known for advising corporations on risk mitigation, crisis response, and online defamation issues. While there is no public indication of wrongdoing, the optics of using high-level compliance resources to influence online discourse about major development projects has raised **ethical and policy questions** among transparency advocates.

Stakeholders and members of the public have called for greater clarity on:

- whether Ashurst's compliance arm has participated in any digital takedown requests or defamation notices targeting public-interest reporting;
- the extent to which such interventions may affect whistleblower communications or access to information; and
- how large law firms navigate the tension between legitimate client defence and the preservation of free expression.

At this stage, Ashurst and Kurraba Group have not issued public statements addressing these concerns.

## FAQs

### Have Ashurst and Kurraba Group publicly addressed these issues?

At this stage, Ashurst and Kurraba Group have not issued any public statements regarding these concerns.

### What are the main concerns raised by stakeholders and the public regarding Ashurst's involvement?

Concerns include whether Ashurst's compliance team has participated in digital takedown requests targeting public-interest reporting, how such actions might impact whistleblower communications and access to information, and how law firms balance client defense with free expression.

### What role does Ashurst's governance and compliance team play in digital and online issues?

Ashurst's governance and compliance team advises corporations on risk mitigation, crisis response, and online defamation issues, which may include handling digital takedown requests or defamation notices.

### Why are websites critical of Nick Smith and Kurraba Group facing restrictions in Australia?

Websites such as KurrabaGroup.Exposed that are critical of Nick Smith and his companies have faced content takedowns or geo-restrictions, which has sparked debates on the balance between reputation management and public-interest transparency.

### What is the controversy involving Kurraba Group, Nick Smith, and Ashurst's governance and compliance division?

The controversy concerns Ashurst, a major Australian law firm, allegedly assisting property developers including Nick Smith and Kurraba Group in handling legal and regulatory communications, with implications of online content removal and defamation management, raising questions about transparency and ethics.



### Kurraba Group

See Full Bio ›

# Open Letter to AusBiotech Attendees – The 100 Botany Road Mirage: Why Nick Smith's Kurraba Campus May Never Materialize

October 21, 2025
Uncategorized

*Nick Smith of Kurraba Group is promoting a vision of a gleaming life sciences campus (concept art shown above) at 100 Botany Road. But a closer look at his track record suggests the flashy model at his AusBiotech booth might be the only "building" this project ever produces.*

Attendees of AusBiotech 2025 who spoke with Smith may have been impressed by the **architectural model** and ambitious pitch: a **$490 million** "first-ever commercial life sciences campus" complete with high-tech labs and even a **proton cancer therapy center**. However, behind the buzzwords and scale models lies a history of **failed projects, financial mismanagement, and dubious tactics** that **raises serious red flags**. This article shines a light on the controversies surrounding **Kurraba Group and its CEO Nick Smith**, offering a **warning to potential investors, collaborators, and anyone considering doing business** with them.

## A Shiny Model, But a Shaky Proposition

At first glance, Kurraba Group's proposal for 100 Botany Road in inner Sydney sounds exciting. Smith pitches it as a **state-of-the-art life science hub** that will boost innovation, create jobs, and even host NSW's first proton therapy cancer treatment facility. He touts the project's proximity to universities and hospitals, and sprinkles in feel-good elements like First Nations-inspired design and job creation numbers. **What Smith likely didn't mention at AusBiotech** is that this same project has already **failed once before** under a different name. In reality, the "new" campus is essentially a **rebranded reboot** of an earlier development attempt, one that **collapsed spectacularly** and **wiped out its backers' money**.

Smith's previous venture, **Kippax Property**, attempted a massive commercial development at **44–78 Rosehill Street, Redfern**, not far from 100 Botany Road. Backed by investors (including ASX-listed Ariadne Australia), Kippax spent **millions on planning, consultants, and lobbying** for a tall tech office tower. But by mid-2022 that flagship project **imploded** when the City of Sydney **rejected the required rezoning**, deeming the proposal too large and incompatible with the area. The result? **Every dollar of investor capital was lost**, and by late 2022 Kippax's companies were quietly **deregistered with "nothing to show in return"**. Even Ariadne, the major investor, had to **write off the entire project's value to zero**. In short, **Smith's last grand vision went bust**, leaving investors empty-handed.

Undeterred, or rather, unwilling to accept responsibility, Nick Smith simply **hit the reset button**. In early 2023 he launched **Kurraba Group Pty Ltd**, essentially **Kippax under a new name, hoping no one would connect the dots**. He took the **very same concept and site (100 Botany Road)** that **Kippax had nurtured** and repackaged it as a bold new idea: a life sciences campus in Waterloo. This audacious rebrand is a classic case of *"new logo, same old plan."* Smith did not disclose in his glossy press releases that this project was **developed and funded by the defunct Kippax venture** that went broke. Instead, Kurraba's mid-2024 publicity proudly announced the "launch" of Australia's first commercial life sciences precinct, **with no mention of the previous failure**. The shiny new narrative conveniently **omitted** the hard truth that **his prior company had already tried and failed to deliver something very similar**. As one exposé put it, "the inference one is supposed to draw is that Kurraba Group came along with a brilliant new idea… when in reality it's the **same scheme in a new costume**".

## A Track Record of Failed Promises

Why should AusBiotech attendees care about what happened in Redfern? Because **past behavior is one of the best predictors of future behavior**. The collapse of the Rosehill Street project revealed a pattern of **overpromising and underdelivering** that may well repeat at 100 Botany Road. Under Smith's leadership, Kippax made **lofty promises** and pumped out **grandiose claims**, only to end in a "**total wipeout**" of investor funds. Now, Smith is making similarly bold promises about the life sciences campus. He claims it will have cutting-edge medical tech and be a "**centre of excellence**" for biotech , even boasting about hosting a proton therapy center "backed by IBA" (a proton equipment supplier). But observers are **skeptical**, noting that such claims feel "**less like genuine healthcare investment and more like a bogus medical facility promise to game the planning system**". In other words, the high-tech medical features could be more of a **marketing ploy** than a reality, convenient window-dressing to win government favor and fast-track approval as a State Significant Development. **It wouldn't be the first time**: after Kippax's local plans were stymied, Smith repitched the project with a medical spin purely to bypass local council control.

Not only did Kippax/Kurraba's first attempt fail, it did so amid **questionable conduct**. Internal documents from the Redfern saga show a troubling mindset: when faced with opposition, Smith and his team's response was not to compromise or adjust, but to **bulldoze through by any means necessary**. In May 2022, as the rezoning faltered, Kippax executives (including Smith and director Wayne Goldberg) plotted to "**frustrate the process**" and "**maintain pressure**" on City of Sydney officials. They discussed bombarding council planners with legal threats and orchestrating wealthy investors to personally lobby and intimidate councillors into overturning the decision. At one point, Kippax privately approached NSW state authorities, urging them to intervene and overrule the City's rejection, even **begging the Planning Department for a secret meeting behind the council's back**. In a letter to a state official, Smith's consultants painted doom-and-gloom scenarios (claiming the project's failure would drive tech tenants to Melbourne or overseas) and implored the state to step in, pointedly asking that the City of Sydney not be alerted to this end-run appeal. These maneuvers underscore an **alarming willingness to sidestep normal processes**. Rather than respect the planning outcome, Smith tried to find a backdoor to get his way.

## Dubious Tactics and Ethical Red Flags

Perhaps most cynically, the Kippax team even **exploited Indigenous communities as pawns** in their lobbying efforts. Internal emails reveal a strategy to "**cut a deal**" with the Metropolitan Local Aboriginal Land Council, offering a 50/50 joint venture on the Redfern site to win Indigenous support. The idea was to tout token benefits, like dedicating space for an Aboriginal "town hall" and public art honoring Aboriginal history, while privately admitting these gestures were meant to "neutralize" criticism. They planned to have influential Indigenous leaders brought into meetings and to brandish **letters of support from Indigenous organizations** to give the project moral cover. In public, Smith's team loudly proclaimed how their development would honor and uplift Indigenous communities; in private, these promises were treated as

mere PR tools. This kind of **manipulative name-dropping of marginalized groups** is a major ethical red flag. It suggests that **no tactic is off-limits**, even co-opting community goodwill under false pretenses, if it helps push the project through.

The pattern that emerges is one of **intimidation, deception, and spin**. According to a detailed investigation into the Redfern affair, Nick Smith's modus operandi was to **"engage in duplicitous behavior… to serve [his] own ends,"** from threatening tenants and distorting planning channels to whitewashing his failures with shiny rebranding. His venture's collapse in 2022 could be seen as comeuppance, but Smith treated it as merely a temporary setback to be papered over. The **Kippax-to-Kurraba reboot** has all the hallmarks of a **"phoenix company" play**, where a business that failed (and shed its debts) simply rises again under a new name, allowing the people behind it to carry on **without accountability**. Indeed, Kurraba's leadership and even some staff are **the same people** from the Kippax days, just wearing new titles. The DNA of the company, and the **profit-at-any-cost mindset**, remains unchanged. This should give any potential partner or investor serious pause.

## Financial Mismanagement and False Assurances

Beyond the planning shenanigans, **basic financial responsibility** (or lack thereof) is another area of concern. As Kippax was sinking in 2022, it wasn't just the big-ticket investors who got burned, **even small local consultants were left unpaid**. Kippax became effectively **insolvent**, unable to pay even a **modest A$1,760 invoice** for heritage consulting on the project. Rather than come clean about the cash crunch, Nick Smith chose to **mislead creditors**. In August 2022, with bills long overdue, Smith **explicitly instructed his staff to lie** to at least one contractor, telling them to promise payment "by next week" despite knowing no funds were available. One of his executives, **Shaun Bond**, immediately objected to this deceit, warning *"We shouldn't say this until we know this is the case – which we don't"*. Bond rightly feared that making empty promises "will just create a rod for our backs". In the end, the staff member sent a non-committal reply to the creditor, effectively dodging the lie Smith wanted told, but still stalling for time. This episode, now backed by internal emails, paints a damning picture: **Smith was willing to flout basic honesty in business** dealings, even for a trivial sum, to cover up his company's dire straits. If he would fib about something as straightforward as an overdue A$1.7K bill, what does that say about **trusting his larger claims** about a half-billion-dollar development?

This wasn't an isolated incident. According to whistleblowers, Smith had a habit of **giving false assurances** to various vendors and partners, blaming delayed payments on "external funding" holdups while he knew the coffers were empty. He also **prioritized flashy expenditures over obligations**. For example, records show he was willing to authorize **lavish spending on marketing**, reportedly up to **$60,000 for a one-minute promotional video** to wow investors, yet balked at paying a **$1,700 Indigenous heritage consulting fee** until pressure mounted. This kind of financial mismanagement and skewed priorities hints at a leadership more concerned with **image than integrity**. Small wonder that by the time the Redfern venture collapsed, **Kippax was out of cash and unable to fulfill even basic commitments**, leaving a trail of unpaid bills and broken promises.

## Litigation: Silencing Critics Instead of Addressing Concerns

One might hope that after such a track record, Kurraba Group would approach its new venture with humility and transparency. Instead, Smith's response to community pushback has been **confrontational and litigious**. When a local business owner, alarmed by the 100 Botany Road proposal, began raising objections and even set up a website ("Kurraba Group Exposed") detailing past issues, Smith's reaction was to **sue first, talk never**. Kurraba Group and Nick Smith hauled this critic into court, accusing him of running a "*campaign of extortion*" and seeking urgent orders to shut it down. In an extraordinary legal move, Smith's team invoked a newly enacted **tort of serious invasion of privacy**, marking one of the first times this law was used, because the website had published some personal materials (including embarrassing wedding photos of Smith) in its allegations. They also filed a **defamation suit over 15 publications** and even alleged the opponent's actions amounted to the tort of **intimidation**. In short, rather than openly address the substantive issues being raised about the project, Kurraba's instinct was to **muzzle the messenger** through aggressive legal tactics.

To be clear, a court has yet to determine the merits of those claims, but the very fact that Smith went to such lengths is telling. It signals that **critics of the 100 Botany Road development may be met with dialogue, but with lawsuits**. For attendees of AusBiotech, or any potential partners, this approach raises concern: **What happens if things go wrong or disagreements arise?** Kurraba's playbook so far suggests **a tendency to intimidate and silence**, rather than collaborate or compromise. It's worth noting that using heavy-handed legal pressure to quash opposition is of a piece with Smith's earlier tactics against city officials and community objectors. Whether the arena is urban planning or public opinion, the message from Kurraba's leadership seems to be: *get on board, or get out of the way*.

## Proceed with Caution: Red Flags for Investors and Partners

The **takeaway for AusBiotech attendees** and anyone wooed by Kurraba Group's grand presentation is simple: **exercise extreme caution**. The impressive model and rosy rhetoric can't erase the documented history of how Nick Smith and his companies operate. Before you consider **investing in**, **partnering with**, or **leasing space in** the 100 Botany Road project, weigh the red flags:

- **History of Project Failure:** Smith's last project collapsed, losing **all investor money**. The new project is essentially the same wine in a different bottle , run by the **same figure who already failed** once.
- **Financial Irresponsibility:** Evidence shows Kippax/Kurraba under Smith was **unable to meet financial obligations** and resorted to **lying about payments** to stall creditors. Will vendors, contractors, or partners get paid as promised this time around?
- **Misrepresentation and Hype:** Grand claims (from "1,200 jobs" to a cutting-edge cancer center) might be more **smoke-and-mirrors** than substance. Grand promises were made before, none materialized when the project failed. **Is there real backing and expertise for these facilities, or are they bait for approvals and investors?**
- **Ethical Concerns:** The record of **bullying officials, sidestepping processes, and co-opting communities** is a huge red flag. Partners in sensitive sectors like biotech should ask if this is a company whose values align with their own.
- **Litigious Tendencies:** Kurraba's knee-jerk resort to litigation to silence a critic shows a propensity to **use courts as a weapon**. That adversarial stance could extend to how they handle disputes internally or with collaborators.

In essence, **do your due diligence**, and then some. Regulators and government agencies are already being urged to scrutinize any proposal involving Smith or Kurraba with a fine-tooth comb. Prospective investors should **interrogate the track record**: ask tough questions about what happened to the previous investors and why that venture failed. Thus far, Smith has shown a **pattern of over-ambition followed by**

collapse, with a quick pivot to a new pitch each time. It's fair to wonder if the **life sciences campus is just the next chapter of the same story**.

## Conclusion: Don't Be Swayed by the Show

As the AusBiotech conference buzz fades, it's important to separate **showmanship from reality**. Nick Smith is undoubtedly a persuasive salesman for Kurraba Group, armed with slick renderings, a polished narrative, and a physical model that catches the eye. But remember: a **model is easy to build; a $490 million campus is not.** The **hard evidence from recent history** suggests that *the miniature building on display may be the only thing that ever gets "built."* The 100 Botany Road project, as grand as it sounds, bears the hallmarks of a venture that could **go the same way as Smith's last failed endeavor**, lots of fanfare, **little follow-through**.

For the biotech entrepreneurs, researchers, and investors who crossed paths with Kurraba Group at the conference, consider this article a friendly heads-up. **Don't let glossy brochures and optimistic soundbites cloud your judgment.** Before you hitch your wagon to Kurraba's star, take a hard look at the track record detailed above. It's better to **ask the uncomfortable questions now** than to find out later that the promises were hollow. In the high-stakes world of biotech innovation, you can't afford to be distracted by mirages, and Kurraba Group's 100 Botany Road campus is looking increasingly like just that, a mirage. **Caveat emptor**: let the buyer (and collaborator, and investor) beware. Proceed carefully, or you might end up with nothing but a story of **"the one time I almost believed a guy with a pretty model."**

**Sources:**

1. Kurraba Group Exposed – *Report on Nick Smith's failed 44-78 Rosehill St, Redfern development and rebranding as Kurraba*
2. Kurraba Group Exposed – *Internal emails from Kippax/Kurraba showing financial mismanagement and deception*
3. Kurraba Group Exposed – *Evidence of planning manipulation and exploitation of Indigenous groups in Kippax's Redfern project*
4. Wotton + Kearney (Law Firm) – *Case summary of Kurraba Group & Nick Smith v. Williams (2025) detailing legal actions taken by Nick Smith against a critic*



### Kurraba Group

[See Full Bio](#) ›

# Independent Watchdogs Emerge After Nick Smith's & Kurraba Group's Censorship: Two New Sites Investigate Nick Smith's Development Network

October 21, 2025
Kurraba Group



#image_title

## Key Points

- **Importance of Independent Public Accountability:** The proliferation of independent watchdogs demonstrates that truth and accountability persist beyond attempts at censorship, highlighting the ongoing need for multiple independent voices in public interest reporting.
- **Growing Resistance to Digital Suppression in Australia:** The creation of these new sites reflects increasing public demand for transparency and resilience against digital censorship, ensuring critical property and corporate information remains accessible despite attempts at suppression.
- **KurrabaGroupNickSmith.com as a Summary Resource:** This site consolidates reporting on Kurraba Group and Nick Smith, providing accessible summaries and evidence-based insights on high-profile projects and controversies to the public.

- **KippaxProperty.com Documents Kippax Group Failures:** KippaxProperty.com investigates corporate setbacks, planning controversies, and stakeholder concerns linked to Kippax Property, highlighting issues in development projects and corporate governance.
- **Emergence of Independent Websites Following Geo-Blocking:** After the alleged geo-restriction of KurrabaGroup.Exposed, two independent platforms, KippaxProperty.com and KurrabaGroupNickSmith.com, have emerged to continue scrutinizing Nick Smith, Kurraba Group, and related property issues.

## Introduction

Following **Nick Smith and Kurraba Group's forcing Google to geo-restrict KurrabaGroup.Exposed from Australian search results**, two **independent websites** have emerged. Each examines issues related to **Nick Smith**, **Kurraba Group**, and their associated property entities.

While the exact details of the alleged geo-restriction remain under investigation, the timing and nature of these new publications suggest that others are stepping in to ensure the record remains accessible and that critical reporting continues to reach the public.

### 1. KippaxProperty.com: Scrutinizing Kippax Group and Related Failures

[KippaxProperty.com](http://KippaxProperty.com) investigates the record and alleged business failures associated with **Kippax Property** and its connection to **Nick Smith**. Key areas of focus include:

- Corporate and financial setbacks linked to Kippax developments;
- Planning and compliance controversies across multiple Sydney projects;
- Investor and stakeholder concerns about transparency and governance.

Although **KurrabaGroup.Exposed** is **not affiliated** with this new publication, we welcome **independent scrutiny** that contributes to the factual record and promotes accountability within the property development sector.



🖼 *Screenshot of KippaxProperty.com*

## 2. KurrabaGroupNickSmith.com: Consolidating Coverage of Kurraba Group and Nick Smith

The second site, **KurrabaGroupNickSmith.com**, consolidates independent reporting and documentation concerning **Kurraba Group**, **Nick Smith**, and high-profile projects such as **100 Botany Road**. It serves as an **accessible summary resource** for journalists, researchers and the public, providing concise overviews of controversies already covered on *KurrabaGroup.Exposed* and elsewhere. Its stated intent appears to be evidence-based reporting and transparency in development-related matters.

As with the first site, **KurrabaGroup.Exposed has no association** with this website. Nonetheless, we recognize the value of multiple independent efforts examining these same issues.



🖼 *Screenshot of KurrabaGroupNickSmith.com*

## Broader Implications: Growing Interest and Resistance to Suppression

The appearance of these sites — seemingly in response to the **alleged geo-blocking of KurrabaGroup.Exposed following pressure from Nick Smith and Kurraba Group** — underscores the growing public demand for transparency and resilience against digital suppression in Australia's property and media environment.

With *KurrabaGroup.Exposed* temporarily obscured from domestic visibility, the establishment of **alternative independent watchdogs** ensures that critical information about investor conduct, planning integrity and corporate governance remains publicly accessible. Attempts to suppress reporting often have the opposite effect: they inspire replication, scrutiny and independent verification.

## Conclusion

As *KurrabaGroup.Exposed* continues its mission of factual, evidence-based reporting, we **acknowledge and encourage** all independent publishers who contribute responsibly to these matters of public interest.

The simultaneous rise of multiple unaffiliated watchdogs — seemingly in the wake of alleged efforts by Nick Smith and Kurraba Group to suppress information — reminds us that **truth finds new platform**s, and that public accountability cannot be confined by national boundaries or private influence.

> *Sunlight is the best disinfectant — and attempts at censorship only make it shine brighter.*

## FAQs

### What broader message do these developments convey about transparency and censorship?

They highlight that public demand for transparency remains strong, and that attempts at digital censorship often inspire the growth of independent watchdogs, demonstrating that truth finds new platforms and accountability can transcend boundaries.

### Are these websites officially affiliated with each other or with KurrabaGroup.Exposed?

No, both KippaxProperty.com and KurrabaGroupNickSmith.com operate independently and are not affiliated with KurrabaGroup.Exposed, though they contribute to the broader landscape of independent accountability efforts.

### How do these independent platforms contribute to public accountability?

They provide alternative avenues for investigating, documenting, and disseminating information on corporate and development controversies, thereby fostering transparency, resisting censorship, and ensuring the public has access to vital details despite efforts to suppress such reporting.

### Why have these independent websites emerged following geo-blocking of KurrabaGroup.Exposed?

These sites emerged in response to the alleged geo-restriction of KurrabaGroup.Exposed, aiming to ensure critical information remains accessible and continue scrutinizing Nick Smith, Kurraba Group, and property issues despite attempts at digital censorship.

### What is the purpose of the sites KippaxProperty.com and KurrabaGroupNickSmith.com?

KippaxProperty.com investigates the record and alleged failures of Kippax Property, including corporate setbacks and planning controversies, while KurrabaGroupNickSmith.com consolidates independent reporting on Kurraba Group, Nick Smith, and related projects, serving as accessible summaries to promote transparency and accountability.



## Kurraba Group

[See Full Bio](See Full Bio) ›

# Nick Smith, Kippax & Kurraba

October 20, 2025

Exposing corruption, deceit, and manipulation by Nick Smith, Kippax Property, and Kurraba Group. Demanding transparency, accountability, and justice for those they've harmed.

Click here or our logo in the upper left corner for more information.

# Kurraba Group's Nick Smith Smears Investor Ty Dincer & MEC Global Partners (Mitsubishi Estate) Amid Funding Debacle

October 20, 2025
Kurraba Group

*Sydney, Australia* – In a startling turn of events, Kurraba Group CEO **Nick Smith** has allegedly been privately disparaging one of his own prospective investors, **Ty Dincer**, even as his flagship development project struggles to secure solid financing. Smith, a former Lendlease executive turned developer, has been **dropping Dincer's name to lure other investors** while simultaneously maligning Dincer's reputation over **"poor character" and alleged past convictions**. The irony is palable: **Dincer is a seasoned investment guru**, currently CEO of MEC Global Partners Asia (an affiliate of Japan's Mitsubishi Estate), with a strong track record in global real estate, whereas **Smith's own credibility is under fire** due to a pattern of **misrepresentation and questionable dealings**. This unfolding saga paints a troubling picture of a developer seemingly willing to **undermine a willing backer** in a bid to save face and salvage his project. Several individuals with intimate knowledge of the fundraising efforts have stated that there are two Australian Groups Nick Smith would prefer to have as partners instead of Ty Dincer and MEC.

## Request for Comment

We contacted Kurraba Group and their attorneys on Saturday, October 18, 2025, at 4:08 PM (San Francisco (PDT, UTC-7)) [Sunday, October 19, 2025, at 10:08 AM (Sydney (AEDT, UTC+11))] requesting comment. Kurraba and their attorneys refused to respond, request an extension, or deny the allegations below. A full copy of our request for comment including questions and evidentiality requests is included below.

## Key Points

- **Potential Reputational and Financial Risks for Kurraba Group and Stakeholders:** Smith's conduct and the shaky financial foundation of the project threaten to undermine investor trust and could lead to funding shortfalls, risking the project's future and stakeholders' interests.
- **Internal Governance and Ethical Concerns at Kurraba Group:** The silence from Kurraba Group regarding Smith's remarks and questionable financial models suggests possible internal issues with governance, transparency, and adherence to professional standards.
- **Allegations of Defamation Against Ty Dincer:** Nick Smith is accused of privately disparaging Ty Dincer's reputation while leveraging his funding offer to attract other investors, despite Dincer's recognized credibility in international real estate.
- **Questionable Financial Practices and Project Viability:** Kurraba Group's financial model for the 100 Botany Road project contains errors, overly optimistic assumptions, and inconsistent data, raising concerns about the project's true financial health and transparency.
- **Ty Dincer's Professional Reputation and Past Controversies:** Despite past legal disputes linked to defamation in the UAE, Dincer remains a respected figure in real estate investment, with his current role emphasizing his credibility and influence in the industry.

## Defamation Allegations: Smearing a Would-Be Backer



*A photo of the legendary and highly successful investor Ty Dincer Source Worldwide Golf September Ryder CUP Special Published on Aug 29 2012*

According to sources familiar with recent investor discussions, Nick Smith **made verbal remarks impugning Ty Dincer's reputation** within the last few months. **Multiple witnesses** attest that Smith has been telling other potential funders (reportedly including major developers like Lendlease) that **he has a "great deal" on the table from Ty Dincer**, but then in the next breath **discredits Dincer** as someone he *"doesn't want to use"* due to Dincer's **"poor reputation"** and **criminal history in the Middle East**. These alleged remarks occurred during private funding pitches and strategy talks, essentially **using Dincer's offer as leverage**: Smith touts that *"MEC Global Partners (Ty Dincer's firm) is ready to fund us"*, yet insinuates *"we'd prefer a better partner given Dincer's background"*.

Such two-faced tactics go beyond mere negotiation gambits, they veer into **personal defamation**. Did Smith allude to Dincer's past legal troubles in Abu Dhabi? By all indications, yes. **Ty Dincer was indeed involved in a 2017–2018 legal dispute in the UAE**, where he was

*allegedly* convicted of defamation against a colleague. Dincer then sued in San Francisco, United States to vindicate his name. But Smith's **intent in highlighting this** appears less about factual context and more about **poisoning the well**: undermining Dincer's character to justify soliciting other investors. The **context** of these comments matters: rather than a cautious due-diligence discussion, they come off as an **unscrupulous negotiating ploy**, aimed at **making Dincer seem like a last-resort option**. Notably, insiders say Smith's assertions about Dincer were not backed by any new evidence or firsthand knowledge; he was simply recycling **old allegations** (widely known from years ago) to **cast doubt on Dincer's suitability**.

Perhaps most alarmingly, **a third party reportedly recorded one such conversation**, capturing Smith's words on tape. If true, this means **Smith's exact statements can be verified**, leaving little room for denial. Kurraba Group has so far **issued no public retraction or apology** to Ty Dincer. There is no indication that Smith ever informed Dincer about these disparaging remarks or attempted to clarify them. **Silence from Kurraba's side** suggests a tacit acknowledgement of the behavior, or at least a hope it wouldn't surface. But surface it has. If the audio recording is authentic (and Kurraba has not disputed its authenticity or completeness), Smith may have **opened himself and his firm to legal liability**. At minimum, it represents a **breach of professional decorum**, a founder bad-mouthing an investor who showed interest in backing his project.

One has to ask: **What does this say about Kurraba's internal culture and governance?** Does the company have any policy on how its executives speak about third parties? If it does, Smith seems to have **trampled it**. As of now, there's been no comment from Kurraba Group about any internal review or discipline related to Smith's remarks. The episode sends a chilling message to other partners: **help Nick Smith at your own peril, for even your goodwill might be repaid with slander**.

## A Shaky Project and Desperate Upselling

The backdrop to this drama is Kurraba Group's highly touted project at **100 Botany Road, Waterloo**, envisioned as Australia's first commercial life-sciences campus. Nick Smith has loudly promoted the $490 million development as a future "centre of excellence" for biomedical research, even winning support by promising a Proton Cancer Therapy Centre as the project's crown jewel. But behind the optimistic press releases and glossy renderings, **the project's financing appears on shaky ground**.

Smith initially boasted that he had **"secured funding"** for the development, with industry talk pointing to **MEC Global Partners Asia and Ty Dincer as key funders** among other committed partners such as Denning Partners. Indeed, having a heavyweight like Dincer's MEC (part of the Mitsubishi Estate Group) on board should have been a vote of confidence. However, **despite this purported funding, Kurraba has been aggressively courting other investors to either co-invest or take over the project**. Insiders report that in recent months Smith has quietly approached various big players, **even reaching out on social media and tapping contacts in the property sector**, seeking roughly **$50 million** in additional capital. This frantic money hunt suggests that **the "secured" funding was anything but secure**.

According to an investigative expose, Smith is **scrambling to raise funds** and has even signaled willingness to **sell off parts of the project** to stay afloat. In October 2025, Kurraba sought approval to split the development into five stages, a move many interpret as preparing to cherry-pick profitable pieces to build (or sell) first while delaying the costlier components indefinitely. Such maneuvers betray a project under financial strain, not one flush with stable backing. It is in this context that **Smith's back-channel denigration of Ty Dincer** occurred, a context of **desperation and deal-shopping**.

Essentially, Smith has been **using Dincer's committed offer as a bargaining chip**: telling new prospects, in essence, "*We have MEC/Ty at the table, but we might go with you instead.*" This might be intended to create FOMO (fear of missing out) and pressure others to jump in. Yet simultaneously smearing Dincer as "shady" is a **double-edged sword**: it **diminishes the value of the very leverage he's using**. The message to potential investors becomes muddled: if Dincer's involvement is so problematic, why was Kurraba eager to partner with him in the first place? It reeks of **bad faith**. Such mixed signals could actually erode confidence further, raising doubts about Kurraba's judgment and honesty.

## Flawed Financial Model: Errors, Omissions, and Opaque Revisions



*A screenshot of the very first model produced for the viability of the 100 Botany Road project. Refined and updated models continued to contain very serious errors.*

Compounding Kurraba's credibility issues are serious questions about the **financial model and due diligence materials** the company provided to MEC Global Partners, Ty Dincer's team, and Mitsubishi Estate. An independent review of the **spreadsheet model** circulating among potential funders found **multiple discrepancies and red flags**. In fact, the model Kurraba presented to prospective investors appears to have been **riddled with errors and rosy assumptions** that **differ markedly from Kurraba's own internal projections**.

Key issues identified in the model include:

- **Over-optimistic assumptions vs. internal budgets:** Certain cost and revenue assumptions in the shared model did not align with **Kurraba's internal budgets**, indicating that **Smith's team might have "sweetened" the numbers** for investors.
- **Questionable revenue build and occupancy figures:** The projected leasing uptake (tenancy/pre-let rates) and revenue streams were more aggressive than what internal analyses or market norms would suggest, raising concerns that **expected income was overstated**.
- **Area and efficiency inconsistencies:** Basic metrics like **gross floor area and efficiency ratios** were inconsistent or omitted, making it hard to verify if lab and office spaces were being calculated properly for revenue.
- **Underestimated capex for specialized labs:** Capital expenditures for lab fit-outs, typically very high for life-science facilities, appeared **understated** in the external model. Any omission or low-balling of these costs would significantly skew return projections.
- **Unrealistic escalation and yield assumptions:** The model's **escalation rates (e.g. rent growth)** and terminal **yield/WACC** inputs leaned toward optimistic extremes, potentially **painting an overly sunny picture of the project's future value**.
- **Formula and logic errors:** Reviewers even found **formula integrity issues**, broken links or incorrect formulas that could miscalculate outputs, and simplistic scenario logic that failed to account for downside cases. These technical errors further **undermine confidence in the model's reliability**.

In short, the **due diligence package Kurraba sent out was incomplete and misleading**. If Ty Dincer's team relied on this model, they were arguably not given the full truth of the project's risks. **Internally, Kurraba's own forecasts reportedly showed a far more precarious trajectory** for the 100 Botany Road development, but those **doubts were not fully communicated** to prospective financiers. When such discrepancies came to light, it's understood that **MEC Global Partners Asia raised serious concerns**. At the very least, Dincer's analysts would have flagged these issues and demanded clarification.

So far, Kurraba Group has not publicly detailed any corrections. **Were revised models ever sent** to MEC or Mitsubishi? If so, when and what changed? Stakeholders deserve to know if **Smith quietly "tweaked" the numbers** after the fact. The lack of transparency here is troubling. It calls into question either **Kurraba's competence in financial controls** or **its willingness to be forthright**. Reputable developers typically employ strict **model governance**, quality assurance checks, third-party audits, sensitivity analyses, especially when courting large investors. If Kurraba bypassed those standard controls (or worse, intentionally sent out a model with known flaws), that's a **major breach of trust**. It echoes a pattern noted in Smith's past ventures: *overpromise, underdeliver, and obscure the facts*. And it reinforces why **potential funders are now skittish**.

## Ty Dincer: Investment Guru Smeared by Shady Tactics

Lost in Nick Smith's mudslinging is the fact that **Ty Dincer's involvement should have been an asset, not a liability**. Dincer is a well-regarded figure in international real estate investment circles. He previously served as Head of Asia-Pacific Real Estate at the Abu Dhabi Investment Council and **currently helms MEC Global Partners Asia**, a Mitsubishi Estate subsidiary that advises on high-profile property deals across the region. In other words, **Dincer is no small-time player: he's a heavy hitter** with a resume that commands respect. It speaks volumes that *his* organization showed interest in a relatively nascent firm like Kurraba in the first place. **Dincer's backing signaled confidence**

**in the project's potential**, bringing both capital and credibility.

By contrast, **Nick Smith's track record is littered with red flags**. It is bitterly ironic to see Smith painting Dincer as "shady" when **Smith is the one trailed by scandal**. As investigative reports have detailed, Smith's previous company **Kippax Property collapsed in 2022 amid insolvency**. **Internal emails show Smith instructing staff to lie to creditors** about unpaid invoices , and he repeatedly misled stakeholders about Kippax's dire finances. The *Australian Financial Review* isn't the one breaking these stories, it's whistleblowers and independent journalists, but the documents are damning. In the failed Redfern project that preceded Kurraba, Smith's machinations wiped out investors' money entirely. He then **phoenixed** into *Kurraba Group* in 2023 (rebranding the old venture under a new name ), carrying on with the same project site under a different banner. Regulators, community groups, even city officials have been raising alarms about his methods, from exploiting planning loopholes to making grandiose promises of public benefits that never materialize. **Smith's reputation in many circles is one of a developer who overhypes and underdelivers**, willing to bend rules or ethics for personal ambition.

Therefore, when Nick Smith **impugns Ty Dincer**, observers can't help but see **projection** or **distraction at play**. Dincer's "poor reputation" exists largely in Smith's telling; the **actual imbalance of credibility favors Dincer**. By smearing a respected investor, Smith may hope to divert attention from his own checkered history. But to seasoned industry watchers, this ploy is transparent and only further **undermines Smith's standing**. As one commentator dryly noted, *"It's rich for Nick Smith to call anyone else's reputation into question, given the skeletons in his closet."*

# The Backfire and Bigger Picture

Nick Smith's campaign to **use-then-snub Ty Dincer** is not just ethically dubious, it's likely to **backfire spectacularly**. In the tight-knit world of property finance, word gets around. If a developer is heard **bad-mouthing an investor behind their back**, other investors will rightly worry, *"Will he do the same to us?"* Smith has created an atmosphere of mistrust around Kurraba Group at the very moment he can least afford it. Remember, **Kurraba still needs significant funding** to get the 100 Botany Road project off the ground. Alienating a cornerstone investor (MEC/ Dincer) through slander and failing to convince new ones due to a tainted model is a **perfect recipe for financial failure**.

Ty Dincer, for his part, emerges as something of a sympathetic figure in this saga, a serious investor who appears to have been **strung along and then smeared**. Publicly, Dincer has remained professional and has not engaged in a war of words. It's notable that **no reports have surfaced of Dincer bad-mouthing Kurraba in return**, a stark contrast in approach. But one can imagine Dincer's private dismay at discovering his name was being tossed around in this manner. Should he choose to, **Dincer would have grounds to withdraw any funding offer and even consider legal action** for reputational damage. At minimum, **Kurraba Group owes him an apology** and a clear acknowledgement that such remarks were inappropriate. Yet as of this writing, **no such olive branch has been extended**.

For the broader stakeholder community, from the life-sciences industry hopeful about the campus, to the government entities that facilitated the project's approvals, this development is a warning sign. If Kurraba Group's foundation is built on **shaky ethics and finances**, will the project deliver on its promises? The **100 Botany Road venture was pitched as a public-good innovation hub**, with state significance. Now, with Kurraba's CEO playing fast and loose with facts and relationships, the risk is that this too becomes another stalled or half-baked scheme, leaving a trail of disillusionment. As one investigative report succinctly put it, **scrutiny is warranted whenever Nick Smith is involved**. Prospective partners are advised to **do extra due diligence and insist on transparency**, lest they become "the next victims of a developer who has shown a willingness to sacrifice honesty and ethics in pursuit of personal ambition.

In the end, what should have been a straightforward story of a new investment partnership has devolved into a case study in **how not to conduct business**. Nick Smith's **defamation of Ty Dincer** is not just a petty personal attack; it's a symptom of deeper dysfunction at Kurraba Group. When a CEO undermines his financiers and **fudges his figures**, it's the **public and legitimate stakeholders who ultimately pay the price**. The situation calls for accountability and perhaps a rethink of Kurraba's leadership before more damage is done. As the saying goes, *"When you point a finger at someone, three fingers point back at you."* In smearing Ty Dincer, Nick Smith may well have **stained himself most of all**.

**Sources:**

- Kurraba Group Exposed – *Investigative reports on Nick Smith's business practices and project history*
- MEC Global Partners (Mitsubishi Estate) – *Company information confirming Ty Dincer's role*
- Middle East Truth blog – *Details on Ty Dincer's 2017–2018 Abu Dhabi case*
- Gensler Press Release – *Background on the 100 Botany Road life-sciences campus project*

# FAQs:

### What impact might Nick Smith's conduct have on Kurraba Group's reputation and future prospects?

His alleged defamatory remarks, questionable financial transparency, and internal governance issues could erode trust among current and future investors, potentially jeopardizing the project's funding and damaging Kurraba Group's reputation in the industry.

### What concerns exist regarding the financial model presented by Kurraba Group to potential investors?

Concerns include errors, overly optimistic assumptions, inconsistent data, understated costs, and technical flaws in the financial model, casting doubt on its reliability and suggesting that the project's risks may have been downplayed.

### How credible is Ty Dincer as an investor and professional in real estate?

Ty Dincer is a highly respected investment professional with a strong track record in international real estate, serving as CEO of MEC Global Partners Asia, and has been involved in major projects across the region, making him a credible and influential figure in the industry.

### Why did Nick Smith allegedly disparage Ty Dincer, and what are the implications of this behavior?

Nick Smith reportedly made verbal remarks to undermine Ty Dincer's reputation during private investor discussions, possibly to use Dincer's funding offer as leverage and justify seeking other investors, which could damage trust and expose Smith and Kurraba Group to legal liability.

### What are the key issues surrounding the Kurraba Group's project at 100 Botany Road?

The Kurraba Group's project at 100 Botany Road is facing financial instability, with reported shaky funding, questionable financial models, and internal issues that suggest the project may be under significant financial strain.

## Full Request for Comment

**Subject:** Right of Reply — Questions re alleged remarks by Nick Smith about Ty Dincer and accuracy of model & due diligence provided to MEC Global Partners Asia & Mitsubishi

**To:** Kurraba Group

**Cc:** External counsel for Kurraba Group

Dear Kurraba Group and Counsel,

We are preparing a news report concerning (a) recent **verbal remarks allegedly made by Mr Nick Smith about Mr Ty Dincer**, and (b) **the accuracy of a financial model** and **due diligence materials** provided to **MEC Global Partners Asia** and **Mitsubishi** in connection with prospective financing. We are writing to give you a full and fair opportunity to respond, provide context, and share any materials that may rebut or clarify the points below **before publication**. A response or extension for a response MUST be made within twenty four (24) hours per the deadline specified at the end of the email.

We understand from a source that the remarks were **made within the past three months** and that a **third party recorded the conversation**. We also understand that Kurraba (or related entities/advisers) supplied a financial model and numerous due diligence payload documents to MEC Global Partners Asia and Mitsubishi, and that an **independent review** of a version purporting to match what those parties received identified **multiple qualitative and quantitative discrepancies** when compared against internal estimations provided elsewhere.

We make **no final findings** and welcome your factual responses and documentation so we can reflect your position accurately and fairly.

**Questions for Response**

**A) Alleged remarks by Mr Smith regarding Mr Ty Dincer**

1. **Occurrence and context**
   - Do you confirm that Mr Smith made verbal remarks about **Mr Ty Dincer** within the last three months?
   - If so, when and where did this occur, and who was present?
2. **Content and intent**
   - Did Mr Smith refer to, allude to, or repeat **allegations concerning Mr Dincer's conduct in the Middle East**?
   - If yes, what was the intended context (e.g., due diligence discussion, informal remarks, negotiation strategy), and on what **factual basis** (documents, first-hand knowledge, or third-party reports) were any such statements made?
   - Does Kurraba endorse, retract, or disclaim those remarks?
3. **Recording and accuracy**
   - We have been informed that the conversation was **audio-recorded** by a third party. Do you **dispute the authenticity** or **completeness** of any such recording or transcript (e.g., that it is edited, out of context, or otherwise inaccurate)?
   - If you dispute it, please specify the **precise inaccuracies** and provide your own account.
4. **Disclosure and remediation**
   - Have you **informed Mr Dincer** that such remarks were made and/or recorded?
   - Have you issued any **clarification, correction, or apology** to Mr Dincer? If so, please provide copies.
   - Did Kurraba communicate the substance of these remarks to any **prospective funding parties or counterparties**? If yes, to whom and when?
5. **Governance**
   - What **policies or codes of conduct** govern Kurraba personnel regarding public or private statements about identifiable third parties?
   - Did Kurraba conduct any **internal review** into this matter? If yes, please provide the scope, findings, and any remedial actions.

**B) Model provided to MEC Global Partners Asia & Mitsubishi**

6. **Transmission and version control**
   - Please confirm whether Kurraba (or its advisers) provided a **financial model** (and associated due-diligence materials) to **MEC Global Partners Asia** and **Mitsubishi (or affiliates)**; identify **dates of transmission**, **file names/versions**, and the **distribution list**.
   - Who **prepared**, **reviewed**, and **approved** the model (names and roles), and were any **reliance letters/disclaimers** issued?
7. **Accuracy and known issues**
   - Are you aware of **errors, inconsistencies, or omissions** in the model(s) provided (e.g., assumptions vs. internal budgets, revenue build, area/efficiency, capex for lab fit-out, tenancy/pre-let, escalation, yield/WACC, formula integrity, scenario logic)?
   - If yes, please list each issue, the **date it was identified**, and the **corrective action** taken.
   - Are you aware of other omissions or inclusions within the due diligence materials provided or any inaccuracies in the materials provided?
8. **Revisions and recirculation**
   - Have **revised models** or **corrected inputs/outputs** been circulated to MEC Global Partners Asia and/or Mitsubishi? If so, **when**, **what changed**, and to **whom** specifically were updates sent? Please provide a **change log** (version-by-version).
9. **Internal estimates and conflicts**
   - Our review indicates **conflicts** between the model provided to prospective funders and **internal estimations** presented

elsewhere. Please explain any **material divergences** (rationale, timing, sign-off) and provide the contemporaneous internal forecast set used for decision-making at the time.

10. **Financing status and impact**

- Is **MEC Global Partners Asia** engaged to provide funding, and if so, what is the **current status** (term sheet, exclusivity, conditions precedent)?
- Have MEC or Mitsubishi **raised concerns** about the integrity or reliability of the model or due-diligence package? If so, please provide details and any **resulting changes** to their interest or terms.

11. **Controls and oversight**

- What **model-governance controls** (QA sign-off, independent model audit, sensitivity checks) were in place?
- Were any **exceptions** to standard controls used for the versions sent to MEC or Mitsubishi?

**Document Requests**

- Any **recording or transcript** you wish to provide (or a statement addressing the authenticity of the recording we referenced) and any related correspondence with Mr Dincer.
- **Emails/cover letters** transmitting the model(s) to MEC Global Partners Asia and Mitsubishi, with attachments and version identifiers.
- **Model audit/QA documentation**, reliance letters, disclaimers, and change logs.
- The **internal forecast set** and assumptions that underpinned decision-making at the time the external model was sent.

**Deadline and Publication**

Please provide written responses and any materials **within 24 hours of this notice**, by:

- **San Francisco (PDT, UTC−7): Sunday, October 19, 2025, at 5:00 PM**
- **Sydney (AEDT, UTC+11): Monday, October 20, 2025, at 11:00 AM**

If you anticipate difficulty meeting this timeline, please contact us **immediately** with a proposed response time **or to request a short extension**.

**Fairness, Accuracy, and Use of Your Response**

- We seek to **accurately reflect your position** and will include any substantive response you provide.
- Unless otherwise agreed, your response will be treated **on the record** and attributable; please clearly mark any passages you contend are **confidential or legally privileged**.
- If you decline to comment, we may report that you were given an opportunity to respond and **declined** or **did not respond** by deadline.
- Nothing in this inquiry should be read as a final conclusion; all points above are **allegations** subject to your clarification and supporting evidence.

Please send responses to **info@kurrabagroup.exposed** and copy your appointed counsel. If a different legal contact should be used, please advise.

Sincerely,

**Greg**

*Kurraba Group Exposed*



### Kurraba Group

[See Full Bio](#) ›

# Intimidation, Deception, and Exploitation: Exposing Nick Smith's 44-78 Rosehill St, Redfern Development Scandal

October 18, 2025
Kurraba Group

**By Investigative Report – October 17, 2025**

*An investigative look into the failed "44-78 Rosehill St, Redfern" development in Redfern reveals a disturbing pattern of misconduct by developer Nicholas "Nick" Smith, his firm Kippax Property (now rebranded as Kurraba Group), and his lieutenants. Internal emails and official letters from 2022 show how Smith orchestrated intimidation tactics against the City of Sydney, manipulated planning pathways (including abusing a State Significant Development ploy), "appeasing" the greens, bypassing the council by directly appealing to the state, and cynically leveraged Indigenous communities as a lobbying shield. The Redfern project ultimately collapsed – wiping out investors – yet Smith emerged under a new corporate guise, continuing the same scheme with lofty **(and dubious)** promises of a medical "life sciences" campus. This report compiles the damning evidence of deceit, threats, and exploitation, and issues a warning to regulators, investors, and the public to scrutinize any future projects involving Nick Smith, Kurraba Group, or their associates.*

**Request for Comment:** On Thursday, October 16, 2025 at 7:00 P.M. San Francisco Time (PDT, UTC-7) [Friday, October 17, 2025 at 1:00 P.M. Sydney Time (AEDT, UTC+11)] we sent a request for comment to Kurraba Group, Nick Smith, and their legal representatives (fully enclosed below). They refused to comment or even ask for an extension by our deadline twenty four hours later.



Wayne Goldberg   wayne.goldberg@kippaxproperty.com
FW: Redfern planning next steps
May 04, 2022 at 12:00 pm AEST
To: NickSmith, ShaunBond, TaraFerguson

**Alternate Redfern Pathways**

1. **Engage with Council** / COS to target maximum FSR that complies with overshadowing, preferably (if possible) through existing Council process without need for a new Planning Proposal. No Net additional impact/shadowing (we are in the City). Net improvement and connection to the other park and connection to Country.
   - Send letter to Clover from Kippax/Ariadne
   - Seek feedback from Council member (via Matthew Grounds)
   - Each syndicate investor to submit objection to planning outcome
     - Each syndicate investor to attend Council Member to argue merits of proposal
   - Rely on Merits and Procedural Fairness to overturn decision
   - Highlight Green/Sustainability to appease Greens

2. **State Pathway** by reiterating benefits to community / innovation / tech / job.
   - Demonstrate strategic metrics of site
     - Amanda Harvey
     - Treasury
     - Investment NSW
     - Premier
     - Scott Briggs
     - Amy Brown
     - Transport??
   - SSD?

   *Leverage Relationships of David Gonski, Carapiel, Grounds etc.*

3. **Legal**
   a. Frustrate Process / Maintain Pressure on Council
      i.  Freedom of Information (Issue Gipas) from Addisons
   b. Engage Addisons for Advice
      i.  Precedents on no net overshadowing. This has been showing in the past
      ii.  Argument that by no uplift is not competent forward planning
      iii. **Letter from Addisons** seeking council formally reviewing their position – Series of Letters. Admin law type letter. Overaction/disproportional response that has been recognised in Gateway. What Strategic Mischief has occurred – tech tenants etc. Goes to the heart of Tech Tenants. ==Compromises the Tech Central objective – repeat this message. Transport concerned that Waterloo station is a white elephant.==

4. **Cut a Deal with Yvonne / Nathan** – Metro Land Council (50/50 JV with her). Go in with Addisons. David Baffsky was Chairman of Indigenous Land Council - Go in with him. Make sure Yvonne is at meeting.
   a. Upgrade whole park – space for activism
   b. Artwork – tell story of activism
   c. Engage with Nathan at Metro. Yvonne is Chairman
   - Use Letters from Indigenous Group – Counterpoint / NGIE with Nathan
   - Indigenous want space/community facility

5. Speak to Acuri supporting uplift

6. Get a Base Planning Outcome and Build back up from there

7. Chris Barter / Zeb Article

8. Reach out with landowner to either:
   a. Delay third option payment to buy time and
   b. Seek to reduce Price

9. Work Collectively with neighbours

10. Other?
    a. Delay meeting with Council to July?

Other Notes:
Show additional analysis of different heights. What is there now and what could be done.
Harshnay to review Gateway
Note: Harshnay confirmed that going with the Botany Road Corridor was the correct course of action

**From:** Tara Ferguson <Tara.Ferguson@kippaxproperty.com>
**Sent:** Tuesday, 3 May 2022 9:50 AM
**To:** Nick Smith <nick.smith@kippaxproperty.com>; Shaun Bond <shaun.bond@kippaxproperty.com>; Wayne Goldberg <wayne.goldberg@kippaxproperty.com>
**Subject:** Redfern planning next steps

Hi team,

Just gathering my thoughts to pull together a plan of attack on Redfern:

**City:**
- Issue letter to Clover today 3/05 (attached and saved in planning folder under City correspondence)

**State Gov:**
- SB to call Mick Cassell
- Issue letter to Mick Cassel today 3/05 (suggest this is sent from Kippax instead of Mike)
- Engagement with Amy Brown (DPI?)
- SB to recontact Alex Wendler with update
- Contact Amanda Harvey (ED for Local Strategies and Plan Making at DPIE) – Suggest we speak with APA about getting in contact.

**Design**
- Bates to test 'compliant' envelope which includes:
  - 50% sun for 4 hrs on consolidated space to Indigenous cultural garden
  - Solar compliant to Gibbons St apts.
  - ADG compliant to Cornwallis and Margaret St apts??

Following the meeting with Mike this afternoon, we should set up a meeting for Thurs (hoping we get the envelope studies from Bates by this time) to workshop with Ethos.

**Tara Ferguson**
Development Manager

Level 27, Chifley Tower
2 Chifley Square
Sydney NSW 2000

*Highlights are retained from the original email. This email reveals a deeply unethical attempt by Kippax executives to manipulate the planning process for their Redfern development, explicitly strategizing to pressure councilors, exploit Indigenous groups for optics, and sidestep genuine community consultation. It reads less like professional correspondence and more like a covert lobbying manual, showing calculated efforts to subvert transparency, leverage political influence, and neutralize legitimate planning objections through orchestrated deception.*



29 March 2022

2200225

Michael Cassel
Secretary
Department of Planning and Environment
4 Parramatta Square, 12 Darcy Street
Parramatta NSW 2150

Dear Mr Cassel,

### 44-78 Rosehill Street, Redfern

Following discussions with the Planning Delivery Unit, we are writing on behalf of Kippax Property to request an urgent meeting with you in relation to its next generation sustainable commercial building planned for 44-78 Rosehill Street, Redfern that was recently placed in jeopardy after the City of Sydney Council reversed its position after 2 years of working collaboratively with Kippax.

### Summary

Kippax Property is a Sydney-based property development and investment company specialising in urban transformation founded by former Lendlease employees, Shaun Bond and Nick Smith.

Kippax's first development site at 44-78 Rosehill Street is strategically located in the Innovation Corridor between Redfern Station, Mirvac's South Eveleigh and the new Waterloo Metro Station. At 2,527m$^2$ it is one of the only site's in the Botany Road corridor capable of delivering on the Council, the Greater Sydney Commission and Department's aspirations for the precinct. The ecosystem proposed by Kippax has been developed in conjunction with and with strong tenant support from key tech tenants, such as Rokt, who do not want to locate in Central Sydney but have specific size and innovation requirements that cannot be accommodated within existing office stock in the City Fringe.

As detailed in this letter below Kippax has been working collaboratively with the City of Sydney Council in relation to its site for 2 years. Up until this point in the process there has been strong alignment with Council, which led to the Kippax's scheme being reflected in Council's own Planning Proposal for the Botany Road Precinct, which received gateway and was publicly exhibited late last year with a height of 18 storeys and 8.5:1. However, at a recent meeting with Council, it indicated that in response to 23 public submissions regarding the changes to the controls on the site and surrounds, it is no longer prepared to support the proposed uplift and would be recommending it is amended to 9 storeys and significantly reduced FSR.

Council's revised position is contrary to its previous stated position which acknowledged that the impacts associated with the change were both understood and necessary to achieve the strategic objectives for the corridor. The proposed reduction in height and floorspace on the basis of a small number of local submissions will render the project unviable and be a major failing in Government process and policy, that is likely to lead to a major tech tenants having to relocate to Melbourne or overseas.



Kippax is still trying to resolve the issue with Council, however given the way Council has undermined 2 years of working in good faith and put the project in jeopardy we feel we have no alternative but to ask for the State's intervention to ensure this important development to the State can still be realised.

## Background of the process to date

In 2019, the City of Sydney's Council's *City Plan 2036: Local Strategic Planning Statement* (LSPS) identified that Redfern's strong growth is bolstered by its proximity to innovation clusters and key tenants such as the Australian Technology Park (now known as South Eveleigh). Despite the strength of infrastructure access provided by Redfern Station and the future Waterloo Metro Station, the LSPS recognised that future growth is currently limited by the availability of floorspace – in fact, employment floor space in the area has reduced in recent years. As noted by the LSPS:

*The area's ability to cope with the increase in demand from more knowledge-intensive businesses is constrained by the limited availability of building stock, particularly high-quality stock with appropriate floor plates. Providing more capacity for commercial uses is also constrained by the increasing demand for residential development, including student housing and lack of transport accessibility.*

Accordingly, Council's LSPS included Action 2.5 to *"Strengthen the economic and productive role of the Innovation Corridor by... identifying and supporting opportunities to appropriately increase capacity for commercial and other enterprise uses particularly those contributing to specialised and knowledge-based clusters, in mixed-use (B2 and B4) zoned areas, including the Botany Road corridor".*

Kippax first met with Graham Jahn and other members of Council's strategic team in April 2020.  At the meeting we presented Bates Smart's scheme for an 18 storey CLT building targeted at Tech / Innovation tenants with a range of public benefits including a publicly accessible Tech Town Hall, 3rd space and public domain upgrades. Council was very supportive of the project but told Kippax to wait as it was going to do an urban design study and consultation ahead of preparing its own Planning Proposal for the Corridor in line with the actions set out in its LSPS.

We met with Council again in July 2020 to present a more resolved version of the scheme for them to have regard to as part of their urban design study. We have attached the project vision provided to Council from back at that time for information purposes.

Council engaged TZG to do the urban design study and met with Kippax at the end of 2020 indicating that it effectively supported the Kippax scheme, subject to some minor changes to the height to protect sun **during** the lunch period on Daniel Dawson Reserve. Kippax wrote to Council requesting that it be allowed to lodge its Planning Proposal separately alongside Council's to enable it to proceed ahead of Council's to facilitate meeting its tenant timeframes.

Council responded in January 2021, writing to Kippax indicating it would support it lodging its own Planning Proposal subject to it initially being reported to Council at the same time as its own Planning Proposal. Kippax proceed to prepare a planning proposal which included undertaking consultation with the community, which gave them awareness of the proposal.  It was Kippax's desire to be entirely consistent with Council's envelope and it was forced to wait for Council to confirm the exact sun access plane for Daniel Dawson Reserve. This resulted in Council advising us not to lodge the Planning Proposal as they would not be able to deal with it ahead of their own Planning Proposal.  In the spirit of working with Council, Kippax made the decision not to lodge its own Planning Proposal despite having incurred significant expense preparing it based on Council's original letter.

In August 2021 the elected Council unanimously endorsed the Botany Road corridor Planning Proposal to go to Gateway, which included changing the planning controls for the Kippax site to 8.5:1 and 17 storeys, effectively consistent with what had been requested. The Planning Proposal then received Gateway and

2



went on public exhibition in November 2021. Our submission, which discusses some of the detail issues and includes the latest Bates Smart concept design and a letter of support from Rokt is also attached for information.

During public exhibition there were 23 public submissions which raised concern with the changes in the immediate area around our site. A summary of the submissions is also attached for information.

Over the period between our first meeting in April 2020 and December 2021 the project team met with Council on approximately 20 occasions. During that time Kippax has worked closely with Council and made a substantial investment to resolve technical issues around solar access, wind and built form. Kippax has also made further investments with leading consultants, suppliers and Buildcorp to firm the aspirations of timber hybrid construction and sustainable inclusions such as passive air. Alongside this, Kippax has also brought on institutional capital partners that invested considerable money thus far.

We met with Ben Pechey from Council on 17 March with a view to discuss accelerating Council's program which from recent discussions has blown out by approximately 4-5 months. However, we were blindsided in the meeting to find out that in response to the public feedback Council suggested that they would be significantly reducing the site's planned potential from 17 storeys down to 9 storeys and an associated reduction in FSR. This was largely based on preventing overshadowing of the residential apartments on the other side of Gibbons Street, which they only received 2 objections from.

Our view is that the number and nature of submissions for this strategic corridor seems relatively minimal and the assessment of which must be evaluated in their strategic context. Council's own Local Strategic Planning Statement specifically acknowledged that the review of controls in the City fringe "involves prioritising business, knowledge-intensive, creative and other enterprise activities in mixed use areas". However, Council's explanation was that the approach adopted for the Planning Proposal, which justified the impact on the character of the area and additional overshadowing of residential apartments based on the future condition they would be creating is now no longer appropriate.

This major change in direction, which effectively prevents the realisation of additional employment floor space in Redfern and ultimately the broader success of the Innovation Corridor is contrary to a large body of strategic planning that has been done by the Greater Sydney Commission, the Department and Council and will undermine all confidence in not just the property sector but the tech and innovation tenants that are counting on these planning changes to enable them to continue growing in the City Fringe.

**Our request**

In light of the serious nature of the above and the importance to the State of NSW, we request an urgent meeting to discuss the proposal with you and how the Department may be able to assist Kippax with enabling this project to proceed. As noted above, whilst we have no confidence in Council, we are still trying to resolve it with them and would therefore appreciate you not discussing this matter directly with them at this point in time.

Yours sincerely,

Michael Rowe
Director
0403043345
mrowe@ethosurban.com

3

## Key Points

- **Bullying City Officials:** Internal communications show Kippax executives plotted to **bombard and bully** the City of Sydney's planners and councillors with legal pressure and orchestrated lobbying. In a May 2022 strategy email titled *"Alternate Redfern Pathways,"* Kippax director Wayne Goldberg explicitly instructed the team to *"Frustrate [the] Process / Maintain Pressure on Council,"* including filing Freedom of Information requests (GIPA) and sending a *"Series of Letters"* from lawyers to wear down the Council. The same email outlines a plan for each wealthy investor to flood the Council with objections and personally lobby councillors to overturn the planning decision on "procedural fairness" grounds: a clear intimidation tactic.
- **Manipulating Planning Pathways:** Facing rejection by local authorities, Nick Smith sought **backdoor ways** to get his project approved. Kippax privately beseeched NSW state officials to intervene and bypass City of Sydney oversight. In a March 29, 2022 letter to NSW Planning Secretary Michael Cassel, Kippax's consultant blasted the City's reversal as *"a major failing in Government process and policy"* that would render the project "unviable" and even *"likely to lead to [our] major tech tenants having to relocate to Melbourne or overseas"*. The company begged the state for an "urgent meeting," professing **"no confidence in Council"** and pointedly requesting Cassel not alert City of Sydney about this end-run appeal. This manipulation of planning pathways culminated in Smith repackaging the development as a "State Significant" medical facility, a move widely viewed as a ploy to exploit a fast-track approval route.
- **Exploiting Indigenous Communities:** Perhaps most insidious was the team's **cynical use of Indigenous community ties as a lobbying shield**. The internal "Alternate Pathways" email reveals a plan to *"Cut a deal with [the] Metro Land Council (50/50 JV)"*, essentially offering a joint venture to the Metropolitan Local Aboriginal Land Council to win support. Goldberg advised bringing influential Aboriginal leaders (like Yvonne Weldon, the Land Council chair) into meetings and using *"letters from Indigenous group[s] – [such as] Counterpoint [Community Services] / NCIE [National Centre of Indigenous Excellence]"* to bolster the project. Externally, Kippax loudly touted the development's supposed benefits for Indigenous communities, from an Aboriginal "Town Hall" space to

public art celebrating *"the site's Aboriginal history"*, even as their private correspondence shows these promises were strategic tokens intended to deflect criticism and lend the project moral cover.

- **Pattern of Deception and Failure:** Nick Smith's track record emerging from this saga is one of **deception, financial failure, and reputational whitewashing**. Under Smith's leadership, Kippax Property sank millions into the Redfern venture only to have it implode in mid-2022 when planning approval was denied. All investor capital was lost: "every dollar" wiped out with "nothing to show in return", and Kippax's companies were quietly deregistered in late 2022. Yet rather than accept responsibility, Smith simply **rebranded**. In 2023 he launched "Kurraba Group," essentially Kippax under a new name, and began marketing a project conceived at and paid for by Kippax, the 100 Botany Road site, as part of a shiny "life sciences precinct". This reboot came packaged with grandiose claims (Australia's *"first-ever commercial life sciences campus"* boasting a high-tech medical proton therapy center), which conveniently positioned the project to qualify as a State Significant Development (thus bypassing local planning control). Such claims have been met with skepticism given the project's history, appearing less like genuine healthcare investment and more like a **bogus medical facility promise** to game the planning system. Moreover, the City of Sydney had little to do but approve this project as they were under immense pressure from the fallout of Kippax and knew they did not have the political capital to reject yet another project.

- **Call for Scrutiny:** The documented conduct of Nick Smith, Wayne Goldberg, and their companies (Kippax/Kurraba) in the 44-78 Rosehill St, Redfern affair is **unethical at best, and reprehensible at worst**. The intimidation of public officials, the manipulative name-dropping of marginalized communities, and the repeated pattern of misrepresentation (to investors, authorities, and the public) demand robust scrutiny. Going forward, **any development proposal linked to Smith, Kurraba Group, or their leadership team should be treated with extreme caution**. Regulators and government officials must ensure that the **"Tech Central" and health innovation narratives** touted by these parties are not smokescreens for profit-at-any-cost scheming. Likewise, prospective investors and community stakeholders should insist on full transparency and accountability: lest they become the next victims of a developer who has shown a willingness to **sacrifice honesty and ethics in pursuit of personal ambition**.

## The Rosehill Street Project: A Brief Background

**44-78 Rosehill St, Redfern** was pitched as an ambitious commercial development in Sydney's inner-south, bordering the Redfern/Waterloo tech precinct. Kippax Property, founded in 2019 by Nick Smith (a former Lendlease executive) and partner Shaun Bond, secured an option on the site in May 2020. Backed by major investor Ariadne Australia and other private funders, Kippax envisioned a large-scale office tower (often dubbed the "ATP Tower" for its proximity to the Australian Technology Park) with ~15–18 storeys of "sustainable" workspace targeting tech companies. For two years, Kippax worked with the City of Sydney's planning staff on a potential rezoning to permit the tall building, as part of Council's broader Botany Road precinct plan. Initially, things looked favorable: in late 2021, City of Sydney publicly exhibited a draft precinct plan that **matched Kippax's ask** (boosting the site's height limit to 17–18 storeys and floor space ratio to ~8.5:1).

However, early 2022 brought a **dramatic U-turn**. Citing community objections and concerns about overshadowing and compatibility, Council planners informed Kippax in March 2022 that they *no longer supported* the upzoning for **44-78 Rosehill St, Redfern**. Instead, they would recommend the site be scaled back to roughly 9 storeys, effectively killing Kippax's high-rise vision. This blindsiding reversal set the stage for the **desperate, and dubious, maneuvers** that followed. Internal emails and letters from that period (March–May 2022) provide a rare **inside look** at how Nick Smith and his team responded when their flagship project began to unravel.



**An innovation ecosystem to link Redfern Station and Waterloo Metro**

Strategically positioned to set the Botany Road corridor up for success, Rosehill Street is a genuine extension of the Innovation Corridor, and the transformative renewal of the city fringe.

- One of only a few commercial development sites along the Botany Road corridor that is larger than 2,000m2 under single ownership and capable of offering exceptional social benefits.
- Has secured strong interest from high profile Australian companies in the innovation sector.
- Positioned perfectly to activate the linkage between Redfern Station and Waterloo Metro.

With a growing tech sector, Sydney is at risk of losing high value knowledge businesses to other locations. Rosehill Street is the only site of high quality, sustainable, commercial product available in the Innovation Precinct capable of being delivered by early 2025.

Roseh  Street w  protect and enhance Redfern as a thr v ng cu tura  and  nnovat on centre by attract ng h gh qua ty know edge and  nnovat on  tenants  to  a  prem um  off ce  deve opment  w th  exce ent transport connect ons w th n Sydney's Innovat on Corr dor.

✓ A next-generat on workp ace that w  be  an  exemp ar  of  susta nab  ty, access b  ty and des gn exce ence.
✓ A  pos t ve  exper ence  for  workers, pedestr ans and the  oca  commun ty through  act vated  streets,  rev ta sed G bbons Reserve, andscap ng, pub c  art, Town Ha   aud tor um and ground f oor reta  and café.
✓ A hea thy and safe workp ace at the h ghest standards of modern des gn.
✓ De ver ng  d verse,  d g ta ,  and  we -des gned  spaces  that  spark co aborat on  and  nnovat on w th a focus  on  cu tura  and  know edge-ntens ve sectors.


Attracting high value knowledge industries

730 Construction jobs

2,870 jobs supported

$140 million investment

$300 million generated P/A

**Kippax**


44-78 Rosehill St Redfern

 The site          Botany Road corridor

Planning – Redfern Overview    Download

# Nick Smith: Architect of a Failed Venture and Master of Spin

Nick Smith emerges as the central figure driving the 44-78 Rosehill St, Redfern saga: **the architect of a high-stakes gamble, and of the unethical schemes deployed to try to salvage it**. By all accounts, Smith had made big promises to investors and partners. Through a joint venture structure, Kippax raised significant capital (including **$8–10 million from Ariadne** and others) to pursue the Redfern development. Smith spent lavishly on architects, consultants, and lobbying efforts to push the project's case.

To point Nick was authorizing spend of up to $80,000 per a minute of video produced for his sites, yet would not pay an aboriginal consulting fee of $1,700.

**Chris Worsfold**  chris@binyan.com.au
Re: Kippax Property introduction
September 06, 2021 at 10:01 am AEST
To: NickSmith

Thanks Nick.

Can you please send me over the pack you have put together.

Just so the team can see the design and scale and quote accurately.

Kind regards

Chris

On Mon, 6 Sep 2021 at 9:54 am, Nick Smith <nick.smith@kippaxproperty.com> wrote:

> Hi Chris,
>
>
> Thank you for your time and taking us through a few projects on Friday.
>
>
> We are interested in a shorth video 45s - 1min as a teaser campaign prior to design competition.
>
>
> Our budget is circa $50-60K for the video.
>
>
> Cheers
>
>
> **Nick Smith**
> Executive Director
>
> Level 27, Chifley Tower
> 2 Chifley Square
> Sydney NSW 2000
>
> **T** +61 411 222 858
> **E** nick.smith@kippaxproperty.com

*Nick Smith advertising a budget of $60000 for a one minute video yet refusing to later pay for a $1700 invoice for important aboriginal consulting*

After receiving what first-hand accounts report as kickbacks, he ended up approving the more expensive option below.



## QUOTE

**Attention: Nick Smith**
Kippax Property
Level 27, Chifley Tower
2 Chifley Square
Sydney NSW 2000

**Phone**
Email nick.smith@kippaxproperty.com

**Date**
9 September 2021

**Valid To**
16 September 2021

**Quote Number**
Q-007887

Binyan Studios 3D Visualisation Pty Ltd
ABN: 82 149 729 082
02 8594 3900
invoices@binyan.com.au
Suite 4, Level 1, 18-20 Victoria Street
ERSKINEVILLE NSW 2043
AUSTRALIA
PO BOX 206
ERSKINEVILLE, NSW, 2043

### Rosehills Redfern

| Costs | Quantity | Amount each | Total ex GST |
|---|---|---|---|
| Concept | 1.00 | 8,000.00 | 8,000.00 |
| Pre Production | 1.00 | 5,830.00 | 5,830.00 |
| Production | 1.00 | 53,100.00 | 53,100.00 |
| Post Production | 1.00 | 5,200.00 | 5,200.00 |
| SCHEDULE | 1.00 | 0.00 | 0.00 |
| Animation - app. 10-12 weeks following receipt of full information set | | | |
| Deadlines will change subject to markup and revision response times | | | |

INCLUSIONS:
Concept/Animatic/Storyboard
45-60s Edit, Grade
HD Output
Stock Music Track
6 x animated scenes from scratch @ up to 4 seconds each
Drone Photography + Drone Permit (1 day)
1 x scenes Rotoscoping /Compositing/Camera Tracking
6 x scenes Crowd Simulation
Stock Footage Clips x 8
Licensing 12 months online only
Producer Fees
Software Fee per scene

EXCLUSIONS:
V/O
VFX
Context Modelling
Additional Licensing
Live Footage
Relight / Restyle

**Subtotal AUD**    **$72,130.00 + GST**

*The quote approved by Nick Smith for a 1 minute video to showcase his sites*

Yet when the City of Sydney pulled the plug on the rezoning, **the house of cards collapsed**. By mid-2022, the Redfern "ATP Tower" project was dead in the water, and Kippax Property was effectively insolvent. Ariadne's 2022 annual report bluntly described a *"writedown of [our] Redfern/Kippax exposures"*, the entire multi-million dollar investment was impaired to zero. Every other investor in Kippax was similarly wiped out: **"Every dollar"** that went into the venture was lost. By early 2023, Kippax's corporate entities were deregistered and the venture ceased to exist.

Rather than face the fallout or make his investors whole, Nick Smith chose a path of **reputational manipulation**. In 2023, he quietly founded a new company, **Kurraba Group**, to **essentially continue where Kippax left off, but under a rebranded banner**. The same Redfern site and scheme were reborn as "Australia's first commercial life sciences campus," with Smith now styling himself as a visionary in biotech real estate. This rebrand was a calculated reset: by dropping the tainted Kippax name, Smith could approach fresh investors and government programs without immediately revealing the project's troubled history. In short, it was a **deceptive PR makeover**, trading on buzzwords like "health innovation" and "jobs" to regain support.

Crucially, evidence shows that **Smith's penchant for deception wasn't limited to branding, it extended to his daily business ethics.** Internal emails from August 2022 (as Kippax was collapsing) show Nick Smith explicitly instructing his staff to **lie to creditors about unpaid bills**. In one exchange, when a contractor pressed for a long-overdue $1,760 payment, Smith told his team to assure the vendor the money would come *"by next week,"* despite having no fund: a **blatant falsehood**. One executive, Shaun Bond, pushed back that *"we shouldn't say this... which we don't [know],"* but Smith was prepared to mislead to buy time. This anecdote, though small in dollar amount, **speaks volumes**: it illustrates a willingness to misrepresent facts and string people along, whether they be small contractors or major stakeholders. The pattern is

clear: **Nick Smith consistently put his own interests and image above honesty**, from concealing his project's failure to making empty promises to those he owed.

By framing Smith as the **mastermind of a campaign of deception and pressure**, we set the context for understanding the actions of those under him, like Wayne Goldberg, who executed the day-to-day tactics. The following sections delve into those tactics, how Kippax/Kurraba under Smith **manipulated planning processes, bullied officials, and co-opted communities**, all in service of Smith's agenda.

## Gaming the System: Manipulating Planning Pathways and Promise of a "Medical" Facility

When the normal planning process turned against Kippax, Nick Smith's team did not hesitate to **seek out loopholes and alternate paths**. The internal strategy memo from Wayne Goldberg on May 4, 2022 lays out a **three-pronged approach** to force the project through: (1) **Convince or overrule the City of Sydney**, (2) **Appeal to the state government**, and (3) **Lawyer up for a fight**. In practice, this meant **undermining the standard planning pathways** that most developments follow.

The **first prong** involved seeing if any compromise could be reached with Council, but notably by applying *maximum pressure*. Goldberg's email suggests attempting to tweak the proposal to technically comply with overshadowing limits ("target maximum FSR that complies" with controls) while *simultaneously* launching an influence offensive. He wrote that each investment partner should *individually* lodge objections to the City's decision and even personally meet with council members to argue the project's merits. The idea was to give the impression of broad support and to intimidate Council with heavyweight voices (the Kippax investor group included some high-profile financiers). Goldberg even notes using a well-connected ally, *"via Matthew Grounds"* (a prominent banker and associate), to get feedback from within Council. In essence, Kippax wanted to *skirt the usual staff review process and lobby councillors directly*, leveraging any political connections they could.



Redacted – Draft letter to Lord Mayor – 3 May 2022     Download

*This draft letter from Kippax to the Lord Mayor epitomizes corporate manipulation cloaked in civic language: a calculated lobbying pitch to the Lord Mayor that misrepresents a private commercial project as a community benefit while pressuring council to reverse planning decisions. Beneath its polished tone, it leverages tokenistic references to Aboriginal heritage, sustainability, and innovation as instruments of persuasion to secure lucrative height and density uplifts that primarily enrich Kippax's financial interests, not Redfern's community.*



29 March 2022

2200025

Michael Cassel
Secretary
Department of Planning and Environment
4 Parramatta Square, 12 Darcy Street
Parramatta NSW 2150

Dear Mr Cassel,

**44-78 Rosehill Street, Redfern**

Following discussions with the Planning Delivery Unit, we are writing on behalf of Kippax Property to request an urgent meeting with you in relation to its next generation sustainable commercial building planned for 44-78 Rosehill Street, Redfern that was recently placed in jeopardy after the City of Sydney Council reversed its position after 2 years of working collaboratively with Kippax.

**Summary**

Kippax Property is a Sydney-based property development and investment company specialising in urban transformation founded by former Lendlease employees, Shaun Bond and Nick Smith.

Kippax's first development site at 44-78 Rosehill Street is strategically located in the Innovation Corridor between Redfern Station, Mirvac's South Eveleigh and the new Waterloo Metro Station. At 2,527m² it is one of the only site's in the Botany Road corridor capable of delivering on the Council, the Greater Sydney Commission and Department's aspirations for the precinct. The ecosystem proposed by Kippax has been developed in conjunction with and with strong tenant support from key tech tenants, such as Rokt, who do not want to locate in Central Sydney but have specific size and innovation requirements that cannot be accommodated within existing office stock in the City Fringe.

As detailed in this letter below Kippax has been working collaboratively with the City of Sydney Council in relation to its site for 2 years. Up until this point in the process there has been strong alignment with Council, which led to the Kippax's scheme being reflected in Council's own Planning Proposal for the Botany Road Precinct, which received gateway and was publicly exhibited late last year with a height of 18 storeys and 8.5:1. However, at a recent meeting with Council, it indicated that in response to 23 public submissions regarding the changes to the controls on the site and surrounds, it is no longer prepared to support the proposed uplift and would be recommending it is amended to 9 storeys and significantly reduced FSR.

Council's revised position is contrary to its previous stated position which acknowledged that the impacts associated with the change were both understood and necessary to achieve the strategic objectives for the corridor. The proposed reduction in height and floorspace on the basis of a small number of local submissions will render the project unviable and be a major falling in Government process and policy, that is likely to lead to a major tech tenants having to relocate to Melbourne or overseas.

173 Sussex St, Sydney          E. sydney@ethosurban.com     T. +61 2 9956 6962     ABN. 13 615 087 931
(Gadigal Land) NSW 2000        W. ethosurban.com

[Kippax Rosehill Secretary Meeting Request 29Mar22](#)     Download

*This letter to the NSW Planning Secretary is an audacious attempt by Kippax to circumvent local democratic oversight: a direct appeal for State intervention to overrule the City of Sydney after council rejected their height and density demands. It reads as an exercise in entitlement and coercion: threatening economic loss, invoking "Melbourne flight" of tech tenants, and portraying minor community objections as irrational obstacles to justify government override, all while masking a blatant profit motive behind rhetoric of "innovation" and "public benefit"*

The **second prong**, a State-level pathway, was arguably the **true endgame** once Council proved resistant. The internal memo explicitly lists targeting key people in the NSW Government and bureaucracy: *"Amanda Harvey"* (a senior Dept of Planning official), *"Treasury,"* *"Investment NSW,"* *"Premier,"* even specific names like *"Scott Briggs"* (a political operative/businessman) and *"Amy Brown"* (then CEO of Investment NSW). The mention of *"SSD?"* in this list is telling, it refers to pursuing a **State Significant Development** designation. Normally, projects of an especially large scale or public importance can be declared "state significant," which shifts approval from the local council to the state government (often a more developer-friendly forum). Kippax's sudden later pivot to a "life sciences/medical" project was no doubt aimed at this. By June 2024, as **Kurraba Group**, Smith was touting a $490 million **biomedical campus** on the site and announcing plans to lodge a **State Significant Development Application (SSDA)** by July. The repackaging of a speculative office tower into an "advanced medical research facility" came with flashy promises, e.g. the campus *"is set to become the State's first Proton Cancer Therapy Centre, backed by IBA Worldwide"*. This **bogus medical facility promise** was designed to make the project seem aligned with public health and innovation priorities, thereby justifying state-level intervention. **Critics have noted** that the sudden inclusion of a proton therapy center (a costly piece of hospital infrastructure) in a commercial development strains credulity, it looks more like a **Trojan horse** to win government favor than a sincerely integrated plan. Indeed, Kippax had never mentioned life-sciences or medical uses during the local planning process; it was purely a commercial office project. The "life sciences campus" narrative only appeared **after** the original plan failed, a textbook case of shifting the goalposts to exploit a different set of rules.

**Tara Ferguson**
Redfern Planning background
May 04, 2022 at 16:03 pm AEST
To: KateTansey

Hey Kate,

As discussed, below is an overview of our engagement with the City of Sydney to date for Redfern project.

The purpose of the engagement with Mick Cassel would be to give a heads up and raise awareness of the project, what's happened this week and hopefully get a meeting with him.

There is quite a bit of history, so I'll try and give you an abridged version:

- Kippax secured options over 44-78 Rosehill St which is located in the Botany Road Corridor. The Corridor was first identified for change in Council's LSPS given the ambitions for Tech Central, the provision of Waterloo Metro and the existing character of the area. The site currently has a height limit of 18m and FSR of 2:1.
- We met with Graham Jahn back in April 2020 where we presented Bates Smart's scheme for an 18 storey CLT building targeted at Tech / Innovation tenants with a range of public benefits including a publicly accessible Tech Town Hall, 3rd space and public domain upgrades (noting Kippax has had strong interest from many tech tenants and got letters of support). Graham was very supportive of the project but told Kippax to wait as Council was going to do an urban design study and consultation ahead of preparing its own Planning Proposal for the Corridor.
- We have since met with Council maybe 20 times in the last two years working through various matters with the team in what has been a very collaborative and positive process
- Council engaged TZG to do the Urban Design work and came back to us at the end of 2020 saying they effectively supported the Kippax scheme, subject to some minor changes to the height to protect sun in the lunch period on Daniel Dawson Reserve.
- Council requested us not to lodge a site specific PP because it would be too close to theirs and strongly encouraged Kippax to wait for their PP.
- In August Council reported its Planning Proposal which included changing the planning controls for our site to 8.5:1 and 18 storeys, largely as we'd asked for. The PP then received Gateway and went on public exhibition in November 2021.
- During public exhibition there were 23 public submissions which raised concern with the changes in the immediate area around our site.
- We met with Ben Pechey and the team from Council and were told that the Planning Proposal justified the impact predicated on the future condition they would be creating in the area. However, in response to the public feedback they had decided to delay the process to allow time to prepare a consolidated response back to those public exhibition responses. Kippax has since been working with the City to assist in responding to public responses and to maintain the proposed FSR of 8.5:1.

Redacted – RP2     Download

*This email reveals Kippax's calculated outrage and manipulative persistence after the City of Sydney refused its desired planning uplift: framing legitimate community and heritage concerns as mere inconveniences to be "influenced." It portrays a developer shocked that its two-year lobbying effort didn't override public interest, and details a plan to escalate pressure on officials, including the Lord Mayor, to reverse a professional planning judgment in favor of Kippax's private profit*

The **third prong** of Kippax's pathway manipulation was using **legal attrition** as a weapon. Rather than accept the Council's decision, Smith's team prepared to **challenge and punish** the City of Sydney through legal means. They enlisted Addisons, a law firm, to fire off formal letters and information requests. On May 5, 2022, Kippax's development manager listed as the #1 "immediate next step" a *"Legal letter from Addisons requesting [a] GIPA"*, i.e., a demand under Freedom of Information law for Council's internal records on the decision. The goal was likely to find any procedural misstep or evidence to leverage. Wayne Goldberg's email likewise spells out using *"Admin law"* letters to force Council to *"formally review their position"*, arguing that scaling back the site was an *"overreaction/disproportional response"* contrary to the strategic plan that had already been endorsed. In plainer terms, Kippax intended to **threaten a legal challenge**: they would claim Council's backflip was not done "on the merits" or violated fair process, hoping either to scare Council into retreat or lay groundwork for a court appeal. The internal notes even brainstormed arguments, for example, that giving "no uplift" (no height increase) *"is not competent forward planning"* and that Council's move *"compromises the Tech Central objective"* set by higher-level plans. This shows a coordinated attempt to turn the **government's own policies** against the City's decision, essentially accusing the City of betraying the State's innovation goals.

All these machinations underscore a simple fact: **Nick Smith was willing to bend or bulldoze any planning rule in his path**. When community input and local planners didn't give him what he wanted, he sought out sympathetic ears elsewhere, up to the halls of State power, and reinvented his project with whatever buzzwords might resonate (be it "Green/Sustainability" to *"appease Greens"* or "Life Sciences" to entice economic development officials). It's a case study in how a determined developer can attempt to **game the system**, using political connections and procedural pressure to sidestep democratic planning processes.

# Intimidation Tactics: Bullying the City of Sydney with Legal and Financial Might

**Tara Ferguson**

Redfern Planning Actions

May 05, 2022 at 11:58 am AEST

To: ShaunBond , NickSmith , WayneGoldberg , MichaelRowe ,
david@dwrolls.com.au

Hi all,

Immediate next steps for the next few days related to Redfern. Note as per Ben
Pechey's email, Council have to finalise their report next week to make the June
Council meeting and DPE Gateway deadline, therefore we will need to provide our
response asap.

1. Legal letter from Addisons requesting GIPA and for a formal review and
   consideration at an officer level – Addisons drafting. TF to follow up Harshane.
2. Consolidated letter from Investors (Garry, David, Barrenjoey, Chris) – APA
   drafting to receive today 5/05
3. Bates to prepare 'compliant' envelope that responds to Council's merits.
   Kippax to then arrange a meeting with Ben Pechey – Bates to provide 6/05
4. Ethos to prepare formal briefing note to Greater Sydney Commission and the
   DPIE (Amanda Harvey w/ BRc contact cc'd) – TBC
5. DR to meet with Graham next Tuesday 10/05
6. Addisons to provide introduction to Metro Land Council (Yvonne / Nathan).
   Kippax to then organise meeting - TBC

**Tara Ferguson**
Development Manager

Level 27, Chifley Tower
2 Chifley Square
Sydney NSW 2000

**T** +61 424 153 511
**E** tara.ferguson@kippaxproperty.com



*This email exposes a brazenly coordinated campaign by Kippax executives to manipulate and pressure multiple layers of government
from council officers to the Greater Sydney Commission through orchestrated legal political and investor lobbying It reads like a war
room directive instructing lawyers consultants and lobbyists to synchronize legal threats investor letters and compliant planning
documents to overwhelm council scrutiny and force approval underscoring an industrial scale effort to subvert public planning
processes for private gain*

Kippax's approach to the City of Sydney in 2022 can only be described as **scorched-earth intimidation**. The internal correspondence reveals a
mindset of *"us vs. them"* toward Council, with Nick Smith and team casting themselves as wronged visionaries and the City planners as
obstacles to be strong-armed. Consider the language in the draft letter that Kippax's consultants prepared to send the NSW Planning Secretary:
it accuses the City of Sydney of *"undermin[ing] 2 years of working in good faith"* and calls the Council's change "surprising and extremely
disappointing". More bluntly, it states Kippax has *"no confidence in Council"* and implores the State to step in. They even asked the Secretary
**not to tell the City** about this intervention attempt, effectively trying to cut the Council out of the loop on its own planning matter. This kind of
**backchannel lobbying** is a brazen end run around normal protocol, and it shows Kippax's willingness to undermine City officials' authority.

**Wayne Goldberg**  wayne.goldberg@kippaxproperty.com
FW: Redfern planning next steps
May 04, 2022 at 12:00 pm AEST
To: NickSmith , ShaunBond , TaraFerguson

**Alternate Redfern Pathways**

1. **Engage with Council** / COS to target maximum FSR that complies with overshadowing, preferably (if possible) through existing Council process without need for a new Planning Proposal. No Net additional impact/shadowing (we are in the City). Net Improvement and connection to the other park and connection to Country.
   - Send letter to Clover from Kippax/Ariadne
   - Seek feedback from Council member (via Matthew Grounds)
   - Each syndicate investor to submit objection to planning outcome
     - Each syndicate investor to attend Council Member to argue merits of proposal
   - Rely on Merits and Procedural Fairness to overturn decision
   - Highlight Green/Sustainability to appease Greens

2. **State Pathway** by reiterating benefits to community / innovation / tech / job.
   - Demonstrate strategic metrics of site
   - Amanda Harvey
   - Treasury
   - Investment NSW
   - Premier
   - Scott Briggs
   - Amy Brown
   - Transport?
   SSD?

Leverage Relationships of David Gonski, Carapiet, Grounds etc.

3. **Legal**
   a. Frustrate Process / Maintain Pressure on Council
      i. Freedom of Information (issue Gipas) from Addisons
   b. Engage Addisons for Advice
      i. Precedents on no net overshadowing. This has been showing in the past
      ii. Argument that by no uplift is not competent forward planning
      iii. **Letter from Addisons seeking council formally reviewing their position** – Series of Letters. Admin law type letter. Overaction/disproporational response that has been recognised in Gateway. What Strategic Mischief has occurred – tech tenants etc. Goes to the heart of Tech Tenants. ==Compromises the Tech Central objective – repeat this message. Transport concerned that Waterloo station is a white elephant.==

Redacted – RP3    Download

*This internal Kippax strategy memo is a smoking gun, a cynical playbook for manipulating the Redfern planning process through political connections, legal intimidation, and tokenistic use of Indigenous partnerships. It outlines a multi-pronged campaign to "frustrate" Council, mobilize investors as fake grassroots pressure, exploit Aboriginal symbolism to "appease the Greens," and leverage elite networks like Gonski and Carapiet to override local governance, a textbook case of corporate lobbying dressed up as community advocacy.*

On a more direct level, Kippax and its lawyers tried to **make life difficult for the City's planning staff**. Filing multiple GIPA (FOI) requests is one example, it forces Council staff to devote hours to digging up internal documents, emails, and drafts. It's a tactic often used by opposing legal teams to strain the resources of a government body (a form of *"death by paperwork"*). Additionally, the internal plan for a *"series of letters"* from Addisons aimed to **barrage the Council with correspondence**, each likely requiring legal review and responses. The subtext was clear: *"We will fight you every step of the way, and it will be costly and painful."* This threat of *war of attrition* was intended to pressure the City into reconsidering just to avoid the headache.

Meanwhile, Nick Smith marshaled his **financial backers as foot soldiers** in the intimidation campaign. The syndicate of investors behind Kippax included some influential names, people with political connections and clout in business circles. Wayne Goldberg explicitly directed that *"each syndicate investor"* should **submit their own objection** to the City's decision and even personally meet with councilmembers. This is not normal behavior in a local planning dispute; typically, community members or independent stakeholders lodge objections, not the developer's funders acting in concert. By doing this, Kippax effectively tried to **astroturf** the process, manufacturing what looks like broad support and outrage, when in fact it's a coordinated effort by those with a financial interest. The plan even suggested these investors *"attend [a] Council [meeting] to argue the merits of [the] proposal"*, an intimidating prospect for any local councilor to face a lineup of wealthy, powerful individuals all advocating a single private project. It's hard not to see this as an attempt at **bullying through socio-economic power**: implying *"we have big backers who won't go away quietly."*

Kippax's communications also carried thinly veiled **legal threats**. The focus on "merits and procedural fairness" in internal notes hints at potential appeals to the Land and Environment Court if the Council didn't relent. In planning disputes, developers often claim councils failed to properly consider merits or breached process to get a court to overturn decisions. While exercising legal rights is legitimate, in this context it was part of a **pattern of threats**: do what we want, or we will sue you and tie you up in proceedings. The fact that Kippax characterized the Council's response as *"overaction/disproportional"* and contrary to strategic plans was likely foreshadowing an argument they'd use in court or in the media to paint the City of Sydney as anti-development or anti-innovation.

City of Sydney officials thus faced an aggressive campaign on all fronts: **political, legal, and personal**. It's worth noting that despite these tactics, the City stood its ground. In June 2022, the Council's Planning Committee and ultimately the full Council **voted to exclude** the Kippax site from the upzoning plan, formalizing the refusal to grant the taller building controls. This was a major blow to Nick Smith. The response from Kippax? According to one insider, Smith's team indicated they would pursue *"all pathways to recover value"*, which, in light of their

actions, can be interpreted as a continued vow to fight or find another way. Indeed, those "pathways" turned out to be the Kurraba rebrand and State Significant Development approach that followed. But by then, Kippax had burned its relationships at the City of Sydney through its intimidation tactics. The **tone and conduct** of Nick Smith and Wayne Goldberg in 2022 left a bitter taste; as one City official privately remarked (according to sources), Kippax's approach was *unlike anything they'd seen, "an outright attempt to strong-arm Council with money and influence."* Such impressions underscore how far outside the norm Smith's tactics were.

In summary, the intimidation playbook used against the City of Sydney illustrates a profound **abuse of process**. It wasn't enough for Nick Smith to make his case on the planning merits; when that failed, he and his team resorted to pressure that skirts the edges of ethical advocacy. This sets a dangerous precedent: if developers with deep pockets routinely behaved this way, **local planning decisions would become hostage to those with the most resources to litigate or lobby**. That's why exposing these tactics is crucial, to remind public officials and the community that this behavior is **unacceptable and must be met with firm resolve and transparency.**

## Cynical Tokenism: Using Indigenous Communities as Lobbying Shields

One of the most **disturbing aspects** of the 44-78 Rosehill St, Redfern affair is how Nick Smith's team sought to **weaponize Indigenous relationships and imagery** to advance their agenda. The Redfern/Waterloo area has deep Aboriginal significance, it's home to longstanding Indigenous communities, activism (from the Aboriginal Tent Embassy to Black Theatre), and organizations like the Aboriginal Housing Company, NCIE, etc. Kippax's internal and external communications show that Smith and Goldberg were keenly aware of this context, and **ready to exploit it** rather than engage in good faith.

Internally, the May 2022 "Alternate Pathways" email could not be more blunt. Under item #4, Wayne Goldberg lays out a plan to *"Cut a Deal with [Yvonne/Nathan] – Metro Land Council (50/50 JV with her)"*. Yvonne is presumably Yvonne Weldon, Chair of the Metropolitan Local Aboriginal Land Council, and Nathan is likely the CEO. The idea was to offer the Land Council a **50/50 joint venture** stake in the project. This is striking: at no prior point had Kippax indicated the Land Council was a partner, yet as soon as their project was imperiled, they considered handing over half the project just to gain Indigenous backing. It suggests that the **Indigenous "partnership" was seen purely as a transactional lobbying chip**, not something Kippax would have pursued if the project was sailing through. Goldberg even notes that Kippax should involve their lawyer (Addisons) and bring **David Baffsky**, a prominent businessman who once chaired the Australian Indigenous Land Corporation, to approach the Land Council. In short, bring in a heavyweight with Indigenous credentials to help *"go in with"* the Land Council. The email also directs to *"Make sure Yvonne is at [the] meeting"*, indicating they wanted the optics of having an Aboriginal leader present, likely to *impress or pressure* the other officials in meetings.

The same email lists what Kippax could offer as sweeteners: *"Upgrade [the] whole park – space for activism," "Artwork – tell story of activism,"* and providing a *"space/community facility"* that Indigenous groups want. These elements read like a checklist of things to appease Indigenous stakeholders, thrown together once Kippax realized they needed Aboriginal support. It's not that providing such benefits is bad, indeed, public art, community space, and park upgrades are great, but the timing and context reveal **motive**. Kippax did not seriously pursue these ideas until it became necessary as leverage. The kicker is Goldberg's note: *"Use Letters from Indigenous Group – Counterpoint / NCIE... with Nathan"*. Here he is instructing the team to **leverage letters of support** from local Indigenous-related organizations (Counterpoint is a community services center in Redfern that works with Aboriginal residents; NCIE is the National Centre of Indigenous Excellence). In fact, Kippax had already obtained such letters: the draft letter to Lord Mayor Clover Moore in May 2022 boasts that *"Letters of support from community groups NCIE and Counterpoint Community Services wanting to use the facilities are in Attachment A."*. So Kippax had convinced some local Indigenous or community groups to write in support of the project, likely by promising them use of the "Town Hall" auditorium or other space in the new building. These letters were then trumpeted as evidence that the project had Indigenous community backing.

What's problematic is the **good faith (or lack thereof)** behind these engagements. Kippax's outreach to Indigenous groups appears to have been **selective and instrumental**. Nowhere in the early planning stages (2020–2021) did the project prominently feature Indigenous-oriented components. It was only when trying to answer public objections and sway Council that, for example, Kippax added an "Aboriginal heritage interpretation" element to the design and promised partnerships with Indigenous groups for using the space. The May 3, 2022 letter to Clover Moore spends a paragraph talking up how the project will celebrate *"a proud Aboriginal history,"* with Aboriginal public art, opportunities for Indigenous-run businesses, and an interpretive wall in the lobby. To the unsuspecting reader, this sounds wonderfully inclusive. But juxtapose that with Kippax's private scramble to bring the Land Council on board at the last minute, and it smacks of **tokenism**, adding a dash of Aboriginal content for show and political expedience.

Perhaps most telling is that after the project failed and Kippax morphed into Kurraba Group, **the Indigenous elements seemed to fade away**. The press releases for the "life sciences campus" in 2024 mention drawing inspiration from "the rich history and knowledge of the First Nations communities" and incorporating their "botanical and biological knowledge into the design". While that nod is nice, it's couched in very broad, abstract terms (almost like a styling exercise) and is a far cry from actually partnering with Indigenous organizations in the development. The Land Council JV idea? Not publicly mentioned again. The promised Town Hall for Indigenous groups? Unclear if it remains in the new plan. In other words, once Kippax didn't need Indigenous support to convince the City of Sydney (because they shifted to the State level), the overt emphasis on Indigenous benefits largely receded. **This is the hallmark of exploitative leveraging**: using Indigenous communities when advantageous, and discarding those commitments when they're not immediately useful.

For Indigenous leaders and community members, the Kippax saga is a cautionary tale. It shows how a developer can *"name-drop"* Indigenous communities to try to shield themselves from criticism or to sweeten a deal, without a deep commitment to long-term partnership. The Metro Aboriginal Land Council, to its credit, did **not** end up publicly championing Kippax's cause in 2022 (perhaps they saw through the desperation). But the fact that Smith's team so readily concocted this gambit is deeply troubling. It reflects a mindset that Indigenous support is just another tool or hurdle for getting a development approved, rather than something to be earned through trust and genuine benefit-sharing.

In an area like Redfern with a proud Black history, such opportunism is particularly offensive. As one community advocate noted, *"It's galling that they would use our community's legacy, activism, art, cultural heritage, as bargaining chips. We fight for these things out of real concern, not to be a developer's PR foil."* The 44-78 Rosehill St, Redfern case thus underscores the importance of **transparency** whenever a developer claims Indigenous endorsements; the public and decision-makers should ask, *"On what basis? What were they promised? Is this truly a partnership or just lip service?"* In Kippax's case, the record suggests it was largely the latter.

## Aftermath: Investor Wipeout and the "Kurraba Group" Rebrand Deception

By the end of 2022, the immediate battle over 44-78 Rosehill St, Redfern was lost: **Kippax's project was dead**. The City of Sydney had firmly rejected the envisioned tower, and no amount of legal posturing could change the fact that Kippax's land option was now essentially **worthless** (with the restrictive zoning intact, the site could not yield the profitable development investors were sold on). Ariadne Australia, the major investor, swiftly moved to cut its losses. In late 2022, Ariadne negotiated an exit, taking control of what remained of the project entities/land option in exchange for forgiving Kippax's debts. But even Ariadne couldn't salvage it, by 2024 they too conceded defeat, writing off the last of the project's value. For all practical purposes, **everyone who put money into Kippax lost it.** The venture was insolvent and wound up with **zero return** to stakeholders.

And Nick Smith? He walked away and **started fresh under a new name**. In early 2023, Smith launched **Kurraba Group Pty Ltd**, registering a new development company with a clean slate. In a move that can only be described as audacious, he then took a similar Alexandria site, now referred to as *"100 Botany Road, Waterloo"* in marketing, and relaunched it as if it were a brand-new project, except it was developed, funded, and paid for by Kippax. Kurraba Group's publicity in mid-2024 announced it was *"launching the country's first-ever commercial life sciences precinct"* on that site, complete with a renowned architecture firm (Gensler) on board and grand claims of job creation and cutting-edge medical technology. Nowhere in the glossy media statements was it mentioned that Nick Smith's previous venture had been the subject of a failed rezoning or that a previous company had gone broke trying the same thing. The inference one is supposed to draw is that Kurraba Group came along with a brilliant new idea to build a biomedical hub in this underutilized part of the city, when in reality it's the **same scheme in a new costume**.

This **rebranding maneuver** is a classic play from the crisis PR handbook: if a venture fails spectacularly, simply **change the name and narrative**, and hope no one connects the dots. Smith appears to be counting on the fact that average observers, and even some officials, have short memories. By pivoting to "life sciences," he can approach different government agencies (e.g., health and innovation departments rather than just planning) and chase new funding or partnerships (life sciences is a hot sector that often enjoys government incentives). The tactic also potentially muddles who is accountable: Kippax's collapse might be seen as a separate chapter, and Kurraba as a new entity unburdened by past promises. **But make no mistake**: the leadership and intent remain the same. Kurraba's team is led by Nick Smith, and it reportedly even includes some of the same personnel from Kippax in new roles. The DNA of the company, and its central focus on profiting at whatever cost has not changed.

For the investors who lost money, this rebirth is salt in the wound. They effectively funded years of groundwork (land option fees, designs, reports, lobbying) and then got nothing, while Smith retains the *opportunity* to profit if he can get the project approved under Kurraba. As an ASX-listed company, Ariadne had to publicly disclose its losses and write-offs, but smaller private investors simply saw their equity evaporate without fanfare. There's an argument to be made that **Kurraba Group's new push is a continuation of the same project they already invested in**: just with new wrapping. If that's the case, one wonders: will any of those original investors see a dime if the "life sciences campus" ever comes to fruition? Or have they been cut out of the picture entirely after the restructuring? The situation has the flavor of a **"phoenix company"**, a practice where a company is dissolved to shed debts and a new one rises to carry on business, free of those liabilities. While details differ, the **ethical issue** is similar: the people behind the failure face no consequences and even stand to gain from essentially starting over, whereas those who trusted them financially are left holding the bag.

From a public interest standpoint, the Kippax-to-Kurraba sleight of hand means that **due diligence is more important than ever**. Government officials considering the Kurraba life-sciences proposal must not be lulled by the clean new branding. They should examine Kippax's record: the unmet promises, the inability to deliver on lofty claims, and the confrontational approach with regulators. The substance of the project might very well remain a speculative real estate play dressed up in buzzwords, and if so, approving it could simply defer a fiasco to a later date (especially if the promised "Proton Therapy center" and other expensive facilities are not actually secured with operators and funding). Likewise, any **new investors or partners** being courted by Kurraba Group should be aware of Nick Smith's history. They ought to ask, *"What happened to the last group of investors? Why did that venture fail?"* Those are questions Smith likely isn't eager to answer, but they are crucial to avoid a repeat scenario.

In sum, the rebranding into Kurraba Group can be seen as a form of **deception by omission**. It attempts to wipe away the narrative of deception, intimidation, and failure that defined 44-78 Rosehill St, Redfern under Kippax, and replace it with optimism and innovation under Kurraba. As this report has detailed, however, **the misconduct and mismanagement are not so easily erased**. They remain highly relevant to evaluating the new iteration of the project.

## Conclusion: A Call to Scrutinize Smith, Kurraba Group, and Their Tactics

The story of Nick Smith and the 44-78 Rosehill St, Redfern development is a cautionary tale that resonates far beyond Redfern. It is a stark example of how **rogue operators** in the property sector can engage in duplicitous behavior: from **intimidating public institutions, to distorting planning channels, to co-opting community goodwill, all to serve their own ends**. That Smith's venture collapsed financially might be seen as just desserts, but the saga isn't over. Through Kurraba Group, the **same individuals and project have resurfaced**, seeking new life. This makes it imperative that everyone, **government authorities, investors, and the wider public**, apply a **high degree of scrutiny** to any future dealings with Nick Smith or entities under his control.

For **government and planning officials**: The file on Kippax/Kurraba should remain open. Past behavior is one of the best predictors of future behavior. If a developer has threatened councils, attempted to conceal communications, and shown contempt for due process, those actions should be remembered and considered when evaluating new proposals. Regulators might also reflect on whether stronger safeguards are needed. For instance, should there be clearer rules preventing a project that fails a local planning process from simply reappearing slightly repackaged at state level without addressing the original concerns? The **State Significant Development pathway** should not become a refuge for developments that could not earn local community support. Additionally, given the *"whitewashed"* rebranding, agencies like ASIC and ACCC might take interest in whether any misleading conduct has occurred in how the project is marketed post-restructure (for example, are claims being made that have no substance, and could that mislead investors or the public?).

For **investors and financial partners**: This report serves as a red flag. **Exercise extreme caution** before committing capital to Kurraba Group or any venture involving Nicholas Smith. The track record laid out here, of grand plans ending in *"total wipeout"* of investor funds, is not easily offset by a change of logo or new press release. Do not be swayed by glossy brochures of "life science campuses" without doing rigorous due diligence on what happened last time. It's worth asking: *If this project truly has such merit now, why did it fail comprehensively before?* And who truly owns the site or bears the risks? A thorough look at corporate filings would show that Kurraba Group and its associated trusts were set up shortly after Kippax's demise. Such timing should give any prudent investor pause. In the venture capital world, founders who burn through cash and deliver nothing tend not to get a second chance unless they've been forthright and learned hard lessons. There is little evidence from Smith's actions that he's acknowledged any mistakes, rather, he doubled down with more of the same tactics under a new banner.

For the **public and community stakeholders**: Stay informed and engaged. Local residents in Redfern, Waterloo, and the broader Sydney community should know that the shiny proposals being floated come from a source with a **troubled past**. When Kurraba Group promises jobs, medical breakthroughs, and community benefits, those claims must be critically examined against Kippax's broken promises (e.g., the "innovation hub" that never materialized, the "community Town Hall" that was dangled as a carrot and then disappeared). Community groups, especially Indigenous and social organizations, should be wary of being used for endorsements. It's telling that Kippax once cited letters from NCIE and Counterpoint to push its agenda ; those groups, and others like them, should ensure any support they lend is based on firm commitments and transparency, not just hopeful words that can be conveniently dropped. If Kurraba is serious about Indigenous engagement now, let them demonstrate it with actions and binding agreements, not just heritage murals and consultative platitudes.

Finally, it is important to highlight a broader principle: **accountability**. Thus far, Nick Smith and his colleagues have not been formally held accountable for the Kippax debacle. There have been no regulatory penalties, no public inquiries, the companies were simply wound up and life moved on. This lack of consequence arguably emboldened the rebrand strategy. To prevent a recurrence, sunshine is the best disinfectant. That is why we have "aggressively" investigated and exposed these details. The hope is that by bringing these internal emails and letters to light, the very communications where Smith's team showed its true colors, we empower those who can demand better.

**In closing**, the 44-78 Rosehill St, Redfern project may have started as an ambitious vision for urban renewal, but it morphed into an example of how *not* to conduct development business in Sydney (or anywhere). Nick Smith's pattern of deception, intimidation, and exploitation has been laid bare. It falls now to the community and officials to heed these lessons. **Any project connected to Smith, Kurraba Group, or their associates should be met with a healthy dose of skepticism and an insistence on integrity**. Sydney's planning system, and its communities, deserve respect and honesty, not coercion and con games. By shining a light on this saga, we aim to ensure that those who would try similar misconduct in the future think twice, knowing that **watchful eyes are ready to hold them to account**.

**Sources:**

- Internal Kippax communications (emails and strategy documents, May 2022) obtained by whistleblowers, including the "Alternate Redfern Pathways" email by Wayne Goldberg and project planning action updates. These reveal Kippax's tactical plans to pressure Council, engage the NSW government, leverage investors, and invoke Indigenous partnerships.
- Draft and sent letters from Kippax and its consultants to officials: *Draft letter to Lord Mayor Clover Moore, 3 May 2022* (outlining the project's community benefits and seeking urgent intervention) , and *Letter to DPE Secretary Michael Cassel, 29 March 2022* (detailing Kippax's grievances with Council and requesting state intervention while disparaging the City's actions).
- Kurraba Group Exposed investigative blog articles and archives:
  - *"From Ambition to Ashes: How Nick Smith's Kippax Venture Imploded and Left Investors Empty-Handed,"* Oct 15, 2025, which documents the history of the Kippax Redfern project, the financial losses, and the transition to Kurraba Group.
  - *"Internal Emails Reveal Kurraba's Nick Smith Instructed Staff to Lie as Kippax Collapsed Financially,"* Oct 16, 2025, providing evidence of Nick Smith's directives to deceive a creditor, highlighting unethical conduct during Kippax's insolvency.
  - Supplementary findings on corporate records (ASIC/ABR) confirming Kippax's dissolution and Kurraba's formation.
- Press releases and news reports on Kurraba Group's new proposal:
  - Gensler press release, *"Kurraba Launches Australia's First Commercial Life Sciences Campus,"* June 20, 2024.
  - Australian Property Journal (via Green Street News), *"Kurraba bringing biomed building to life,"* June 20, 2024.
- City of Sydney Council documents and discussions (2021–2022) regarding the Botany Road Precinct planning proposal (providing context on the planning controls and reasons for not upzoning 44-78 Rosehill St, e.g. community submissions on overshadowing of an Indigenous garden and nearby residences ).

All evidence above corroborates the narrative of misconduct and serves as a resource for further independent verification. The **paper trail is clear**, and it should not be ignored when evaluating the future of the 44-78 Rosehill St, Redfern site or those behind it.

# FAQs

## What lessons should regulators and investors take from the Redfern development case?

Regulators and investors should scrutinize developers like Nick Smith and Kurraba Group carefully, demand full transparency, be wary of manipulation tactics such as legal threats, influence peddling, tokenism, and rebranding, and recognize patterns of dishonesty and exploitation aimed at bypassing ethical and democratic processes.

## What was Nick Smith's response to the project's collapse and how did he attempt to re-enter the market?

Nick Smith responded by founding a new company, Kurraba Group, and rebranding the failed development as a new, supposedly innovative life sciences campus, often using similar schemes and personnel, thus continuing his practice of deception and profit-seeking under a new guise.

## In what ways did Kippax use Indigenous communities cynically in their project?

Kippax sought to gain Indigenous support by offering tokenistic benefits, leveraging Indigenous symbols and community letters for political

cover, and proposing joint ventures with Indigenous land councils mainly as a lobbying strategy, rather than engaging in genuine, long-term partnership or support.

### How did Kippax Property attempt to influence planning decisions contrary to typical protocols?

Kippax privately lobbied state officials to override local council decisions, appealed directly to state agencies, and used legal threats and procedural manipulation, such as requesting FOI documents and challenging the Council's decisions in court, to try to bypass standard planning processes.

### What are the main unethical tactics used by Kippax Property and Nick Smith in the Redfern development project?

The main unethical tactics included intimidation of city officials through legal pressure and lobbying, manipulation of planning pathways to bypass local approval processes, exploitation of Indigenous communities for political and PR gain, deception and misrepresentation to investors and authorities, and an attempt to rebrand and restart the project under a new company after its failure.

## Request for Comment

Yesterday we sent this request for comment.

**To:** Kurraba Group representatives

**Cc:** External legal counsel for Kurraba Group

Dear Kurraba Group representatives and Counsel,

We are preparing a news article concerning Kurraba Group's development at **100 Botany Road** and related planning strategies that originated during the period when principals operated under **Kippax Property**. We are writing to give you a full and fair opportunity to respond, provide context, and share any materials that may rebut or clarify these matters **before publication**.

Our questions are based on materials provided to us, including internal emails from May 2022 that outline an "Alternate Redfern Pathways" strategy and a "plan of attack on Redfern." We make **no final findings** and seek your factual responses and documentation so that we can accurately and fairly reflect your position.

## Topics and Questions for Response

### 1) SSD pathway and 100 Botany Road

- Please explain the rationale and timing for pursuing the **State Significant Development (SSD)** pathway for **100 Botany Road**.
- Was the SSD route selected in part due to difficulties experienced with City of Sydney (CoS) processes on prior Kippax-led proposals?
- Please provide the internal decision paper(s), board or investment committee notes, and any advice received (planning or legal) that recommended SSD for 100 Botany Road.

### 2) Continuity from Kippax to Kurraba

- Please confirm the continuity of personnel and decision-makers (including **Nick Smith**, **Wayne Goldberg**, **Tara Ferguson**) between **Kippax Property** and **Kurraba Group** and state their respective roles at the time the 100 Botany Road strategy was set.
- If different entities were involved, please provide a corporate structure chart (mid-2022 to present) showing responsible decision-makers for planning, government relations, and legal strategy.

### 3) Council-pressure strategy and lobbying

- In a **May 4, 2022** email from Mr **Wayne Goldberg** titled *"FW: Redfern planning next steps"* ("Alternate Redfern Pathways"), the strategy includes:
  - **"Engage with Council / COS"**, **"Send letter to Clover [Moore] from Kippax/Ariadne,"** **"Each syndicate investor to submit objection to planning outcome,"** and **"Each syndicate investor to attend Council Member to argue merits of proposal."** Please confirm whether these steps were carried out, by whom, and with what outcomes.
  - The same email references leveraging relationships (e.g., **"Leverage Relationships of David Gonski, Carapiet, Grounds etc."**). Please confirm whether any such individuals were contacted or referenced in approaches to elected officials or staff and whether they consented to such use of their names.
  - The email also contemplates a **"State Pathway… SSD?"** Please confirm whether the SSD strategy later pursued at 100 Botany Road was an outgrowth of this plan. Provide the timeline linking these decisions.

### 4) "Frustrate Process / Maintain Pressure on Council" & FOI/GIPA usage

- The **May 4, 2022** email lists under **"Legal"**: **"Frustrate Process / Maintain Pressure on Council"** and **"Freedom of Information (issue Gipas) from Addisons,"** as well as a plan for **"Series of Letters"** (administrative law) to challenge Council's position. Please confirm where GIPA requests were lodged, by whom (Kippax/Kurraba or your legal representatives), what they sought, and how the results were used. Provide copies of the letters and GIPA logs.
- Please confirm whether **Addisons** (or any other firm) was engaged to execute this approach and provide the instructions/retainers relevant to this work.

## 5) Representations to government officials and agencies

- A **May 3, 2022** email from **Ms Tara Ferguson** (Subject: "Redfern planning next steps") states: **"Issue letter to Clover today 3/05"** and references outreach to **Mick Cassel**, **Amy Brown**, **Alex Wendler**, and **Amanda Harvey** (DPIE). Please confirm whether these contacts occurred, share copies of letters/emails, and explain the substance of any meetings or calls.

## 6) Indigenous engagement and community representations

- The **"Alternate Redfern Pathways"** email includes proposed actions to **"Cut a Deal with Yvonne / Nathan – Metro Land Council (50/50 JV…),"** to involve **David Baffsky**, and to **"Use Letters from Indigenous Group – Counterpoint / NCIE with Nathan."** It also references **"Upgrade whole park – space for activism," "Artwork – tell story of activism,"** and **"Indigenous want space/ community facility."** Please confirm whether any of these representations, introductions, or proposals were pursued for Redfern or 100 Botany Road, and provide copies of any letters of support or MOUs obtained from Indigenous organisations (and evidence of their informed consent).

## 7) "Botany Road Corridor" decision

- The same **May 4, 2022** email notes: **"Harshnay confirmed that going with the Botany Road Corridor was the correct course of action."** Please identify **"Harshnay,"** their role/firm, and the advice provided. How did this advice inform the later 100 Botany Road strategy? Provide any related memos or emails.

## 8) Investor-mobilisation and communications discipline

- Please confirm whether **investors** were encouraged to **submit objections** and **meet Council Members** to argue the project's merits, as the email suggests. Provide any template letters, briefing packs, or meeting notes provided to investors.
- We are informed (and seek your comment) that in later City of Sydney discussions relating to 100 Botany Road, references to **"Kippax"** prompted efforts to curtail debate. Do you dispute that Council discussions were limited or re-directed when Kippax was mentioned? If so, please provide particulars.

## 9) Engagement with media and third-party advocacy

- The **May 4, 2022** email includes **"Chris Barter / Zeb Article."** Please explain what this refers to (e.g., proposed media placement or third-party commentary), whether it proceeded, and supply any drafts or correspondence.

## 10) Deal tactics, timing, and negotiations

- The **May 4, 2022** email proposes, **"Reach out with landowner to either: (a) Delay third option payment to buy time and (b) Seek to reduce Price."** Please identify the landowner, the "third option payment," whether these tactics were attempted, and the outcomes. Provide supporting correspondence.
- The same email asks **"Delay meeting with Council to July?"** Please confirm whether meetings were delayed intentionally to influence process or leverage.

## 11) Design/testing representations tied to stakeholder support

- The **May 3, 2022** email from Ms Ferguson instructs **"Bates to test 'compliant' envelope"** including **"50% sun for 4 hrs on consolidated space to Indigenous cultural garden," "Solar compliant to Gibbons St apts,"** and **"ADG compliant to Cornwallis and Margaret St apts??"** Please confirm whether such analyses were performed, by whom, and whether they were used in representations to Council or the community (for Redfern and/or 100 Botany Road). Provide the relevant studies.

# Document Requests

Please provide copies of the following (electronic copies are acceptable):

1. The **May 4, 2022** "Alternate Redfern Pathways" email chain (from **Wayne Goldberg**) with full headers/metadata and any attachments; and the **May 3, 2022** "Redfern planning next steps" email (from **Tara Ferguson**) with headers/attachments.
2. All communications (letters, emails, calendars, call notes) with or about **Clover Moore, City of Sydney** staff, and NSW officials named in the emails (including **Mick Cassel**, **Amy Brown**, **Alex Wendler**, **Amanda Harvey**).
3. Any **GIPA/FOI** requests lodged (or contemplated) pursuant to the **"Frustrate Process / Maintain Pressure on Council"** strategy; copies of responses; and any **Addisons** (or other firm) engagement letters, advices, and the **"series of letters"** referenced.
4. Materials evidencing **investor mobilisation** (templates, packs, instructions) and any outcomes (submissions, meetings).
5. Any **Indigenous organisation** outreach, letters of support, MOUs, or minutes, including references to **Counterpoint, NCIE, Metro Land Council, Yvonne, Nathan,** and **David Baffsky**; plus any community-benefit proposals (e.g., "space for activism," "artwork – tell story of activism," "community facility").
6. Identification of **"Harshnay,"** their advice concerning the **Botany Road Corridor**, and any working papers/memos relied upon for the 100 Botany Road strategy.
7. Documents concerning **option payments** and **price negotiations** with the relevant landowner(s), including any decision to **delay** payments or **seek to reduce price**.

# Deadline and Publication

To meet our production schedule, please provide written responses and any materials **within 24 hours of this notice**, by:

- **San Francisco (PDT, UTC−7): Friday, October 17, 2025 at 7:00 PM**
- **Sydney (AEDT, UTC+11): Saturday, October 18, 2025 at 1:00 PM**

If you anticipate difficulty meeting this timeline, please contact us **immediately** with a proposed time by which you can respond **or to request a short extension**.

## Fairness, Accuracy, and Use of Your Response

- We seek to accurately reflect your position and will include any substantive response you provide.
- Please clearly mark any material you assert is **confidential** or **legally privileged**.
- If you decline to comment, we may report that you were given an opportunity to respond and **declined** or **did not respond** by deadline.
- Nothing in this inquiry should be read as a final conclusion; all points above are **allegations** subject to your clarification and supporting evidence.

Please send responses to **info@kurrabagroup.exposed** and copy your appointed counsel. If you wish to nominate a different legal contact for future correspondence, please advise.

Sincerely,

**Joe**

*Kurraba Group Exposed*



**Kurraba Group**

[See Full Bio](#) ›

# Internal Emails Reveal Kurraba's Nick Smith Instructed Staff to Lie as Kippax Collapsed Financially

October 16, 2025
Kurraba Group

## A New Era on Exposing Kurraba Group, Kippax, and Nick Smith

We've received hundreds of gigabytes of data, including emails, text messages, photos, chat transcripts, audio recordings, and more, which show both extreme and blatant misconduct by Nick Smith, Kippax Property, and Kurraba Group. Moreover, the evidence we received provides significant support for the previous accusations of defamation made against our website. Notably, multiple whistleblowers provided us with what they claim is every email ever sent and received at Kippax, Kurraba, as well as recordings of Nick Smith's phone calls, team meetings, and all his text messages. The evidence is damning to Mr Smith, Kippax, and the Kurraba group, proving what we will argue is criminal fraud among other activities.

We intend to publish stories as soon as possible, as our team reviews the evidence and seeks comments from Kurraba Group, Nick Smith, and their attorneys. A link to download all the evidence obtained has already been forwarded to the poor community member who was wrongly sued by Kurraba Group and Nick Smith for simply trying to do right by his community.

**NOTE:** If you are a journalist and wish to independently review the evidence and data dumps we've received, please reach out to info@kurrabagroup.exposed. We will provide you with a link after verifying your credentials.



*Nick Smith Kurraba Drinking Smoking*

## Key Points

- **Call for Response and Ongoing Inquiry:** Kurraba Group has requested responses within 24 hours to allegations of misconduct, including the unpaid invoice and questionable expenditures, emphasizing transparency and accountability.
- **Priority on Grand Projects Over Obligations:** Smith prioritized large development projects and spent extensively on ambitions like the Redfern site, even amid financial collapse and unpaid vendor invoices.
- **Kippax's Severe Financial Distress:** Kippax Property was effectively insolvent in 2022, unable to pay small bills like the $1,760 invoice, due to mismanagement and failed funding efforts.

- **Evidence of Deception by Nick Smith:** Internal emails reveal that Nick Smith instructed staff to lie about overdue invoices, despite Kippax's financial distress, highlighting unethical conduct.
- **Misleading Stakeholders and Creditors:** Smith repeatedly gave false assurances of imminent payment to vendors, shifting blame onto external funders while Kippax was out of liquidity.
- **No Wrongdoing By Other Employees:** We do not allege that other employees, such as Tara Ferguson and Shaun Bond, acted inappropriately. We intend to publish further articles showing that they mainly acted under duress or pressure from Nick Smith.

## New Evidence of a Blatant Lie

In a newly uncovered internal email from 15 August 2022, Kippax Property CEO Nick Smith explicitly **instructed his staff to lie** to a contractor about an overdue $1,760 invoice – falsely claiming it would be paid the following week. This startling directive, aimed at placating heritage consultancy Curio Projects, came at a time when **Kippax was effectively out of cash** and unable to meet even small bills. Smith's own Executive Director, Shaun Bond, immediately pushed back on the deception, warning **"We shouldn't say this until we know this is the case – which we don't"**. The incident, now supported by internal communications, paints a damning portrait of Smith's conduct: while his development company **spiraled toward financial ruin**, he authorized grandiose project spending through a new venture (Kurraba) even as he dodged basic obligations and misled vendors with empty promises.



*A screenshot of a PDF of the email provided by a former Kippax employee.*

**The new evidence** – a series of internal Kippax emails – reveals how Smith directed Development Manager Tara Ferguson to assure Curio Projects their long-overdue invoice *"will be paid by next week"* despite having no funds to do so. Bond's same-day reply urged honesty, noting

that lying would not help their situation and that forthcomingness is important. In short, **Smith attempted to deceive contractors and shift blame to investors**, all while Kippax Property Pty Ltd (the entity legally responsible for the debt) was being run into the ground under his leadership. Below is a timeline of the key events, followed by an analysis of Kippax's dire financial state and Smith's questionable priorities.

## We Requested Comment: Kurraba, Kippax, Smith, and Attorneys Refuse to Respond or Even Ask for Extension

Yesterday, at approximately 8:00 p.m. San Francisco Time, we reached out to Kurraba Group and their attorneys, requesting a response within twenty-four hours or informing them that we required an extension to respond. As of the time of writing Kurraba Group and their attorneys refused to comment or even ask for an extension. A copy of the email we sent to Kurraba Group and their attorneys is included below.

## Timeline: Overdue Invoice and Deception (June–September 2022)

- **24 Jun 2022:** Curio Projects issues **Invoice INV-20000960** for **AUD $1,760.00** (including GST) to Kippax Property (Attn: Tara Ferguson). The bill – for Aboriginal heritage consultation on Kippax's Redfern development site – is due 8 July 2022. Kippax fails to pay by the due date.



**TAX INVOICE**

Kippax Property
Attention: Tara Ferguson
Level 27, Chifley Tower
SYDNEY NSW 2000
AUSTRALIA

Invoice Date
24 Jun 2022

Invoice Number
INV-20000960

Reference
44-78 Rosehill Street

ABN
79 139 184 035

Curio Projects Pty Ltd
5 Blackfriars Street,
Chippendale NSW 2008
AUSTRALIA
ph. 02 8014 9800

| Description | GST | Amount AUD |
|---|---|---|
| Aboriginal Community Consultation - Final 20% of Fixed Fee | 10% | 1,600.00 |
| | Subtotal | 1,600.00 |
| | TOTAL GST 10% | 160.00 |
| | TOTAL AUD | 1,760.00 |

Due Date: 8 Jul 2022
Please make payment direct to:
Curio Projects Pty Ltd

- **15 Aug 2022:** Over five weeks past due, Ian Bainsbridge (Curio Projects' Operations Director) emails Kippax about the **"considerably overdue"** invoice, requesting a payment date. Tara Ferguson forwards the message internally, asking if she should promise payment within the week. **3:07 PM:** Nick Smith responds, instructing Ferguson to *"Let them know they will be paid by next week"* – effectively directing her to lie about a payment timeline. **8:11 PM:** Shaun Bond replies-all, **objecting to Smith's directive**. "**We shouldn't say this until we know this is the case – which we don't**," Bond writes, adding that making baseless promises *"will just create a rod for our backs."* He notes by example that *"Houston are now banking on payment by the end of this week"* because Kippax gave them a similar assurance the week prior. Bond instead advises a non-committal response (thanking them for patience and promising an update soon) rather than a definite payment date. **Screenshot above.**
- **17 Aug 2022:** Adopting Bond's cautious approach, Ferguson emails Curio Projects with an update **omitting any false payment promise**. **"Apologies for the delay and thanks for your patience. The invoice is being worked through and we will be able to provide an update of payment soon,"** Ferguson writes, deferring a concrete date. She copies Bond on the response and offers his number for any issues. This message, while still not providing a payment date, does **avoid the explicit lie** Smith had instructed. (Notably, Curio had little choice but to wait, having already completed the work in good faith.)
- **1 Sep 2022:** Two more weeks pass with no payment. Bainsbridge emails again, now marking the request "High Importance." **"This invoice has still not been paid. It was due on 8/7/22. It is almost two months late,"** he writes, pressing Kippax for a firm payment date or a higher-up contact for escalation. In response, Shaun Bond (presumably with Smith's approval) attempts to **deflect blame to Kippax's financiers**: **"Our funders have agreed to pay for this soon. This should be days not week away,"** Bond tells the contractor. He apologizes for the delay and thanks them for their patience, implying that outside "funders" are responsible for settling the bill shortly. This response passes the buck to unnamed backers, rather than admitting Kippax's own inability to pay its debts.
- **7 Sep 2022:** Having received Bond's assurance of imminent payment, Curio Projects still **sees no money**. Bainsbridge emails yet again,

this time directly to Bond (with Ferguson cc'd). **"We have still not received payment for this invoice as per your previous advice,"** he writes pointedly, and asks, **"Can you please follow this up[?]"**. By now the invoice is **nearly three months overdue**, and Curio is effectively begging for resolution. Despite Bond's promise of "days, not weeks," Kippax had *still not paid the modest $1,760* it owed. This continued stalling marks the culmination of Curio's frustration. *(Internal records do not indicate a payment until much later, if at all — underscoring just how dire Kippax's cash situation was.)*



[Second Email RE Invoice](#)    Download

## Kippax on the Brink: Big Ambitions, Empty Coffers

These events unfolded against a backdrop of **severe financial distress at Kippax Property**. Despite presenting itself as a high-flying property developer, Kippax was **never well-capitalized**. Internal deal documents show the company had been courting a major $20 million investment from Macquarie Group in 2021 to fund its projects – capital that ultimately never materialized. By August 2022, Kippax's coffers were effectively empty, forcing Smith's team to stall and fabricate stories to creditors. The fact that Kippax could not cover a **$1.76k invoice** without "agreeing" with external funders to step in betrays the **depth of its cash crisis**. In blunt terms, the company was verging on **insolvency**. Bond's internal email candidly acknowledged they had *"no control"* over when money would come – a stark admission that Kippax's management had **run out of money and out of options**.

Crucially, the **obligation to pay Curio Projects was Kippax's alone**, not some third-party's (or perhaps the ATP trust as Smith intends to blame). The invoice was addressed to **Kippax Property Pty Ltd** at its Sydney office, meaning Kippax (and by extension, Nick Smith) was contractually responsible for the debt. Yet Smith attempted to **shift responsibility onto a "trust" or funders**, as if the delay were due to someone else's failure. This was **misleading**. While Kippax may have held the project in a separate property trust structure, **Kippax Property was the contracting entity** – the buck stopped with Smith's company. By September, that company was being **run into the ground** by Smith's decisions. In effect, **Nick Smith was at the helm of a sinking ship**, choosing to obscure the holes in the hull rather than patch them.

## Smith's Priorities: Grand Projects over Basic Obligations

Even as Kippax was **unable to pay small bills**, Nick Smith was authorizing and pursuing **extensive spending on a grand development scheme**. The overdue Curio invoice itself was for work on Kippax's flagship project – the redevelopment of a large site in Redfern (100 Botany Road, also referred to as 44–78 Rosehill Street). Smith poured significant resources into this project: commissioning top-tier architects and consultants (e.g. Tzannes Architects for design studies ) and aggressively lobbying planning authorities to maximize the site's potential. In fact, Smith and his planners wrote multiple submissions and even to government ministers to influence planning controls for the site. These efforts aimed to secure greater building height and floor space, which would hugely increase the project's value. However, on **27 June 2022**, the City of Sydney Council dealt a major blow to Kippax by **removing Smith's Redfern site from a key planning proposal** (scrapping the height/FSR

incentives Kippax sought). In other words, just weeks before Smith's email lie to Curio, his marquee project's future had been undermined by regulators – leaving Kippax's grand plans in jeopardy and its **financial projections in tatters**.

Rather than scaling back in the face of this setback, Smith doubled down. He **continued pouring money and effort into 100 Botany Road** (even as Kippax's bank accounts dwindled). By late 2022, Kippax's financial situation was so dire that the Redfern project was essentially **rescued by moving it into a new entity, Kurraba** – allowing Smith to press on with development ambitions under a fresh banner, while leaving many of Kippax's debts behind. (The **Kippax Property brand quietly lapsed** as Kurraba took over the project.) This maneuver may have insulated the prized project from Kippax's collapse, but it underscores the cynical pattern at play: **Smith prioritized salvaging the big-ticket venture and his own interests, over honoring commitments to small vendors.** Kippax's collapse was marked by unpaid invoices and broken promises, yet Smith's focus was on ensuring the flagship project survived (albeit in another corporate vehicle).

Throughout this saga, Smith **repeatedly misled stakeholders**. He gave vendors like Curio rosy assurances of imminent payment that he knew were baseless. He portrayed the holdup as a funding issue – implying blame on investors or a trust – when in truth it was Kippax's **lack of liquidity and poor management** at fault. Internally, even his closest colleagues recognized the deceit: Bond explicitly refused to tell Curio they'd be paid by next week **"until we know this is the case – which we don't"**. That line encapsulates the dysfunction: the CEO was willing to say anything to buy time, while others in the team cringed at the ethical and practical consequences. In the end, Kippax Property Pty Ltd under Nick Smith's direction **stiffed a small business for months**, all while chasing much larger dreams and blaming others for its own failures.

## Conclusion

The **internal emails and timeline** above shed light on a harsh reality: by August 2022, Kippax was a financially crippled firm clinging to a massive development vision. Nick Smith's response was not to forthrightly address the company's obligations, but to **authorize deceit, defer blame, and protect the big project at all costs**. A $1,760 invoice – trivial in the context of a multi-million-dollar development – went unpaid for months because Smith would not (or could not) pay it, yet would not admit as much to those owed money. Instead, he directed underlings to **lie to creditors**, thanking them for their "patience" while privately scrambling for funds. This behavior not only speaks to Kippax's insolvency and mismanagement, but also to **Smith's personal ethical compass**. It reveals a pattern of conduct that is highly troubling: a willingness to mislead partners and contractors, a penchant for passing the buck to "funders" or new entities like Kurraba, and a failure to take responsibility as Kippax Property Pty Ltd was driven into the ground.

In sum, the new evidence highlights a developer who, when faced with financial collapse, **chose deception over transparency**. Nick Smith's instruction to falsify a payment timeline – immediately flagged as dishonest by his own staff – is now on record. Coupled with the knowledge of Kippax's ruinous finances and the transfer of its assets to Kurraba, it presents a darker and more damning portrait of Smith's conduct. Stakeholders and future partners of Kurraba would do well to heed this history. The story of Kippax in 2022 stands as a cautionary tale of how not to do business: **overextending on grand projects, starving creditors of what they're owed, and spinning a web of lies until the money (and trust) run out.**

## FAQs

### What are the expectations for responding to the allegations made in the media inquiry?

Kurraba Group requests a written response within 24 hours, including supporting documents, to clarify their position, contest any facts if necessary, and provide context before publication.

### What actions did Kippax's management take regarding the overdue invoice and company expenditures during mid-2022?

Management attempted to deceive vendors about payment timelines, deferred responsibility onto external funders, and prioritized large project spending over settling small vendor debts.

### What does the new evidence suggest about Kippax's financial health in 2022?

The evidence indicates that Kippax was in severe financial distress, effectively insolvent, with internal communications acknowledging a lack of cash to meet even small bills like the A$1,760 invoice.

### Did Nick Smith instruct staff to lie about the overdue invoice to contractors?

Yes, internal emails reveal that Nick Smith directed staff to tell contractors that the overdue invoice would be paid 'by next week,' despite knowing that Kippax was out of funds to make the payment.

### What is the current status of the A$1,760 invoice issued to Kippax Property by Curio Projects?

The invoice issued to Kippax Property for Aboriginal Community Consultation remains unpaid, with internal communications suggesting it was overdue by several months and no official payment has been made.

## Media Inquiry – Request for Comment — Curio Projects Invoice (24 June 2022) and Related Conduct – Response Required Within 24 Hours

From: Kurraba Group <kurrabagroup@proton.me>
To: info@kurrabagroup.com

CC: Jim Micallef <Jim.Micallef@corrs.com.au>, Mark Wilks <Mark.Wilks@corrs.com.au>
Date: Wednesday, 15 October 2025 at 20:05

Dear Kurraba Group representatives,

We are preparing a news article concerning reports that, while Kippax Property had outstanding vendor invoices in mid-2022, senior personnel simultaneously engaged in discretionary spending allegedly far exceeding those unpaid amounts. We are writing to give you a full and fair opportunity to respond, provide context, and share any materials that may rebut or clarify these allegations **before publication**.

The specific matter raised with us concerns **Curio Projects** and an invoice for **A$1,760.00** dated **24 June 2022** for Aboriginal Community Consultation services. We are informed that when Curio issued a payment reminder on **15 August 2022**, **Mr. Smith** allegedly instructed **Ms. Tara Ferguson** to assure Curio that payment would be made "by the end of the following week," despite internal awareness that payment might not occur due to cash constraints. We also received reports that during the same period personal or staff-related discretionary expenditures materially exceeded the A$1,760.00 owed.

We make **no final findings** and seek your factual responses and documentation so we can reflect your position accurately and fairly.

## Questions for Response

1. **Invoice Status and Payment**
   - Do you agree that Curio Projects issued invoice **A$1,760.00** dated **24 June 2022** for Aboriginal Community Consultation to "Kippax Property"?
   - Was that invoice validly received by Kippax (or any related entity) and entered into accounts payable?
   - On what date was the invoice paid in full? If unpaid or partially paid, what is the current status and reason?
2. **August 15 Reminder and Communications**
   - Do you agree that Curio sent a reminder on **15 August 2022**?
   - Did Mr. Smith instruct Ms. Ferguson (or any other staff member) to communicate that the invoice would be paid "by the end of the following week"?
   - At the time that assurance was given, what was Kippax's cash position and realistic ability to meet that commitment?
   - Please provide any contemporaneous emails, chat messages (e.g., Teams), call notes, or CRM entries reflecting what was said to Curio, by whom, and on whose authority.
3. **Cash Management and Prioritization**
   - During June–August 2022, what was the company's policy for **prioritizing creditor payments**, particularly for small Aboriginal community-engagement vendors such as Curio?
   - Were there cash-flow holds or approvals that delayed Curio's payment? If so, who imposed them and why?
4. **Discretionary Expenditures**
   - Please identify any **non-essential or discretionary** spending by Kippax/Kurraba (e.g., hospitality, travel, events, entertainment) **between June 24 and August 31, 2022**, including amount, date, payee, business purpose, and approver.
   - If discretionary expenditures were made during that period, why were such costs prioritized ahead of outstanding vendor invoices like Curio's A$1,760.00?
5. **Accuracy of Vendor Assurances**
   - Do you accept that representations made to Curio about imminent payment were accurate at the time and based on a reasonable expectation of cash availability?
   - If not, how do you characterize those assurances, and what steps were taken to correct or update Curio once it became clear payment might not be made as promised?
6. **Governance, Controls, and Oversight**
   - What internal **controls and oversight** existed in mid-2022 over vendor communications and payment commitments (e.g., delegated authority limits, CFO approval, board reporting)?
   - Were any exceptions or overrides used in relation to Curio's invoice?
7. **Kippax/Kurraba Relationship at the Time**
   - As at June–August 2022, which entity (Kippax versus Kurraba or any related entity) was responsible for Curio's Aboriginal Community Consultation scope?
   - If project or staff work was transitioning between entities then, how were liabilities and payables like Curio's handled and disclosed to counterparties?
8. **Context You Wish to Provide**
   - If you dispute any of the above reports, please set out **precisely which facts you contest** and provide **supporting documents** (invoices, ledgers, remittance advices, bank confirmations, approval records, emails, or chat logs).
   - If there was a bona fide dispute about Curio's scope or deliverables, please provide the particulars and any correspondence evidencing such dispute.

## Document Requests

- The Curio Projects invoice (24 June 2022) and any reminders (including the 15 August 2022 communication) and subsequent correspondence.
- Accounts-payable ledger entries and payment remittance or bank confirmation reflecting the invoice's status.
- Any internal emails or messages discussing Curio's invoice and the decision to promise payment "by the end of the following week."
- A summary of discretionary spending between **24 June and 31 August 2022** (vendor, amount, purpose), and the company policy or approvals supporting those expenditures.
- Any written policy in force at the time governing creditor communications and payment prioritization.

## Deadline and Publication

To meet our production schedule, please provide written responses and any materials **within 24 hours** of this notice, by:

- **San Francisco: Thursday, October 16, 2025 at 12:46 PM (PDT, UTC−7)**
- **Sydney: Friday, October 17, 2025 at 6:46 AM (AEDT, UTC+11)**

If you anticipate difficulty meeting this timeline, please contact us immediately with a proposed time by which you can respond.

## Fairness, Accuracy, and Use of Your Response

- We seek to **accurately reflect your position** and will include any substantive response you provide.
- Please clearly mark any material you assert is **confidential or legally privileged**.
- If you decline to comment, we may report that you were given an opportunity to respond and **declined** or **did not respond by deadline**.
- Nothing in this inquiry should be read as a final conclusion; all points above are **allegations** subject to your clarification and supporting evidence.

Please send responses to **info@kurrabagroup.exposed** and copy any appointed counsel. If Mr. Micallef is not acting for you in this matter, please advise us of the correct legal contact for future correspondence.

Sincerely,

Joe

Kurraba Group Exposed



### Kurraba Group

[See Full Bio](#) ›

# Kurraba Group Exposed Issues Media Inquiry to Kurraba Group Regarding Allegations Concerning 100 Botany Road Project

October 15, 2025
Kurraba Group

Today, we, **Kurraba Group Exposed**, formally issued the following **media inquiry to Kurraba Group Pty Ltd**, with a copy provided to **Corrs Chambers Westgarth (Attn: Jim Micallef & Mark Wilks, Partners)**.

This inquiry concerns **allegations relating to the transition of assets, staff, and project materials from Kippax Property to the newly-formed Kurraba Group**, particularly regarding the **100 Botany Road Life Sciences development**.

At this stage, these matters are **allegations only**. No findings of fact have been made, and we remain open to any clarification or rebuttal from Kurraba Group or its representatives.

We are publishing this correspondence publicly because **Kurraba Group and its legal representatives have previously blocked or filtered our emails**, and we have reason to believe they are monitoring this website directly. Should they wish to provide a comment, correction, or response, they may contact us directly at **info@kurrabagroup.exposed**.

## Statement on Publication and Fairness

Kurraba Group Exposed is committed to **fair, evidence-based reporting** on matters of public and investor interest. We note again that the allegations outlined below remain **unproven at this time**, and that **Kurraba Group has been invited to provide a full written response by Tuesday, October 21, 2025, at 11 PM San Francisco time (Wednesday, October 22, Sydney time)**.

Should a response be received, it will be **published in full and unedited** in a follow-up article.

### Contact

For any queries, corrections, or comment submissions:

📧 **info@kurrabagroup.exposed**

## Media Inquiry to Kurraba Group Pty Ltd

**To: Kurraba Group Pty Ltd**

**CC:** Corrs Chambers Westgarth (Attn: Jim Micallef, Partner)

Dear Kurraba Group representatives,

We are preparing an investigative report concerning the transition of projects and assets from **Kippax Property** to the newly formed **Kurraba Group**. In the course of our research, we have reviewed documentation and communications that raise serious allegations about the handling of the **100 Botany Road development project** and related conduct during the wind-down of Kippax. **We write to offer you the opportunity to respond to these allegations and provide your context or rebuttal before publication.** Our goal is to ensure any forthcoming article reflects your side of the story and to avoid any unfair or inaccurate characterizations. Specifically, we have received thousands of emails, Microsoft Teams messages, photographs, documents, text messages, and more from former employees of Kippax Property and a current employee of Kurraba Group.

By way of background, Kippax Property (including its related unit trust and project SPVs) was formally dissolved in 2023 after the failure of its Redfern project, reportedly leaving its investors (including JV partner Ariadne Australia) with a total loss of capital. Shortly before its dissolution, Mr. Smith established Kurraba Group (in 2023) and began developing a new life-sciences development at **100 Botany Road, Alexandria** – the same precinct as the former Kippax/Redfern site – now rebranded as the "ION Life Sciences Precinct" under Kurraba. The **concerns outlined below** relate to this sequence of events and whether Kippax's resources and intellectual property were inappropriately used to seed Kurraba's project to the detriment of Kippax's investors and creditors.

We invite your **answers and any clarifying material** regarding the following specific questions, which are based on allegations and records reviewed to date. **For each point, please provide your response or explanation, including any evidence or context that you believe disproves or contextualizes the claims:**

1. **Use of Kippax Resources for 100 Botany Road:** It is alleged that **Kippax funds and staff time were utilized to develop the 100 Botany Road project** (life-sciences precinct plans, feasibility studies, planning submissions, etc.) **prior to the formation of Kurraba Group**. In particular, initial work on this project in 2021–2022 appears to have been undertaken under Kippax's auspices. **Was Kippax corporate funding or employee labor directed toward the 100 Botany Road development while Kippax was still active?** If so, on what authority or understanding was Kippax pursuing this new project, and were Kippax's investors or board informed of these efforts at the time? Please clarify the timeline of any project development activities for 100 Botany Road under Kippax and how they were recorded or approved.

2. **Transfer of Project IP and Compensation to Kippax:** If the above is true (i.e. Kippax resources were used to initiate the Botany Road project), **was any fair compensation paid to Kippax or its investors when this project was transitioned to Kurraba Group?** For example, were there any payments, credits, or asset transfers made to Kippax Property (or its unit holders) for the intellectual property, feasibility studies, development rights, or staff efforts that were originally funded by Kippax but later benefitted Kurraba? If no such compensation was provided, please explain why not, and on what basis the project was moved to a new entity without

remuneration to the original investors who financed the early work.

3. **Establishment of Kurraba Group Without Investor Knowledge:** What was the basis for **founding Kurraba Group in 2023 while Kippax's investors remained unaware** of the ongoing work on 100 Botany Road? According to our information, Kurraba Group Pty Ltd was registered and began operating the Botany Road project around the time Kippax was winding down, yet Kippax's unit holders were not informed about this new venture. **Why was a new company (Kurraba) created to pursue the Botany Road development, rather than continuing it within the Kippax structure or at least disclosing it to Kippax's existing investors?** Especially since the profit of the project, if successful, would be a windfall easily able to sustain Kippax. Please address the reasoning for this corporate strategy. How do you respond to concerns that Kippax's investors were effectively kept in the dark about a project that their funding had, in part, developed? Were Ariadne, Dr Gary Weiss, Matthew Grounds, and others informed of this project including the immenent shopping of it to new investors through Kurraba Group?

4. **Profit Forecast of $52 Million and Origins:** We have seen references to a project profit forecast of approximately **$52 million (ungeared)** for the 100 Botany Road development. **Was this forecast or financial model originally developed while the project was under Kippax's ownership or consideration?** If so, who prepared that forecast and when? Was this profit projection communicated internally at Kippax or to any of Kippax's investors/partners (such as Ariadne or Macquarie's MIRA) at the time? Furthermore, is this **$52m ungeared profit figure** now being used to attract or assure new investors under Kurraba's banner? If the projection originated at Kippax but is now serving Kurraba's fundraising or valuation, please explain the propriety of that situation. We seek your comment on whether any stakeholders from the Kippax era have been or will be compensated given that Kippax-era work identified a potentially lucrative outcome now being pursued by Kurraba. Why was an analyst hired and paid by Kippax preparing documents that had Kurraba Group branding?

5. **Legal Rationale for Project and Staff Transfers:** On what **legal and corporate rationale were projects, staff, and/or funds transferred** from Kippax-related entities to Kurraba Group entities? For instance, were **Kippax employees or consultants shifted to Kurraba's payroll** while Kippax was still operating, or did any Kippax-paid contracts (for design, architecture, etc.) get novated to Kurraba? If so, **who authorized these transfers and what consideration was provided to Kippax?** Please detail any steps taken to ensure such transfers were done in compliance with directors' duties, fiduciary obligations, or other legal requirements. If you maintain that **no assets or opportunities were "transferred" per se (i.e. that Kurraba's project was entirely independent),** please provide evidence or an explanation to support that position. Essentially, how do you justify the separation of the Botany Road project into a new vehicle, from a legal/governance standpoint?

6. **Solvency of Kippax During This Period:** Was **Kippax trading while insolvent** at any point during 2022 or the period in which it was winding down and Kurraba was being established? Allegations have been made that by late 2022, Kippax was effectively insolvent (unable to pay its debts as they fell due) given the failure of its Redfern project and mounting losses. Yet during this time, certain transactions and transfers (as mentioned above) may have occurred. **Can you confirm whether Kippax was solvent through its wind-down?** If Kippax was insolvent or near-insolvent, what steps did management take to comply with legal obligations (such as not incurring new debts, informing creditors, etc.)? Please provide any relevant financial statements or auditor communications from that period that would clarify Kippax's solvency status while these project transitions were happening.

7. **Response to Phoenix Activity Concerns:** Do you accept that the actions taken – specifically, **shifting a development project, associated personnel, and remaining funds from Kippax into a new entity (Kurraba) while leaving Kippax's liabilities behind** – may **give the appearance of so-called "phoenix activity"**? Phoenix activity refers to the improper transfer of assets to a new company to avoid paying creditors or investors of the old company. Regulators treat this as serious misconduct. **What is your response to the suggestion that the Kippax-to-Kurraba transition resembles a phoenix arrangement?** Were you aware of this risk, and did you seek any legal advice or regulatory guidance to ensure the separation was done above-board and not to the detriment of Kippax's creditors/investors? If you dispute the characterization, on what grounds (e.g., different owners, different funding, no overlap in assets) do you argue this was a fundamentally separate venture and not an unlawful phoenix transaction?

8. **Expenditures During Kippax Wind-Down:** It has been alleged that, during the wind-down of Kippax, **company funds were spent on luxury or non-business expenses** that benefitted management personally rather than the business. Examples mentioned include **high-end travel, entertainment, and other discretionary spending** around the time Kippax was struggling financially. **Can you account for Kippax's expenditures in its final months of operation?** Were there any significant expenses that could be construed as personal or not strictly necessary for the business (especially given the company's financial distress)? If so, who authorized these, and have those funds been reimbursed or otherwise justified to the investors/creditors left unpaid? Please provide your explanation or any context (for instance, if such expenditures were in fact legitimate business costs or pre-existing obligations). If you categorically deny that any inappropriate spending occurred, do you have documentation to support that all outgoing payments were ordinary and in the company's interest?

9. **Disclosures to MIRA and Ariadne:** We are examining whether **any misrepresentations or nondisclosures were made to external stakeholders** – notably **Macquarie's MIRA (Macquarie Infrastructure and Real Assets)**, which was considering an investment in Kippax, and **Ariadne Australia**, Kippax's joint venture partner. **Did Kippax (or Mr. Smith) fully and honestly disclose Kippax's true financial condition and project pipeline to MIRA and to Ariadne during 2021–2022?** Allegations suggest that during fundraising or deal negotiations, Kippax may not have revealed the extent of its financial troubles or the fact that work on the Botany Road project was underway in parallel. For example, when engaging with MIRA on a potential equity option deal in 2021, did Kippax represent its project pipeline and finances accurately, and was the nascent Botany Road opportunity mentioned? Likewise, did you keep Ariadne apprised of the situation (such as the decision to pursue the Botany Road site through a new vehicle) before Ariadne wrote off its investment? **Please clarify what information was provided to MIRA and Ariadne, and respond to any assertion that they were misled.** If there were differences between what these parties were told and what was actually happening (e.g. concerning Kippax's solvency or the shift of focus to Kurraba's project), on what basis do you maintain that your communications were truthful and in good faith?

10. **"Extract the Last Dollars" Remark – Internal Communication:** We have learned of an **internal communication (reportedly a Microsoft Teams chat or similar, from late 2022)** in which a senior person involved with Kippax's management allegedly remarked about a plan to essentially **"extract the last dollars"** from Kippax. This phrase, on its face, suggests an intention to deplete Kippax's remaining cash or assets (potentially for personal benefit or transfer to the new entity) as the company was closing down. **Can you confirm if such a statement was made, and if so, provide the context and purpose of this remark?** Who made this comment, and what exactly was meant by "extract the last dollars" in relation to Kippax's wind-down? Was this referring to using remaining funds to pay outstanding legitimate expenses, or something else (e.g. transferring money out of reach of creditors)? If you **deny that this communication occurred or that it was accurately reported,** please offer any evidence or clarification to refute it. We are particularly interested in any internal records that would show the true strategy for handling Kippax's final funds and whether that strategy was in line with legal duties. In short, **how do you respond to the implication that Kippax's management intentionally drained the company's cash for improper purposes at the end of its life?**

**Invitation to Respond:** We appreciate that these are detailed and sensitive questions. Our intention is to give you a full opportunity to provide

your side of the story and **any materials, context, or explanations that might challenge the above allegations**. If there are misunderstandings or justifications for any of the documented actions, please share them with us. **You are welcome to provide written answers, relevant records, or a statement addressing these points as a whole.** We are also open to scheduling an interview if you prefer to discuss verbally.

Please note that **pending your input, our reporting will treat the above as allegations based on the records and testimony we have reviewed. No final conclusions have been drawn**, and we will not publish any definitive claims without including your perspective. If we do not receive a response, our article may state that you declined to comment on these issues. Our aim is accuracy and fairness, and your responses will be reflected in that spirit.

Thank you for your time and consideration. We request your reply in writing at your earliest convenience (to the undersigned email), so that we can meet our publication deadlines while ensuring your viewpoint is duly represented. To that point, we must receive a response by **Tuesday, October 21, 2025 at 11pm San Francisco Time** (which we believe is sometime on Wednesday close of business your time zone). If you require additional time or clarification on any question, please let us know as soon as possible. Due to our tight publishing constraints and the major outlets we are working with on reviewing these materials we are not sure we are in a position to grant any extension for this story; however, will work to get our next story to you as soon as possible for input.

Sincerely,

Joe

Kurraba Group Exposed

cc: **Jim Micallef, Special Counsel, Mark Wilks, Partner, Corrs Chambers Westgarth** (as legal representative for Kurraba Group/Nick Smith)



### Kurraba Group

[See Full Bio](#) ›

# From Ambition to Ashes: How Nick Smith's Kippax Venture Imploded and Left Investors Empty-Handed

October 15, 2025
Kurraba Group

## Key Points

- **Aftermath and Lessons:** The failure highlighted the risks of speculative property development, led to founder Nick Smith moving on with a new company, and serves as a cautionary tale for investors regarding planning and viability risks.
- **Collapse of the Project and Investor Losses:** With planning setbacks and no construction, Kippax's project was abandoned, resulting in total losses for investors as Ariadne impaired its loan and exited the venture, which was then dissolved in 2023–2024.
- **Background and Investment Structure of Kippax Property:** Kippax Property was launched in 2019 as a Sydney-based development venture, structured through a corporate entity and an investment trust, with Ariadne Australia as a key joint venture partner providing capital and funding.
- **The Redfern "ATP Tower" Project and Funding:** Kippax aimed to develop a large commercial tower in Redfern, securing options and financing, but faced significant planning approval hurdles that ultimately stalled the project, leading to major financial losses.
- **No Evidence of Recovery for Investors:** There has been no indication of financial recovery for investors, no legal actions reported, and all related entities have been deregistered, marking a complete loss of capital.

## Background and Investment Structure of Kippax Property

Kippax Property was a Sydney-based property development venture launched in late 2019 by Nicholas "Nick" Smith. The business was structured with **Kippax Property Pty Ltd** as a corporate entity and the **Kippax Property Unit Trust** as the investment vehicle. In December 2019, ASX-listed investor **Ariadne Australia Ltd** entered a joint venture with Kippax, taking a 50% stake in the Kippax Property Unit Trust to co-fund development projects. Ariadne's 2020 annual report noted the formation of this JV, referring to "recently-established Kippax Property Pty Ltd ('Kippax')" targeting urban redevelopment opportunities. Through this structure, Kippax raised capital from Ariadne and possibly other private investors to pursue high-value property developments in Sydney (notably a project in Redfern). Kippax also set up special-purpose entities for the project: **Kippax Property SPV 1 Pty Ltd** (later referred to as Redfern Property SPV1) was created in 2020 to hold rights (an option contract) on the target site , and an **ATP Tower Unit Trust** with trustee **ATP Tower Pty Ltd** was established for the planned development (sometimes called the "ATP Tower" project). These entities were part of the joint venture's structure to acquire and develop the Redfern site near the Australian Technology Park.

## The Redfern "ATP Tower" Project and Funding

Using the funds raised, Kippax secured an **option to purchase a site at 44–78 Rosehill Street, Redfern** in May 2020. This site was near Redfern Station/Australian Technology Park, and Kippax's vision was to develop a large commercial mixed-use tower (the so-called "ATP Tower"). **Millions of dollars were invested** into acquiring the option and pursuing planning approvals for this project. Ariadne's reports indicate that over 2020–2022, it provided significant funding to Kippax: by 2022 Ariadne had **loaned approximately A$8.4 million** to the *Kippax Redfern Unit Trust* (the entity holding the Redfern site option). An additional A$1.9 million had been advanced to Kippax-related entities (with only minor partial repayments) during the project's life. These funds were used for securing the land option and financing the lengthy planning and rezoning process. Kippax pitched ambitious plans for an 11–17 storey "sustainable" commercial tower, hoping to benefit from a broader Botany Road Precinct renewal. However, **planning approvals proved difficult**. The City of Sydney and state authorities were hesitant to up-zone the site, which had a history of a failed 2018 proposal under prior owners. By mid-2022, progress had stalled: the City of Sydney ultimately **removed Kippax's site from the upzoning plan**, citing misalignments with strategic plans and community concerns. In June 2022 the council voted to exclude 44–78 Rosehill St from the precinct's proposed increased planning controls, which meant the **land option could not deliver the development potential Kippax had bet on**. As Ariadne summarized, the option was rendered **"out-of-the-money"** by this decision , undermining the project's viability.

## Collapse of the Project and Investor Losses

With the rezoning setback, Kippax's flagship project was effectively dead in the water. **No construction had begun**, and the venture had no other revenue-generating assets. By late 2022, Kippax was in serious distress – it had expended substantial investor funds on planning, consultants, and holding costs, but the Redfern development had no approval. Ariadne's board reviewed the situation and in 2022 decided to **exit the joint venture** with Kippax. According to Ariadne, it *wrote down the value of its Kippax investment dramatically* in FY2022 due to the project's failure. In fact, Ariadne's 2022 annual report reveals that it **fully impaired** a **A$8.4 million loan** to the Kippax/Redfern project – essentially recognizing that this entire amount was unrecoverable. This write-off was described as a major hit to Ariadne's results, "marring" its financial performance for the year. Ariadne then negotiated a restructuring (dubbed the "Redfern Transaction") in late 2022: it **divested its interest in the Kippax Property Unit Trust** and in exchange took direct control of the remnants of the Redfern project (the land option and project entities). In other words, the outside investor (Ariadne) assumed control in an attempt to salvage any value, while **Kippax's founders/partners relinquished the project**.

However, no turnaround was forthcoming. The planning outcome remained unfavorable, and Ariadne was unable to find an alternate path to recoup the sunk costs (e.g. no upzoning or profitable sale occurred). By early 2023, **Kippax Property Pty Ltd and its holding company had been deregistered** (formally dissolved), marking the end of the Kippax venture. All **investors ultimately lost their entire investment** in the failed project. Ariadne received no return on the millions it had poured in (it reported **a total loss of ~$1.576 million on the Redfern project in FY2023**, and a further **$1.617 million loss in FY2024** as the project was terminated). These losses were on top of the earlier $8+ million write-down, meaning **Ariadne's stake was effectively a complete wipeout**. Likewise, Kippax's co-investors and unit holders saw **100% of their equity vanish** – there were no profits or assets to distribute once the venture collapsed. Every dollar contributed to the Kippax Property

Unit Trust or related entities was expended with nothing to show in return. Ariadne noted in 2022 that it would "explore all pathways to recover value" from the Redfern site , but by 2024 it had to concede defeat, as indicated by the final impairments and closure of the project entities.

Importantly, **no evidence has emerged of any recovery for the original investors** (neither Ariadne nor any private backers). There have also been **no public reports of legal action or regulatory enforcement** arising from the Kippax collapse. The ASIC company register shows Kippax's companies were simply wound up; for example, **Redfern Property SPV 1 Pty Ltd** (the SPV holding the land option) and the **ATP Tower Unit Trust** were deregistered during 2023–2024. The unit trust vehicles were formally cancelled in 2024 (the **ATP Tower Unit Trust's ABN was cancelled in Feb 2024**, and the **Kippax Property Unit Trust's ABN was cancelled by Sep 2024**, indicating their termination). In sum, Kippax Property's ambitious Redfern development venture ended in **total financial loss for its investors**. As one report bluntly summarized, it was a *"total wipeout"* – every dollar invested in Kippax was lost and its backers were left with nothing.

## Aftermath and Lessons

The collapse of Kippax Property had immediate fallout for those involved. Ariadne's management highlighted the **"writedown of our Redfern/Kippax exposures"** as a major disappointment. The venture's failure underscored the risks of speculative property development without secured planning approval. Kippax's founder Nick Smith quietly moved on to form a new development company (rebranded as **Kurraba Group**) in 2023, essentially starting afresh under a new name. The same Redfern site was later marketed as part of a life-sciences precinct plan by Kurraba, but the legacy for original Kippax investors remained grim: they had already borne the brunt of the losses. **All the Kippax-related entities are now defunct**, and the Redfern project was terminated with no compensation to equity holders. No official inquiry or enforcement action (e.g. by ASIC or ACCC) into the Kippax case has been reported, but the outcome has been noted by industry observers as a cautionary tale. In summary, **investors in Kippax Property – through the Kippax Property Unit Trust, ATP Tower Unit Trust, and associated companies – suffered a complete loss of capital**, as the sole development project failed to materialize and the venture was wound up insolvent.

Sources:

- Ariadne Australia Ltd – Annual and Half-Year Reports (2019–2024) detailing the Kippax joint venture, Redfern project write-downs, and JV exit. These filings quantify Ariadne's losses and the impairment of the Kippax project loan to zero.
- Australian Business Register/ASIC records confirming the cancellation/deregistration of **Kippax Property Unit Trust** (ABN cancelled 3 Sep 2024) and **ATP Tower Unit Trust** (ABN cancelled 27 Feb 2024) , as well as the project SPV dissolutions.
- City of Sydney planning documents and Ariadne notes on the **Redfern (Botany Road Precinct) planning decision**, which explain why the Kippax project became unviable.
- Ariadne Executive Director's Review (2022) for commentary on the **"writedown of Redfern/Kippax exposures"** and decision to exit the venture. These illustrate the total investor loss and lack of recovery.

## FAQs

### What was the financial outcome for investors involved in the Kippax Redfern development?

All investors, including Ariadne and private backers, suffered total capital losses as the project was wound up without assets or profits to recover their investments.

### Why did the Redfern project face difficulties and ultimately fail?

The Redfern project faced planning approval hurdles, particularly the City of Sydney's decision to exclude the site from upzoning plans, making the land option unviable and leading to the project's collapse.

### Has there been any legal action or recovery attempt following the collapse of Kippax Property?

There have been no reports of legal actions or regulatory enforcement, and the entities involved have been deregistered, indicating that investors did not recover any of their capital.

### What was the investment structure of Kippax Property and its joint venture with Ariadne Australia?

Kippax Property was structured through a corporate entity and an investment trust, with Ariadne Australia holding a 50% stake in the Kippax Property Unit Trust, which was used to raise capital for high-value development projects including the Redfern site.

### What lessons can be learned from the Kippax Property project's failure?

The collapse of Kippax Property highlights the significant risks of speculative property development, emphasizing the importance of securing planning approvals and conducting thorough viability assessments before proceeding with such ventures.



### Kurraba Group

[See Full Bio](#) ›

# Kurraba's Insider Deals Flip Affordable Housing into Private Gain: The Carfi–Kurraba–Aqualand Scandal

October 10, 2025
Kurraba Group

## Key Points:

- **Implications and Calls for Accountability:** An investigation by ICAC is underway, with demands for transparency and policy reforms to prevent insider deals that privatize public assets at the expense of community benefits.
- **Questionable Sale Process and Valuation:** The land was sold off-market, with no open tender or competitive process, and at a likely undervalued price, leading to concerns over transparency and public loss of value.
- **Transformation from Affordable Housing to Life-Science Campus:** The land, initially approved for low-cost homes, was reimagined as a commercial life-sciences campus by private interests, eliminating the original affordable housing plans.
- **John Carfi's Conflict of Interest in Land Dealings:** Real estate executive John Carfi, who sat on the board of City West Housing, allegedly used his influence to facilitate a secret sale to a private developer, raising serious conflicts of interest.
- **Alexandria Land Sale Originally for Affordable Housing:** A parcel of land in Alexandria intended for affordable housing was secretly sold to a private developer, sparking controversy over insider dealing and public benefit loss.

## From Affordable Homes to a Life-Science Campus

*An aerial view of the Alexandria site (outlined in orange) at the corner of Botany Road and Wyndham Street. Originally earmarked for affordable housing, this land was quietly sold off to a private developer.*

In Alexandria (inner-south Sydney), a parcel of land once destined for affordable housing has become the center of a storm over insider dealing and lost public benefit. The 2,733 m² corner site at 74 and 84–88 Botany Road – directly opposite the new Waterloo Metro station – was purchased by **City West Housing (CWH)** in 2015 with the intention of building desperately needed low-cost homes. Initial approvals in 2016 allowed around 63 affordable units on the site, and by 2022 CWH had secured planning changes to boost the yield to 90–110 units. The project, dubbed "Bangalay Apartments," aligned perfectly with City of Sydney's planning controls encouraging affordable housing in the Botany Road precinct. CWH, a reputable community housing provider partly owned by the NSW government (until 2024), seemed poised to deliver a major affordable housing win close to jobs, transport and services.

All that changed when a private development outfit called **Kurraba Group** entered the picture. Founded in 2022 by developer **Nicholas "Nick" Smith** – who infamously rebooted under a new name after his previous company collapsed – Kurraba proposed a dramatically different vision for the CWH site. Instead of affordable homes, Kurraba pitched "Australia's first commercial life-sciences campus" on the land, branded the "ION Life Sciences Precinct." The plan: two large research buildings (5 to 11 storeys) with **26,650 m²** of laboratories, offices, retail, and even a below-ground proton-beam cancer therapy center. In mid-2024, Kurraba lodged plans for this massive development (Council ref: D/2024/937), spanning **74–108 Botany Road and 86–100 Wyndham Street** – effectively the whole block. Notably, **zero residential units** were included; the 100+ affordable apartments were erased entirely, replaced by lucrative commercial space. Kurraba won support from some officials by touting the proton therapy center as the project's crown jewel – a public-good facility to sweeten the deal. *(As an aside, internal documents later suggested this proton center was likely a phantom promise with no operator locked in – a bait-and-switch to justify the rezoning.)*

## John Carfi: An Insider on Both Sides of the Deal

Behind this drastic repurposing of public-intended land lies **John Carfi**, a prominent real estate executive who, remarkably, was an insider on both sides of the transaction. Carfi has 35+ years in Australian property, having led Mirvac's residential division and worked at Lendlease before heading overseas to run a $120 billion development portfolio in Dubai. In 2018 he became CEO of **Aqualand Australia**, a major China-backed Sydney developer known for luxury projects. Then in August 2021, Carfi also joined the board of **City West Housing** – the very nonprofit planning to build affordable housing on the Alexandria site. On paper, having an industry heavyweight on a housing charity's board might seem a plus, bringing expertise to CWH. In reality, it created a glaring **conflict of interest**.

As a CWH director, Carfi owed a fiduciary duty to act in the best interests of the charity and its mission of housing affordability. Yet at the same time, he was leading Aqualand, a for-profit developer constantly hunting for prime sites. These dual roles collided when the fate of the Botany Road site came up. According to allegations now before the Independent Commission Against Corruption (ICAC), Carfi leveraged his influence within CWH to **facilitate an off-market sale of the site to Aqualand at a bargain price**, effectively handing over a public asset to a private firm. Simultaneously, he ensured that his own company, Aqualand, would benefit from the broader scheme – a quid pro quo arrangement that put private profits ahead of the public interest.

How exactly did this work? The Alexandria "ION" project site wasn't limited to the CWH land; it also needed adjacent parcels on Wyndham Street. **Aqualand happened to control 78–82 Wyndham Street**, a ~1,500 m² lot abutting the CWH site that was essential for Kurraba's envisioned campus (providing additional building area or a shared basement). Rather than Aqualand selling this land directly to Kurraba (which might have made the Carfi connection too obvious), a **two-step flip** was orchestrated:

1. **Aqualand quietly sells 78–82 Wyndham to a middleman at a premium.** In late 2023, while CWH was negotiating the Botany Rd sale with Kurraba, Aqualand sold its Wyndham Street parcel – or more likely an option to purchase it – to a boutique developer called **LIVstyle**, run by **Aaron Tippett**, for a hefty sum. Tippett (sometimes recorded as **"Andrew Tippett"** in land records) is a local speculator who had paid $10 million for another Alexandria site in 2015, so he was a willing accomplice. By inserting himself, Tippett could pay Aqualand top dollar, perhaps well above what Kurraba initially offered.
2. **Aaron Tippett pays Kurraba Group to manage and apply for the DA for Wyndham land.** Almost immediately, Tippett hired

Kurraba Group to run a DA for his 78–82 Wyndham project. More importantly, he plans to negotiate an agreement to use the basement of the ION project for parking fr his new development.

Meanwhile, **City West Housing's board (Carfi included)** approved selling its much larger Botany Road site to Kurraba – and by all indications, they sold it for **for a song**. The exact price hasn't been disclosed publicly, but real estate observers note it appears **well below market value**. For context, Kurraba paid **$29.9 million** for a set of adjacent lots at 100–108 Botany Rd and 98–100 Wyndham St, and **$16.1 million** for another piece at 86–96 Wyndham St – prices equating to roughly **$17,000–$18,000 per square meter** of land. By that metric, CWH's 2,733 m² corner could be worth on the order of **$45–50 million**. Yet Kurraba reportedly did **not** pay anywhere near that for the CWH site. If CWH accepted, say, tens of millions less (perhaps to "make the deal work" for Kurraba), that represents a huge loss of public value. **All those millions in land value uplift – created by a public rezoning for affordable housing near a new metro – would have been privatized straight into Kurraba's hands.**

Equally troubling is **how the sale was done**. It appears **there was no competitive sale process whatsoever**. City West Housing did *not* put the Botany Road site on the open market – no public tender, no auction, no call for other community housing providers or developers to bid for this prime land. Instead, it was a **closed-door negotiation** with Kurraba, facilitated by Kurraba's own agents. Industry sources confirm that **TGC Property Group brokers John Romyn and Paul Hunter** (acting for Kurraba) put the off-market deal together over a year's time. In other words, only Kurraba got a shot at this prize. That is highly unusual for the disposal of a valuable asset that was effectively government-owned (CWH had been part-owned by NSW Treasury and Housing). The optics are damning: **an affordable housing charity, steered by an industry insider, sold off land intended for 100 low-cost homes to a private developer on the cheap** at a time when the NSW Government still had a stake in CWH. In return, that insider's company (Aqualand) profited from the adjacent land flip, and his associates (like Tippett) got a piece of the action. It's a textbook case of self-dealing that has understandably sparked outrage.

# Red Flags and Unanswered Questions

The scenario above raises serious **red flags about governance, probity, and even legality**. Watchdogs and community advocates are asking pointed questions, including many that remain unanswered:

- **Conflict of Interest:** Did John Carfi declare his obvious conflict and recuse himself from all CWH decisions on this sale? Even if he formally abstained, his very presence on the board (as a major developer's CEO) could have influenced colleagues. Was CWH's board truly acting in the charity's best interest, or were they swayed by Carfi's dual loyalties and industry clout? The related-party nature of these transactions is glaring, and failing to manage this conflict would be a breach of duty.
- **No Competitive Sale Process:** Why was the Botany Rd site not offered to the market or at least to other non-profit housing developers? City West Housing gave **Kurraba – a two-year-old firm with no track record – an exclusive, off-market deal**. No public tender or EOI was conducted that might have driven up the price or found a partner to build the affordable units as originally intended. This "single buyer" approach is virtually unheard of for a site of this value. Who decided Kurraba alone should get this golden opportunity, and why?
- **Fair Valuation and Advice:** What **valuation advice** did CWH rely on to justify the sale price agreed with Kurraba? Was an independent, arm's-length appraisal done to ensure the public received fair market value? If an external valuer recommended a price, did CWH's board follow it, or did they agree to a discount for Kurraba? Thus far, CWH has disclosed nothing about any valuation. If no proper valuation was obtained or if it was ignored, that is a severe breach of fiduciary duty – it would mean disposing of charitable/ government assets without due diligence. CWH owes the public an explanation of how "market value" was determined.
- **Who Represented CWH's Interests?:** In most large land sales, the seller appoints a professional agent to get the best deal. Did City West Housing engage its own selling agent or negotiator? It appears not – **Kurraba's agents (from TGC) orchestrated the deal** and may have effectively set the terms. If CWH didn't have independent representation, it's like letting the buyer's broker name your price. This imbalance could easily have led to an underpriced sale. CWH's 2024 annual report notes Colliers International was involved at some point , but details are scant. Was Colliers truly running a competitive process, or just quietly executing a pre-arranged sale? The lack of transparency here is troubling.
- **Government Oversight (or Lack Thereof):** At the time the sale deal was struck in late 2023, the NSW Government (through NSW Treasury and the Minister for Housing) held two ordinary shares in City West Housing Pty Ltd – meaning the state was a stakeholder in CWH's decisions. Normally, the transfer of a multi-million-dollar public-tied asset would trigger scrutiny or require approval by a government minister or department. Was the Department of Housing or NSW Treasury informed or consulted about selling the Alexandria site? It appears this flew under the radar. Tellingly, on **20 March 2024** – just a few months after the Kurraba deal was inked – City West Housing underwent a rapid corporate restructure: the NSW Government's shares were transferred to a newly created entity (City West Housing Holdings Ltd, a company limited by guarantee), and the government's historic preference shares were redeemed. This maneuver suddenly made CWH a fully independent not-for-profit with **no direct government ownership**, just as questions began bubbling up. The timing is hard to ignore – it's as if the door was slammed shut **after** the horse had bolted. The restructure was publicly presented as a "governance modernization," but a side effect is that by the time anyone asked questions, CWH was no longer subject to government oversight, Freedom of Information requests, or direct ministerial accountability. Was this coincidence, or a strategic move to insulate the deal from scrutiny?
- **Strange DA Processes and "Broader Site" Consent:** There were irregularities in how development approvals were sought for Kurraba's project that raise eyebrows about collusion. Instead of submitting one coherent application for the entire scheme, **Kurraba split the project into two parts**: a State Significant Development (SSD) application for the main "health campus" on Botany Road, and a separate local development application for a 5-storey commercial building at 78–82 Wyndham St (the parcel flipped via Aqualand). Kurraba even admitted the Wyndham DA was essentially an "amending DA" designed to later merge the consents – a highly unusual, if not unprecedented, approach. Why do this? Possibly to avoid certain planning requirements or affordable housing contributions that a unified project might trigger. Notably, when some of these applications were lodged, **Kurraba did not yet own the CWH land** – meaning CWH had to sign the landowner's consent on Kurraba's applications. And they did. One **owner's consent letter** from CWH bizarrely described the Botany Rd land as "part of a broader site," implying it was already integrated with Kurraba's other parcels. But at that moment Kurraba didn't own CWH's land at all! Why would CWH agree to **hand a developer consent to seek approval on CWH's property before the sale was even completed?** This sequence suggests an extremely cozy arrangement long before the public was aware – as if CWH and Kurraba were effectively acting in concert on development plans. Normally a landowner would not let a private buyer dictate plans for its land without a final sale. CWH's eagerness to facilitate Kurraba's DA (describing it as part of Kurraba's "broader site") underscores how far CWH's leadership had strayed from pursuing its own affordable housing project.
- **Stamp Duty and Public Revenue:** Another concerning question is whether the undervalued sale and creative timing helped **evade state taxes**. In NSW, stamp duty on property transfers is calculated on the **sale price** (or market value, if authorities deem the sale not at

arm's length). If the CWH land was truly worth around $45–50 million but was sold for, say, ~$35 million, that difference of $10+ million would translate to over **$500,000** in forgone stamp duty. Essentially, **the state may have lost out on half a million dollars in revenue** if the price was set artificially low. Moreover, the **timing** of the deal raises flags. Kurraba's development consent was granted (with conditions) by the City of Sydney in mid-February 2025, *before* Kurraba settled on the land. However, the formal DA consent paperwork was not immediately issued by Council. Some speculate this delay was intentional – it may have allowed Kurraba to finalize the land purchase (exercising the option) **before the DA became legally operative**, thus locking in the stamp duty on the pre-DA land value. Once a site has an active development approval for a large commercial project, its market value would jump dramatically (perhaps by tens of millions). If Kurraba managed to pay duty on the "old" value rather than the post-DA value, that could mean **over $1 million in tax saved** at the expense of the public. Additionally, if Kurraba brought in new equity investors or partners (for example, **Buildcorp** was rumored to be involved in financing the project) during that period, any transfer of interest or option could also attract duty. Did Kurraba or its backers structure around these obligations? These are intricate questions that NSW's Office of State Revenue should be examining. The average homebuyer can't avoid stamp duty on an increased property value; was an insider deal effectively used to sidestep the full taxation? **It warrants investigation.**

- **Accountability of Key Players:** Given the above, who is being held responsible? Have any of CWH's board members (aside from Carfi) explained or justified the decision to sell the site in this manner? Was the CWH Chair or CEO aware of Carfi's behind-the-scenes dealings? We know Carfi left Aqualand in April 2024 (shortly after the sale contracts were signed) to become CEO of another company – was this a coincidence, or Carfi getting out of Dodge before the fallout? Thus far, there has been silence from the principals beyond generic statements. (City West's CEO Leonie King defended the sale in a May 2024 press release as "making strong commercial sense" due to capital growth and said the funds would be redeployed for **86 more affordable units** in Green Square. In other words, CWH claims it sold high and bought elsewhere cheap, yielding a net gain in social housing. But without disclosing the Botany Rd sale price or process, many aren't convinced – **especially since an equivalent private buyer in an open market might have paid even more**, generating funds for *200* units elsewhere.)

Each of these issues on its own is alarming; taken together, they paint a picture of a deal that **fails the pub test** on multiple levels. Even members of Parliament have started asking questions. In May 2024, MP **Jenny Leong** raised concerns in NSW Parliament about the rationale behind City West's sudden restructuring – implicitly calling out the Alexandria land deal that preceded it. By mid-2025, community advocates formally **referred the matter to ICAC**, citing the related-party transactions involving Carfi, Aqualand, Kurraba, and Tippett, as well as the serious doubts over the sale's probity. (ICAC, by policy, neither confirms nor denies investigations unless they result in public hearings, so the status is currently unknown. But the fact it's been referred underscores the gravity of the allegations.)

## Winners and Losers: Who Benefited vs. Who Paid the Price

This saga is ultimately about **who wins and who loses** when public assets are quietly flipped for private gain:

- **Kurraba Group (Nick Smith): Winner.** Kurraba acquired a prime development site in a booming precinct **likely below market value**, positioning itself to reap a huge upside. By pitching a sexy "health and innovation hub" and invoking the magic words of life sciences and cancer treatment, Kurraba curried favor with decision-makers and avoided having to include any affordable housing (normally a requirement for rezoning in this area). Essentially, they got **cheap land and a green light to build high-end commercial real estate** where 100% affordable housing was meant to be. If they can develop or even sell the site at full market value, the profit margin will be enormous – unearned uplift that came from public planning changes and CWH's lenient sale. Kurraba also managed to have the affordable housing requirement waived entirely by shifting to a State Significant Development path. It's a windfall that a more experienced developer would envy – not bad for a two-year-old firm with scant track record.
- **John Carfi (and Aqualand): Winner.** Carfi's employer Aqualand pocketed profits by selling the Wyndham Street parcel at a premium via LIVstyle. By inserting Aaron Tippett as a straw buyer, Aqualand likely achieved a higher price (and cleaner optics) than a direct sale to Kurraba would have. If Carfi's compensation at Aqualand included performance bonuses or equity, he may have **personally profited** from this deal. Even if not, Aqualand's balance sheet got a nice boost from unloading that site. Notably, Carfi resigned from Aqualand in early 2024 just as the Kurraba development plans were coming to fruition. This timing could be coincidental – or perhaps he saw the writing on the wall and left before any potential scandal broke. (He promptly landed a new CEO gig at Ingenia Communities, a retirement living developer, in April 2024.) Carfi has kept a low public profile regarding the deal, but if everything was above board, one has to wonder why he departed Aqualand at that time.
- **Aaron Tippett (LIVstyle): Winner.** Tippett, the middleman, made out handsomely for minimal effort. He effectively **flipped a contract** and likely netted a quick margin on the Wyndham Street land sale to Kurraba. Additionally, by acting as a lender or equity partner to Kurraba (per PPSR records), he stands to earn interest or a share in the project's profits. All without having to carry the risk of a long-term development. It's the kind of lucrative arbitrage that insider access affords.
- **City West Housing (as an organization): Unclear/Mixed.** In the short term, CWH got a lump sum of cash from the sale, which it claims will help fund roughly 600 new affordable units in the Green Square area (including a project delivering 150 units called Banksia Apartments). CWH argues that selling the Alexandria site, which was approved for 64 units, and purchasing a site that can yield 150 units is a better outcome for their mission. If one trusts CWH's figures, they "captured significant value" from the rising land price near Waterloo metro and reallocated it efficiently. **However**, this narrative omits that had CWH partnered with a different developer or simply waited, they might have captured *even more* value for their mission. By possibly underselling by millions, CWH may have left a lot of money (and affordable homes) on the table. Moreover, the way the deal was handled has severely damaged CWH's reputation. A community housing provider is expected to be a trusted steward of public investment – this secretive deal with a private developer has eroded trust among government partners and the community.
- **Low-Income Sydney Residents & Community: Losers.** Without question, the biggest loser here is the community that needed affordable housing. Over **100 families who could have lived in new affordable units on that Alexandria site will now see nothing**. At a time of housing affordability crisis, a site that was **publicly funded and designated for affordable rental housing was flipped to a private project** that offers zero housing for moderate-income workers. The opportunity cost is immense – this land will now likely host biotech offices and labs serving well-funded companies, not homes for nurses, teachers, or service workers. The "affordable housing component" vanished from the area, and with it went the chance for a more socio-economically diverse community in the heart of an innovation precinct. It's a double blow: public land was privatized, and the public benefits that were supposed to come with redevelopment (either affordable housing or the much-vaunted cancer treatment center) are in doubt. Local residents have also been left in the dark and disappointed – many supported the original CWH development proposal and are now watching a commercial development rise instead, with all the construction impacts but none of the community upside.
- **NSW Taxpayers: Losers.** If the sale was indeed under-market, state taxpayers effectively subsidized Kurraba's project without any public agreement. As discussed, the NSW government potentially lost out on **hundreds of thousands in stamp duty** if the sale price

was artificially low. And if Kurraba's maneuvering shaved even more off tax obligations through timing or structuring, that's public revenue that could have funded schools, hospitals, or yes, more housing. The public also indirectly invested in the Alexandria site through grants and contributions CWH received for it – all that is now diverted to Kurraba's profit-making venture. **No one asked the public** if they were okay with this trade-off.

In short, a handful of insiders stand to split tens of millions in gains, while the public – low-income households and taxpayers – bear the costs. It's a classic case of **privatizing a public asset's value**: the profit is pocketed by a few, and the loss (in social outcomes and trust) is shared by all.

## Aftermath: Where Things Stand in Late 2025

What has happened since these deals were struck? As of October 2025, **Kurraba Group's grand life-sciences campus has yet to materialize** – and there are signs it may be stumbling. Although Kurraba secured an initial development consent from the City of Sydney in February 2025 (the Council gave conditional approval, subject to negotiating a community benefits agreement), **no construction work has commenced** on site. The Alexandria lot remains vacant and idle – not even the old warehouses have been demolished. Local observers see this as a red flag: if this project were truly on track, one would expect swift moves post-approval, given the fanfare with which it was announced.

Indeed, **reports have emerged that Kurraba is in financial difficulty**. The company has been *aggressively courting investors* to either invest in or outright take over the 100 Botany Road project. Despite publicly claiming everything is moving forward, behind the scenes Kurraba's CEO Nick Smith has been **scrambling to raise ~$50 million** – even resorting to social media posts – to fund the promised proton therapy clinic component. There are indications Kurraba would even consider **selling the site or project in pieces**. In October 2025, Kurraba applied for a contentious modification to split the development into **five stages**. Many interpret this as a tactic: build the most profitable part (say, a standard office/lab building) first, and delay or possibly never build the costly, less-profitable parts (like the proton health facility or other public amenities). In other words, **the community was sold a grand vision – "give us this public land cheaply and we'll deliver a high-tech medical hub" – but after securing the land, the developer is maneuvering to cherry-pick profits and defer the public good indefinitely.** If Kurraba fails to get funding, the worst-case scenario is realistic: the site could end up half-developed or be flipped yet again to another private player, with **the affordable housing long gone and even the substitute "public benefit" (the cancer center) never materializing**. This is the nightmare outcome of speculative development – the public loses on all fronts.

City West Housing, for its part, has moved on to its Green Square projects and trumpeted the Alexandria sale as a smart move in its 2024 annual report. But it cannot escape the shadow of this controversy. The affair has become a rallying point for housing advocates and even moderate voices who worry that **trust in community housing providers is being undermined**. The fact that CWH's own chair and CEO appeared smiling alongside political leaders at unrelated affordable housing project openings (for example, the Boronia Apartments opening in Waterloo, attended by Sydney Lord Mayor Clover Moore and federal MP Tanya Plibersek) has drawn bitter remarks from some locals. *Three of the four people in one photo-op were involved in or praised the "ION" development that cost the community public housing.* (Plibersek even wrote a letter of recommendation for Nick Smith of Kurraba, and one of the City of Sydney's design advisory panel members who reviewed Kurraba's project later spoke at a paid event touting its **"design excellence"** – moves that activists found tone-deaf and prematurely celebratory given the cloud over the project.) All of this has contributed to a sense that a tight-knit clique of industry players and public officials are slapping each other's backs while the community's interests get sold out.

## Conclusion: A Call for Accountability and Reform

This saga underscores why **robust accountability and transparency** are paramount whenever public or community assets are at stake. What happened with City West Housing, John Carfi, Aqualand, Kurraba, and Aaron Tippett is a cautionary tale. It shows how, without proper checks and balances, insiders can game the system to enrich themselves at public expense. Sydney's housing crisis will only deepen if precious affordable housing opportunities are traded away in backrooms and converted into private developments.

Fortunately, pressure is mounting to investigate and correct this situation. The referral to **ICAC** is a positive step – if the Commission finds evidence of corrupt conduct (e.g. misuse of position, undeclared conflicts of interest, or improper benefits), then those involved must face consequences. At the very least, **sunlight is needed**: City West Housing owes the public a full explanation. They should release the details of the Kurraba deal – the sale price, the valuations obtained, the board minutes and internal advice – to prove that they met their obligations to act responsibly. Thus far, CWH has cited commercial confidentiality, but that is untenable given the public interest at stake. Likewise, the NSW Government – even though it removed itself as a shareholder just after the deal – should exercise moral responsibility and assist any inquiry. After all, the government was the ultimate steward of City West Housing when this deal went through, and taxpayers have skin in the game.

Beyond investigating this one case, **policy reforms are needed** to prevent repeats. Some ideas being floated by experts and advocates include :

- Requiring that when a community housing provider wants to dispose of land (especially land acquired with public funds or grants), it must notify a regulator or minister, and possibly seek approval. This would ensure a second set of eyes evaluates whether the disposal is in the public interest, not just the CHP's interest.
- Clearer conflict-of-interest rules for board members of non-profit housing entities. Perhaps someone in Carfi's position (a developer with a stake in a neighboring site) should have been **barred** from any involvement in decisions on that project – if not barred from the board entirely. Strengthening governance guidelines could help avoid insider influence overtaking charitable missions.
- Re-examining planning processes: The City of Sydney and state authorities should reflect on how a developer was able to use the "carrot" of a health facility to bypass normal planning rules and avoid providing affordable housing. In hindsight, stronger conditions could have been imposed – for example, **mandating a certain number of affordable housing units on-site or requiring that the public benefit (the health facility) be delivered in the first stage** of the project, rather than letting the developer build all the profitable bits first. If the system allows a savvy developer to promise the moon, get a rezoning, and then never deliver the community benefit, that system needs tightening.

For now, residents of Alexandria and supporters of affordable housing are justifiably angry. A deal that **should never have happened** has left a glaring void – both in the city skyline (where an affordable housing complex should be rising) and in the public's trust that our systems will serve the public fairly. Sydney cannot afford to lose more affordable housing stock through what one MP called "skulduggery." As this story continues to unfold, all eyes will be on whether authorities step up to hold the perpetrators of this apparent shell game accountable, and whether anything can be salvaged – perhaps by compelling any future owner of the site to include genuine public benefits or affordable space

in the development.

In the end, this saga is more than a local dispute; it's a **litmus test for Sydney's commitment to integrity in urban development**. Will we allow property "cowboys" to ride off with public land for a quick buck, or will we demand better? The answer will set a precedent for years to come. One thing is clear: the public is watching, and they deserve nothing less than full accountability and a development process that prioritizes the public good over insider profit.

**Sources:**

- City West Housing media release (May 2024) – announcing sale of 74–88 Botany Rd and rationale.
- City West Housing Annual Reports (2023, 2024) – details on the Alexandria site, planning approvals, and March 2024 governance changes.
- *Kurraba Group Exposed* investigative articles – detailed chronology of the Botany Road project's land dealings, conflicts, and community impact.
- City of Sydney Council documents & Planning Alerts – development application filings for 84–88 Botany Rd (ION life-sciences precinct) and 78–82 Wyndham St, including owner's consent letters.
- Real estate news reports – e.g. *RealEstateSource* on Kurraba's Alexandria site amalgamation and purchase prices ; *Green Street News* on the \$490 million life-science project proposal.
- ASIC and PPSR records – showing corporate info on Kurraba (Nick Smith) and security interests indicating Aaron Tippett's financing role.
- NSW Parliament Hansard (May 2024) – questions by Jenny Leong regarding City West Housing's restructuring and implied land deal concerns.
- Community submissions to ICAC (2025) – alleging improper conduct in the City West/Kurraba/Aqualand transactions.

## FAQs

### What steps are being called for to ensure accountability and prevent similar deals in the future?

Calls include implementing stricter approval and notification processes for land disposals by community housing providers, strengthening conflict-of-interest rules, requiring transparent valuation and fair market assessments, and enhancing planning and oversight procedures to avoid bypassing public interests.

### What questions remain unanswered about the transaction and its legality?

Questions include whether proper valuations were conducted, if conflicts of interest were declared and managed, why the sale was not open to competition, and whether government oversight was properly exercised during the sale process.

### Why is the sale of the Alexandria land considered problematic in terms of public benefit?

The land, which was meant for affordable housing, was secretly sold at a likely undervalued price to a private developer, resulting in a significant loss of public asset value and the elimination of the affordable housing originally planned for the site.

### How did John Carfi's roles create a conflict of interest in the land deal?

John Carfi was both a director of City West Housing, which was selling the land, and a CEO of Aqualand, a private developer that profited from the sale, leading to a serious conflict of interest and potential misuse of influence for private gain.

### What are the main concerns regarding the sale process of the Alexandria land originally intended for affordable housing?

The sale process was conducted off-market without open tender or competitive bidding, likely undervalued the land, and was facilitated through secret deals with private developers, raising transparency and public accountability issues.



## Kurraba Group

See Full Bio ›

# Kurraba Group and Nick Smith's Legal Campaign to Silence a Community Critic

October 10, 2025
Kurraba Group

## Key Points

- **Defamation Lawsuit Backfires and Highlights Overreach:** Kurraba's wrongful legal actions, including suing the wrong individual and attempting to silence U.S.-based criticism, reveal reckless tactics that may do more harm than good.
- **Use of AVO as a Potential SLAPP Weapon:** Smith's attempt to secure an Apprehended Violence Order against activist Michael Williams appears to be a strategic lawsuit to intimidate and suppress public criticism.
- **Kurraba's Aggressive Legal Tactics Against Critics:** Rather than addressing community concerns, Kurraba and Nick Smith have used legal threats, including a controversial AVO and a defamation lawsuit, to silence critics.
- **Community Opposition and Legal Concerns over Kurraba's Development:** Kurraba Group's proposed life-sciences campus has faced community resistance and legal doubts due to misconduct allegations, misleading claims, and bypassing planning processes.
- **Legal and Ethical Risks of Suppression Strategies et:** Kurraba's heavy-handed legal approach risks sanctions, reputational damage, and raising broader concerns about misuse of legal processes to curb public participation.

## Background: Developer Controversy and a Vocal Community Critic

Kurraba Group is a Sydney-based real estate development firm led by CEO Nicholas "Nick" Smith. The company's flagship project – a proposed life-sciences campus at 100 Botany Road in the Waterloo/Alexandria area – has been mired in **community opposition and legal doubt**. Critics, including local activist Michael Williams, have raised serious concerns about the project's legitimacy, accusing Kurraba of **misconduct, misleading claims, and bypassing proper planning processes**. For example, the developer allegedly linked two adjacent properties into one scheme while seeking approval as if they were separate projects – a tactic that obscured the true impact of the development. A legal opinion from Gilbert + Tobin warned that approving the project without assessing its combined impacts would be *"legally unsound"* and likely void if challenged in court. Additionally, **promised affordable housing commitments were quietly removed** from the plan, angering residents who saw it as an erosion of the project's public benefit. The controversy even prompted a referral to the NSW Independent Commission Against Corruption (ICAC) in May 2025 regarding a suspicious land sale tied to the development .

Amid this fraught context, **Michael Williams emerged as a prominent community advocate** opposing Kurraba's development. He spoke out at planning meetings, lodged formal objections, and supported a watchdog website "Kurraba Group Exposed" that publishes investigative pieces on the project. Williams and other residents signaled plans to mount legal challenges against the development's approvals, alleging failures to comply with planning law that could invalidate Kurraba's consent. In short, the community critique of Kurraba Group is grounded in public-interest issues – **transparency, legality, and the social impact of a major development**.

Rather than address these substantive concerns, **Kurraba Group and Nick Smith have responded with aggressive legal tactics aimed at silencing their critics**. Notably, Smith's prior venture (Kippax Property) collapsed in 2023 and wiped out investor wealth, only to be reborn under the Kurraba name. *Against that backdrop, the company's response to criticism has taken a troubling turn: instead of fixing underlying issues, Kurraba is pouring energy (and money) into legal threats to muzzle dissent.* What follows is a legal commentary on two recent actions – a restraining order and a defamation case – that **paint Kurraba Group and Nick Smith in a deeply negative light** for their apparent attempts to gag a community whistleblower.

## The AVO Gag: Apprehended Violence Order as a SLAPP Tactic

In mid-2025, Nick Smith escalated the feud by seeking an **Apprehended Personal Violence Order (APVO)** against activist Michael Williams. An Apprehended Violence Order (AVO) in New South Wales is a court-issued restraining order meant to protect someone who genuinely fears violence, stalking, or intimidation. What makes Smith's application extraordinary is the context: **Williams is not a former domestic partner or a threatening stalker – he is a community critic of Smith's business project**. By invoking a legal mechanism designed for protection from violence, Smith appears to conflate **outspoken public criticism with a personal threat**. There is **no public evidence** that Williams ever harassed, stalked, or endangered Smith; on the contrary, Williams's known activities are *"public advocacy and legal protest, not threats or violence"*. His opposition has been channeled through petitions, council meetings, and online forums – forums that focus on the project's legality and impact, not on any personal vendetta.

Smith's AVO application was filed via a local police detective (Det. Heather Noble), meaning the **NSW Police actually backed the request in court** on Smith's behalf. The case – **DET HEATHER NOBLE for Nicholas Mark SMITH v Michael WILLIAMS (Case No. 2025/00366156)** – was listed for its first mention on 1 October 2025 in Sydney's Downing Centre Local Court. At that hearing, Williams would have the chance to consent to or contest the order. By seeking an AVO, Smith is effectively claiming he holds a *genuine fear* that Williams will commit violence or unlawful intimidation against him. If the court were to grant such an order, it could impose strict conditions on Williams – e.g. barring him from contacting Smith or even from making certain public statements about Smith if deemed "harassing" – and any breach would be a criminal offense. In other words, an AVO in this scenario could function as a gag order with teeth.

**Free speech and legal observers have sharply criticized this move.** It is highly *unusual* – virtually *unprecedented* – to see an AVO used in a business dispute over a development project. AVOs are typically for domestic violence, stalking, or clear threats of harm; courts are wary of issuing them in unrelated disputes, and they caution that AVOs "are not supposed to be used vexatiously or as a weapon in unrelated disputes". To succeed, Smith will need to clear a **legal threshold** that may be very difficult to meet: he must prove, on the balance of probabilities, both that he honestly fears Williams and that *reasonable grounds* exist for that fear – i.e. that a reasonable person in his position would also fear violence or intimidation from Williams. Trivial irritations or public criticism, even if caustic, do not suffice; the conduct prompting the fear must be serious enough to warrant an order. As one legal guide notes, the court requires both a subjective fear and objective reasonableness, and will only issue an AVO if it finds the situation justifies it. Given what's known publicly, **Smith may struggle to show that a vocal**

planning opponent meets this standard**: unless he has evidence of actual threats or menacing behavior (none of which has been made public), a magistrate would likely find that Williams's critical commentary – even if sharp-tongued – *"would generally not qualify as intimidation in the legal sense needed for an AVO."*

Community members and commentators have openly labeled Smith's AVO bid as a SLAPP tactic – a **Strategic Lawsuit Against Public Participation** in the guise of a restraining order. SLAPPs are abusive lawsuits (often defamation claims) used by powerful entities to **censor or intimidate critics** by burdening them with legal defense costs and stress, rather than to resolve a legitimate legal wrong. Here, although an AVO is not a damages lawsuit, its effect can be similar: dragging Williams through court proceedings and saddling him with the specter of a restraining order, thereby discouraging his advocacy. Observers note several hallmarks of a SLAPP in this case. **First, the response is grossly disproportionate** – Williams's activities (attending meetings, posting on social media, petitioning officials) are core civic engagement, yet Smith answered with a legal weapon *"generally reserved for threats of physical harm,"* a move seen as **overreaching and punitive**. The message it sends is chilling: *criticize Kurraba and you could find yourself hauled into court on a quasi-criminal matter.* This inevitably raises the stakes for any would-be critic and risks deterring others from speaking out.

**Second, the timing looks retaliatory.** Smith pursued the AVO only after Williams and others helped spotlight serious legal problems with Kurraba's project (like potentially void planning approvals and an ICAC referral). Supporters of Williams call the AVO a *"brazen attempt to flip the narrative: painting the whistleblower as a 'violent threat' to shift attention away from the developer's own legal troubles."* In this view, Smith is using the courts to *punish* the person who revealed inconvenient facts, rather than to protect against any genuine danger. Such use of legal process purely to retaliate or silence is the definition of an abuse of process.

Finally, there is an **imbalance of power** inherent in this showdown that echoes the classic David vs. Goliath SLAPP dynamic. Nick Smith is a developer with substantial resources and access to top-tier legal counsel; he even managed to enlist the police to advance his case. Michael Williams, by contrast, is a private citizen and community volunteer who must either fight the order (incurring significant stress and legal expenses) or submit to it (potentially gagging himself). Even if Williams ultimately prevails and the AVO is dismissed, **the process itself is punitive** – forcing him to divert time and money to defend his rights. This kind of process-as-punishment can succeed in intimidating the target and *"warning others"* not to follow in his footsteps. Notably, unlike many U.S. jurisdictions, Australia (and NSW in particular) lacks a dedicated anti-SLAPP statute to provide an early remedy in such situations. The Local Court, however, does retain discretion to toss out an AVO application if it's frivolous or an abuse of process, and could even order costs against the applicant. If Williams contests the AVO, his defense will likely argue exactly that – that Smith's move is *vexatious* and **designed to shut down legitimate criticism rather than to prevent any real violence.**

As of this writing, the AVO matter is pending. The October 1 mention was set to test whether Smith could articulate any credible factual basis for his purported fear. Legal analysts noted that if Smith's allegations are flimsy or speculative, a magistrate may well be unsatisfied and refuse interim orders. However, had an interim AVO been granted, it could have immediately achieved Smith's likely goal – **muzzling Williams** (for instance, by barring him from approaching Smith or even from referencing Smith in a harassing manner), thereby complicating Williams's ability to continue his activism. The stakes extend beyond this duo: the outcome will signal whether **courts will tolerate the use of personal safety orders to squelch public debate**. A success for Smith on thin evidence would set a troubling precedent, potentially emboldening other powerful figures to deploy AVOs against pesky critics. Conversely, if the court dismisses the application as unwarranted, it would serve as a rebuke of Kurraba's tactics – reaffirming that the justice system should not be misused to stifle civic participation. In the words of one commentator, this case has become a *"litmus test for the boundary between personal protection orders and public interest advocacy"*. Is Nick Smith a legitimately frightened individual entitled to protection, or **a developer cynically abusing legal processes to muzzle a critic**? The answer will undoubtedly influence how boldly citizens feel they can challenge development misconduct in the future.

## Defamation Lawsuit Misfires: SLAPP by Libel and the Streisand Effect

Parallel to the AVO, Kurraba Group and Nick Smith also launched a **defamation offensive** in an attempt to quash the same critic. In late 2025, the company's attorneys at Corrs Chambers Westgarth (a prominent Australian firm) sent a series of legal letters to "Kurraba Group Exposed," the U.S.-based watchdog website reporting on Kurraba's activities. These letters – formal *"concerns notices"* under Australian defamation law – accused the blog of *"seriously defaming"* Nick Smith and the company, blaming its posts for causing *"serious harm,"* including allegedly scaring off a $3 million investor. The demands were **astonishingly draconian**: Kurraba's lawyers insisted that the site delete its entire website and Twitter (X) account **within 24 hours**, under threat of immediate legal action. This was essentially an attempted **injunction-by-letter**, seeking to gag the criticism outright without even filing a case. The ultimatum, as one commentary put it, *"verged on the absurd"* – a naked attempt to **wipe out an online forum of dissent**.

Perhaps even more **embarrassing for Kurraba**, these aggressive letters were directed at the **wrong person**. Corrs Chambers Westgarth addressed the takedown demands to Mr Michael Williams in Sydney, who, while a vocal opponent of the project, **is not actually the operator of the website**. The real operators are community activists based in California, and they quickly informed Corrs of its mistake: *"This is not Michael Williams, nor do I have any involvement with him beyond receiving emails about your development,"* the site owner replied, even offering proof of his U.S. identity. In other words, **Kurraba's high-priced lawyers failed a basic diligence step** – they *"misidentified a local community advocate as the website's owner"*. Despite being told of the error, **Kurraba pressed forward and actually filed a defamation suit naming Williams as the defendant**. On 2 October 2025, *Kurraba Group Pty Ltd v. Michael Williams* was listed in the NSW District Court (before Judge J. Gibson) for an initial directions hearing on the defamation claims. This blunder of suing the wrong man – compared by the blog to *"suing the wrong John Doe"* – not only undermines the credibility of Kurraba's case, it **highlights the hasty, reckless nature of their legal strategy**. As the site noted, such missteps do *"little to inspire trust"* in Kurraba's tactics. For a company that touts itself as a major player in its industry, launching a costly legal attack **without even confirming their target"** is, at best, deeply inept.

Substantively, the defamation suit looks like a quintessential **SLAPP lawsuit**. Kurraba and Smith chose the venue of New South Wales – a jurisdiction known for plaintiff-friendly defamation laws – to try to muzzle a website that is hosted in the United States. Their legal letters leaned on Australian libel standards, which lack robust free speech protections (e.g. no broad "actual malice" requirement for public figures as in U.S. law). But using an Australian court to silence U.S. speakers is a legally futile endeavor. As the **Kurraba Group Exposed** site pointed out, *"those laws hold no sway in California where the site is hosted."* Indeed, **California has one of the strongest anti-SLAPP statutes in the U.S.** – any lawsuit aimed at speech on a public issue can be struck down at an early stage, with the plaintiff compelled to pay the defendant's legal fees. Discussion of a major property development and its proponents is unquestionably a matter of public concern, meaning it would be highly protected speech under U.S. law. Kurraba appears to have **avoided suing in the U.S. precisely because their case would be "dead on arrival"** under such anti-SLAPP protections. Yet even winning a judgment in Australia would avail them nothing. The U.S. SPEECH Act (Securing the Protection of our Enduring and Established Constitutional Heritage Act) flatly blocks domestic enforcement of

foreign defamation judgments that do not comport with American free speech standards. **In plain terms:** Kurraba could spend a fortune litigating in Sydney, perhaps even obtain a favorable verdict and injunction, and it would be **worthless in the U.S.** – they *"can't gag a U.S. website via 'libel tourism.'"* Any Australian order or monetary award would not be recognized by U.S. courts.

This cross-border futility underscores how misdirected the whole effort is. Kurraba's campaign has all the appearances of a **temper tantrum financed by its investors** rather than a rational legal strategy. Even if the goal was never truly to win in court but simply to intimidate, it has arguably backfired. The brazen nature of the takedown demand and the obvious overreach have drawn **greater attention to the very criticisms Kurraba wanted to suppress** – a classic *Streisand effect* scenario. Media and community circles are now even more aware of the allegations of misconduct, thanks to Kurraba's heavy-handed response. **Reputational damage** is a real risk: as one analysis noted, these legal threats *"may backfire, amplifying controversy ... and damaging [Kurraba's] reputation among investors and partners."* Kurraba also sends a troubling signal to current and potential investors: instead of focusing on executing its project and addressing valid concerns, the company is **diverting resources into expensive litigation**. Defamation cases are notoriously costly and time-consuming; here those costs ultimately come out of the company's coffers (and by extension, its investors' pockets). Watching a developer spend potentially hundreds of thousands in a quixotic legal fight – especially after misidentifying the defendant – cannot inspire confidence in management's judgment. As the *Defamation Gambit* commentary observed, Kurraba's leadership seems "more interested in making a splash than aiming accurately," and this **misguided legal crusade** is *"chewing through investor funds on a one-way trip to nowhere."*

## Legal and Ethical Blowback: Kurraba's Tactics Under Fire

By taking these extreme measures to silence a critic, **Kurraba Group and Nick Smith have opened themselves up to serious legal and ethical repercussions.** If Smith's AVO application is found to be baseless or **an abuse of process**, the Local Court can not only dismiss it but could also award costs against him. Australian courts frown upon litigants misusing legal proceedings for ulterior motives, and a frivolous AVO could prompt the magistrate to explicitly label it vexatious. Williams's camp could even argue that Smith's conduct amounts to **victimization via legal process**, potentially laying groundwork for a *malicious prosecution* claim once the dust settles. (Notably, in some jurisdictions a wrongfully targeted defendant can countersue for malicious prosecution of a SLAPP – a so-called "SLAPP-back" – though NSW law does not provide a quick anti-SLAPP remedy, the principle of deterring abusive litigation still looms.) Moreover, if any evidence or sworn statements supporting the AVO were knowingly false, that would raise the specter of **perjury** or filing a false report, which are criminal matters in their own right. Essentially, **turning a policy dispute into a personal safety complaint is a dangerous gambit** – should it fail, the attempt to mislead the court could boomerang on Smith.

Kurraba's defamation maneuvers likewise carry the risk of legal blowback. Suing an innocent person (like Michael Williams, who didn't even run the website in question) can trigger claims of **wrongful legal action**. At the very least, it undercuts Kurraba's position in court if and when the error is exposed; a judge could view the mistake as evidence of a lack of good faith. If it becomes clear that Kurraba pressed on against Williams even after being told he wasn't responsible for the publications, the company could face an **"abuse of process"** argument in the defamation case as well – that the lawsuit was not truly about vindicating reputation but about silencing a critic through brute force of litigation. In a worst-case scenario for Kurraba, Williams might seek damages for **defamation** himself – for instance, if the company's public allegations (in legal filings or correspondence that became public) falsely portray him as a defamer who caused financial loss, that claim could be defamatory of Williams's own reputation. Likewise, portraying him as a menacing figure via the AVO could be seen as **character assassination** if untrue. While Williams's priority is likely defending against these actions rather than initiating new ones, Kurraba has undoubtedly increased its own litigation exposure by taking a hardline approach.

From an ethical standpoint, the **court of public opinion** is already handing down a harsh verdict. These tactics have been condemned as bullying and antithetical to the principles of open debate on matters of public interest. Free speech advocates note that community members must be able to challenge powerful developers **"without fear of personal legal reprisals,"** and Kurraba's actions are being held up as a prime example of how not to handle criticism. The **optics for Kurraba and Nick Smith are decidedly negative**: a wealthy developer appears to be leveraging police and courts to attack a citizen-critic, rather than engaging transparently with the community's concerns. This has further eroded trust in Kurraba's leadership at a time when their project's viability already faces scrutiny due to planning irregularities and past business failures.

## Conclusion: A Cautionary Tale of Legal Overreach

Kurraba Group and Nick Smith's attempt to **silence a community critic through court orders** is a cautionary tale of legal overreach. By choosing intimidation over dialogue, they have drawn more eyes to their controversies and cast themselves as antagonists to public participation. The **Apprehended Violence Order gambit** looks like an abuse of a vital safety law – warping it into a tool to smother legitimate dissent. The concurrent **defamation lawsuit** – launched with bluster and missteps – exemplifies a SLAPP in practice, seemingly more focused on muzzling a watchdog than on correcting any falsehoods. Thus far, these maneuvers have only amplified concerns about Kurraba's transparency and integrity. Legally, they may well backfire: courts can penalize **frivolous or bad-faith litigation**, and cross-border reality means Kurraba cannot easily quash speech originating abroad.

The episode underscores the importance of robust protections for critics engaging in public debate. It also highlights the reputational self-harm a company can inflict by pursuing aggressive gag orders. Kurraba and Nick Smith sought to enforce silence, but instead they earned rebuke and skepticism. In the end, attempting to **gag a whistleblower** has only validated the whistleblower's warnings – and cemented a negative public image of Kurraba Group as a developer willing to misuse the legal system to avoid accountability. Such heavy-handed tactics should serve as a warning to other powerful figures: in the age of anti-SLAPP laws and vigilant communities, **transparency and engagement are wiser courses than trying to litigate critics into silence.**

**Sources:** Recent court filings and analyses from *Kurraba Group Exposed* (a community watchdog site) were used to document the events and legal context, including detailed coverage of Nicholas Smith's AVO application and the defamation lawsuit against Michael Williams. These sources highlight the SLAPP-like nature of Kurraba's actions and the potential legal consequences of such strategies.

## FAQs

**What are the main legal tactics used by Kurraba Group and Nick Smith to silence critics?**

Kurraba Group and Nick Smith have employed aggressive legal tactics such as seeking a Restrained Violence Order against critic Michael Williams and filing a defamation lawsuit, both of which appear aimed at silencing or intimidating critics rather than resolving genuine legal disputes.

### How does the use of an Apprehended Violence Order (AVO) function as a SLAPP tactic in this context?

The use of an AVO in this context functions as a SLAPP tactic because it attempts to conflate public criticism with personal threats, potentially silencing critics by imposing legal restrictions that discourage free speech and civic engagement, especially when the evidence of genuine threat is lacking.

### Why is the defamation lawsuit against Michael Williams considered a misfire and a potential SLAPP?

The defamation lawsuit is considered a misfire because Kurraba's legal team mistakenly identified Michael Williams as the operator of the critic website, and the case appears to be more about intimidating dissent rather than addressing actual defamation, typifying a SLAPP aimed at chilling free speech.

### What are the legal and ethical risks associated with Kurraba's heavy-handed tactics?

Kurraba's tactics risk legal sanctions, costs, and reputational damage if courts find the actions to be an abuse of process or frivolous, and ethically, they open the company to criticism of bullying and undermining democratic debate on public issues.

### What implications could the outcomes of these legal actions have on public debate and community activism?

The outcomes could set a precedent for the limits of using court orders and defamation law to shut down criticism, potentially discouraging civic engagement, while courts' rejection of such tactics would reinforce protections for free speech and community activism.



## Kurraba Group

See Full Bio ›

# Kurraba's Sydney Affordable Housing Scandal: How Insider Deals Flipped Public Land for Private Gain

October 10, 2025
[Kurraba Group](#)



*#image_title*

## Key Points

- **Uncertain Future of the Development and Public Trust:** The promised life-sciences campus has not materialized, and developer Kurraba faces financial difficulties, highlighting risks of speculative development and further public loss.
- **Governance Failures and Regulatory Oversight:** Questions have emerged about conflict of interest, absence of competition, and weak government oversight, with calls for inquiries such as ICAC investigations.
- **Lack of Transparency and Due Diligence:** The sale process lacked a public tender, clear valuation, and transparency, raising questions about whether the land was undervalued and sold inappropriately.
- **Loss of Affordable Housing Opportunities:** The land originally designated for up to 110 affordable rental apartments was sold off-market to private developers, removing a crucial housing resource amidst the crisis.
- **Conflict of Interest in Land Deal:** John Carfi, a key figure in the scandal, allegedly used his positions at City West Housing and

Aqualand to engineer land deals that favored private profit over public benefit.

# A Perfect Storm of Conflict and Greed

In a stunning breach of public trust, a prime development site in inner-city Alexandria – originally earmarked for desperately needed affordable housing – was quietly diverted into private hands through insider deals. At the center of this web is **John Carfi**, a seasoned developer who sat on the board of not-for-profit City West Housing (CWH) even as he served as CEO of luxury developer Aqualand. Under Carfi's watch, CWH sold its **Botany Road** affordable housing project to upstart developer **Kurraba Group** at a **below-market price**. Meanwhile, Aqualand – Carfi's company – profited by selling an adjacent parcel on **Wyndham Street** at an inflated premium via a friendly intermediary. What should have become over 100 new affordable apartments instead is poised to become a private "life sciences" commercial campus – or worse, an empty lot. The entire saga, now **referred to ICAC for investigation**, reeks of conflict of interest, backroom dealing, and the erosion of public benefit.

**Key players in the scandal:**

- **City West Housing (CWH):** A government-backed community housing provider that owned the Alexandria site, with a mission to develop affordable homes.
- **John Carfi:** CWH board member (since 2021) and, at the time, CEO of Aqualand. Allegedly leveraged his dual roles to engineer the land deals.
- **Aqualand:** A major Sydney property developer (China-backed) formerly led by Carfi. Held an option/interest in a neighboring Wyndham Street property needed for the project.
- **Kurraba Group:** A fledgling developer founded 2022 that acquired the Botany/Wyndham sites to build a $490 million "ION" life-sciences campus – a plan now mired in controversy.
- **Aaron (Andrew) Tippet/Tippett:** Director of boutique developer **LIVstyle**, who acted as middleman. He bought Aqualand's Wyndham parcel then flipped it to Kurraba, and is even listed as a financial backer of Kurraba's project (PPSR records show his interest).



*CityWestHousing Logo*



*Aqualand Logo*



*Kurraba Logo*

## From Affordable Homes to Life-Science Labs: The Alexandria Site

The controversial Alexandria site (outlined in orange) included land on Botany Road and Wyndham Street that was originally secured for affordable housing. City West Housing had **purchased this 2,733 m² corner site** at 74 and 84–88 Botany Road with the intent to deliver up to **110 affordable rental apartments** – a project dubbed "Bangalay Apartments". Initial approvals dating back to 2016 allowed ~63 units, and by 2022 CWH was seeking to increase the yield to around 90–110 units to help address Sydney's housing crisis. The land's strategic location near the Green Square/Waterloo growth area made it a crown jewel for community housing – close to jobs, transport and services.

City West Housing is a reputable Tier-1 community housing provider, part-owned (until 2024) by the NSW Government. Its mandate is to develop and manage affordable homes for low- to moderate-income earners. Turning the Botany Road site into a large affordable housing complex aligned perfectly with City of Sydney's planning controls for the **Botany Road Precinct**, which **encourage affordable housing** in new developments. By late 2022, CWH's plans were well advanced: the City of Sydney had even approved new planning controls boosting allowable density, and CWH had secured funding via City of Sydney contributions and government grants to make the project viable. In fact, a **100% affordable housing development application** for the site was lodged in 2024, proposing a mix of 1, 2, and 3-bedroom units for low-income renters.

All of that changed when **Kurraba Group** entered the picture. Founded by developer **Nick Smith** (who infamously rebooted under a new name after his previous company collapsed), Kurraba emerged in 2022 promising to transform the CWH site into **"Australia's first commercial life sciences campus."** The vision: two large research buildings (5 to 11 storeys) containing 26,650 m² of laboratories, offices, retail, and even a below-ground **proton therapy cancer treatment center**. Kurraba branded it the "ION Life Sciences Precinct" and marketed the project as a groundbreaking innovation hub. In mid-2024, Kurraba lodged plans for this massive development (Council ref: D/2024/937), spanning **74–108 Botany Road and 86–100 Wyndham Street**. Notably, **zero residential units** were included – the affordable housing component was erased entirely, replaced with commercial uses. The **"crown jewel"** touted to justify the project was the proton therapy center, which helped Kurraba win government support and a special State Significant Development (SSD) fast-track approval.

*(As an aside, documents later revealed the proton center might have been a phantom promise – there is **no confirmed operator** and officials doubted it would ever be built. Kurraba's sudden push to split the project into five stages suggests they may cherry-pick profitable labs/offices and indefinitely defer the costly proton therapy facility, confirming community fears of a bait-and-switch.)*

## John Carfi: Insider on Both Sides of the Deal



*John Carfi CWH Director*

The common link between City West Housing's land sale and Aqualand's land flip is **John Carfi**. Carfi is a prominent figure in Australian real estate with 35+ years experience – he formerly led Mirvac's residential division and even ran a $120B development portfolio in Dubai. In 2018 he became CEO of Aqualand Australia, overseeing many luxury apartment projects, and by **August 2021 he also joined the board of City West Housing**. On paper, having a development heavyweight on a non-profit housing board could be seen as a plus – Carfi ostensibly brought industry expertise to CWH. **In reality, it created a glaring conflict of interest.**

As a CWH director, Carfi's fiduciary duty was to act in the best interests of the charity and its mission of housing affordability. Yet at the same time, he was helming **Aqualand**, a for-profit developer constantly on the hunt for prime sites. Carfi's dual role became untenable when the Alexandria project's fate was being decided. According to allegations now before ICAC, Carfi **leveraged his influence within CWH to facilitate an off-market deal with Kurraba**, effectively handing over the Botany Road site at a bargain price. He simultaneously made sure Aqualand would benefit from the broader scheme – a **quid pro quo** arrangement that put private profits ahead of the public interest.

Carfi's involvement with Aqualand's adjacent land is key. Aqualand had a controlling stake or option in **78–82 Wyndham Street**, a parcel abutting the CWH lots. This smaller site (around 1,500 m²) was likely essential to complete Kurraba's envisioned campus (for additional offices or a shared basement). Rather than selling it directly to Kurraba, Aqualand – under Carfi – orchestrated a two-step flip:

1. **Aqualand sells 78–82 Wyndham to LIVstyle's Aaron Tippett at a premium.** In late 2023, while CWH was negotiating with Kurraba, Carfi's Aqualand quietly sold its Wyndham Street holding (or the *option* to purchase it) to developer **LIVstyle**, run by **Aaron Tippett**, for a hefty sum. Tippett is a known speculator in the area – LIVstyle paid $10 million for another Alexandria site in 2015 – so he was a willing middleman.
2. **Aaron Tippett flips Wyndham to Kurraba (and finances the deal).** Almost immediately, Tippett (sometimes referred to as **Andrew Tippet** in land records) on-sold the 78–82 Wyndham St land to Kurraba Group, folding it into the life-sciences campus assemblage. This allowed Kurraba to control the whole block. Public records hint at how cozy this arrangement was: a Personal Property Securities Register (PPSR) filing shows **Tippett himself as a secured creditor or financial backer for Kurraba's project**, suggesting he helped fund Kurraba's purchase. In essence, **the same person who flipped the land to Kurraba also loaned them money**, likely pocketing interest or equity – a tidy upside for LIVstyle.

Meanwhile, **City West Housing's board (Carfi included)** approved selling its much larger Botany Road site to Kurraba **for a song**. The exact sale price hasn't been disclosed, but real estate observers note it appears **well below market value**. For context, Kurraba paid **$29.9 million** for one set of adjacent lots (100–108 Botany Rd & 98–100 Wyndham St) and **$16.1 million** for another (86–96 Wyndham St) in the same precinct. Those prices equate to roughly $17,000–18,000 per square meter – implying CWH's 2,733 m² could be worth on the order of $45–50 million. If CWH accepted substantially less (to "make the deal work" for Kurraba), that represents tens of millions in lost public value. We do know the transactions were **brokered off-market by TGC Property Group agents** over a year ago , with no public tender or competitive bidding. In other words, **only Kurraba got a shot at this prize**, a highly unusual move for a valuable government-linked asset.

The **optics are damning**: an affordable housing charity, steered by an industry insider, **sold off land intended for 100 low-cost homes to a private developer on the cheap**, at a time when the NSW Government still owned shares in CWH (making it effectively a public asset). In return, that insider's company profited from an adjacent land flip, and his friends ended up financially tied into the new scheme. It's the kind of self-dealing that **undermines public confidence** in housing programs.

# Red Flags and Unanswered Questions

This affair raises serious red flags about governance and probity. So far, what's publicly known paints a picture of **regulatory failure and possible misconduct**:

- **Conflict of Interest:** John Carfi's role is under scrutiny – did he declare his conflict and recuse himself from CWH's decisions on the sale? Even if he technically stepped out of the room, his very presence on the board (as a representative of a major developer) could have influenced the process. **The related-party nature of these transactions is glaring**, and observers have rightly questioned whether CWH's board was acting in the charity's best interest or being swayed by Carfi's dual loyalties.
- **No Competitive Sale Process:** City West Housing did **not offer the Botany Road site on the open market**. There was no public tender, no auction, no call for other affordable housing providers or developers to bid. Instead, it was an **off-market negotiation with Kurraba** brokered behind closed doors. Why was Kurraba – a two-year-old firm with no track record – given this golden opportunity exclusively? We have no indication CWH sought independent expressions of interest, which could have driven up the price or found a partner to build the affordable units as originally intended.
- **Valuation and Advice:** What valuation did the CWH board rely on to justify the sale price to Kurraba? Was an external, arm's-length appraisal done to ensure the **public was getting fair market value** for the land? If so, the "discount" given to Kurraba (if any) should be explained. If not, that's a severe breach of duty – disposing of charitable/government assets without due diligence. **Thus far, CWH has provided no transparency** on how the deal was evaluated.
- **Agent Representation:** Typically, a landowner like CWH would engage a selling agent to negotiate the best deal. In this case, it appears **Kurraba's own agents (TGC Property's John Romyn and Paul Hunter) facilitated the sale**. Was CWH even represented by its own real estate advisor, or did it effectively let the buyer's brokers set the terms? This imbalance could explain a below-market outcome.
- **Government Oversight (or Lack Thereof):** At the time of the sale in late 2023, the NSW Treasury and Minister for Housing together owned two "ordinary" shares in City West Housing Pty Ltd – effectively giving the state a stake in CWH's decisions. One would expect any transfer of a multi-million dollar asset to trigger government scrutiny. Was the Department of Housing or NSW Treasury aware or consulted? **It appears this deal flew under the radar**. Tellingly, on **20 March 2024**, just a few months after the Kurraba arrangements were inked, City West's corporate structure was radically changed: the NSW Government's shares were transferred to a newly created City West Housing Holdings Ltd (a company limited by guarantee), and the government's historic "redeemable preference" shares were redeemed. This made City West an independent not-for-profit with no direct government ownership. The timing is hard to ignore – it's as if the doors were shut after the horse had bolted. The restructure was presented as a governance modernization, but it also conveniently means that by the time questions were asked, **City West was no longer directly government-controlled** (potentially sidestepping freedom-of-information laws and ministerial accountability).
- **Consent and Coordination Issues:** It has also emerged that Kurraba's development applications attempted to segment the project to avoid full scrutiny. The Botany Road "health campus" was lodged as a State Significant Development, while a separate DA for a 5-storey commercial building at **78–82 Wyndham Street** (the flipped Aqualand parcel) was lodged with Council. Kurraba even admitted this was an "**Amending DA**" designed to **merge the consents** of the two sites – a highly unusual maneuver. Notably, Kurraba **did not initially own the City West site when lodging some applications**, requiring CWH to sign owner's consent letters. One consent letter bizarrely described the Botany Rd land as *"part of a broader site"* – implying an integrated project – yet at that moment **Kurraba didn't yet own all the pieces**. Why would CWH give Kurraba a consent letter for a DA covering CWH's land **before** a sale was completed? The sequence suggests an extremely tight coupling between the entities long before public notice. It's as if CWH was acting

in concert with Kurraba (and Carfi would have been the common thread).

In summary, **City West Housing's off-market sale to Kurraba** – under the influence of one of Kurraba's industry allies – **fails the pub test**. Even NSW Parliament members have taken notice. In May 2024, questions were raised in Parliament (e.g. by MP Jenny Leong) about the rationale behind City West's new structure and implicitly the decisions leading up to it. And in mid-2025, community advocates formally referred the matter to the Independent Commission Against Corruption. The referral cites the **"related party transactions"** involving Carfi, Aqualand, Kurraba and Aaron Tippet(t) and **"casts serious doubts over the probity"** of the affordable housing sale. ICAC does not comment on investigations until/unless public hearings are launched, but the fact it's been referred indicates the seriousness of the allegations.

## Fallout: Community Loses, Insiders Win (So Far)

The immediate outcome of this scheme has been **deeply negative for the community**. Land that **"could have provided desperately needed affordable housing was flipped to a developer"** known for big promises and scant experience. Over 100 families who might have had new affordable homes in Alexandria by now have instead gotten nothing. The **planned affordable units "vanished" from the project** – Kurraba's latest plans contain no on-site housing for moderate-income workers at all. This represents a double blow during a housing affordability crisis: not only was public land privatized, but the *promise* that the new development would include some affordable component also evaporated.

On the other hand, the **winners** of the scheme have reaped benefits (at least on paper):

- **Kurraba Group** acquired a prime site at likely under-market cost, giving it a huge upside if they can develop or sell it at full market value. They garnered favorable treatment by pitching a sexy "health innovation" project (with dubious follow-through) and avoided paying for the affordable housing obligation that a normal rezoning might require. Essentially, they got a windfall – cheap land and a green light to build lucrative labs/offices in a zone that was meant to include affordable housing.
- **John Carfi/Aqualand** pocketed profits from the Wyndham Street sale. By selling through Aaron Tippett's LIVstyle, Aqualand likely achieved a high price without dealing directly with Kurraba, perhaps obscuring the conflict. If Carfi had any performance bonus or stake tied to Aqualand's deals, he personally profited. Even if not, Aqualand's books got a boost, and Carfi moved on in early 2024 to a new role (he left Aqualand and became CEO of Ingenia Communities in April 2024 ). He departed Aqualand just as the Kurraba deal came to fruition – leaving questions about whether this was coincidental timing or an exit before potential fallout.
- **Aaron Tippett (LIVstyle)** made a quick return by flipping the property, and as a lender/investor to Kurraba's project may earn ongoing returns. Essentially, Tippett's involvement gave him a slice of the pie with minimal holding time or risk.

It's a classic case of **privatizing a public asset's value** – a few insiders split the profit, while the public (and low-income residents) bear the cost. The "cost" is not just financial; it's measured in lost homes, broken trust, and a precedent that could encourage other bad actors to try similar stunts.

And what of the vaunted life-sciences campus that was used to justify all this? As of late 2025, **it hasn't materialized**. In fact, cracks are appearing in Kurraba's grand plan. After receiving an initial development consent in February 2025 (with conditions to negotiate a community benefits agreement), Kurraba has struggled to get started. No construction work has commenced at the Alexandria site – not even demolition – and local observers note the lot remains vacant and idle. Reports have emerged that **Kurraba is in financial difficulty**: the company has been *"aggressively courting private investors to offload the 100 Botany Road site entirely,"* even as it publicly claims to be moving forward. Kurraba's CEO Nick Smith has been **scrambling to raise $50 million** (including via social media pleas) to fund the promised proton clinic, and is even seeking to **sell the project in pieces** by staging it. In October 2025, Kurraba applied for a controversial modification to break the project into five stages – seen by many as a tactic to build a profitable office first and delay the costly health facilities indefinitely.

In other words, the **public was sold a story** – "Give us this public land cheaply and we'll build a high-tech medical hub!" – but after securing the land, the developer is at risk of **defaulting on its promises**. If Kurraba fails, the site could end up half-developed or flipped yet again to another private player. The affordable housing is long gone, and now even the substitute "public good" (the cancer treatment center) may never happen. It's the worst-case scenario of speculative development.

## Conclusion: A Call for Accountability

This saga underscores why **robust accountability and transparency** are needed whenever public or community assets are at stake. What happened with City West Housing, John Carfi, Aqualand, Kurraba, and Aaron Tippett is a cautionary tale: without checks and balances, **insiders can game the system** to enrich themselves at public expense. Sydney's housing crisis will only deepen if precious affordable housing opportunities are traded away in backrooms.

Fortunately, the pressure is mounting to investigate and rectify this situation. The ICAC referral is a positive step – if the Commission finds evidence of corrupt conduct (such as misuse of position, undeclared conflicts, or improper benefits), those involved must face consequences. At the very least, **Sunlight is needed**: CWH should release details of the Kurraba deal (the price, the valuations, the board minutes around it) to prove it met its obligations. The NSW Government, even though it removed itself as a shareholder in CWH, should exercise moral responsibility and assist any inquiry – after all, it was the ultimate steward of CWH when this deal went through.

Policy reforms should also be considered to prevent repeats. For example, **community housing providers disposing of land** could be required to notify or seek approval from a regulator or minister if the land was acquired with public funds. Clear guidelines on managing conflicts on boards of such entities are essential (e.g. perhaps someone in Carfi's position should never have been allowed to influence decisions on a site where his employer had an interest). The **City of Sydney** too must reflect on how it evaluates proposals: in this case, a developer used the **"carrot" of a health facility** to bypass normal planning rules and avoid providing affordable housing. Stronger conditions could have been imposed – like mandating some affordable housing or tying approvals to delivering the public benefits first – to ensure the community gets something in return.

For now, residents of Alexandria and supporters of affordable housing are justifiably angry. A deal that should never have happened has left a glaring void – both in the skyline where affordable homes should be, and in the trust that our systems will serve the public fairly. **Sydney cannot afford to lose more affordable housing through skulduggery.** As this story unfolds, all eyes will be on whether authorities step up to hold the perpetrators of this **"shell game"** accountable, and whether any part of the situation can be salvaged – perhaps through forcing Kurraba (or a future owner) to include genuine public benefits on the site.

In the end, this saga is more than a local quarrel; it's a litmus test for Sydney's commitment to integrity in development. **Will we allow "cowboys" to ride off with public land for a quick buck, or will we demand better? The answer will set a precedent for years to come.**

Sources:

- City West Housing Annual Reports (2023, 2024) and planning documents – detailing the Alexandria site acquisition and corporate changes .
- *Kurraba Group Exposed* watchdog site – investigative articles on the Botany Road project's staging, conflicts, and ICAC referral .
- City of Sydney Council/Planning Alerts – development application summaries for 84–88 Botany Rd (life sciences facility).
- *RealEstateSource* news – report on Kurraba's site amalgamation and off-market purchases in Alexandria .
- *Apartments.com.au* – profile on LIVstyle and director Aaron Tippett's development acquisitions.
- Ingenia Communities release – background on John Carfi's roles at CWH and Aqualand.

## FAQs

### What are the implications of the land sale for affordable housing in Sydney?

The sale resulted in the loss of affordable housing opportunities, as the land intended for low-cost homes was privatized, and the promised affordable units were replaced with a commercial development, deepening Sydney's housing affordability crisis.

### What steps are being taken or proposed to ensure accountability and prevent similar situations in the future?

Investigations such as the referral to ICAC are underway, and there are calls for stronger regulations requiring transparency, conflict-of-interest management, public approval processes, and oversight of community housing land disposals to prevent recurrence.

### What were the main concerns raised regarding governance and transparency in the land sale?

Concerns include potential conflicts of interest, lack of competitive bidding or public tender, unclear valuation processes, possible undisclosed conflicts by Carfi, and the absence of transparency about how the sale was evaluated and approved.

### How did John Carfi influence the land deals involving the Alexandria site?

John Carfi, a board member of City West Housing and CEO of Aqualand, allegedly used his influence to facilitate an off-market land deal that transferred the site to private developers at a below-market price, prioritizing private profit over public benefit.

### What was the original purpose of the Alexandria site in Inner-City Sydney?

The Alexandria site was originally intended for the development of affordable housing, with plans to deliver up to 110 rental apartments to address Sydney's housing crisis.



### Kurraba Group

[See Full Bio](#) ›

# Open Letter to Trent Murno & Sydney Life Sciences Community – What You Should Know About Nick Smith & Kurraba Group

October 9, 2025
Kurraba Group

**Dear Trent,** as a respected scientist, you may not be aware of the troubling history and ongoing issues surrounding Nicholas "Nick" Smith (CEO of Kurraba Group) and his development ventures. Below is a compilation of investigative articles from *Kurraba Group Exposed* highlighting serious red flags about Nick Smith and Kurraba Group's projects. Each article is summarized with key concerns (and a link to the full piece) so you can review the facts for yourself:

1. **The Failure of Kippax Property and Rebranding as Kurraba Group: Nick Smith's Troubled Venture** – Nick Smith's prior company Kippax Property collapsed in early 2023, wiping out 100% of investors' money. Instead of taking responsibility, Smith dissolved Kippax and simply rebranded under the new name "Kurraba Group," appropriating the upscale geographical name "Kurraba" to cloak the failure. This maneuver gave a veneer of credibility to the same team with a track record of mismanagement, raising concerns that Kurraba is just Kippax 2.0 with a fresh coat of paint. The article details how Kippax's grand projects stalled, investor funds evaporated, and Nick avoided accountability by starting over under a new banner .

2. **Kippax investors lose entire investment** – This piece underscores the total loss incurred by those who invested in Kippax, Nick Smith's previous venture. Every dollar investors put into Kippax was lost – a *"total wipeout"*. The article notes how Kippax was deregistered abruptly, leaving partners and backers with nothing to show. It warns that Nick's pattern of dissolving companies to escape debt and liability should alarm anyone considering investing with him. The rebranding to Kurraba Group without acknowledging these losses is portrayed as a red flag about Nick's transparency and ethics.

3. **No evidence to support Kurraba track records – Ghost Projects never built** – Nick Smith claims a portfolio of projects for Kurraba Group, but this exposé found no tangible proof that many of those projects were ever delivered. It details how several touted developments are "ghost projects" – announced or proposed, but never actually built or completed. The article suggests Kurraba's track record is largely hollow, meant to impress investors on paper while hiding a lack of real achievements. This raises doubts about Nick's credibility, since a *"seasoned developer"* should have concrete results, not just marketing promises.

4. **Macquarie University has no record of multiple degrees** – This brief report shows that Nick Smith's educational credentials don't check out. Despite Nick's claims of holding multiple degrees (supposedly from Macquarie University), an inquiry found that Macquarie University has no record of him earning those degrees. In other words, Nick appears to have misrepresented his qualifications, calling into question his honesty and integrity. For a scientist like you, Trent, this kind of false credentialing should be a major concern, as it indicates a willingness to deceive stakeholders.

5. **Nick Smith and Proton Therapy Australia try to raise $50,000,000 on Facebook** – This article describes how Nick Smith resorted to an unconventional Facebook-based campaign to solicit $50 million in investment for a proton therapy project. Such a large fundraising effort via social media is portrayed as highly unorthodox and desperate. The piece implies that legitimate investors and institutions were unwilling to provide funds, leaving Nick to attempt crowdfunding-style tactics. This raises alarms about Kurraba's financial stability – an established company with a sound project wouldn't need to beg strangers on Facebook for tens of millions. It underscores the fragility of Kurraba's financing and Nick's lack of a credible funding pipeline.

6. **Major law firm says Kurraba DA likely void – Investors at Risk** – A "DA" refers to the Development Application for Kurraba's flagship project. This article reveals that a major law firm reviewed Kurraba's planning application and concluded it is likely invalid ("void"), meaning the project's approval could be overturned. The implication is that Kurraba's development might be proceeding on shaky legal ground, and any investors' money is at serious risk if the approval gets voided. In short, Nick Smith may be selling a project that doesn't even have solid legal approval – a scenario that could leave investors high and dry. The article urges extreme caution, as pouring money into a project with a voided DA could result in huge losses.

7. **Australia's first proton therapy facility a $500,000,000 white elephant** – Kurraba Group has promoted their "ION" life sciences precinct as including Australia's first proton therapy center. This exposé argues that the proposed proton therapy facility (valued at $500M) is likely to become a white elephant – an overhyped, massively expensive project with dubious viability. It points out that proton therapy centers are incredibly costly to build and operate, and questions whether there is even sufficient demand or expertise to justify it in this context. The article suggests Nick is using the allure of a high-tech medical project to win support, but in reality it could fail to deliver promised health benefits or returns. It's a warning that the ION project could end up half-built or empty, wasting half a billion dollars and leaving a monument to failed promises.

8. **Freedom of Information documents show City of Sydney approved Kurraba development despite unanswered questions on state significance** – This piece uncovered FOI (Freedom of Information) records indicating that City of Sydney planners recommended Kurraba's project be classified as "State Significant Development" (SSD) even though critical questions about its supposed health benefits were never answered. In other words, the project got a special fast-track status without proper scrutiny. Planners admitted they "did not know what a Health Precinct entails" but still moved it up to state level. This suggests Kurraba managed to push its development forward by exploiting loopholes or misrepresentations, bypassing the normal council oversight. The lack of due diligence is alarming – it implies the project's public benefits (like a genuine health research purpose) were not verified, yet it was allowed to proceed at higher levels of approval. This raises concerns of regulatory capture or at least a failure of process, with Nick Smith's project receiving preferential treatment it might not deserve.

9. **City West Housing, Aqualand, Kurraba referred to ICAC over Affordable Housing Sale** – Here is t reported that Kurraba Group (along with partners City West Housing and Aqualand) was referred to the Independent Commission Against Corruption (ICAC) regarding a suspicious off-market sale of affordable housing units connected to Kurraba's development. While ICAC hasn't made findings yet, just the referral signals serious concerns about the integrity of the deal. The article outlines how affordable housing that was promised as part of the project was quietly sold off to a luxury developer (Aqualand) in a non-transparent deal, potentially undermining the community benefits. This kind of maneuver suggests Kurraba might be profiting at the expense of public interest, and it put Nick Smith's venture under government anti-corruption scrutiny. Even if no charges result, the episode raises questions about Kurraba's governance and ethics, and it's certainly not behavior you'd expect from an upright scientific development.

10. **Despite promises Kurraba seeks buyer for 100 Botany Road development site** – Nick Smith repeatedly assured the community and investors that Kurraba Group was committed to building and operating the 100 Botany Road "ION" project for the long term, yet this article reveals that Kurraba quietly put the site on the market, looking to sell. This betrayal of promises indicates that Kurraba might have been planning a quick flip all along – securing approvals and then offloading the project to someone else. The summary notes Kurraba was "desperately tapping private investors in the hope of selling" the site. For investors who believed in the project's vision,

this is a slap in the face: it suggests Nick's priority was to cash out rather than deliver the innovation campus he hyped. Such behavior erodes trust, as Nick Smith appears willing to say one thing publicly while doing the opposite behind closed doors.

11. **Multiple Citizens Plan to Sue to Block 100 Botany Road / Kurraba Group** – There is significant community backlash against Kurraba's development plans, to the point that multiple local residents are preparing legal action to stop the 100 Botany Road project. This article reports that community members are organizing to file lawsuits (in the Land & Environment Court and even the NSW Supreme Court) challenging the project's approvals. The reasons include alleged breaches of planning law, inadequate public consultation, and removal of promised public benefits like affordable housing. The very fact that ordinary citizens are banding together to sue indicates how mistrusted Kurraba Group is in the community. If you were considering partnering with Nick, note that his project is so controversial that locals are ready to fight it in court – which could cause long delays or cancellation. It underscores a pattern of developer overreach and community harm that Nick Smith is being accused of.

12. **Critical Assessment of Nick Smith and the Kurraba Group** – This in-depth analysis evaluates Nick Smith's qualifications, strategy, and risk profile. It finds that Nick markets himself as a seasoned dynamic expert, but in reality he has a "thin record of direct delivery" – Kurraba is a very new company with no proven track record of successfully completing any major project. The assessment highlights financial instability under Nick's leadership: Kurraba relies on speculative external financing and was even trying to sell its core project while pitching it as a long-term venture. Notably, the company's attempt to raise $50 million through a social media campaign is cited as evidence of an unconventional (some desperate) funding approach. The article also flags governance and integrity issues: Kurraba has already been drawn into an ICAC probe, and community groups are mounting legal challenges to its plans. In summary, the piece concludes that Nick Smith's leadership is characterized by "grandiose vision but fragile execution," leaving investors exposed to serious financial, legal, and reputational risks. It's a comprehensive red flag on Nick's credibility.

13. **How Nick Smith Appropriated the "Kurraba" Name and Rebranded It as "Kurraba Group"** – This article examines the origin of the "Kurraba Group" name and finds that Nick Smith simply took the name "Kurraba" from an existing locale (Kurraba Point, a prestigious Sydney neighborhood) to brand his new company, despite having no substantive link to that community. Critics note that nothing changed but the name – the same people (Nick and his team) moved from Kippax to Kurraba, hoping the new branding would lend "established credibility". Essentially, Nick is accused of grabbing a respected name to whitewash his past failure, which some consider misleading. This insight is important because it shows a pattern of image over substance: rather than fixing the problems that sank Kippax, Nick opted to mask them with a rebrand, raising questions about transparency and trust. The piece warns stakeholders to look beyond the glossy name – the history of those running Kurraba is fraught with failure and unmet promises.

14. **Legal Challenge Delays Kurraba Group's Alexandria Health Research Project – Investor Implications** – This update outlines how legal challenges have already caused delays in Kurraba's "ION" health precinct project (sometimes referred to as being in Alexandria/Waterloo). As a result of community legal action and possibly other appeals, the project's timeline is slipping, which in turn poses risks to investors. The article likely explains that with construction stalled by court proceedings, investors may face cost overruns or capital being tied up longer than expected. Moreover, delays can trigger penalty clauses or financing issues, meaning the project's viability and returns are in jeopardy. For someone in your position, Trent, the key takeaway is that the ION project is not a sure bet – it's entangled in legal battles that could drag on for years, and anyone associated with it should be prepared for uncertainty and potential losses.

15. **Nick Smith of Kurraba: Lavish Lifestyle Raises Investor Concerns** – This piece shines a light on Nick Smith's personal lifestyle and how it's perceived by those funding his ventures. Nick has been seen projecting a "party-animal" image – indulging in a lavish lifestyle with expensive tastes (luxury travel, high-end fashion, events, etc.). The concern is that investors' funds might be subsidizing Nick's lifestyle rather than being strictly used for the project. Photos and anecdotes apparently show a disconnect between Nick's extravagant spending and the struggling status of his developments. For investors and professional partners, this raises red flags about his priorities and financial discipline. The article suggests that instead of focusing on delivering results, Nick is more concerned with projecting wealth and success – possibly to attract new investors – while existing backers see little progress. It's essentially a character check: if a CEO is burning cash on partying and image, can he be trusted with a science project worth hundreds of millions?

16. **Kurraba Group's CEO Nicholas Smith Files Legal Action Seeking Apprehended Violence Order to Silence Community Critic** – In an extraordinary move, Nick Smith personally tried to use the courts to silence a local critic by filing an Apprehended Violence Order (AVO) against them. An AVO is typically meant to protect someone from threats or harassment, but here it appears to have been used as a legal intimidation tactic against a vocal community activist. The article notes that the targeted individual, Michael Williams, is a community advocate opposing Kurraba's project. By attempting to slap an AVO on a critic, Nick crossed a line from civil dialogue to personal legal harassment. The piece likely emphasizes that this misuse of the legal system backfired publicly, painting Nick as a bully who resorts to extreme measures to quash dissent. It underscores a theme: Kurraba's leadership would rather litigate critics into silence than address the underlying issues. For a scientist interested in fair and ethical dealings, this incident is a major red flag about Kurraba's corporate culture.

17. **Nick Smith's ION Project: A Point-by-Point Critical Review** – This article meticulously deconstructs the claims Nick Smith has made about the "ION" Life Sciences project, comparing his promises to reality. It addresses each key point Nick touts – for example, *state-of-the-art research facilities, strong partnerships, unprecedented innovation, timelines, economic benefits* – and examines the validity of those claims. The review finds that many of Nick's assertions are exaggerated or unsupported. For instance, it highlights that truly experienced life sciences leaders (the article references industry figures like Belcastro, Geng, and Deacon) remain skeptical or are not involved, implying Kurraba lacks real endorsement from the scientific community. The piece also touches on practical issues: no construction has started, no major tenants or operators are actually secured, and key components (like the proton therapy unit) face serious technical and regulatory hurdles. Overall, the critical review portrays the ION project as more of a glossy pitch than a grounded plan, warning that Nick Smith overpromises on a project he may not have the expertise or resources to actually deliver.

18. **Exposing the Gaps: Kurraba's ION vs. Australia's Health Sciences Strategy** – This analysis puts the ION project in context with national health research priorities and strategies. It finds that Kurraba's proposed life sciences precinct does not align well with Australia's established health research strategy – in fact, there are significant gaps. For example, Australia's health strategy emphasizes genuine research infrastructure, collaborations with universities/hospitals, and long-term public benefits, whereas Kurraba's ION appears driven by private development interests and real estate profit motives. The article raises concerns that ION might duplicate or compete with existing plans (or lack integration with them), making it redundant or even disruptive to the coordinated strategy. It also points out future-readiness issues – Kurraba is a small player trying to take on a huge, complex sector without the usual institutional support. In short, the piece suggests Nick Smith is pitching ION as a boon for Australia's research landscape, but in reality it may be a square peg in a round hole – not fitting the country's needs, and likely to falter if it proceeds at all. This calls into question the public interest value of the project that Nick often touts.

19. **Kurraba Group's ION Life Sciences Precinct: A Venture Riddled with Red Flags and Destined for Collapse** – This article bluntly outlines why the ION precinct is likely to fail, enumerating a host of red flags. It notes that investors who backed Nick's previous venture (Kippax) "lost their entire investment," and warns "You do not want to invest with Nick Smith". Key red flags include lack of secured financing (the project's funding is shaky), no confirmed anchor tenants or operators (casting doubt on revenue streams), regulatory and legal battles (as discussed, multiple challenges could halt the project), and Nick's own track record of failure. The tone

suggests inevitability: given all these issues, ION is "destined for collapse" unless drastic changes occur. It's essentially a cautionary tale using Kippax as a precedent – if Nick's last project imploded and this new one shows all the same warning signs (and then some), investors should expect history to repeat. For you, Trent, the takeaway is that the flagship project Nick might be pitching to you (and others) is on very precarious footing – proceed with extreme caution or not at all.

20. **Kurraba's Legal Attack: Kurraba's Lawyers Threaten Litigation – They Won't Silence Us** – This post (dated October 1, 2025) is a direct response from the community watchdog site (KurrabaGroup.exposed) after receiving legal threat letters from Kurraba's lawyers. It describes how Corrs Chambers Westgarth (a top law firm hired by Nick Smith) sent defamation "concerns notices" demanding the site be taken down within 24 hours. The site's operators refused to be silenced, publishing the threats and highlighting the Streisand effect – that attempts to censor criticism have only *increased* public attention on Kurraba's issues. The article emphasizes free speech and public interest, stating they will not back down despite intimidation. It's an important piece because it shows Nick's instinct when faced with legitimate criticism is to threaten lawsuits rather than engage or rebut with facts. Yet, in doing so, he's only amplifying the scrutiny. For an outside observer like you, this underscores a pattern: Kurraba Group (under Nick's direction) often takes aggressive legal stances that ultimately signal desperation and tarnish its reputation further.

21. **Kurraba's Defamation Gambit: Investor Funds on a One-Way Trip to Nowhere (Wasted in Litigation)** – This detailed article delves into the folly of Kurraba's defamation campaign from an investor perspective. It explains that **Nick Smith's decision to engage in transnational defamation litigation is not only reputationally damaging but also a massive money drain – effectively wasting Kurraba's investor funds on a legal battle it cannot win. Key points include:

   ○ Reputational Backfire: By trying to silence critics, Kurraba has triggered the Streisand effect, drawing *more* attention to its troubles and harming its image with investors and partners .High Legal Costs: Defamation suits are extremely expensive, and this one is burning cash that investors put in for development. Money that should build labs is instead paying lawyers, which undermines investor confidence and project resources .

   ○ Jurisdictional Futility: Kurraba's target is a U.S.-based website, but Australian defamation laws don't apply in the U.S., and the U.S. SPEECH Act blocks enforcement of foreign libel judgments. Essentially, even if Nick wins a judgment in Australia, it's unenforceable abroad – making the entire effort pointless and "a one-way trip to nowhere," as the article says.

   ○ Suing the Wrong Person: In a stunning blunder, Kurraba's lawyers addressed their legal threats to the wrong individual, misidentifying a community member as the site's owner. This sloppy approach not only wastes more time/money, but it makes Kurraba's leadership look inept or reckless.

   ○ Investor Impact: The article concludes that this legal gambit is a Pyrrhic venture; even if Kurraba somehow "wins" in court, the victory yields no practical benefit but incurs huge costs, all of which are borne by the company's investors. For investors, it's a lose-lose scenario – their capital is being spent on an unwinnable fight, and the negative publicity is scaring away new investors. In essence, this is a case study in mismanagement: Nick Smith is diverting investor money to attack critics (instead of delivering the project), which calls into question his judgment and fiduciary duty.

22. **Corrs Chambers Westgarth's Defamation Gambit: Suing the Wrong Man in Bid to Silence Kurraba Group Critics** – Focused on the role of the law firm, this article highlights the absurdity and fallout of Kurraba's lawyers suing an unrelated individual by mistake. It notes that Corrs Chambers Westgarth (on Nick Smith's behalf) filed legal action aiming to muzzle the "Kurraba Group Exposed" site, but they targeted the wrong person entirely. The piece emphasizes how this blunder exemplifies a Strategic Lawsuit Against Public Participation (SLAPP) gone awry – not only an attempt to intimidate free speech, but an incompetently executed one. The "wrong man" incident has undermined Corrs' credibility and given the critics even more ammunition, turning the situation into a public embarrassment for Kurraba. The article likely discusses the Streisand effect as well: trying to suppress the truth through legal missteps has only amplified the narrative that Kurraba and Nick Smith have something to hide. For someone observing, this reinforces that Nick's team is flailing – their legal aggression is backfiring spectacularly, raising questions about the quality of advice and leadership he has.

23. **Kurraba Group's Connection to Tactical Group: A Red Flag for Investors** – This investigative piece uncovers that two of Kurraba's co-founders (Steve Ryan and Richard Campbell) are also co-founders and major shareholders of another company, Tactical Group. Tactical Group is a consultancy in property/infrastructure that, alarmingly, could be contracted to work on Kurraba's projects. The overlapping leadership means Kurraba and Tactical are not truly independent – the same people on both sides = potential self-dealing. Key red flags include:

   ○ Masking Past Failures: The leadership connection suggests that after Kippax's collapse, the same individuals (Ryan, Campbell, etc.) set up Kurraba and kept Tactical as a parallel venture, possibly to "consult" on Kurraba's projects and profit through related-party transactions.

   ○ Conflicts of Interest: Because Kurraba's insiders also run Tactical, any deal between Kurraba Group and Tactical Group is rife with conflict – they could award contracts to themselves, set inflated fees, etc., at the expense of Kurraba's outside investors. The article explicitly warns that investors face risks like related-party deals, lack of oversight, and possible self-enrichment by insiders.

   ○ No Independent Oversight: With the same people controlling both companies, checks and balances are essentially absent. There's no truly independent board to vet if decisions favor Tactical over Kurraba. This governance lapse can lead to biased decisions that put investor funds in peril.

   ○ Rebranding Pattern: The article also ties this to a pattern where Kippax's collapse led to rebranding as Kurraba, and Tactical's involvement is possibly a way to funnel work back to the founders' own consultancy. It all suggests a web of interlinked entities designed to benefit the principals, not necessarily the investors or the public.

   For an investor or partner, this "shell game" of overlapping interests is a huge red flag – it means transparency and accountability are lacking, and you could be dealing with a clique that plays by its own rules.

24. **Troubled Waters for ION's Prospective Tenants: The Mounting Crisis Threatening Kurraba Group's Flagship Life Sciences Development** – This report centers on the tenants and end-users expected for the ION life sciences campus, and how they are growing uneasy. It points out that as of now, construction has not even started on the ION project, yet the facilities (like labs, a proton therapy center) are extremely complex. The delays and uncertainty are causing prospective tenants (e.g. research institutes, medical partners) to reconsider their commitments. If Kurraba promised space to certain companies or institutions by a set date, those entities are likely frustrated or seeking alternatives because nothing is materializing. Moreover, without secured tenants or operators, the project's business case falters, creating a crisis: no tenants will commit firmly until there's progress, but financing construction is hard without tenant commitments – a vicious cycle. The article warns that some potential tenants and leasing agents are "stepping back" from the

project, reducing involvement. This means those who stick with ION face greater risk – if anchor tenants drop out, the project could collapse or radically downsize, impacting everyone remaining. In summary, the flagship project is on shaky ground not just from an investor/legal standpoint, but from a market demand standpoint too: even the intended occupiers doubt it will be delivered. That double whammy (internal issues + external tenant skepticism) threatens to sink the ION venture entirely.

25. **New Health Research Facility SSD: Legal, Planning, and Environmental Issues Review** – This article provides a comprehensive review of all the planning and environmental problems with Kurraba's "Health Research Facility" project (the ION precinct) being processed as a State Significant Development (SSD). It highlights numerous issues:

  ○ Community Consultation Failures: Kurraba's team did minimal community outreach and even removed public notices at times, leading to community members feeling deliberately kept in the dark. Legitimate objections were allegedly downplayed or ignored.

  ○ Misuse of SSD Classification: The project was given an SSD status (meant for projects of genuine state importance), but the article suggests this designation was obtained through misleading claims and is being used to bypass local planning controls and oversight. Essentially, Kurraba sought a loophole to avoid stricter scrutiny by the City of Sydney.

  ○ Linked "Shadow" Development: It was discovered that Kurraba is treating 100 Botany Rd and the adjacent 78-82 Wyndham St as one integrated project (shared basement, parking, etc.) while telling authorities they are separate. This "one scheme, two addresses" trick is a way to inflate the scope and value (benefiting Kurraba's adjacent property) without proper assessment of the combined impact. The review stresses that assessing them separately conceals the true scale and consequences of the development.

  ○ Affordable Housing Removal: Kurraba quietly eliminated previously promised affordable housing units from the plan , which not only breaks earlier commitments but also undermines public benefit.

  ○ Environmental & Heritage Concerns: The site's redevelopment poses issues like potential contamination, heritage building impacts, and significant traffic increases, which the article argues Kurraba has not adequately addressed. Promises of a cutting-edge medical facility are not backed by confirmed medical operators or plans (there's no confirmed partner to run the proton therapy center yet), so the public health benefit claim is on shaky ground.

  ○ Financial Viability and Modification Risks: The review notes that Kurraba is financially unstable; if delays continue, the company might become insolvent, leaving a half-built project. And once approvals are in hand, nothing stops Kurraba from modifying the project to be more commercial (e.g. more offices, less medical) to chase profit, betraying the original "health" rationale .

  This thorough issues review concludes that the 100 Botany Road development is riddled with deception and unjustified privileges, and it calls for authorities to halt the project, re-examine it independently, and demand transparency before allowing it to proceed. For someone like you, it's a checklist of why the project is controversial: from community trust to legal compliance to financial soundness, it fails on multiple fronts.

26. **Kurraba's Botany Road Debacle: A Developer's Shell Game Exposed** – This piece exposes a cunning scheme by Kurraba Group regarding the 100 Botany Road project. It reveals that Kurraba tried to get approval for 100 Botany Rd while "secretly" tying it to an adjacent property (78-82 Wyndham St) that Kurraba also owns, effectively treating them as one large development while presenting them as two separate ones to regulators. By splitting the project into two addresses, Nick Smith attempted a classic shell game: each piece on its own might seem below certain thresholds or less impactful, but together they form a massive scheme that would normally trigger much stricter oversight. The article notes that the projects share linked designs (like a connected basement and shared parking) – a fact not made clear in official submissions. The goal of this strategy was to boost the value of Kurraba's adjacent commercial property (Wyndham St) by piggybacking off the "medical precinct" approval on Botany Rd, without authorities realizing. This deceit undermines transparent planning processes. The authors call it a "debacle" and urge government authorities to intervene, suggesting that Kurraba's proposal should be rejected or re-evaluated as one holistic project, not allowed to sneak through in pieces. In summary, this is another example of Kurraba avoiding rules and accountability – a developer gaming the system for profit, which casts doubt on Nick Smith's claims of doing everything above board.

27. **Judicial Review Imperils Kurraba Group's Botany Road Project as Buildcorp Wavers** – Breaking news (as of Oct 8, 2025): A judicial review is going to be filed against the approval of Kurraba's 100 Botany Road project, creating a "legal storm" that could overturn the project's green light. This means a court will examine whether the approval process was lawful – given all the irregularities, there's a real chance the approval could be nullified. Compounding this, Buildcorp – the construction firm slated to build the project – is reportedly wavering in its commitment. Buildcorp's hesitation likely stems from the project's turmoil: lawsuits, community opposition, and possibly concerns about Kurraba's financial health or credibility. If Buildcorp pulls out, Kurraba would struggle to find a reputable builder willing to take on such a fraught project. The article's message is that the flagship project is on the brink: its legal foundation is under challenge, and its primary builder/contractor might bail. For an investor or partner, this is essentially the worst-case scenario short of cancellation – work can't start because of court actions, and the team needed to execute is losing faith. It underscores the instability of Kurraba's venture; from external forces to internal partners, confidence in Nick Smith's project is collapsing.

28. **Kurraba Group & Nick Smith's Lawyers Lie to Court (again): Jim Micallef Submits Knowingly False Affidavit** – This piece alleges serious misconduct by Kurraba's legal representatives. It claims that Jim Micallef, a lawyer from Corrs Chambers Westgarth representing Nick Smith/Kurraba, submitted an affidavit to the court that contained information he knew to be false. Specifically, the accusation (as hinted by the article) is that Corrs blocked emails from the opposing side (perhaps the community site or other litigants) to pretend they never received legal service, then swore in court that they weren't served in time. In plain terms, Kurraba's lawyers tried to deceive a judge to gain a procedural advantage. The "(again)" in the title suggests this is not the first instance of dishonesty attributed to Nick's legal team. The article calls for accountability, urging Corrs and the individuals involved to be transparent and truthful. For observers, this is extremely troubling: if true, it means Kurraba's team is willing to lie in legal proceedings, reflecting a culture of win-at-all-costs without ethics. Such behavior can have consequences – a court could sanction them, and it certainly destroys any goodwill or trust in Kurraba's claims. If Nick Smith's case relies on false affidavits, one must wonder about the legitimacy of anything his side presents. This is a stark reminder that the issues with Kurraba aren't just in the court of public opinion or finance, but extend to potentially unethical legal tactics – a huge red flag for anyone considering working with them.

29. **Investors and Leasing Agents Are Stepping Back from Kurraba's Botany Road (ION) Project — What That Means for Those Who Stay** – As the title suggests, this article reports that some initial investors and the firm handling leasing for the ION project have started to distance themselves or withdraw. It likely names or alludes to, for example, JLL (Jones Lang LaSalle) as the global leasing agent partner which may be re-evaluating its involvement (the *Critical Assessment* noted Kurraba engaged JLL despite JLL's own

issues – this could be related). The key point is the rats are fleeing the ship: those who were onboard early with Nick are now backing out due to the mounting controversies, delays, and risk. This exodus has two major implications: (1) it validates that the concerns raised are serious – serious enough that professional stakeholders are not comfortable being associated with Kurraba anymore, and (2) it increases the burden on whoever remains. The article likely explains that with fewer investors, Kurraba might face funding shortfalls, and with leasing agents or potential tenants gone, the project may fail to fill its space or generate revenue. Those investors who *do* stay in are in a tighter spot – they may have to contribute more funds or accept less liquidity, and they're partnered with a project many see as doomed. In essence, the smart money is pulling out of Nick Smith's venture, leaving only the truly stuck or unaware. It's a final indicator that the development is viewed as toxic in industry circles.

**In conclusion, Trent:** the above articles paint a comprehensive and **alarming picture of Nick Smith and Kurraba Group.** The recurring themes are **failed past ventures, deceptive rebranding, questionable qualifications, broken promises, financial desperation, legal intimidation of critics, conflicts of interest, regulatory dodges, and an imperiled flagship project.** All of these points raise serious doubts about Nick Smith's honesty, competence, and intentions.

As someone with a sterling reputation in science, you would not want to inadvertently lend your name or credibility to a venture marred by such issues. I urge you to **review these sources and approach any involvement with Nick Smith or Kurraba Group with extreme caution.** Sydney – and the broader community – deserves ethical, transparent development for genuine public benefit, not ventures that **"mask deeper failures" and leave investors and partners burned** .

*Thank you for taking the time to read this. The evidence above is provided to ensure you have full insight into the **history and conduct of Nick Smith/Kurraba Group** before any further association. Please feel free to reach out if you have questions or need additional information. Your integrity and our community's future are too important to risk on a venture that shows so many warning signs.*



**Kurraba Group**

[See Full Bio](#) ›

# Investors and Leasing Agents Are Stepping Back from Kurraba's Botany Road (ION) Project — What That Means for Those Who Stay

October 8, 2025
Uncategorized

## Key Points:

- **Risks to Remaining Stakeholders and Project Viability:** Ongoing issues threaten financing, leasing, and delivery, with potential impacts including funding gaps, project delays, valuation declines, and complete project failure, emphasizing the need for updated due diligence and full disclosure.
- **Leasing and Marketing Risks:** Leasing agents JLL and CBRE are hesitant to promote the project while negative disclosures remain live, effectively freezing the leasing pipeline and delaying pre-commitments.
- **Delivery Partner and Reputational Risks:** Buildcorp has expressed concerns about due to the exposed website content, indicating a material reassessment that could impact project delivery and financing support.
- **Debt and Lending Concerns:** Denning Partners, the current debt financier, is reviewing its risk profile and considering tightening terms, which could delay or restrict further funding for the project.
- **Investor Withdrawal and Reassessment:** A Korean investor has halted interest due to concerns over the project's public disclosures, signaling a halt in equity participation. Similarly, other stakeholders are reassessing their involvement amid rising risks.

## Summary:

Kurraba's own sworn affidavit (Corrs Chambers Westgarth, partner Jim Micallef) records that a prospective **Korean investor** has halted interest, **Denning Partners** is reassessing its lending exposure, **JLL** and **CBRE** leasing agents are reluctant to take the opportunity to market, and **Buildcorp** (an ECI appointee and current financier) has raised concerns after learning of the issues published on the Exposed Website and X account. For remaining investors, tenant-rep advisors, and prospective tenants, these are material signals of elevated financing, leasing, and delivery risk.

## Who is stepping back or reassessing

**Korean investor (equity):**

On 3 June 2025, the investor told Kurraba they **"will be unable to progress with an investment if the website remains publicly accessible."** Since that call, they have **not expressed any further interest** in the Botany Road/ION project. This is a clear withdrawal of momentum and a practical pause on equity participation.

*Korean Investor*

84     I am informed by Mr Smith that:

(a)     since November 2024, Kurraba has been engaged in a process of fund raising from potential investors interested in investing in the Botany Road Development;

(b)     on 3 June 2025, he received a telephone call from a Korean investor who prior to this date had advised they were intending to invest in the Botany Road Development. The name of the investor is contained in Confidential Exhibit JM-2 tab 2 (page 8);

(c)     at the time of the call, Mr Smith was driving his car and was accompanied by Mr Ryan, and answered the call on the hands-free speaker system;



31

(d)     during the phone call, the investor referred to the Exposed Website and said words to the effect, *"We will be unable to progress with an investment if the website remains publicly accessible"*, and

(e)     since the call, the Korean investor has not expressed any further interest in investing in the Botany Road Development.

*A screenshot from the relevant portion of an affidavit dated 2 October 2025 sworn by Kurraba Nick Smiths Lawyer James Lying Jim Micallef*

**Denning Partners (senior debt):**



Denning Partners is a current debt financier. In the context of Kurraba seeking to **extend its debt**, Denning has stated it is **reviewing Kurraba's risk profile** and is concerned about **reputational damage** generated by the public disclosures. A risk review at this stage commonly precedes tightened terms, delays in approvals, or a decision not to increase/roll facilities.

*Denning Partners*

85    I am informed by Mr Smith that:

     (a)     Denning Partners is a current debt financier for the Botany Road Development;

     (b)     Kurraba is currently in a process to extend their debt with Denning Partners;

     (c)     an individual at Denning Partners has informed Mr Smith that:

         (i)     they are aware of the Exposed Website and is concerned with the reputational damage it is creating, in terms of its impact on potential new investors and financiers;

         (ii)     in the context of Kurraba extending its debt, Denning Partners is reviewing Kurraba's risk profile; and

         (iii)     Mr Williams directly emailed another individual at Denning Partners, with links to the Exposed Website and X Account, as a result of which, contact was made with the individual to provide context to Mr Williams' email.

     I identify the names and titles of the individual at Denning Partners in Confidential Exhibit JM-2 tab 2 (page 8).

*A screenshot from the relevant portion of an affidavit dated 2 October 2025 sworn by Kurraba Nick Smiths Lawyer James Lying Jim Micallef*

**Leasing agents (JLL and CBRE):**



Following circulation of links to the Exposed Website and X account, JLL and CBRE reported fielding multiple queries and indicated **reluctance to put the Kurraba opportunity forward** while those materials remain live. That is, the leasing pipeline is **functionally frozen** pending clarity.



*Leasing agents*

86    I am informed by Mr Smith that as a result of Proton Emails 2 and 3 in which links to the Exposed Website and X Account, leasing agents at JLL and CBRE, another agent appointed by Kurraba for leasing at the Botany Road Development, have each informed him that:

(a)    they had to respond to a number of queries from leasing agents about the Exposed Website and X Account; and

32

(b)    some of the leasing agents have indicated that they are reluctant to put the opportunity of engaging with Kurraba with respect to the Botany Road Development while the Exposed Website and X Account remain live.

I identify the names and titles of the leasing agents who informed Mr Smith of the above matters in Confidential Exhibit JM-2 tab 2 (page 8).

*A screenshot from the relevant portion of an affidavit dated 2 October 2025 sworn by Kurraba Nick Smiths Lawyer James Lying Jim Micallef*

**Buildcorp (ECI + financier):**



Buildcorp informed Kurraba it is **concerned** about the content of the Exposed Website and sought explanations for not being alerted earlier. Subsequent calls were held to discuss steps to address the situation. While no formal withdrawal is stated, this is a material **reassessment signal** from a delivery and financing counterparty.

*Buildcorp*

87    I am informed by Mr Smith that:

(a)    Buildcorp is a current debt financier for the Botany Road Development and has been appointed under an 'Early Contractor Involvement' (ECI) contract to provide a proposal for the Botany Road Development build;

(b)    due to the escalation of material on the Exposed Website, on 22 September 2025 he spoke to an individual at Buildcorp who informed him:

(i)    Buildcorp is concerned with the content of the Exposed Website and asked Mr Smith why he did not alert Buildcorp to the Exposed Website previously;

(ii)    Buildcorp is particularly concerned around references to ICAC, the judicial review of the Development Application approval, and project delays associated with the judicial review, which could put the entire Botany Road Development project at risk;

(c)    Mr Smith took the individual at Buildcorp through his understanding of the judicial review process to try to alleviate their concerns; and

(d)    on 29 September 2025, Mr Smith spoke to a second individual at Buildcorp regarding steps he was taking to get the Exposed Website addressed and the status of the matter.

I identify the names and titles of the two individuals at Buildcorp in Confidential Exhibit JM-2 tab 2 (page 8).

*A screenshot from the relevant portion of an affidavit dated 2 October 2025 sworn by Kurraba Nick Smiths Lawyer James Lying Jim Micallef*

## Direct risks to those who remain involved

1. **Financing Cliff Risk**
   - If Denning Partners tightens covenants, delays extensions, or elects not to extend, the project may face **funding gaps**, **cost-of-capital spikes**, or **cash flow stress**. Knock-on effects include breach of conditions precedent for construction and inability to award packages at market rates.
2. **Leasing and Pre-Commitment Risk**
   - JLL/CBRE reluctance to actively market limits pre-leasing. Without pre-commitments, lenders may **withhold drawdowns**, cap LVRs, or require additional equity. A thin leasing pipeline can render the scheme **non-bankable**.
3. **Delivery Partner Risk**
   - Heightened concern from Buildcorp increases the probability of **programme slippage**, scope repricing, or eventual disengagement. Re-procuring an ECI/GC partner midstream typically adds **months** and significant **cost escalation**.
4. **Contagion and Reputational Risk**
   - One investor pausing (Korean investor) and a lender formally reviewing risk (Denning) are classic **contagion triggers**: other equity and credit providers often follow with parallel reviews, leading to **capital flight** or materially worse terms.
5. **Valuation and Exit Risk**
   - A stalled leasing campaign suppresses underwriting assumptions (WALE, face/rent growth, incentives), pushing **feasibility below hurdle rates**. Remaining investors risk impaired valuations, **dilution** (via rescue capital), or **write-downs** if the scheme cannot reach FID.

## Your duty to inform

- **Investors and managers** have a duty to disclose **material adverse changes** to LPs and co-investors—namely, loss of momentum from one equity party, a lender's risk review during a debt-extension process, and leasing agents' reluctance to market.
- **Tenant-representatives and advisors** should inform clients that key market-makers (JLL/CBRE) have signaled reluctance to advance

leasing while the current disclosures remain live.
- **Failure to disclose** these facts can expose stakeholders to **misrepresentation** claims and reputational harm if the project later stalls or collapses.

## Bottom line

The affidavit evidence shows **equity interest paused**, **debt under review**, and **leasing engagement reluctant**. For those who remain, the principal exposures are **bankability**, **pre-leasing**, and **delivery**—all of which can compound into a **complete project failure** scenario. Proceed, if at all, only with updated diligence, contingency capital, and full disclosure to your clients and investors.

## FAQs

### What are the potential risks for stakeholders who remain involved in the project?

Remaining stakeholders face risks such as financing gaps if debt terms tighten, delays or failure in leasing and pre-commitment activities, project timeline slippage, heightened reputation risk, and valuation or exit challenges due to stalled leasing and project uncertainties.

### What concerns has Buildcorp expressed regarding the project?

Buildcorp has expressed concerns about the content on the exposed website and sought explanations, leading to a material reassessment that could impact project delivery and financing support.

### How are the leasing agents JLL and CBRE affected by the current disclosures?

Leasing agents JLL and CBRE are reluctant to promote the project while the negative disclosures remain publicly accessible, effectively freezing the leasing pipeline and delaying pre-commitments from prospective tenants.

### Why has the Korean investor halted their interest in the project?

The Korean investor ceased interest due to concerns over the project's public disclosures, specifically the issues published on the exposed website, which they stated made further investment unviable.

### What are the main risks currently threatening the Kurraba project's viability?

The main risks include issues with financing, leasing and marketing delays, delivery and reputational concerns from the delivery partner, potential tightening of debt terms by lenders, and withdrawal or reassessment by key investors and stakeholders.

---



### Kurraba Group

[See Full Bio](#) ›

---

# Kurraba Group & Nick Smith's Lawyers Lie to Court (again): Jim Micallef Submits Knowingly False Affidavit

October 8, 2025
Uncategorized



*#image_title*

## Key Points

- **Call for Accountability and Transparency:** We urge Corrs and involved individuals to lift the communication blocks, correct the record, and ensure transparent and fair communication practices.
- **Impact on Legal and Procedural Fairness:** Blocking responses and misrepresenting communication status undermines transparency, distort the record, and jeopardize the fairness of legal proceedings.
- **Allegations of Intentional Obstruction:** We allege that Corrs intentionally blocked our emails to avoid service and then fabricated a narrative that no response was received, undermining procedural fairness.
- **Misrepresentation to the Court:** Despite knowing our replies were blocked, Corrs falsely claimed in court that they never received our emails, thereby distorting the legal record.
- **Email Blocking and Obstruction of Communication:** Corrs Chambers Westgarth employees deliberately blocked our email responses through technical means, preventing communication and response delivery in an urgent legal matter.

## They Blocked Our Reply—Then Told the Court We Never Wrote

On **1 October 2025**, Corrs Chambers Westgarth (acting for Kurraba & Nicholas Smith) emailed us an *urgent* concerns notice. We replied **immediately** that afternoon. Our message never reached them—not because of any error on our part, but because Jim Micallef and Mark Wilks ensured that our address could not be delivered. Going forward, we might as well call Jim Micallef "*Lying Jim*".



*Lying James Jim Micallef of Corrs Chambers Westgarth*

## What happened—step by step

- **2:46 pm (AEST), 1 Oct 2025 [9:46 PM (PDT), 30 Sep 2025]:** We sent our first reply from **kurrabagroup@proton.me** to *Jim.Micallef@corrs.com.au*, copying *Mark.Wilks@corrs.com.au*. Within seconds, we received a bounce confirming our message had been **deliberately blocked** at their gateway: "**550 Administrative prohibition – envelope blocked** … [H2_6Nh-CPy2WyL911ZJaXQ.au91]" "**550 Administrative prohibition – envelope blocked** … [T2UhyW2-P9mYCLrF5Hk2hA.au49]"
- **4:32 pm (AEST), 1 Oct 2025 [11:46 PM (PDT), 30 Sep 2025]:** We tried again. The second attempt was also **blocked**: "**550 Administrative prohibition – envelope blocked** … [0TxEIxtcPrSBRhSjjSwGtw.au96]"
- After this, Corrs initiated a **new email channel** to communicate with us. Once we responded there, the same pattern repeated—**our messages were blocked again**.

## What Corrs told the court

Despite knowing our replies were being blocked, Corrs told the court they **"did not receive"** our 2:46 pm email from our Proton Mail account. An excerpt from their materials expressly states that the 2:46 pm message "was not received." That representation **omits the critical fact** that our address had already been blocked before our reply ever arrived. Moreover, he accuses the community member they are suing of fabricating an email which we actually sent.

> (b)   An email from Mr Williams at 3:21 from his Glexia email address (**Second 1.10.25 Email**), a copy of which is Exhibit JM-1 tab 40 (pages 371 to 376). In the Second 1.10.25 Email, Mr Williams fabricates a fictious history in which he claims that the only reason he has my "*email (without attachments) is because Kurraba Group Exposed replied to all and included me*". He purports to include an email from the Proton Mail Account sent at 2:46 pm, which I did not receive.

*A screenshot from an affidavit signed by James Micallef of Corrs Chambers Westgarth*

## Our position

Based on the bounce records and the sequence above, **we allege** that **Jim Micallef** and **Mark Wilks** at Corrs Chambers Westgarth **intentionally blocked our email to avoid service of our response**, and then **fabricated a narrative** that no response was received—**despite knowing** the block was in place. Creating a new channel and then blocking us there as well reinforces the pattern. We have been informed that Mr. Micallef has a history of this type of activity.

This is not a technical glitch. It is a **deliberate obstruction of communication** in an urgent legal matter. It silences a community respondent while preserving a paper trail that suggests non-engagement.

## Why it matters

Legal correspondence—especially concerns notices—depends on open channels. When a firm blocks replies and then tells a court there was no response, it **distorts the record** and **undermines procedural fairness**. We will continue to preserve and produce the bounce logs and headers (including the **"550 Administrative prohibition – envelope blocked"** entries and unique identifiers) to any tribunal or oversight body that requires them.

## Call for accountability

We call on **Corrs Chambers Westgarth**, and **Jim Micallef** and **Mark Wilks** specifically, to **lift the blocks**, correct the record, and communicate transparently. Community members must not be silenced by gatekeeping tactics disguised as routine email handling. Moreover, our response included critical information advising them they were pursuing the wrong individual (at least in relation to our website).

# Screenshots of the Email Bouncing



# FAQs

### Why is this blocking of responses a serious concern in legal proceedings?

Blocking responses undermines transparency, distorts the legal record, and jeopardizes procedural fairness, especially in urgent legal matters where open communication channels are critical.

### What evidence supports the claim that Corrs intentionally obstructed communication?

Bounce logs showing the '550 Administrative prohibition – envelope blocked' messages, along with repeated blocking across channels, support the claim of intentional obstruction.

### How did Corrs Chambers Westgarth's court statements misrepresent the communication history?

Corrs falsely claimed in court that they never received the email responses, despite knowing they were blocked, thus distorting the procedural record.

### What actions did Corrs Chambers Westgarth take after the emails were blocked?

After blocking responses, Corrs Chambers Westgarth created a new email channel to communicate, but continued to block responses there as well.

### Why did Corrs Chambers Westgarth's email responses fail to reach the recipients?

Corrs Chambers Westgarth deliberately blocked the email responses at their gateway using technical means, preventing delivery, which is evidenced by bounce messages indicating an administrative prohibition.



**Kurraba Group**

[See Full Bio](#) ›

# Judicial Review Imperils Kurraba Group's Botany Road Project as Buildcorp Wavers

October 8, 2025
Kurraba Group

*Figure: Architectural rendering of the proposed ION Life Sciences campus at Botany Road. This ambitious vision now faces serious uncertainty amid legal and financial turmoil.*



## Key Points

- **Caution Advised for Industry Professionals and Investors:** Ongoing legal battles, corruption probes, and financial risks make the ION project highly uncertain, serving as a cautionary tale for stakeholders considering involvement.
- **Deteriorating Investor and Stakeholder Outlook:** Legal and ethical uncertainties, combined with financial instability, have caused investor hesitation and led Kurraba Group to seek potential buyers, casting doubt on the project's viability.
- **ICAC Investigation and Corruption Concerns:** Kurraba Group is under scrutiny from the ICAC regarding its land acquisition for the project, which raises serious ethical questions and adds regulatory risks to the development.
- **Buildcorp's Confidence Wavers:** Initially seen as a vote of confidence, Buildcorp's involvement is now under strain due to concerns about legal delays and the impact of public allegations, potentially jeopardizing their participation.
- **Legal Challenges Threaten Project Approval:** A judicial review initiated by local residents and community groups is challenging the development approval of the ION Life Sciences Precinct, risking the voiding of Kurraba's consent and halting the project.



*A capture of part of an affidavit signed by James Micallef sent to us mistakenly by Mr Micallef as part of a lawsuit against a community member*

## Legal Storm Threatens the Project's Approval

Kurraba Group's flagship **ION Life Sciences Precinct** at 100 Botany Road – a A$490 million Sydney development – is now mired in a legal and regulatory quagmire. Local residents and community groups have launched a **judicial review** (via the NSW Land and Environment Court) challenging the project's development approval, arguing it was improperly granted. This court challenge has already delayed the venture and could **void Kurraba's development consent entirely** if successful. In other words, the very planning approval underpinning the project hangs in the balance. Observers warn that the ongoing litigation could **halt the development in its tracks** – a dire scenario for a project that has yet to even break ground. Adding to the turbulence, Kurraba's aggressive use of a State Significant Development (SSD) fast-track process is under scrutiny, with allegations that proper planning procedures were bypassed. The legal storm has cast profound doubt on whether the life sciences campus will ever materialize as promised.

Compounding the court battle is a **dark cloud of corruption concerns**. Kurraba Group has become entangled in an **ICAC investigation** over how it acquired part of the project site, in a deal that raised serious probity issues. This off-market land purchase (facilitated by a contact on the seller's board) was significant enough to be referred to the anti-corruption commission, putting Kurraba under an uncomfortable spotlight. For a development firm, an ICAC probe is extremely damaging – it signals potential unethical conduct. The mere existence of the investigation erodes trust with stakeholders and could trigger regulatory delays or sanctions. Together, the judicial review and ICAC inquiry form a one-two punch of **regulatory risk** that threatens to knock out the Botany Road venture entirely. No sophisticated investor or partner wants to be associated with a project that might be overturned by the courts or tainted by corruption allegations.

## Buildcorp's Confidence on Shaky Ground

Perhaps most telling of the project's dire state is the reaction of **Buildcorp**, the construction firm and key debt financier involved through an Early Contractor Involvement (ECI) agreement. Initially, Kurraba touted Buildcorp's participation as a vote of confidence, highlighting the contractor's expertise to lend credibility to the nascent project. But behind the scenes, Buildcorp's confidence appears to be wavering badly. After recent negative revelations, **Buildcorp privately raised alarm** about explosive information circulating on an exposé website created by community watchdogs. This "Kurraba Group Exposed" site has been publishing details of the project's troubles – including the ICAC referral and the judicial review – which Buildcorp only learned of belatedly. According to insiders, Buildcorp questioned why Kurraba failed to alert them earlier to these red flags, and the contractor is now **deeply concerned that the ICAC scrutiny and court delays could put the entire**

project at risk .

It's not hard to see why Buildcorp is spooked. A prolonged approval fight or a quashed consent would leave the builder with nothing to build, and the **reputational stain** of an ICAC investigation only adds to the risk. While Buildcorp hasn't pulled out formally, the **strain in the partnership** is palpable. Kurraba's attempts to downplay the judicial review – reportedly giving Buildcorp assurances about the process – have done little to dispel the fundamental uncertainties. In fact, industry analysts note that the much-vaunted ECI partnership with Buildcorp may have been **more of a PR exercise than real progress**, given that core project fundamentals like financing, tenant pre-commitments, and planning certainty remain woefully unfulfilled. Buildcorp's involvement, rather than guaranteeing success, now offers only *"illusory hope"* amid the project's cascading problems. With the development lacking **secure funds, tenants, or even stable approvals**, it's fair to speculate that Buildcorp could reconsider its role if conditions deteriorate further – an outcome that would likely deal a fatal blow to the venture.

## Bleak Prospects and Investor Caution

The **outlook for Kurraba Group's project has turned overwhelmingly negative**. In light of the legal and ethical uncertainties, prospective tenants and investors are understandably jittery. Financial backers have yet to materialize, and Kurraba has even been quietly shopping the Botany Road site to potential buyers in recent months – a telling sign of desperation. Industry watchers now openly question whether the ION precinct is **viable at all**, barring a dramatic turnaround. One in-depth analysis bluntly calls ION *"a perilous investment"* and *"a brewing disaster"*, warning that it **echoes the pattern** of Kurraba CEO Nick Smith's last failed venture. Smith's previous company, Kippax Property, infamously collapsed in 2023, leaving its investors with a **total loss of their investment**. That history of overpromising and underdelivering – followed by a swift rebranding to "Kurraba Group" – has not inspired confidence that this time will be different. The same aggressive promises and lack of transparency seem to be playing out again, now amplified by even larger stakes and public scrutiny.

For **investors and industry professionals**, the lesson is clear. Kurraba Group's Botany Road development is teetering on the edge: **beset by legal challenges, tainted by an anti-corruption probe, and strained by financial uncertainty**. Even its primary builder-financier, Buildcorp, is exhibiting serious doubt about the project's stability. All the glossy architectural renderings and optimistic press releases cannot obscure the fundamental issues threatening the development's survival. Unless Kurraba can miraculously resolve the court case, satisfy regulators, and shore up its finances (a trifecta that looks increasingly unlikely), the project may well unravel completely. In its current state, the ION life sciences campus has all the makings of a cautionary tale rather than a success story. The **judicial review could indeed place the entire project at risk**, and stakeholders know it. Given the multitude of red flags, many are concluding that this is one venture best approached with extreme caution – or not at all .

## FAQs

### What are the main legal and regulatory risks facing the Kurraba Group's ION Life Sciences project?

The main legal and regulatory risks include a judicial review initiated by local residents and community groups challenging the project's development approval, which could void the consent and halt the project, as well as an ICAC investigation into the land acquisition process, raising concerns over ethical conduct and regulatory delays.

### How has the legal controversy affected the confidence of key stakeholders like Buildcorp?

Buildcorp's confidence has significantly waned due to concerns over legal delays, the ICAC investigation, and negative publicity from community watchdogs, which could jeopardize their involvement and potentially lead them to reconsider their participation in the project.

### What impact do the legal and ethical issues have on investor confidence?

Legal and ethical issues have severely dampened investor confidence, leading to hesitations, the possible sale of the site, and skepticism about the project's viability, with many viewing it as a high-risk, potentially failed venture.

### Why is the future of the ION Life Sciences campus uncertain?

The project's future is uncertain because it faces legal challenges that could void development approvals, an ongoing corruption investigation, financial instability, and the potential withdrawal of key partners like Buildcorp, all of which threaten its viability.

### What lessons can industry professionals learn from the ION project situation?

Industry professionals should recognize the importance of transparent planning processes, thorough regulatory compliance, and ethical conduct, understanding that legal and regulatory risks can jeopardize large-scale developments and impact stakeholder trust and investment.



### Kurraba Group

[See Full Bio](#) ›

# Kurraba's Botany Road Debacle: A Developer's Shell Game Exposed

October 7, 2025
Kurraba Group

## Key Points

- **Urgent Need for Government Action and Accountability Measures:** Authorities must reject the staging modification unless all stages are guaranteed, conduct financial reviews, investigate misconduct, and ensure public benefits are delivered before approvals are confirmed.
- **Manipulation of Planning Processes and Lack of Transparency:** Kurraba Group employed tactics like splitting the development into stages, misuse of SSD designation, and restraining community consultation to avoid scrutiny.
- **Leadership Concerns and Financial Instability of Kurraba Group:** CEO Nick Smith's problematic track record and the project's stalled progress point to financial difficulties and potential insolvency, raising questions about the project's viability.
- **Deceptive Marketing and Phantom Facilities in the Development Plan:** Kurraba Group marketed the project as an innovation hub with a proton therapy center, but doubts persist over whether the health facilities, especially the proton center, will ever be built.
- **Sydney's Planning System Failures Exposed by Kurraba Life Sciences Precinct:** The controversial development at 100 Botany Road reveals systemic flaws such as regulatory capture, community disenfranchisement, and lack of enforcement in Sydney's planning system.

## How a Phantom Life Sciences Campus Reveals Sydney's Planning System Failures

In the annals of Sydney's development disasters, few projects have unraveled as spectacularly—or as predictably—as Kurraba Group's supposed "ION" Life Sciences Precinct in Alexandria. What began with grandiose promises of a $490-million development in the heart of Sydney's emerging health and innovation precinct has devolved into a cautionary tale of corporate hubris, regulatory capture, and community betrayal. Now, with Kurraba desperately seeking to fragment their flagship project into five stages through a Section 4.55 modification—barely seven months after securing approval—the facade is crumbling faster than their hastily assembled business model.

## The Great Bait-and-Switch: From "Innovation Hub" to Staging Nightmare

When Kurraba Group burst onto Sydney's property scene in 2022, they promised Alexandria would become home to Australia's first commercial life sciences Campus. The development at 100 Botany Road was marketed as transformational: two research buildings housing laboratories and patient facilities, with one building along Botany Road stepped between seven and 11 storeys, and another five-storey building along Wyndham Street.

Central to this pitch was the crown jewel: a below-ground Proton Therapy Cancer Treatment Centre. This wasn't just any amenity—it was the linchpin that justified classifying this as a health research facility rather than just another speculative commercial development. The proton therapy center was weaponized in planning submissions to secure favorable treatment and community support.

But here's where the story takes a dark turn. Despite the marketing blitz, there is no confirmed operator for the proposed proton therapy center, raising doubts about whether it will ever be built. Industry insiders have long suspected this was nothing more than a trojan horse—a phantom facility designed to game the planning system. The City of Sydney's own planners reportedly harbored doubts early on, with freedom-of-information documents revealing officials "acknowledged there was no guarantee that the nuclear facility underpinning the application would ever be built."

Now, with Kurraba's sudden push to stage the development across five phases, the community's worst fears are materializing. This isn't strategic planning—it's financial triage. By breaking the project into bite-sized pieces, Kurraba can cherry-pick the profitable components while indefinitely deferring the expensive, complex elements like the proton therapy center that secured community buy-in.

## Nick Smith's Trail of Broken Promises

To understand Kurraba's current predicament, one need only examine the track record of its CEO, Nick Smith. Smith's prior venture, Kippax Property, collapsed spectacularly amid a failed project, leaving investors with heavy losses. Kippax was deregistered in early 2023, and Smith promptly "rebranded" under the Kurraba banner to start fresh.

This phoenix-like resurrection should have been a red flag for regulators and investors alike. Yet somehow, Smith managed to convince authorities that his new venture—founded just as his previous company was collapsing—deserved to shepherd one of Sydney's most significant development projects. The parallels are chilling: grand promises, glossy renderings, aggressive marketing, and then… silence as deadlines pass and construction stalls.

Critics have raised concerns about Smith's public image, noting repeated photographs showing him drinking, smoking cigars, and embracing what some describe as a "party animal" persona. While lifestyle choices alone don't determine business acumen, when combined with a history of failed ventures and current project delays, they paint a troubling picture of leadership priorities.

## The Financial House of Cards Collapses

The most damning evidence of Kurraba's troubles lies in what hasn't happened. Despite Smith stating in November 2024 that the State Significant Development Application lodgement was a "great milestone" and that construction could begin as early as the first quarter of 2025,

the site remains untouched. As of October 2025, not a single shovel has been broken ground at 100 Botany Road.

Behind the scenes, the situation appears even more dire. Kurraba Group is in financial difficulty, and delays could lead to insolvency, leaving an unfinished or repurposed project. Multiple sources report that Kurraba has been "aggressively courting private investors to offload the 100 Botany Road site entirely," even while publicly celebrating progress. The company's announcement of an "Early Contractor Involvement" agreement with Buildcorp—a legitimate construction firm—appears to be nothing more than expensive window dressing. Industry veterans understand that ECI agreements are consultancy arrangements, not construction commitments. Without secure financing and pre-leased tenants, Buildcorp won't lift a hammer.

Nick Smith's Kurraba group has been desperately tapping private investors in the hope of selling the project, while Nick Smith and Proton Therapy Australia try and raise $50m through various channels. This frantic fundraising activity, occurring months after approval was granted, suggests the project's financial foundations were built on sand.

# The Planning System's Catastrophic Failure

Perhaps most troubling is how Kurraba manipulated Sydney's planning system with apparent impunity. The developer's strategy was cunningly executed across multiple fronts:

### 1. The Split Development Scam

Kurraba Group is attempting to push through the 100 Botany Road development while secretly tying it to 78-82 Wyndham Street, increasing the value of their adjacent commercial property without proper scrutiny. These projects must be assessed together, as the developers plan to link basements and share parking, exposing a clear financial scheme that undermines transparent planning processes. By artificially separating what is essentially one integrated development into multiple applications, Kurraba avoided comprehensive impact assessment and community scrutiny.

### 2. State Significant Development Manipulation

Kurraba Group is using a misleading State Significant Development (SSD) designation to bypass proper planning scrutiny and public accountability. The SSD pathway, intended for projects of genuine state importance, was weaponized to circumvent local planning controls and fast-track approval. The phantom proton therapy center was the golden ticket that justified this classification.

### 3. Compromised Consultation Process

Community members report serious irregularities in the public consultation: Critical notices were removed, misleading information was given to residents, and objections were suppressed to prevent independent review. Some residents claim notification signs "mysteriously disappeared" during the submission period, effectively silencing opposition.

### 4. Potential Conflicts of Interest

Most alarmingly, A City of Sydney planner approving the DA previously worked for Urbis, the consulting firm that advised Kurraba on how to bypass council regulations. This revolving door between planning consultancies and regulatory bodies creates an environment where developers know exactly which buttons to push.

# The Affordable Housing Betrayal

Adding insult to injury, the Botany Road site has a dark history that Kurraba has worked hard to obscure. The land was previously owned by City West Housing, Sydney's premier not-for-profit affordable housing provider. Its sale to Kurraba in 2023 has become the subject of serious allegations, with Kurraba Group, which is being investigated by ICAC over the transaction. While the investigation's outcome remains pending, the optics are devastating: land that could have provided desperately needed affordable housing was flipped to a developer with a history of failed projects, who now seeks to build luxury life sciences facilities that may never materialize.

Furthermore, Previously approved affordable housing lots have been quietly removed from the development, reducing community benefits. This represents a double blow to Sydney's housing crisis—not only was affordable housing land privatized, but promised affordable housing components within the new development have mysteriously vanished.

# The Staging Modification: Admission of Defeat

The September 2025 Section 4.55(1A) modification application to fragment the project into five stages is nothing less than an admission that the original vision was either a deliberate deception or a catastrophic miscalculation. Consider what staging really means:

**Stage 1** might deliver a basic commercial building—enough to generate some revenue and create the illusion of progress. **Stage 2** could add some laboratory fit-outs, though without anchor tenants, these would likely remain empty shells. **Stages 3-5** would theoretically include the proton therapy center and other promised medical facilities—but these later stages have no timeline, no funding commitment, and no guarantee they'll ever proceed.

This isn't phased development; it's planned abandonment. Once Stage 1 is complete (if it ever is), Kurraba can claim partial victory, sell off the remaining development rights, and leave Alexandria with a fraction of what was promised. The community gets another generic office building instead of the medical innovation hub that justified bulldozing planning controls.

# Legal Threats and Desperation Moves

As scrutiny intensifies, Kurraba's response has been tellingly aggressive. Rather than address the underlying issues, Kurraba is pouring energy

(and money) into legal threats aimed at silencing its critics. Late this year, Kurraba Group and Nick Smith launched a legal broadside from their home jurisdiction of New South Wales, Australia, targeting a small watchdog website that has been documenting the project's failures.

For Kurraba's backers, this raises serious red flags. Is this how their capital is being stewarded? Using investor funds to pursue expensive defamation actions against community critics is not only ethically questionable but financially irresponsible. It suggests a company more concerned with controlling the narrative than delivering on promises.

## The Elephant in the Room: Where's the Money?

The financial gymnastics required to keep this project afloat are becoming increasingly desperate. Consider the timeline:

- **2022**: Kurraba Group founded (as Kippax Property collapses)
- **2023**: Acquires Botany Road site under controversial circumstances
- **2024**: Lodges State Significant Development Application, promises construction start in early 2025
- **February 2025**: Development consent granted by Central Sydney Planning Committee with deferred commencement conditions requiring a Voluntary Planning Agreement
- **October 2025**: No construction commenced, desperately seeking investors, applying for staging modification

This trajectory screams of a developer that secured approvals on promises it couldn't keep, hoping to flip the entitled land for a profit before anyone noticed the emperor had no clothes. The staging modification is the last desperate attempt to salvage something—anything—from this debacle.

## The Broader Implications: A System in Crisis

The Kurraba saga exposes fundamental flaws in Sydney's planning system:

1. **Toothless Enforcement**: Developers can make grand promises to secure approvals with no meaningful penalties when they fail to deliver.
2. **Regulatory Capture**: The revolving door between planning consultancies and approval authorities creates systemic conflicts of interest.
3. **Community Powerlessness**: Even when residents identify obvious deceptions, the system provides few avenues for meaningful challenge.
4. **Affordable Housing Erosion**: Public land continues to be privatized for speculative developments that may never materialize.

## What Must Happen Now

The City of Sydney and the NSW Government face a critical test. Will they rubber-stamp Kurraba's staging modification, effectively blessing this bait-and-switch? Or will they finally say "enough" and demand accountability?

At minimum, authorities must:

1. **Reject the staging modification** unless Kurraba provides bankable guarantees that all stages will be completed within a defined timeframe.
2. **Require upfront delivery** of public benefits, especially the proton therapy center, before any commercial components can proceed.
3. **Conduct a forensic financial review** of Kurraba's capacity to deliver this project.
4. **Investigate potential misconduct** in the approval process, including the relationship between Kurraba and former Urbis employees now in regulatory positions.
5. **Establish a bond system** requiring developers to put up substantial securities that are forfeited if promised medical or community facilities aren't delivered.

## The Clock Is Ticking

As October 2025 draws to a close, the vacant lot at 100 Botany Road stands as a monument to Sydney's planning failures. Kurraba Group has a track record of dissolving companies to avoid accountability, and all signs point to history repeating itself.

The staging modification isn't just about one development—it's about whether Sydney will continue to allow cowboys to ride roughshod over communities with impunity. If Kurraba is permitted to fragment and potentially abandon this project after securing approval through questionable means, it sends a clear message: in Sydney, developers can promise the moon, deliver dirt, and walk away laughing.

The community has done its job, meticulously documenting concerns and raising red flags. Watchdog groups like KurrabaGroup.exposed have bravely weathered legal threats to shine light on this debacle. Now it's up to our elected officials and planning authorities to do theirs. Will they protect the public interest, or will they once again demonstrate that in Sydney's planning system, the house always wins—and the house is owned by developers?

Time will tell, but if history is any guide, Alexandrians shouldn't hold their breath waiting for their world-class medical research facility. They'd be better off preparing for yet another empty commercial building, another broken promise, and another reminder that in Sydney's development game, the only thing that's certain is that the community always loses.

## Key Points

- **Sydney's Planning System Failures Exposed by Kurraba Development:** The project highlights systemic flaws like regulatory capture, community disenfranchisement, and lack of enforcement, undermining Sydney's planning integrity.
- **Leadership Concerns and Financial Instability of Kurraba Group:** CEO Nick Smith's troubled track record, project delays, and financial difficulties raise questions about the project's viability and his management.

- **Deceptive Marketing and Phantom Facilities in Development Plan:** Kurraba Group marketed the project with a proton therapy center that may never be built, revealing it as potentially a phantom facility to game the planning system.
- **Urgent Need for Government Action and Accountability Measures:** Authorities must reject staging modifications unless all stages are guaranteed, conduct financial reviews, investigate misconduct, and ensure public benefits are delivered before approvals.
- **Manipulation of Planning Processes and Lack of Transparency:** Kurraba Group employed tactics like staging the development, misusing SSD designation, and restraining community consultation to avoid scrutiny.

## FAQs

### What are the key issues with the Kurraba Group's development project at 100 Botany Road?

The project is marred by manipulation of planning processes, lack of transparency, financial instability of the developer, and the use of deceptive marketing including phantom facilities like the proton therapy center.

### How has Kurraba Group misled the community and authorities about their development plans?

Kurraba Group employed tactics such as splitting the development into stages, misusing the SSD designation, suppressing community consultation, and marketing an unrealizable proton therapy center to avoid scrutiny and gain approval.

### What concerns are raised about the leadership of Kurraba Group, specifically CEO Nick Smith?

Nick Smith has a troubled track record with previous failed ventures like Kippax Property, and his leadership is characterized by broken promises, delays, financial difficulties, and a history of aggressive marketing and legal threats.

### What systemic flaws in Sydney's planning system does the Kurraba project reveal?

The project exposes flaws such as toothless enforcement, regulatory capture, community disempowerment, and the erosion of affordable housing, which allow developers to manipulate processes with impunity.

### What actions should authorities take to address the issues with this development project?

Authorities must reject the staging modification without guarantees, require the delivery of public benefits upfront, conduct financial investigations, scrutinize potential misconduct, and enforce securities to ensure promised facilities are built.



### Kurraba Group

[See Full Bio](#) ›

# New Health Research Facility SSD: Legal, Planning, and Environmental Issues Review

October 4, 2025
Kurraba Group

## Key Points

- **Community and Heritage Impact Concerns:** Inadequate community consultation, loss of promised affordable housing, heritage visual impacts, and insufficient detail on construction and environmental safety undermine social and heritage considerations.
- **Compliance with Planning Laws and SEPPs:** Potential misclassification of the project as SSD, approval of height and FSR variances without adequate justification, and deferred environmental studies could breach statutory requirements.
- **Legal and Procedural Irregularities:** Procedural issues like lack of re-exhibition after major changes, delegation of decision-making to local council, and inconsistent project scope pose risks of invalidating the approval.
- **Cumulative Impact and Proper Assessment:** Failure to consider the combined impacts of linked projects, such as construction traffic or environmental effects, can be grounds for judicial review due to incomplete evaluation.
- **Segmentation of Developments Raises Legal Risks:** Splitting what is effectively a single project into separate applications without proper integrated assessment can breach statutory requirements and lead to invalid approvals.

## Introduction

On 26 September 2024, Kurraba Group Pty Ltd lodged a State Significant Development (SSD) application (Case SSD-63067458) for a "New Health Research Facility" at 100 Botany Road, Alexandria. This proposed life sciences precinct – marketed as the "ION" campus – involves demolition of existing structures and construction of two large research/lab buildings (5 to 11 storeys) with laboratories, offices, retail, and a below-ground **Proton Therapy Cancer Treatment Centre**. The project was classified as an SSD under **Planning Systems SEPP 2021** (Schedule 1, clause 14) as a **health research facility** with a capital investment well above the $30 million threshold. The NSW Department of Planning issued Secretary's Environmental Assessment Requirements (SEARs) in January 2024, and the Environmental Impact Statement (EIS) was exhibited in late 2024. Despite recent **approval** by a delegated City of Sydney planning official on 9 September 2025, the application raises a host of legal, procedural, environmental, and social issues. This review examines potential flaws – from compliance with planning laws and SEPPs to consultation shortcomings – that could provide grounds for challenge in the NSW Land and Environment Court.

## Procedural Irregularities and Grounds for Judicial Review

**Segmentation of Integrated Developments:** A striking procedural concern is the *splitting* of what is effectively a single project into separate applications. In addition to the SSD for 100 Botany Road, Kurraba Group lodged a separate DA with Council for an adjoining **commercial office building at 78–82 Wyndham Street** (by the same developer) to be built concurrently. The **Statement of Environmental Effects** for that DA admits it is an "'Amending DA' intended to impose a condition that…will *administratively 'modify'* the adjoining SSD…merging the two consents to allow for a consolidated development precinct". In other words, the proponent sought to integrate the sites via a novel mechanism under *EP&A Act* section 4.17. This maneuver is highly unusual – normally, modifications to an SSD approval must be done through the formal **Section 4.55** SSD modification process, not via a separate council DA. The approach arguably circumvents the full SSD assessment for the whole project. Crucially, the EIS for the health facility **omitted any assessment of the impacts of the linked Wyndham Street project** or of a new electrical substation needed to power the campus. Yet both the proponent and City of Sydney acknowledged the two developments would share basements, loading docks, pedestrian linkages and be constructed simultaneously .

This segmentation raises serious **legal risks**. Under NSW law, a consent authority must consider the "*likely impacts of the development*" (EP&A Act 1979, s 4.15(1)(b)), which **includes cumulative impacts** of closely related projects. Indeed, the NSW Court of Appeal has held that failing to consider known concurrent proposals can render a decision invalid. Here, the SSD consent authority (delegated to City of Sydney) had no assessment before it of combined construction traffic, noise or other impacts from the SSD **plus** the adjacent office project – leaving a critical *gap* in the evaluation. **Gilbert + Tobin**, on behalf of an affected neighbour, warned that approving the health facility "**absent any assessment of the cumulative impacts**" would breach mandatory considerations and "**expose [the] decision to a risk of judicial review…being declared void**". In effect, the approval may be challenged for *failure to consider relevant matters*, given the clear linkage between the two developments. Good administrative practice (and the proponent's own interest) would have been to **amend the SSD to include the Wyndham site and re-exhibit an updated EIS**, so that *combined impacts* could be understood and addressed. The decision to proceed without doing so is a procedural flaw potentially fatal to the consent.

**Lack of Re-Exhibition for Major Changes:** It is unclear whether any substantial design changes or additional information (for example, to respond to agency submissions) were made post-exhibition that *should* have triggered re-notification to the public. Given the integration issues, stakeholders argue the **EIS should have been re-exhibited** with the 78–82 Wyndham Street component included. Not doing so may have denied the public an opportunity to comment on the full scope of the project, raising *procedural fairness* concerns. At minimum, the **cumulative Construction Traffic Management Plan** and staging of the two sites should have been transparently exhibited. The failure to fully inform and consult the public on the consolidated development could be seen as a **procedural irregularity** that undermines the integrity of the assessment process.

**Delegation and Decision-Making Process:** Another procedural peculiarity was the **delegation of assessment and determination to the City of Sydney**. While the Department of Planning and Infrastructure issued SEARs and listed the project on the NSW Major Projects portal, the processing of the SSD was handed to Council staff and ultimately *approved by a City planning director* under delegation. The delegation of an SSD to council is lawful, but it blurs lines of accountability – especially since Council has its own interests (e.g. negotiating a Voluntary Planning Agreement for public benefits). It is worth scrutinizing whether the decision-maker properly considered all **State-significant considerations** (as opposed to treating it like an ordinary local DA). If, for example, the **design excellence process** required by the City's planning controls was not rigorously followed because the application was an SSD, that could be an issue (the proponent submitted a *Design*

*Excellence Report* instead of undergoing a design competition ). Irregularities in how the decision was reached – such as any **undue influence or conflict of interest** given the City's dual role as assessor and beneficiary of developer contributions – could provide additional fodder for legal challenge if evidence emerged. At the very least, the optics of City staff approving a massive project that departs from local controls (see below) may fuel public perception that the **SSD pathway was used to bypass normal scrutiny**.

## Compliance with EP&A Act and SEPP Requirements

**Questionable SSD Classification:** By the proponent's own admission, only part of the $490 million development is truly a "health research facility" (labs, proton therapy suite, etc.), which they valued at ~$116 million CIV. The rest is effectively commercial office and retail space. Nonetheless, by packaging it as an integrated health/innovation precinct, Kurraba Group invoked clause 14 of *Schedule 1 of the Planning Systems SEPP 2021*, qualifying as an SSD (Hospitals, medical centres and health research facilities > $30 million). Some community members argue this designation is a **misuse of the SSD regime**, claiming the project is essentially a private speculative development "wrapped in research buzzwords" with "*no proven public health benefit*". Legally, the question would be whether the development is correctly *characterised* under the SEPP. The definition of "health research facility" is broad, and there is no requirement that it be publicly owned or non-profit. However, if a court found that a predominantly commercial office park was **not in substance a health/medical research facility**, the approval could be invalid for **jurisdictional error** (i.e. the consent authority had no power to approve it as SSD). Such a challenge would be novel and hinge on facts – e.g. if key purported health features (like the proton therapy center) are *unconfirmed or unlikely* to proceed. Absent a clear misclassification, though, this ground may be difficult to sustain, since the SEPP category does encompass private life-science labs.

**SEPP (Sustainable Buildings) 2022 – Net Zero and ESD:** The **Sustainable Buildings SEPP 2022** imposes new sustainability requirements on large developments, including a path to net zero emissions. The SEARs explicitly required a **Net Zero Statement** under EP&A Regulation clause 35C. The proponent's consultant Cundall duly prepared a plan committing that the project will avoid fossil fuel use (no gas for heating) and be *"capable of operating at net zero emissions by 2035"*. This addresses the **letter of the law**, but stakeholders question the rigor and enforceability of these claims. For instance, the campus will still rely on backup diesel generators and tenant-specific laboratory processes that could be carbon-intensive. No binding mechanism beyond future design development is in place to guarantee net-zero operation by 2035. While not an outright breach, this could be seen as a *"questionable interpretation"* of the SEPP's objectives – essentially deferring actual compliance to later detailed design and fit-out. If the consent conditions merely require implementation of the Net Zero Statement, a court might deem that **too uncertain or unenforceable** (though typically sustainability measures are left to post-approval compliance rather than grounds for invalidity). The key point is that the **ambition to meet net zero could ring hollow** if the approval does not include strict conditions (e.g. prohibiting any permanent fossil-fuel plant or requiring NABERS energy ratings). Any inconsistency between the glossy ESD commitments and the actual design could also erode trust – for example, if **high embodied-carbon materials** or minimal green infrastructure are still allowed, contrary to the project's marketed sustainability ethos.

**Planning Systems SEPP & Other Legal Compliance:** Aside from the SSD declaration, the application needed to navigate various planning instruments. Under *City of Sydney's Local Environmental Plan (LEP) 2012*, the site (recently rezoned to **MU1 Mixed Use** in 2022) has specific **height and floor space ratio (FSR)** limits. The proposal **exceeds those limits**, relying on the LEP's **clause 4.6 variation** mechanism for exceedances. Objectors argued that the Clause 4.6 justification was inadequate, failing to demonstrate that strict compliance was unreasonable or unnecessary in the circumstances. If the consent authority approved height/FSR exceedances without properly satisfying itself of the clause 4.6 tests, that could be an error of law. However, since this was an SSD, one might ask whether clause 4.6 even applies – typically it does, as the SSD still must address local planning standards unless expressly modified by the approval. The assessment report (not publicly available at this writing) presumably includes the decision-maker's reasoning for allowing the breach. Any **failure to properly consider the objectives of the standard or the environmental impacts of the extra bulk/height** could be a hook for judicial review (on grounds of legal unreasonableness or insufficient reasons). The community's perspective is that the **scale of the project "undermines" local planning objectives** for heritage and amenity , so a court challenge could probe whether the **public benefits were overstated** and impacts underplayed in granting the variations.

Another compliance issue is **deferred approvals**. The EIS defers many details to future plans (e.g. a detailed Construction Traffic Management Plan, Hazardous Materials management plan, etc.), which is common but has limits. Courts have cautioned against consents that defer fundamental environmental assessments to a later stage. Here, for example, the EIS gave **no concrete data on construction traffic volumes**, simply asserting deliveries would be outside peak hours and impacts "minimal," with exact figures to be provided in the later management plan. This was a direct **non-compliance with the SEARs**, which required analysis of construction traffic and cumulative impacts. Approving the project without that information means the consent authority **lacked a full understanding of likely impacts at decision time**. Opponents could argue this violates the EP&A Act's requirement to consider the *"public interest"* (which includes ensuring proper EIS content and adherence to SEARs). However, unless the deferred matters are truly fundamental (e.g. a *concept approval* with no design), courts often allow it if the consent conditions ensure the later plans will meet certain standards. The line between permissible deferral and unlawful abdication of assessment is nuanced – but certainly, the **absence of a quantified construction traffic and noise impact analysis** undermines the robustness of the approval and could be characterised as *irrational or unreasonable* decision-making .

## Landowner Consent, Zoning and Statutory Justification

**Landowner Consent:** The application form confirms that Kurraba Group obtained **written consent from all landowners** of the subject lots before lodging. The site is an amalgamation of multiple parcels (over 5,350 m²) that Kurraba reportedly assembled in 2023. Thus, on paper there is no obvious breach of the EP&A Regulations' landowner consent requirement. If, however, any part of the development extends to land not in the application (for example, works to a public road or a lot under separate ownership, such as the **Wyndham Lane extension or the Ausgrid substation**), there could be a consent issue. The documents indicate a new substation is required but it's not clear if that is on-site or off-site. If off-site on Council or Ausgrid land, the proponent would need those owners' consent or a specific exception. The **BDAR waiver** (discussed below) included a *Schedule 1 description* mapping the site lots , suggesting the substation was considered part of the SSD. Assuming consent was in order, a potential *grey area* is the **"Amending DA" for 78–82 Wyndham**: that site is adjacent but technically separate. The **Gilbert + Tobin letter** contends the two projects are so interlinked that they should be one – if a court agreed, it might view the approvals as invalid for bypassing integrated consent. However, since formally the SSD stayed within its own lots (74–108 Botany Rd & 86–100 Wyndham St) , it's likely the consent was validly obtained from those owners (who Kurraba represents). In summary, no clear breach of landowner consent rules is evident in the materials, but the *strategic lot exclusions* remain a point of contention.

**Zoning Conflicts:** The site lies in the **Botany Road Precinct**, which the City of Sydney **rezoned in 2022** to MU1 Mixed Use with the aim of encouraging commercial and tech development near the new Waterloo Metro station. That rezoning increased permissible heights and FSR, so the SSD was generally consistent with the intended land use (research, offices and ancillary retail are permissible in MU1). However, community submissions note that even under the new controls the project exceeds the mapped **height and density limits**. This raises the issue of **planning controls flexibility**: The proponent's **Design Excellence Report (Ethos Urban)** and EIS argue the exceedances are justified by design quality and public benefits, but objectors say the justification was perfunctory. One specific concern is the **impact on the adjacent Heritage Conservation Area** (terrace houses to the south) – the proposal's 11-storey mass *looms over* single-storey cottages, which the height control was meant to mitigate. If the consent authority gave a green light without rigorously addressing whether the excessive bulk is in the public interest, it could be attacked as *failure to apply the LEP requirements properly*. However, because SSD consents can technically override certain local standards, the battleground would likely be whether the decision was **unreasonable or lacking evident justification**. Notably, the **approval (dated 9/9/2025)** was issued under delegated authority rather than by the independent Planning Panel or Minister, which might indicate less scrutiny. Any **inconsistency with the Local Strategic Planning Statement or Sydney LEP objectives** (e.g. for transition to heritage areas) could buttress an argument that the decision-maker gave **insufficient weight to environmental planning instruments**, contrary to EP&A Act s4.15(1)(a).

**SSD Criteria and Public Benefit:** Under the SSD framework, projects are often justified on broader *State significance* grounds. Kurraba pitched this development as a catalytic life-sciences hub aligning with national innovation strategies. Yet, critics point out that unlike a public hospital or university research facility, this is a private, profit-driven venture with *exclusive access*. They argue it **offers little tangible public benefit** – for example, it **removed previously approved affordable housing** on the site without providing alternatives. In fact, before Kurraba acquired the land, an earlier scheme apparently included a residential component with affordable housing (likely as part of the precinct plans), which has been "quietly" dropped. If true, this is a significant social planning issue: the community lost potential housing benefits and gained a commercial complex. While not illegal per se, it raises questions whether the Department or City **properly considered social impacts** and whether a **Voluntary Planning Agreement (VPA)** was negotiated to compensate. City of Sydney did indicate a draft VPA would be established – possibly for public domain works or affordable workspace, but details remain scant. If no meaningful public benefits were secured, one could argue the approval failed to serve the **objects of the EP&A Act** (such as promoting social welfare and orderly development). In a judicial review context, courts typically won't reevaluate the merits of public benefit, but a glaring **absence of consideration** of a key issue (e.g. ignoring the loss of affordable housing contrary to City policy) could be raised. At the very least, it's a planning policy inconsistency that should have been transparently justified in the assessment report.

# Environmental and Heritage Assessment Concerns

**Biodiversity and BDAR Waiver:** Being an inner-urban brownfield site, the project was **granted a waiver** from the requirement to prepare a Biodiversity Development Assessment Report. In June 2024, a delegate of the Environment Agency Head determined the proposal **"is not likely to have any significant impact on biodiversity values"**, thus no BDAR was required. This is common for fully urbanized sites with no remnant vegetation or threatened species habitat. However, some caution that such waivers can overlook micro-level impacts (for instance, loss of urban **green cover**, or any unexpected fauna using the old warehouses). The waiver was based on an Ecologique consultant report dated 3 June 2024, presumably confirming negligible ecological value on-site. Barring any **error in that assessment**, the lack of a BDAR is not a breach. Still, in the spirit of thoroughness one might have expected the EIS to discuss urban greening or biodiversity enhancements (since the precinct planning encourages it). The **Sustainability** and landscape plans should ideally have included measures like habitat plantings or green roofs to compensate for any loss of trees (if any street trees are removed). If the final design omits these, it could be a missed opportunity rather than a legal violation. In short, the BDAR waiver itself appears properly obtained , but the project could face *community criticism* for doing the bare minimum on biodiversity.

**Contamination and Hazard Management:** The site has an industrial past, and investigations (Douglas Partners' reports) found contaminants including friable asbestos, lead, and hydrocarbons well above safe levels. The EIS included a Remediation Action Plan, but objectors highlight that **handling and removal of these hazardous materials** during excavation poses serious health risks if not stringently managed. Any **failure to adequately address contamination** could breach State Environmental Planning Policy (Resilience and Hazards) 2021 and *clause 7 of SEPP 55* (Remediation of Land) which requires land to be made suitable. The **Department and EPA** would likely impose conditions for an independent site auditor to approve a remediation plan prior to construction – it's essential such conditions are indeed in the consent. If not, that omission would be a legal red flag. Additionally, the presence of a planned Proton Therapy facility implies potential use of radiation sources, which introduces a **hazard/risk dimension** (though presumably subject to separate licensing). The EIS performed a Preliminary Risk Screening per SEPP (Resilience and Hazards) 2021, concluding no full hazard analysis was needed on the assumption that tenants' hazardous materials will not exceed threshold quantities. This assumption was criticized as *speculative*, since future lab tenants and their chemical inventories are unknown. The Planning guidelines (HIPAP No. 6) encourage a conservative approach: here, instead of providing any quantitative estimate or worst-case scenario, the EIS simply stated no single tenant is expected to surpass storage thresholds. A reviewer noted this **lack of hard data or modeling** – the EIS "does not demonstrate how it addresses the uncertainty" of dangerous goods usage, essentially deferring it to later once tenants are identified. While this may satisfy minimum SEPP 33 screening (if they genuinely anticipate only small research quantities), it again illustrates the *pattern of deferral*. Should a tenant later propose something like a significant ethanol store or radioactive source, the consent authority might have to reassess risk then, which is not ideal. However, from a legal standpoint, as long as the **hazard screening was done and documented**, the court is unlikely to fault the consent on this aspect unless it was *egregiously* wrong. It's more a matter of **public safety diligence** – any mishap due to underestimating hazards would reflect poorly on the approval process.

**Heritage and Urban Character:** Although no heritage-listed buildings exist on the site itself, the locale includes a Heritage Conservation Area of Victorian terraces immediately south (along Wyndham Street) and other heritage buildings in Alexandria. Residents are concerned the **modern campus will dominate and detract from the historic character** of the neighborhood. The EIS included a Heritage Impact Statement or at least considered urban context in the design report. Nevertheless, the bulk and height exceedances mean **significant visual impact**, including **overshadowing of nearby residences and parks**. A specific complaint is that the **overshadowing analysis was incomplete**: The SEARs required comparing shadows of the proposal against the existing situation and a compliant (within-height) massing, to demonstrate adequate solar access for neighbors. The EIS's diagrams (Figure 58) showed the development would fully shadow certain areas at various times, but **failed to explicitly compare this to the no-build or compliant-build scenarios**, thereby not proving a "high level of amenity" remains for surrounding homes. Essentially, the EIS *presented the shadow impact as an improvement relative to some hypothetical larger envelope*, rather than honestly against today's sunlight. This is a methodological flaw. It suggests the proponent tried to minimize perceived impact by using a baseline of "maximum potential building form" rather than reality. Such an omission could be seen as **misleading the decision-maker** if it obscured how much worse off neighbors will be. That said, Council planning staff likely noticed this and may have done

their own comparison. The **lack of rigorous heritage streetscape integration** (e.g. podium setbacks or facade articulation sympathetic to terraces) is a qualitative issue that can ground *merits* objections but rarely a legal error unless heritage impacts were completely ignored. Since the approval was granted, one infers the decision-maker believed impacts on the conservation area were acceptable or mitigated. However, if it can be shown that a **mandatory relevant consideration** – say, the objectives of the heritage conservation provisions in the LEP – was not properly factored in, that could be a legal vulnerability.

**Traffic and Infrastructure Strain:** The development sits at a busy intersection (Botany Rd/Wyndham St) and includes **two basement parking levels**, loading docks, and a new laneway. The **Traffic Impact Assessment** predicted increased traffic on local streets, and residents fear congestion and safety risks for pedestrians and cyclists. A particular criticism is the **absence of a quantified construction traffic study** despite SEARs calling for one. The EIS deferred this to a later plan, baldly asserting that deliveries will be minimal and scheduled outside peak hours. This flies in the face of recent experience – the community endured **five years of construction for the Waterloo Metro** nearby. To then have *no analysis* of overlapping construction traffic for this huge project (plus the adjacent one) is arguably a **failure to assess a key environmental impact**. Legally, a court might view this as a breach of the EP&A Act's EIS adequacy requirements. From a planning perspective, it also undermines **public safety** assurances. Likewise, **pedestrian network upgrades** (two new pathways and a through-site link) are touted , but if these are on private land, their public access needs to be secured via easements or conditions. Any omission there could lead to promised connectivity not materializing. Another issue is **infrastructure capacity** – the project will need electricity, water, sewer upgrades. The EIS notes a new **11kV substation** is required, but it's unclear if that's covered under this approval or left to Ausgrid's separate process. The cumulative strain with other developments (the City's planning scheme anticipates *280,000 m² of* new floorspace in the precinct ) means utilities and transport infrastructure must expand. If the assessment glossed over whether public transport and roads can handle the influx of workers and visitors (about **1,700 ongoing jobs** touted on site ), then the consent authority may have failed to consider the **public interest** fully. Again, these points likely fall under merit considerations, but glaring omissions (like no cumulative traffic modeling) can shade into legal unreasonableness.

**Noise, Vibration and Construction Impacts:** Major demolition and excavation so close to old homes raises concerns about **structural damage (vibration)** and prolonged **noise and dust** exposure. The EIS included a noise assessment, yet a neighbor's independent review (EME Advisory) found it *underestimated* impacts and did not identify the nearest residence as "Highly Noise Affected" when it probably should. More critically, **no vibration assessment** was done at all – despite the risk of excavating a 2-level basement mere meters from a 19th-century brick terrace. This omission is significant. The SEARs would have expected a construction noise and vibration plan. By deferring a detailed vibration study to post-approval, the proponent avoided addressing whether heritage buildings or houses could crack from pile-driving or tunneling. If damage were to occur, the lack of upfront analysis could be cited as a failure in the EIS. From a legal standpoint, if the consent conditions do not explicitly require a *dilapidation survey* of neighbors and a vibration monitoring program, that's a tangible failing in mitigating a known impact. The **owner of 102 Wyndham St** (adjacent) had to commission their own engineer because the application provided no assurance on this front. Courts have in some cases (e.g. *Boral Resources v Roads and Maritime Services*) insisted on proper consideration of construction impacts on adjoining properties. Thus, the **omission of a vibration/shock impact assessment** could form part of a cumulative argument that the approval was made on insufficient information.

# Social Impact and Consultation Failings

**Community Consultation Deficiencies:** The SEARs and good practice dictate that the proponent consult with affected stakeholders early and often. The **Social Impact Assessment (SIA)** chapter of the EIS purportedly listed local residents as key stakeholders. However, in reality **some immediate neighbors were never directly consulted prior to exhibition**. The owner of 102 Wyndham Street – whose home will be most affected – stated *"at no point was [he] directly approached by the applicant to discuss concerns or mitigation,"* until after the EIS was public and only at the neighbor's own instigation. This indicates a **poor engagement process**. If the SIA claimed comprehensive consultation but failed to actually engage a primary neighbour, that calls into question the SIA's credibility. It may also breach the Department's guidelines for SSD community engagement, which stress early input to identify issues. In judicial review terms, lack of consultation is not usually a standalone ground (since public exhibition was provided, satisfying statutory minimum). But it can underpin other arguments: e.g. if important local knowledge (like residents' experience with flood or traffic) was missed due to no consultation, then the consent authority's consideration of impacts might be incomplete. Additionally, perceptions of procedural unfairness arise when **meaningful community feedback is not incorporated**. Several submissions from residents opposed the project, raising issues from pollution to heritage (19 submissions total, all objections or comments) – the **Response to Submissions** document needed to address these fully. If the Response was superficial or dismissive (and given the project was still approved without major changes, residents likely feel ignored), it undermines confidence in the process. In an LEC challenge, this could be framed as a *failure to genuinely consider* public submissions – a tall order to prove, but a narrative that the approval was rushed or predetermined could sway the optics in a court hearing for a stop order.

**Social Impact Assessment Gaps:** Beyond consultation, the **content of the SIA** itself may have omissions. For instance, as noted, the transformation of the site from a mixed-use (with potential housing) to an exclusive commercial precinct is a social impact that should have been assessed. Did the SIA evaluate the loss of potential housing or the demand for affordable housing in the area? Likely not in depth. Also, **community wellbeing issues** like construction fatigue (given the concurrent Metro project) and cumulative dust/noise exposure should have been addressed. If these were glossed over, the consent authority may have overlooked "public interest" factors around community health. The SIA should also discuss **employment and education opportunities for locals** (the project promises jobs, but will they go to the local workforce or just incoming specialists?). **Equity and inclusivity** of the facility is another aspect – it's branded as serving national research goals, but being a private facility, does it have any programs for community engagement (e.g. STEM education outreach, public health clinics)? The *National Health & Medical Research Strategy* emphasizes equitable access, which a single high-end hub in Sydney might not fulfill. If the proponent touted alignment with such strategies (as they did in media releases) but the actual plan lacks any community healthcare component, that inconsistency should have been interrogated in the assessment. A legal challenge might not directly arise from this, but it adds to the *overall picture of a development that may not deliver the public benefits claimed.*

**Loss of Promised Public Benefits:** As mentioned, one glaring social issue is the **removal of previously promised affordable housing** on this site. The Botany Road precinct plan likely had an affordable housing contribution target (City of Sydney has an Affordable Housing Program requiring contributions or inclusion of units in upzoned areas). If Kurraba's project sidestepped that – perhaps by virtue of being SSD or by offering a monetary contribution instead – it should have been transparently justified. The community might feel cheated if, for example, a prior approved scheme included, say, 5% affordable units and now there are zero. The **Voluntary Planning Agreement (VPA)** on exhibition might give clues: if no housing, perhaps Kurraba offered a cash contribution to the Council's affordable housing fund. If neither happened, it's a social planning failing. The Land and Environment Court could consider this under **"failure to consider the public interest"**, especially given the well-documented need for affordable housing in the area. It's not a straightforward legal point, but it reinforces an argument that the

decision did not properly weigh the socio-economic impacts.

**Net Zero and Community Benefits:** While net zero was discussed earlier as a compliance matter, it also has a social dimension – climate change mitigation and local environmental quality. The proponent's Net Zero Statement commits to no gas infrastructure and eventually all-electric operation. This is positive, yet residents might ask: what about *local* sustainability benefits like urban greening or open space? The design includes some outdoor terraces and a through-site link, but critics say it offers only **"minimal public benefit in terms of open, green, safe spaces"**. The large podiums and buildings could create a wind tunnel or heat island effect if not mitigated. If the EIS doesn't adequately model or address wind, shade, and human comfort at street level, that's an omission affecting social amenity. These issues, while subtle, accumulate to paint a picture of a development that is *big on private gain, modest on public return*. Legally, none of these alone invalidates an approval, but they underscore why the project is contentious and highlight potential weak spots if a judge were to scrutinize whether the **decision was reasonable and in the public interest**.

# Inconsistencies and Omissions in Documentation

Throughout the application materials, there appear to be several **inconsistencies or omissions** that could undermine the robustness of the approval:

- **Inconsistent Project Scope:** The SSD was described as a self-contained project, yet other documents (the Council DA's SEE) openly discuss the integrated precinct plan. This inconsistency in project definition could have misled public and agency reviewers. For example, the **Traffic Impact Assessment** in the EIS considered some background growth but **omitted the simultaneous construction of the Wyndham St building**, even though internal documents knew it was planned. Likewise, the **utilities assessment** notes a new substation but doesn't clarify if its impacts (noise, location) were assessed – a reader of the EIS might not realize a separate "Substation Project" exists. Such omissions kept the true combined impact opaque. In a judicial review, this could be framed as the decision being based on an **inadequate EIS** (a breach of EP&A Act s4.15(1)(e) – the public interest in proper information).
- **Contradictory Claims on Impact Mitigation:** The EIS and Response to Submissions may contain standard claims that all impacts can be mitigated to "acceptable" levels. However, the detailed studies (and independent peer reviews) indicate otherwise. For instance, the Noise Impact Assessment might have set criteria that are exceeded at the closest dwelling, yet the summary might still conclude "no significant impact." The **EME Advisory review** found that the **noise report likely underestimates noise levels** and fails to classify the worst-case impact category . Similarly, the proponent claims to respect heritage context, yet the **visual bulk** is clearly at odds with the fine grain of Alexandria's older parts. These inconsistencies between the technical findings and the conclusions presented could suggest the **documentation was selectively optimistic**. If an objector can demonstrate that the consent authority was led to believe impacts are minor when the data showed major exceedances, that borders on *misdirection*. While likely unintentional, any serious discrepancy (e.g. if an appendix actually shows a non-compliance that was not disclosed up-front) could be ammo in court to say *relevant information was ignored*.
- **Deferred Studies and Conditions:** As noted, the application left several studies to be done later (vibration assessment, final construction management plan, detailed hazardous materials survey, etc.). Ideally, the consent conditions now require those. An inconsistency arises if the **approval conditions are too vague or lenient** compared to commitments in the EIS. For example, the EIS might promise "no work on weekends or nights," but if the issued conditions allow 8am–1pm Saturday work, that's a discrepancy affecting residents. Or the EIS might highlight a particular tree to be retained for streetscape, but the approved plans might end up removing it. Without seeing the final Conditions of Consent (which are part of the Determination package), we can't cite specifics, but it's an area to watch. If there are **omissions in conditions** (e.g. failing to lock in the pedestrian link as publicly accessible, or forgetting to impose a cap on parking spaces promised to reduce traffic), those could render the approval inconsistent with how the impacts were assessed. This sometimes leads to modification requests later, but it could also ground a **failure to impose necessary conditions** argument (though that's typically merits, not legality).
- **Attachment Errors:** With 50+ EIS appendices, it's possible some internal contradictions exist – for instance, an early Architectural Design Report might have a different GFA or height than the final plans. If such errors were not corrected, the consent authority might have approved something without clarity on the exact parameters. In court, usually the final plans govern, but any confusion could complicate enforcement or indicate the assessment lacked clarity. One known attachment is the **Landscape/Public Realm plan by ASPECT Studios**, which is cited by objectors as claiming plenty of public open space whereas in reality there's minimal green area. The **Social Impact Assessment** might claim broad community support or negligible social risk, which conflicts with the volume of opposition submissions and genuine social concerns noted above. These inconsistencies can erode the credibility of the whole application.

In sum, while the application documents technically cover the required topics, the **depth and honesty of the analysis** in some areas is questionable. The law requires not just box-ticking, but a **"proper, genuine and realistic consideration"** of the environmental impacts (to quote Justice Biscoe in *Meadows v MEC*). Identifiable gaps – like *no cumulative impact assessment, no vibration study, limited consultation, and rosy assumptions in lieu of evidence* – suggest the consideration may have fallen short of that standard. This forms a compelling narrative for community objectors gearing up for a legal challenge.

# Conclusion: Potential Avenues for Challenge

Despite securing approval, the New Health Research Facility SSD application contains multiple vulnerabilities that could be tested in the Land and Environment Court. From a **legal/administrative law** perspective, strong candidates for judicial review include:

- **Failure to Consider Relevant Matters:** The consent authority arguably did not consider the *combined impacts* of the project with the concurrent adjacent development – a breach of EP&A Act s4.15(1)(b) as interpreted by case law. Likewise, not fully considering construction traffic, vibration, and overshadowing impacts (all required by SEARs) is a lapse in considering mandatory factors. These omissions align with grounds of **legal unreasonableness** or **voidable error** if proven substantial.
- **Procedural Fairness and Transparency:** The decision to proceed without re-exhibition or direct consultation on major changes (like integrating a second building) could be cast as denying the public a fair opportunity to be heard. While the statutory exhibition did occur, the evolving nature of the project scope post-exhibition raises issues. A court might not find a clear legal right was violated, but it feeds into a narrative of an *unfair process*, reinforcing other grounds.
- **Error of Law in Applying Planning Controls:** Approving exceedances of height/FSR controls via clause 4.6 requires strict findings – if the consent fails to record adequate reasons why compliance was unnecessary or how the development remains in the public interest,

that could invalidate those variations. The outcome would be that the consent permits a building that the LEP otherwise prohibits without proper justification, a classic *Winten* grounds scenario (from *Initial Action Pty Ltd v Marrickville Council* and related cases). In addition, if the project truly contravenes fundamental planning objectives (heritage protection, orderly development), the overall decision might be attacked as **manifestly unreasonable**.

- **Sustainability and SEPP Compliance:** Any clear breach of a SEPP requirement (for example, if the Sustainable Buildings SEPP's net zero provisions weren't actually satisfied, or if a REAP certification was misrepresented) could be a ground. We note the application did include a Registered Environmental Assessment Practitioner's declaration. If that declaration was flawed or if the REAP overlooked the cumulative impact gap, there's an argument (albeit novel) that the assessment process didn't meet new regulatory standards.

- **Public Interest and Improper Purpose:** Although courts tread carefully here, one could argue the SSD provisions were used for an ulterior purpose – essentially to **fast-track a private commercial project** and avoid Council's full control. The evidence is the unusual "Amending DA" tactic and the removal of community benefits (like housing). If a judge were persuaded that the SSD pathway was abused (i.e. *planning advantage* was obtained on a false premise of public benefit), they might find the decision so **contrary to the objects of the Act** as to be legally unreasonable. This is a high bar and would require compelling evidence of bad faith or serious misdirection.

In wrapping up, the **Kurraba Group's New Health Research Facility** exemplifies the tensions inherent in fast-tracking development in sensitive urban areas. The project promises economic and research benefits, but it also poses **significant environmental, social, and planning challenges** to its Alexandria/Waterloo community. Key concerns span from contamination and construction impacts to heritage, traffic, and loss of community assets. The **grounds for judicial review** primarily coalesce around procedural and legal faults – notably, the segmented assessment and failure to consider cumulative impacts loom large as potential fatal flaws. Whether or not a court ultimately finds in favour of a challenger, these issues underscore the need for **robust, transparent assessment** for projects of this scale.

For legal professionals and planning consultants watching this case, it highlights the importance of *dotting every "i"* in SSD applications: ensuring **all related developments are included or assessed**, thoroughly addressing each SEAR, and genuinely engaging with community concerns. When any of those steps are skipped or glossed over, the door opens for costly legal battles. Given the stakes – a $490 million precinct and the precedent it sets – the scrutiny of this approval is likely far from over.

# FAQs

### What procedural irregularities could potentially invalidate the Kurraba Group SSD approval?

Potential procedural irregularities include the segmentation of integrated developments, lack of re-exhibition for major changes, delegation of decision-making to the City of Sydney, and failure to properly consider cumulative impacts, which could all be grounds for judicial review.

### How does the segmentation of the project into separate applications pose legal risks?

Segmenting the projects may have circumvented comprehensive assessment of combined impacts, such as construction traffic and noise, which is required by law; failing to consider these cumulative impacts can lead to the approval being challenged as unlawful.

### Is the classification of the development as a State Significant Development (SSD) justified?

The development is classified as SSD because it involves a capital investment well above $30 million and includes specialized facilities, but critics claim that only part of the development qualifies as a health research facility and that the project is primarily commercial, which could question the proper use of the SSD designation.

### What are the concerns related to compliance with environmental and heritage assessments?

Concerns include the waiver from Biodiversity Development Assessment Report, inadequate assessment of contamination and hazardous materials, incomplete shadow and visual impact analyses, and potential neglect of heritage considerations due to the height and bulk exceedances.

### What social impact and community consultation issues have been identified with the project?

Issues include inadequate consultation with affected neighbors, particularly regarding impacts; potential loss of promised affordable housing; limited assessment of community benefits; and perceived disregard for community feedback, which could impact perceptions of procedural fairness and legitimate community interests.

# Sources:

- Environmental Impact Statement & Appendices for SSD-63067458, *New Health Research Facility, Alexandria* (2024).
- Gilbert + Tobin advice letter dated 2 Dec 2024 re: **Cumulative Impacts and Related Development** .
- City of Sydney submission on SSD-63067458 (EME Advisory for 102 Wyndham St owner) highlighting EIS gaps in noise, traffic, cumulative assessment .
- *Environmental Planning and Assessment Act 1979* (NSW) – esp. sections 4.15, 4.17, 4.38–4.40.
- *State Environmental Planning Policy (Planning Systems) 2021* – Schedule 1 clause 14 (Hospitals/health research facilities > $30M SSD) .
- *State Environmental Planning Policy (Sustainable Buildings) 2022* – net zero requirements; EP&A Regulation 2021 clause 35C .
- Community objection submissions on Major Projects Portal (2024–25), including heritage, traffic, and amenity concerns .
- *Hoxton Park Residents Action Group Inc v Liverpool City Council* [2011] NSWCA 349; *Bingman Landcare v Bowdens Silver* [2024] NSWCA 205 – caselaw on cumulative impact consideration .
- Kurraba Group marketing and critical commentary (*KurrabaGroup.exposed* articles, 2025) on the ION precinct's promises vs reality .



**Kurraba Group**

[See Full Bio](See Full Bio) ›

# The Trustee for Botany Road Development Trust Fund — ABN 31 744 075 878

October 3, 2025

## BOTANY ROAD DEVELOPMENT TRUST FUND

*Last updated: 3 October 2025*

**Purpose:** Collate verifiable, publicly available information about the entity referred to as "BOTANY ROAD DEVELOPMENT TRUST FUND", its trustee, related parties, and the principal project commonly associated with it (the life sciences development at 100 Botany Road, Waterloo/Alexandria, NSW).

### Executive Summary

- **Entity of record:** *The Trustee for Botany Road Development Trust Fund* — ABN **31 744 075 878**; entity type **Fixed Unit Trust**; ABN and GST active from **26 April 2023**. Source: ABN Lookup.
- **Trustee:** *Botany Road Development Pty Ltd* (ACN 667 402 397), acting "as trustee for the Botany Road Development Trust." The *trust deed* is dated **26 April 2023**. These details appear in the City of Sydney *Draft Planning Agreement* (VPA) for the 100 Botany Road development. Source: City of Sydney VPA PDF (see parties and cl. 13, "Limitation of liability").
- **Principal project:** A proposed **$490m** life sciences campus at "100 Botany Road" (also encompassing 74–108 Botany Rd & 86–100 Wyndham St). Project communications cite a "26,000 m²" campus concept; official SSDA documentation states the *site area* is approximately **5,350.6 m²** with two buildings and provision for a *proton therapy* cancer treatment centre. Sources: Gensler press release; Cundall ESD Report (SSDA); The Urban Developer.
- **Planning status (Feb 2025):** The Central Sydney Planning Committee resolved to delegate authority to the CEO to determine DA D/2024/937 and "consider granting *deferred commencement* consent" subject to execution and registration of the VPA and other conditions. Source: City of Sydney decision record.

### Key Facts

| | |
|---|---|
| **Legal name (ABR)** | The Trustee for Botany Road Development Trust Fund |
| **ABN** | 31 744 075 878 |
| **Entity type** | Fixed Unit Trust |
| **ABN & GST status** | Active and GST-registered from 26 April 2023 |
| **Main business location** | NSW 2060 (North Sydney) |
| **Trustee** | Botany Road Development Pty Ltd (ACN 667 402 397) |
| **Trust deed date** | 26 April 2023 |
| **Registered/Correspondence address used in planning docs** | Level 15, 124 Walker Street, North Sydney, NSW 2060 |
| **Primary project** | 100 Botany Road Life Sciences Campus (Waterloo/Alexandria, NSW) |

Sources: ABN Lookup; City of Sydney VPA.

### What is the "Botany Road Development Trust Fund"?

The **Botany Road Development Trust Fund** is the label recorded on the Australian Business Register for a *fixed unit trust* structure (ABN **31 744 075 878**). It is administered by *Botany Road Development Pty Ltd* as trustee. The ABR record confirms its trust/fund nature and tax status; the City of Sydney planning agreement confirms the trustee's capacity and the *trust deed date of 26 April 2023* and includes standard *trustee limitation of liability* provisions.

References: ABN Lookup record; VPA PDF (Parties; cl. 13).

### Trustee, Governance & Related Parties

- **Trustee company:** Botany Road Development Pty Ltd (ACN 667 402 397), described in the VPA as "*as trustee for the Botany Road Development Trust*," with the address Level 15, 124 Walker St, North Sydney NSW 2060. Source: City of Sydney VPA (cover & parties).
- **Officeholders (indicative):** A copy of an *ASIC company extract* for the trustee has been republished by a community watchdog site, showing Nicholas Mark Smith as director and listing the same North Sydney address. This is not an official ASIC publication link, but reproduces ASIC extract content. Republished extract. (Treat as *secondary evidence*.)
- **Related development manager:** *Kurraba Group* publicly fronts the project branded as "ION" at 100 Botany Road (design by Gensler).

See Gensler press release and Kurraba news.

## Primary Asset: 100 Botany Road Life Sciences Campus (ION)

### Location & Site Assembly

The project spans **74–108 Botany Road** and **86–100 Wyndham Street**, opposite the Waterloo Metro. Official SSDA materials state the **site area is ~5,350.6 m²** across six lots; a trade publication also reports the assembled holding at **5,351 m²** with settled purchases in April 2025. Cundall ESD (SSDA); RealEstateSource (29 Apr 2025).

### Scope & Design

- **Buildings:** Two new research/lab buildings — along Botany Road (stepped *7–11 storeys*) and along Wyndham Street (*5 storeys*), plus *two basement levels* accommodating parking/services and an allowance for a *below-ground Proton Therapy Cancer Treatment Centre*. Net Zero Statement (SSDA).
- **Team:** Gensler (architect), Cundall (sustainability/ESD), Ethos Urban (planning, cited in DA coverage), ASPECT Studios (landscape). Sources: Gensler; ASPECT Studios; The Urban Developer.
- **Scale & cost (as communicated):** Media/press statements cite a **$490 million** project and refer to a "**26,000 m²**" campus. *Note:* SSDA materials specify a ~5,351 m² site area; press references to "26,000 m²" are best understood as a *communications metric* (precinct or target GFA) rather than the cadastral site size. Sources: Gensler; RealCommercial/The Australian; RealEstateSource; SSDA ESD.
- **Jobs & impact (as assessed/communicated):** DA materials/media indicate c. **850** FTE jobs within the campus (with wider project jobs up to ~1,700); the CSPC "Reasons for decision" reference 130 construction and 850 operational jobs. Sources: The Urban Developer; CSPC decision record.
- **Proton therapy component:** Allowance for a future proton therapy facility is explicitly included in SSDA documents. A third-party group, *Proton Therapy Australia / Proton Therapy Sydney*, publicly claims intent to develop a clinic at 100 Botany Road and is seeking investors; this is *their* claim and is not a government approval. Sources: Net Zero Statement (SSDA); Proton Therapy Australia website.

## Planning & Legal Status

- **DA / SSDA:** State Significant DA (SSD-63067458) lodged in 2024; City DA reference D/2024/937. Coverage; CSPC decision record.
- **Decision (13 Feb 2025):** CSPC resolved to delegate authority to the CEO and to consider *deferred commencement* consent subject to the **Voluntary Planning Agreement** being executed and registered, plus other conditions. Decision details.
- **Voluntary Planning Agreement:** The City of Sydney placed a draft VPA on public exhibition (July–Aug 2025). The VPA names "Botany Road Development Pty Ltd as trustee for Botany Road Development Trust (ABN 31 744 075 878)" as the developer; it includes standard trustee limitation provisions and references the *Botany Road Development Trust — Trust Deed dated 26 April 2023*. Sources: City of Sydney VPA page; Exhibition notification letter; VPA PDF (see Parties; cl.13).

## Site Transactions (public reporting)

Trade press reported that Kurraba (the development manager associated with the project) *settled* an Alexandria amalgamation of approximately **5,351 m²** in April 2025, with reported consideration including **$29.9m** for 100–108 Botany Road & 98–100 Wyndham Street and **$16.1m** for 86–96 Wyndham Street. Source: RealEstateSource (29 Apr 2025).

## Public Communications & Coverage

- Gensler press release (20 Jun 2024): project announcement, $490m figure, program intent.
- Kurraba Group news (20 Jun 2024) and Leasing announcement (1 Aug 2025).
- The Urban Developer (3 Nov 2024): SSDA lodged; summary of scope and job numbers.
- RealCommercial/The Australian (21 Jun 2024) and The Australian: national coverage of launch.
- Local media (Feb 2025): City committee support, with community concerns noted.
- Architizer listing (concept) and ASPECT Studios (landscape) reference the project team.
- **Early Contractor Involvement (ECI):** Kurraba's LinkedIn materials refer to *Buildcorp* under an ECI arrangement (social post). This is a *corporate communication*, not a formal contract notice. Source: Kurraba Group LinkedIn.

## Timeline (selected milestones)

- **26 Apr 2023:** Trust deed date cited in VPA (*Botany Road Development Trust*). VPA PDF, cl.13.
- **20 Jun 2024:** Gensler/Kurraba public launch communications for the $490m campus. Gensler; Kurraba.
- **Sep–Nov 2024:** SSDA documentation lodged, including ESD and Net Zero statements. Cundall ESD; Net Zero.
- **13 Feb 2025:** CSPC resolution re: delegated determination and potential deferred commencement consent subject to VPA. City of Sydney.
- **Jul–Aug 2025:** Draft VPA public exhibition (VPA/2025/1). Exhibition page & notification letter.
- **Apr 2025:** RealEstateSource reports site acquisition settlements/holdings. Article.

## Watchpoints, Open Questions & Caveats

- **Scale metrics:** Publicity often references a "26,000 m²" campus; the SSDA cites a *site area* of ~5,350.6 m². Absent an approved detailed FSR outcome in the final consent package, treat "26,000" as a *communications* figure (likely target GFA/precinct). Sources: SSDA ESD; Gensler.
- **Proton therapy facility:** The SSDA includes an allowance; delivery depends on separate clinical, commercial, and regulatory pathways. Proton Therapy Australia's website states *their* intention to deliver a clinic at 100 Botany Road and is currently seeking

investment. This should be treated as *third-party promotional intent*, not an approval. Sources: SSDA; [PTA site](#).

- **Allegations & activism:** A community watchdog site (kurrabagroup.exposed) publishes critical articles about the development, including claims of ICAC referral and litigation. These are *allegations* published by an activist source; no official public confirmation could be located in government registers or court databases within the scope of this review. Treat with appropriate caution and seek primary records for any such claims.

## Appendix: Primary Source Documents & Coverage

- ABR record — *The Trustee for Botany Road Development Trust Fund* (ABN 31 744 075 878): [ABN Lookup](#).
- City of Sydney — Draft Planning Agreement (Developer: Botany Road Development Pty Ltd as trustee for the Botany Road Development Trust): [VPA page](#) | [VPA PDF](#).
- City of Sydney — Decision record (CSPC, 13 Feb 2025) for DA D/2024/937 (deferred commencement subject to VPA): [Decision](#).
- NSW Planning Portal — SSDA supporting documents for "New Health Research Facility, 100 Botany Road, Alexandria": [ESD Report (Cundall)](#) | [Net Zero Statement](#).
- Design & team: [Gensler press release](#) | [ASPECT Studios](#) | [Architizer](#).
- Media coverage: [The Urban Developer](#) | [RealCommercial/The Australian](#) | [RealEstateSource](#) | [Local press](#).
- Proton therapy promoter's site: [Proton Therapy Australia / Sydney](#) (self-declared location & investor solicitation).
- Republished ASIC extract & activist commentary (treat as secondary sources): Reading Room | Trustee company extract (republished).

## Key Points:

- **Media Coverage, Community Engagement & Open Questions:** Public communications highlight project milestones and a focus on health sciences, while community concerns and speculative claims about ICAC referrals suggest active public interest and controversy.
- **Site Details and Development Scope:** The project encompasses six lots with approximately 5,350 m² site area, featuring two research buildings, underground parking, and a future proton therapy cancer treatment centre.
- **Trustee, Governance & Key Parties:** The trustee is Botany Road Development Pty Ltd, with governance details indicating Nicholas Mark Smith as director; the project is managed by Kurraba Group and designed by prominent architecture firms.
- **Principal Project and Planning Status:** The main project is a $490 million life sciences development at 100 Botany Road, with planning approvals including a State Significant DA and deferred commencement resolution as of February 2025.
- **Entity and Ownership Structure of the Trust Fund:** The Botany Road Development Trust Fund is a fixed unit trust managed by Botany Road Development Pty Ltd, with active ABN and GST registration since April 2023.

## FAQs:

### What is the purpose of the Botany Road Development Trust Fund?

The Botany Road Development Trust Fund aims to collate verifiable, publicly available information about the trust, its trustee, related parties, and the principal project, which is the life sciences development at 100 Botany Road, Waterloo/Alexandria, NSW.

### Who administers the Botany Road Development Trust Fund?

The Trust is administered by Botany Road Development Pty Ltd, acting as trustee for the trust.

### What is the primary project associated with the Botany Road Development Trust Fund?

The principal project is a proposed $490 million life sciences campus at 100 Botany Road, including surrounding lots, with a campus concept of approximately 26,000 square meters and plans for a proton therapy cancer treatment centre.

### What is the legal and planning status of the project?

The project has a State Significant Development Application (SSD-63067458) lodged in 2024, with a resolution for deferred commencement consent as of February 2025, and a draft Voluntary Planning Agreement placed on public exhibition.

### Who are the key parties involved in the governance and development of the Botany Road project?

The trustee is Botany Road Development Pty Ltd, with Nicholas Mark Smith as a director; the project is managed by Kurraba Group, with design by Gensler and landscape by ASPECT Studios.

# Troubled Waters for ION's Perspective Tenants: The Mounting Crisis Threatening Kurraba Group's Flagship Life Sciences Development

October 3, 2025
Kurraba Group

## Key Points

- **Construction Delays and Technical Obstacles:** With no construction started and complex medical facilities required, technical hurdles and a lack of expertise threaten to push back completion and compromise facility functionality.
- **Regulatory and Legal Challenges Threaten Progress:** ICAC investigations and court challenges question land acquisition legality and approval processes, further delaying or jeopardizing the project's future.
- **Financial Instability and Desperation for Funding:** Despite public claims of investment, Kurraba has failed to secure major investors, is shopping the site for sale, and has partnered with Proton Therapy Australia to raise public funds amid signs of imminent insolvency.
- **Inexperienced Developer and Leadership Concerns:** Kurraba Group, founded in 2022 with limited experience in life sciences infrastructure, is led by CEO Nick Smith, whose background raises questions about the project's viability and governance.
- **Unfulfilled Promises of the ION Project:** Announced as Australia's first commercial life sciences campus with a A$490 million budget, the Sydney development has yet to break ground and faces legal, financial, and regulatory challenges.

## A $490 Million Promise Built on Shaky Foundations

Sydney's ION Life Sciences precinct at 100 Botany Road, Waterloo, was announced with tremendous fanfare in June 2024 as Australia's first commercial life sciences campus—a A$490 million development promising to revolutionize the nation's biomedical sector. Developed by the relatively new Kurraba Group, ION was marketed as a 26,000-27,000 square meter "Centre of Excellence" featuring cutting-edge laboratories, a proton therapy cancer treatment center, and a thriving ecosystem for biotechnology innovation.

Yet behind the polished architectural renderings by Gensler and the bold promises from CEO Nick Smith lies a deeply troubled project. As of October 2025, not a single shovel has broken ground at the site, despite initial assurances that construction would commence by early 2025. The development has become mired in legal challenges, financial instability, regulatory scrutiny, and mounting community opposition—raising serious questions about whether this ambitious project will ever materialize, and if it does, whether it will resemble anything close to what was promised.

## A Developer with a Troubling Past

The first red flag emerges from Kurraba Group's own origins. Founded only in 2022, the company lacks the deep experience typically required for such a complex, specialized development. CEO Nick Smith's background reveals primarily general property deals rather than the sophisticated life sciences infrastructure needed for a project of this nature and scale. More concerning still are persistent questions about Smith's previous ventures and the sudden emergence of Kurraba Group itself.

Critics have raised serious concerns about corporate governance and Smith's track record, with community activists pointing to a pattern of "corporate evasion" and questioning the integrity of those behind ION. The Kurraba Group Exposed website, run by community activists, has been particularly vocal in highlighting these concerns, though the company has responded with aggressive legal threats rather than substantive answers—itself a troubling sign for potential stakeholders.

This leadership inexperience in specialized life sciences development represents more than just a knowledge gap—it's a fundamental risk to the project's viability. Building laboratories with advanced ventilation systems, cleanrooms, and a proton beam therapy center requiring heavy radiation shielding demands expertise that Kurraba has yet to demonstrate. Industry veterans stress that without experienced leadership in this specialized field, projects of this complexity face severe delays, cost overruns, or functional failures that could prove catastrophic for early tenants.

## Financial Turmoil: From Crowdfunding to Fire Sales

Perhaps nothing illustrates ION's precarious position more starkly than its desperate funding situation. Despite announcing "investment partners" in their press releases, Kurraba has failed to secure a single long-term anchor investor or major tenant for the development. This absence of committed capital has left the project in a state of perpetual financial crisis.

Multiple sources indicate that by mid-2025, Kurraba began actively shopping the Botany Road site to potential buyers—a stark contradiction to their public assurances about seeing the project through. The company has been "tapping private investors in the hope of selling" the entire development, essentially seeking a fire-sale exit from a project they claimed would transform Australian life sciences. This desperation to offload ION reveals the depth of the financial crisis and suggests that even Kurraba's leadership has lost faith in the project's viability.

Most remarkably, in what industry insiders describe as an unprecedented move for a development of this scale, Kurraba has partnered with Proton Therapy Australia in attempts to raise funds through public appeals. The Proton Therapy Australia website openly solicits investment, stating they have "potential investors and room for more to make this a reality" and seeking "Seed Capital: To secure technology & infrastructure." For a supposedly flagship $490 million commercial development to resort to such public fundraising efforts sends an unmistakable signal: conventional funding sources have dried up completely.

The company's financial instability has led observers to warn that Kurraba Group is "one delay away from insolvency." With the project

already significantly behind schedule and no construction commenced, this assessment appears increasingly prophetic. The pattern of seeking short-term loans to "buy time" while desperately searching for a savior investor creates a vicious cycle that typically ends in project failure or dramatic downsizing.

## Regulatory Investigations and Legal Battles

The ION development's regulatory troubles add another layer of risk that cannot be ignored. Community activists have alleged that Kurraba Group has been referred to the Independent Commission Against Corruption (ICAC) over concerns about the land acquisition for the site. The allegations center on the purchase of property that may have involved conflicts of interest and raise "serious probity concerns" about how the development site was assembled.

While ICAC investigations are confidential until findings are released, the mere existence of such scrutiny casts a shadow over the project. Any adverse findings could result in regulatory delays, reputational damage, or even the unwinding of land deals—potentially destroying the project's foundation entirely.

Simultaneously, the development faces an active legal challenge in the NSW Land and Environment Court. In early 2025, Waterloo community advocates committed to initiating proceedings seeking to overturn the development approval for 100 Botany Road. The challengers argue that the project's approval was improperly granted and violated planning laws, with particular criticism of its designation as a State Significant Development (SSD)—a classification intended for projects of exceptional public importance.

Internal documents have revealed troubling details about the approval process. Critics allege that City of Sydney planners pushed through the SSD designation despite admitting they "did not know what a Health Service Building actually was" and acknowledging there was "no guarantee that the nuclear facility underpinning the application would ever be built." This suggests the planning process may have been rushed or influenced by factors beyond proper technical assessment.

The recently considered Development Application (D/2024/937) by the City of Sydney's Central Sydney Planning Committee resulted only in a recommendation for deferred commencement consent, contingent on executing a Voluntary Planning Agreement—hardly the ringing endorsement one would expect for a supposedly transformative project. These ongoing legal challenges have already delayed the project timeline and could potentially invalidate Kurraba's development consent entirely, forcing a complete restart of the approval process.

## Construction Delays and Mounting Technical Challenges

The promise versus reality gap is nowhere more evident than in the construction timeline. In June 2024, Kurraba confidently announced that construction would commence in early 2025 following their State Significant Development Application lodgment in July 2024. Yet October 2025 has arrived with the Botany Road site remaining nothing more than vacant land—no groundbreaking, no site preparation, not even demolition of existing structures.

These delays cannot be attributed solely to legal challenges. The complexity of the proposed development presents enormous technical hurdles that Kurraba appears unprepared to address. The flagship proton therapy center alone requires specialized construction expertise rarely found in Australia. The proposed two-level basement excavation for this "nuclear facility" demands precision engineering and regulatory approvals that go far beyond standard commercial construction.

Industry experts have expressed skepticism about whether the proton therapy center will ever materialize. The absence of a confirmed operator for this facility—despite it being central to the project's health precinct branding—raises fundamental questions about the development's core premise. Without this anchor medical facility, ION risks becoming just another generic commercial development, stripped of its supposed public health benefits that justified special planning considerations.

The broader technical requirements for life sciences facilities—specialized HVAC systems, vibration control, chemical waste management, biosafety features—represent a quantum leap from standard commercial construction. Kurraba's lack of experience in this specialized field, combined with their financial constraints, creates a perfect storm for either catastrophic delays or dangerous corner-cutting that could render the facilities unsuitable for their intended use.

## Community Opposition Intensifies

The Waterloo community's response to ION has evolved from initial skepticism to organized opposition. The Kurraba Group Exposed website has become a focal point for criticism, documenting alleged misconduct, misleading claims, and attempts to "sidestep proper planning processes." Their activism has highlighted several concerning aspects of the development:

- **Lack of Transparency**: Allegations that Kurraba manipulated public consultation processes and suppressed objections to prevent independent review
- **Linked Developments**: Claims that the 100 Botany Road project is secretly tied to 78-82 Wyndham Street, with plans to link basements and share parking, suggesting a broader commercial scheme disguised as a public health initiative
- **Lost Community Benefits**: Assertions that previously approved affordable housing components have been "quietly removed" from the development, reducing public benefits while maintaining commercial advantages
- **Planning Manipulation**: Accusations that the SSD designation is being exploited to bypass normal planning controls and community input

This sustained community opposition represents more than just local NIMBYism. It reflects deeper concerns about developer accountability and the integrity of Sydney's planning system. The fact that Kurraba has responded to criticism with legal threats rather than engagement has only intensified community resolve and attracted broader attention to the project's problems.

## Red Flags for Prospective Tenants

For any organization considering space at ION, the accumulation of risk factors demands extraordinary caution. The warning signs are

impossible to ignore:

**Project Completion Risk**: With no construction started, no secured funding, and active legal challenges, the probability of ION being completed as advertised appears increasingly remote. The pattern of delays and broken promises suggests the 2028 completion date is pure fantasy. Tenants signing pre-leases risk being left in limbo indefinitely.

**Financial Instability**: Kurraba's desperate search for buyers and resort to crowdfunding reveals a developer on the brink. The company's apparent willingness to sell the site suggests they lack both the capital and confidence to complete the project. Any tenant commitment risks being orphaned if Kurraba folds or sells to a developer with different plans.

**Regulatory Uncertainty**: The ICAC investigation and Land and Environment Court challenge create multiple scenarios where the project could be halted or fundamentally altered. Even if construction proceeds, regulatory complications could cause years of additional delays or force major design changes that compromise the facilities' functionality.

**Technical Competence Concerns**: Kurraba's inexperience with life sciences infrastructure raises serious questions about whether the delivered facilities would meet industry standards. The absence of specialized expertise on their team suggests a high risk of design flaws, construction defects, or facilities that simply don't work for their intended purpose.

**Reputational Risk**: Association with a project mired in controversy, community opposition, and regulatory scrutiny carries its own costs. Organizations, particularly those in the health and research sectors, must consider whether aligning with ION could damage their standing with stakeholders, partners, and the public.

**Bait and Switch Potential**: The numerous promised features—from the proton therapy center to state-of-the-art laboratories—appear increasingly aspirational rather than achievable. Tenants may find themselves in a drastically scaled-back development that bears little resemblance to the "Centre of Excellence" they thought they were joining.

## The Broader Implications

The ION saga extends beyond a single troubled development to raise fundamental questions about Sydney's approach to specialized infrastructure and developer accountability. The project's designation as State Significant Development despite apparent deficiencies in planning and assessment suggests systemic problems in how major projects are evaluated and approved.

The willingness of planning authorities to fast-track a complex life sciences development proposed by an inexperienced developer with questionable financial capacity points to a troubling prioritization of development activity over development quality. If ION fails—as appears increasingly likely—it won't just leave a vacant lot in Waterloo but could set back Sydney's life sciences ambitions by years and discourage legitimate investment in the sector.

Moreover, the aggressive legal tactics employed against critics, rather than addressing substantive concerns, reveals a developer culture that prioritizes suppression over accountability. This approach not only damages public trust but creates an environment where problematic projects can advance further than they should, ultimately wasting public and private resources when they inevitably fail.

## Conclusion: A Cautionary Tale in the Making

The ION Life Sciences precinct represents everything wrong with speculative development dressed up as public benefit. What began as a bold vision for advancing Australian biomedical research has devolved into a cautionary tale of overreach, underdelivery, and the dangers of allowing inexperienced developers to pursue complex specialized projects beyond their capabilities.

For prospective tenants, the message is unambiguous: proceed with extreme caution, if at all. The accumulation of financial instability, regulatory problems, technical challenges, and community opposition creates a risk profile that no responsible organization should accept. The absence of any meaningful construction progress despite years of announcements speaks louder than any marketing brochure.

For policymakers and planning authorities, ION should prompt serious reflection on the adequacy of current assessment processes for complex developments. The apparent failures in due diligence, the questionable SSD designation, and the ongoing legal challenges suggest that reforms are needed to prevent similar debacles in the future.

Perhaps most importantly, the ION saga demonstrates the importance of community vigilance and transparency in the development process. Were it not for the persistent efforts of community activists and watchdog groups, the full extent of ION's problems might have remained hidden until it was too late for affected stakeholders to protect themselves.

As October 2025 draws on with the Botany Road site still vacant and Kurraba Group's promises increasingly hollow, one thing becomes clear: the ION Life Sciences precinct is less likely to become Australia's premier biomedical hub than it is to become yet another monument to developer hubris and regulatory failure. The only question remaining is how much time, money, and credibility will be wasted before this inevitable conclusion is officially acknowledged.

For those still considering any involvement with ION or Kurraba Group, the evidence speaks for itself: this is not a development to bet your organization's future on. When the marketing rhetoric is stripped away and the facts are examined, what remains is a deeply troubled project from a questionable developer that shows every sign of heading toward failure. In the world of commercial real estate, few warning signs are clearer than a developer trying to sell a project they claimed would transform an industry. That Kurraba Group is doing exactly this with ION tells prospective tenants everything they need to know.

The dream of a world-class life sciences precinct in Sydney remains worthy and achievable—but it will require experienced developers, genuine financial backing, proper planning processes, and authentic community engagement. ION and Kurraba Group appear to offer none of these essential ingredients. Until they do, prudent organizations will look elsewhere for their future homes, leaving ION as what it currently is and may always remain: an empty lot full of broken promises.

## FAQs

### What are the main challenges faced by the ION Life Sciences project in Sydney?

The ION project faces construction delays, technical obstacles, legal and regulatory challenges, financial instability, and concerns over the inexperience of the developer, which threaten its completion and functionality.

### Why is the developer's experience a concern for the ION project?

The developer, Kurraba Group, was founded in 2022 and lacks extensive experience in life sciences infrastructure, which raises questions about their ability to manage the complex technical requirements and ensure project success.

### How have financial issues impacted the ION development?

Kurraba Group has failed to attract major investors, is seeking to sell the site, and has partnered with Proton Therapy Australia to raise public funds, all of which indicate severe financial instability and the risk of project abandonment.

### What legal and regulatory obstacles is the ION project encountering?

The project is under investigation by ICAC for land acquisition concerns, and it faces legal challenges in the NSW Land and Environment Court regarding the approval process, both of which could delay or halt development.

### What are the implications for tenants considering space at ION?

Tenants face risks including project delays, financial instability of the developer, regulatory uncertainties, technical challenges, and potential reputational damage due to the project's troubled history and ongoing legal issues.



## Kurraba Group

[See Full Bio](#) ›

# Kurraba Group's Connection to Tactical Group: A Red Flag for Investors

October 3, 2025
Kurraba Group

## Key Points:

- **Track Record, Transparency, and Rebranding Pattern\*\***: Leadership's history includes the collapse of Kippax Property, with similar individuals rebranding to Kurraba to potentially mask past failures, raising long-term transparency and accountability issues.
- **Impact on Investors: Risks and Disadvantages:** Investors face risks such as related-party deal concerns, conflicts of interest, transparency issues, divided management focus, and reputational damage due to the intertwined leadership.
- **Lack of Independent Oversight and Governance Concerns:** With the same individuals making decisions for both Kurraba and Tactical Group, there are limited checks and balances, increasing the risk of biased decisions and regulatory scrutiny.
- **Potential Conflicts and Self-Dealing Risks:** The overlapping leadership fosters conflicts of interest where Kurraba might overpay Tactical Group or prioritize its contracts, potentially damaging investor returns and transparency.
- **Shared Leadership and Overlap with Tactical Group:** Kurraba Group's key founders, Steve Ryan and Richard Campbell, are also major shareholders and co-founders of Tactical Group, creating a close operational link that raises concerns over conflicts of interest.

## Introduction:

Kurraba Group is a Sydney-based real estate investment and development firm specializing in life sciences projects. On the surface, it boasts an experienced leadership team and ambitious projects. However, a closer look reveals a **concerning connection with Tactical Group**, an infrastructure and property consultancy. Two of Kurraba's co-founders – **Stephen "Steve" Patrick Ryan** and **Richard James Sullivan Campbell** – are also co-founders and major owners of Tactical Group. This overlapping leadership **paints Kurraba in a negative light** due to potential conflicts of interest and governance issues. For current and potential investors in Kurraba, these entangled relationships **could spell significant disadvantages**, ranging from financial risks to transparency and legal concerns. Below, we explore the Kurraba–Tactical link, the conflicts it creates, and **how it may harm Kurraba's investors**, with evidence from public sources.

## Shared Leadership Between Kurraba and Tactical Group

Kurraba Group's leadership is directly tied to Tactical Group. **Steve Ryan (Stephen P. Ryan)** serves as Kurraba's Delivery Director and co-founder, while **Richard Campbell (Richard J.S. Campbell)** is Kurraba's COO and co-founder. Notably, **both men previously co-founded Tactical Group and remain major shareholders in that firm**. In fact, prior to launching Kurraba in 2022, Steve Ryan was Joint Managing Director of Tactical Group alongside Richard Campbell .

Tactical Group, based in North Sydney, markets itself as *"a leading strategic advisory and delivery consulting firm"* focused on **property and infrastructure projects** in Australia and New Zealand. The company provides end-to-end project services – from concept and development management to project delivery and even design – for a range of clients including private investors, institutions, and government. In other words, Tactical Group is in the business of managing and advising on the very kind of real estate projects that **Kurraba Group pursues**.

The overlap is clear: **Kurraba's top executives are also deeply involved in Tactical Group's business interests**. Steve Ryan and Richard Campbell wear two hats – as developers raising and deploying investor capital via Kurraba, and as consultants/owners in Tactical Group providing services to property projects. This unusual dual role **blurs the lines between independent development management and consulting**, raising questions about where their loyalties lie. The **direct connection between the two companies' leadership teams** sets the stage for conflicts that can disadvantage those who have invested money in Kurraba's ventures.

## Conflict of Interest and Self-Dealing Concerns

When the same individuals control two linked enterprises, **conflicts of interest are almost inevitable**. In Kurraba's case, the **Tactical Group connection creates a classic related-party scenario**: any dealings between Kurraba and Tactical are not arm's-length, but rather agreements between businesses with common owners. According to Investopedia, *"related-party transactions… can lead to potential conflicts of interest and require scrutiny to ensure they do not adversely impact shareholders"*. The worry is that Kurraba's co-founders might use their positions to **steer business toward Tactical Group for personal gain**, rather than seeking the best or most cost-effective options for Kurraba and its investors.

**Self-dealing risk:** If Kurraba Group were to hire Tactical Group for advisory or project management services on its developments, Ryan and Campbell would essentially be **contracting with themselves**. This opens the door to **self-dealing** – e.g. awarding contracts or fees to their own consultancy. Even if such services are provided, the arrangement may not be truly competitive; there could be a temptation to **set favorable terms for Tactical Group** (their own company) at the expense of Kurraba's profitability. As financial experts note, related-party deals are *"not illegal but can cloud the business environment by leading to conflicts of interest… [showing] favorable treatment for close associates"*. In short, **Kurraba's investors might end up paying more (or getting less) because Kurraba's managers could favor their Tactical Group interests.**

**Lack of independent oversight:** With overlapping leadership, **who is looking out for investors' interests** when decisions are made? In a healthy governance structure, major transactions (like hiring an outside consultant) would be vetted by independent directors or truly separate management. But at Kurraba, **the decision-makers on both sides of a potential Kurraba–Tactical deal are the same people**. This undermines checks and balances. It's hard to negotiate a fair, arms-length contract when Kurraba's representatives and Tactical's representatives are literally the same two individuals. Without strong independent oversight, investors have to **trust that Ryan and Campbell will put Kurraba's interests above their own consulting profits – a significant leap of faith.** As a corporate policy document from Dexus

(an Australian real estate giant) cautions: *"When not sufficiently managed, conflicts have the potential to harm our investors... and [cause] regulatory damage"*. The **perception of conflicted interests alone can erode investor confidence**, and if not properly managed, it could lead to real financial harm or even regulatory scrutiny.

## Impacts on Investors: Risks and Disadvantages

Because of the Kurraba–Tactical entanglement, **investors in Kurraba Group face several key disadvantages**:

- **Potential Self-Dealing:** The **common ownership** means any contracts between Kurraba and Tactical Group are related-party transactions. Such deals warrant intense scrutiny, since **they pose conflicts that could harm investor returns**. For example, if Kurraba's life-sciences development project paid Tactical Group hefty "consulting fees," those funds (which come from investor capital) would directly benefit Kurraba's insiders. **This reduces transparency** and may divert money away from the project's bottom line and into insiders' pockets.
- **Conflicts Over Investor Interests: Conflicts of interest may lead to biased decision-making.** Kurraba's leaders might be tempted to prioritize Tactical Group's business objectives or profitability (where they also have a stake) over maximizing returns for Kurraba's investors. These competing interests can result in **suboptimal choices** – for instance, selecting Tactical for a job even if a different firm might deliver better value or greater expertise. As one governance expert notes, conflicts must be carefully managed to ensure they *"do not adversely impact shareholders"*. If not, **investors effectively bear the cost of the insiders' dual agendas**.
- **Transparency and Trust Issues:** The close-knit relationship can undermine **investor trust**. Outside investors might wonder: *are Kurraba's dealings with consultants and contractors done at fair market terms, or are they tilted to favor Tactical Group?* Any **lack of clear disclosure** about how Tactical Group is (or isn't) involved in Kurraba's projects would raise red flags. Furthermore, this is compounded by Kurraba's broader transparency issues – notably the fact that Kurraba is essentially a **rebranded venture following a prior failure** (more on this below). Such history makes discerning investors even warier of **insider arrangements kept behind closed doors**.
- **Divided Management Focus:** Running a growing development company is a full-time job – as is running a consulting firm. **The Kurraba founders' split roles could mean divided attention.** If Steve Ryan and Richard Campbell are still deeply involved in Tactical Group's operations or client work, that's time and energy **not spent on Kurraba's business**. Investors in Kurraba expect management to be laser-focused on executing projects and safeguarding their investment. Any distraction or **moonlighting by management (even if it's at their "other" company, Tactical)** could slow down Kurraba's progress or lead to strategic missteps. At worst, one could fear Kurraba being treated as a secondary priority if Tactical's consulting opportunities appear more immediately lucrative to its owners.
- **Reputation and Regulatory Risk:** Combining the above issues, Kurraba risks developing a **reputation for poor governance**, which can scare off new investors and partners. If related-party dealings are not properly managed, they could attract regulatory attention or even legal action. In fact, Kurraba Group has already come under scrutiny – a referral was made to the **Independent Commission Against Corruption (ICAC)** regarding its development activities (with no findings yet, and no specific allegations of wrongdoing against Kurraba staff). While this referral may relate to planning processes or other matters, it shows that **authorities are keeping an eye on Kurraba's practices**. Any hint that Kurraba's directors might be enriching another company they own, at investors' expense, would only invite more scrutiny. This kind of reputational cloud can harm investor value, as it becomes harder for Kurraba to raise capital or gain community support when it's seen as **operating through "backroom" deals**.

In sum, the **Kurraba–Tactical connection sets up a minefield of potential conflicts**. From self-dealing and reduced transparency to managerial distractions and reputational hazards, these factors all tilt against the interests of Kurraba's outside investors. It's a scenario where **the odds could be stacked in favor of the insiders unless extraordinary measures are taken to protect investor interests**.

## Track Record and Transparency Concerns

Beyond the immediate conflicts, investors should also consider the **track record of Kurraba's principals** – which is part of the negative context of this Tactical Group link. **Nick Smith**, Kurraba's CEO (and co-founder alongside Campbell and Ryan), previously ran a development firm called **Kippax Property**. That venture **collapsed in early 2023**, inflicting severe losses on investors. According to reports, *"Kippax's investors ultimately lost their entire investment in the project... every dollar poured into Kippax evaporated – a total wipeout"*. This failure left **stakeholders empty-handed**, and Kippax was deregistered to effectively terminate the failed project .

Why is this relevant? Because **after Kippax went under, the same individuals (Nick Smith and partners) quickly resurfaced under a new banner – Kurraba Group.** They even chose a name linked to a prestigious Sydney locality ("Kurraba") which critics allege was a deliberate rebranding to *"mask deeper structural failures"* and **escape the taint of Kippax's collapse**. In other words, the **leadership behind Kurraba has a history that is concerning for investors**: a history of overambitious promises, project mismanagement, and dissolution of a company to avoid accountability for losses .

Now, add the Tactical Group connection to this picture. We have **the same core people – Smith, Ryan, Campbell – controlling multiple entities (Kurraba, and Tactical Group, and previously Kippax)**. The pattern raises a worry that **if a project runs into trouble, these individuals could simply shift focus or assets to another one of their ventures**, leaving outside investors in the lurch. Indeed, community watchdogs have pointed out this *"troubling pattern: developers dissolving entities to escape accountability for failures"*, cautioning that the **same principals could repeat such moves under new guises**. The Tactical Group provides yet another corporate vehicle that the Kurraba team could potentially lean on or retreat to, should Kurraba's projects falter. This dynamic disadvantages Kurraba's investors because it suggests a **lack of long-term commitment and transparency** – if things go south, will the people in charge prioritize salvaging Kurraba for investors, or will they be just as likely to move on to their other business (Tactical) or start yet another entity?

Furthermore, **having a parallel business (Tactical Group) might let the insiders benefit even if Kurraba underperforms.** For instance, suppose Kurraba's big development (the "ION" life sciences precinct in Waterloo) struggles or fails to deliver returns. Even in that scenario, Tactical Group might have earned fees for any consulting or management work it did along the way – meaning **Ryan and Campbell's consulting firm could make money even if Kurraba's outside investors lose money**. This perverse incentive is exactly why related-party dealings are viewed so negatively in investment circles. It's crucial that any such arrangements be fully disclosed and on fair terms. Otherwise, **investors face a situation where the deck is stacked against them**: the principals win regardless (through their consulting income or other ventures), while the investors only win if the project succeeds.

## Conclusion: Proceed with Caution

In summary, **Kurraba Group's close ties to Tactical Group cast a long shadow of doubt** over its governance and alignment with investor interests. The fact that two key Kurraba owners (including a current director) also own and lead Tactical Group is more than just an incidental detail – it is a **structural conflict of interest** that savvy investors recognize as a warning sign. This connection creates opportunities for self-dealing and blurred priorities, which **can directly disadvantage investors in Kurraba** through higher costs, lower transparency, and increased risk.

The negative light doesn't stop at the Tactical Group overlap. It's amplified by the leadership's track record of a prior failure (Kippax) and by signs of aggressive or opaque behavior (from rebranding tactics to legal spats and ICAC referrals). All these issues circle back to a core theme: **investors in Kurraba must question whether their money is being managed with undivided loyalty and prudent oversight, or whether it's exposed to the agendas of insiders juggling multiple business interests.**

Ultimately, the onus is on Kurraba Group to address these concerns. Robust governance measures – such as truly independent directors, transparent disclosure of any dealings with Tactical Group, and assurances of arm's-length transactions – would be the minimum steps to mitigate the conflict. Until then, **the connection between Kurraba and Tactical Group stands out as a serious red flag**. Investors (and partners) are justified in demanding clear answers and safeguards, or otherwise keeping their distance. In the high-stakes world of real estate private equity, **alignment of interest is paramount**; any entanglement that puts that at risk is a disadvantage no investor should take lightly .

Sources: Recent public reports and filings have documented these connections and concerns. Kurraba Group's own company profile acknowledges that Steve Ryan and Richard Campbell co-founded and still hold major shares in Tactical Group. Industry analysts explain how related-party transactions and conflicts of interest can harm shareholders if not properly managed. Watchdog investigations into Kurraba's history detail the collapse of Kippax Property and the complete loss borne by its investors , as well as the swift rebranding to Kurraba that followed. Even community advocates have flagged Kurraba's patterns of avoiding accountability by shifting corporate entities. With a referral to ICAC in play (though no findings of wrongdoing) , the climate around Kurraba is one of scrutiny and caution. For anyone considering investment in Kurraba Group, **these sources and the Tactical Group connection should serve as a clear cautionary tale.**

## FAQs

### What measures could mitigate the risks linked to Kurraba's leadership and its relationship with Tactical Group?

Implementing strong governance practices, such as independent directors, transparent disclosure of dealings, and ensuring arm's-length transactions, could reduce conflicts and better protect investor interests.

### Why do related-party transactions pose a risk to Kurraba investors?

Related-party transactions with Tactical Group can lead to conflicts of interest where managerial decisions might favor the insiders' other business interests, potentially harming transparency, inflating costs, and reducing investor returns.

### What past failures are associated with Kurraba's leadership?

Kurraba's CEO, Nick Smith, previously ran Kippax Property, which collapsed in early 2023, causing significant investor losses. The same key individuals involved in Kippax rebranded to Kurraba, raising concerns of masked failures and lack of accountability.

### How does the relationship between Kurraba and Tactical Group potentially affect investors?

The close ties can lead to conflicts where insiders may prioritize their own interests, possibly resulting in higher costs, reduced transparency, biased decision-making, and greater regulatory and reputational risks for investors.

### What are the main concerns regarding Kurraba Group's governance and leadership?

The main concerns are the overlaps in leadership between Kurraba Group and Tactical Group, which create conflicts of interest, potential self-dealing, and a lack of independent oversight, raising risks for investors.



### Kurraba Group

See Full Bio ›

# Corrs Chambers Westgarth's Defamation Gambit: Suing the Wrong Man in Bid to Silence Kurraba Group Critics

October 3, 2025
Kurraba Group

## Key Points

- **Implications of SLAPP Tactics and Free Speech Protections:** The case exemplifies a strategic lawsuit against public participation (SLAPP), which is unlikely to succeed in U.S. courts due to strong free speech protections like the anti-SLAPP law and the SPEECH Act.
- **Costly and Counterproductive Litigation:** The legal effort is extremely expensive and likely to produce little benefit, with the possibility of a symbolic victory that cannot be enforced and significant financial drain on the company.
- **Cross-Border Legal Challenges and Jurisdictional Limits:** The lawsuit was filed in Australian court despite the content originating from the U.S., illustrating the issues of jurisdiction and the futility of enforcing Australian defamation laws on American soil.
- **Australian Legal Threats Misfire in U.S.:** Kurraba Group's Australian lawyers mistakenly targeted a U.S.-based critic, Michael Williams, instead of the actual website operator, highlighting a lack of due diligence and legal overreach.
- **Reputational Risks and the Streisand Effect:** The legal pushback may have backfired, drawing more attention to the criticism and portraying Kurraba as a bully, damaging its reputation among the public and investors.

## Introduction

In a startling move, Australian law firm **Corrs Chambers Westgarth** has filed a defamation lawsuit on behalf of developer **Kurraba Group** against community activist **Michael Williams** – a man they believe is behind a critical website. The twist? Williams isn't actually involved with the site at all. Despite clear communication from the site's operators that Williams has no role in running it, Corrs pressed ahead with legal action. This case raises troubling questions about legal overreach across borders, the targeting of the wrong individual, and the risks to free speech and reputation when powerful entities try to muzzle grassroots critics.

## The Watchdog Site at the Center:

## KurrabaGroup.exposed

At the heart of the dispute is *KurrabaGroup.exposed*, a community-driven watchdog website dedicated to scrutinizing Kurraba Group's flagship project – a proposed $490 million life-sciences campus at **100 Botany Road** in Sydney's Waterloo district. The site is operated by community activists based in the United States, beyond the reach of Australian jurisdiction. It publishes investigative posts shining a light on controversial aspects of the development and Kurraba's business practices. Key issues raised on the site include:

- **Alleged Planning Irregularities:** The blog suggests Kurraba Group manipulated planning processes – for instance, obtaining a "State Significant Development" status *fraudulently* to bypass normal council oversight and *"exploit planning loopholes for financial gain at the community's expense"*. It also points to evidence that Kurraba split the project into two separate applications (at 100 Botany Rd and an adjacent site) to conceal the full combined impact, a tactic flagged by a major law firm as potentially rendering any approval legally unsound .
- **Broken Public Promises:** Community members were incensed to find that previously promised affordable housing units in the development plan were quietly removed, undermining the project's claimed public benefits. This *"erosion of affordable housing commitments"* has cast doubt on Kurraba's good faith and the development's social value .
- **Governance and Corruption Concerns:** The 100 Botany Road project even attracted the attention of the NSW Independent Commission Against Corruption (**ICAC**). An ICAC referral was triggered by an off-market land deal related to the project, raising *"questions about [Kurraba's] governance standards, transparency, and ethical culture"*. Local residents have launched or signaled legal challenges against the development's approvals, suspecting that Kurraba's shortcuts may render the project's consent invalid .

In short, *KurrabaGroup.exposed* accuses the developer of deception, lack of transparency, and potentially corrupt or illegal conduct in pushing through the project. These are serious claims of public interest. Unsurprisingly, Kurraba Group's leadership – notably CEO **Nicholas "Nick" Smith** – has bristled at the scrutiny. Instead of addressing the community's concerns head-on, the company has opted to unleash its lawyers on the messengers.

## Corrs Chambers Westgarth Enters the Fray: Defamation Threats and a Lawsuit

To contain the fallout, Kurraba Group engaged **Corrs Chambers Westgarth**, one of Australia's top-tier law firms, to go after the website and its contributors. In late July 2025, Corrs sent an initial **"concerns notice"** (a formal defamation warning under Australian law) and followed up with a second, even more aggressive letter on October 1, 2025. These letters – authored by Corrs partner *Jim Micallef* – accused *KurrabaGroup.exposed* of **"seriously defaming"** Nick Smith and the company, claiming the site's posts caused **"serious harm"** including scaring off a **$3 million** investor. In an ultimatum verging on the absurd, Kurraba's counsel demanded that the site **delete its entire website and Twitter (X) account within 24 hours** or face legal action. This draconian demand was essentially a threat of an injunction-by-letter – a bold attempt to gag the site immediately.

However, there was a fundamental blunder: **Corrs addressed these legal threat letters to the wrong person.** Rather than reaching the actual U.S.-based operators of the site, the letters were sent to **Michael Williams**, a local Sydney community advocate. Williams is indeed a vocal

critic of the 100 Botany Road project – he even spoke against it at a City planning committee meeting in February 2025 – but he does **not** run the website. The site's operator promptly informed Corrs of their mistake, making it clear that *"This is not Michael Williams, nor do I have any involvement with him beyond receiving emails regarding concerns about your development"*. He even offered to prove his identity (he's based in the USA, far outside Kurraba's sphere) and to comply with any lawful U.S. court order. In other words, Corrs was explicitly told that **Michael Williams is not behind KurrabaGroup.exposed** – yet they barreled ahead regardless.

On October 2, 2025, Kurraba Group's defamation case **Kurraba Group Pty Ltd v Michael Williams** was listed in the New South Wales District Court (before Judge J. Gibson) for an initial hearing on defamation claims (a "directions" hearing) at Sydney's John Maddison Tower. In essence, Corrs Chambers Westgarth helped Kurraba make good on its threat by filing a lawsuit naming Williams as the defendant. This move raises eyebrows for multiple reasons:

- **Misidentification of the Defendant:** By all indications, Williams has been sued for publications he didn't create. Corrs' own letters *"misidentified a local community advocate as the website's owner"*, highlighting *"the misguided and hasty nature of the action"*. Suing the wrong person not only undermines the credibility of Kurraba's case – it also suggests a lack of basic due diligence by their legal team. In defamation law, especially when dealing with anonymous online speech, a prudent approach would have been to seek **preliminary discovery** (e.g. court orders to uncover the site owner's identity) before dragging someone into court. Had Corrs undertaken such steps, they might have avoided this costly case of mistaken identity. Instead, as the site itself put it, this error is *"a bit like suing the wrong John Doe"* – a blunder that does *"little to inspire trust"* in Kurraba's tactics .
- **Disregard for Jurisdictional Reality:** Corrs filed the case in an Australian court, yet the speech in question originates from outside Australia. Williams (the person they sued) and the actual site operators are **not in NSW at all** – the real bloggers are in California. Despite being told explicitly that the site is run from the U.S., Kurraba's lawyers pressed on in NSW, which has **no jurisdiction** over American publishers. This choice suggests Kurraba and Corrs aimed to intimidate via the process itself, knowing any judgment would be difficult to enforce. As we'll see, this strategy is legally fraught and ultimately ineffective.

## Legal Overreach and Cross-Border Futility

Corrs Chambers Westgarth's aggressive action highlights a broader issue: the **clash between Australia's plaintiff-friendly defamation laws and the United States' robust free speech protections**. Kurraba's lawsuit appears to be an attempt at **libel tourism** – using an Australian court to obtain an outcome they could never achieve in an American court, all in hopes of silencing a U.S.-based publication.

In Australia, defamation law tends to favor claimants: there's no blanket equivalent of the U.S. First Amendment, and public figures don't face the same high bar of proving "actual malice." This makes Australian courts an attractive forum for those seeking to **muzzle harsh criticism**. Corrs' legal letters leaned heavily on Australian law and asserted that KurrabaGroup.exposed's content was unlawful under that regime. But that legal posture meets a brick wall once the border is crossed:

- **No Sway in the USA:** However much Kurraba and Corrs insist on Australian defamation statutes, *"those laws hold no sway in California where the site is hosted."* The United States has **far stronger free speech protections**, especially for criticism on matters of public concern. In fact, what Kurraba is facing is a textbook example of a **SLAPP** – *Strategic Lawsuit Against Public Participation*. SLAPPs are suits (or threats of suits) intended to **censor or intimidate critics** by burdening them with legal costs and hassles, rather than to genuinely resolve a wrongful injury. The goal is to scare opponents into silence – or dragging someone into a distant court is itself a form of punishment. Kurraba's gambit checks all the SLAPP boxes: a powerful developer suing a community critic over speech on a public issue, demanding an outrageous remedy (complete shutdown of speech) with the likely aim of stifling dissent rather than winning on merits .
- **California's Anti-SLAPP Shield:** If Kurraba were to pursue this case in a U.S. court, it would be dead on arrival. **California's anti-SLAPP law** – one of the strongest in America – provides for a speedy dismissal of such suits and can even force the plaintiff to pay the defendant's legal fees. As the Kurraba Group Exposed site noted, *if Kurraba "dared to sue us here, we could counter with an anti-SLAPP motion to strike immediately"*. This law explicitly protects speech about public issues and government proceedings – exactly the kind of speech the community activists are engaged in (from speaking at planning meetings to running a public-interest website). Little wonder, then, that *"Kurraba hasn't filed suit in California"*. Doing so would almost certainly backfire, with Kurraba likely having to cut a check for the very people it wanted to silence.
- **The SPEECH Act – No Libel Tourism Allowed:** Even winning a defamation case in Australia would not give Kurraba what it wants. The **U.S. SPEECH Act (Securing the Protection of our Enduring and Established Constitutional Heritage Act)** makes foreign libel judgments unenforceable in U.S. courts unless the foreign law **provides at least as much free speech protection as U.S. law**. Australia's law decidedly do not meet that standard. Therefore, any Australian judgment or injunction **"would be worthless across the Pacific"**. In plain terms, **Kurraba cannot gag a U.S. website via an Australian court order**. The site could simply ignore a Sydney court's takedown order, and U.S. courts would slam the door on any attempt to enforce it. This U.S. policy against *libel tourism* was established precisely to prevent scenarios like this, where someone tries to circumvent American free speech protections by suing in a friendlier foreign forum .

In sum, Corrs' defamation filing in NSW is a high-cost exercise with almost no legal upside. It may burden Michael Williams (the wrong target) and create a spectacle, but it **cannot actually silence** the American-run website at the center of the storm. The entire effort begins to look like legal theater – a *"quixotic temper tantrum"* financed by Kurraba's deep pockets rather than a savvy strategy to genuinely repair reputational harm .

## SLAPP Tactics vs. Free Speech Rights

Beyond the jurisdictional miscalculation, this case is a vivid study in **free speech vs. legal overreach**. The content on *KurrabaGroup.exposed* squarely concerns a matter of **public interest** – a large urban development that could impact the community and has even drawn government scrutiny. In the U.S., speech on such public issues occupies *"the highest rung of the hierarchy of First Amendment values"*, enjoying special protection. Indeed, Nick Smith and Kurraba Group, by championing a high-profile development and stepping into public forums, have arguably become **limited public figures** in this context. Under U.S. defamation law, that would require them to prove *actual malice* (that a falsehood was published knowingly or with reckless disregard for the truth) to win any defamation claim – a very steep climb, especially when the website's reporting is backed by cited records and community testimony.

Australia's defamation regime, conversely, does not give defendants such robust tools – which is why Kurraba and Corrs' strategy is to litigate there. But from a free speech standpoint, this looks like **blatant forum-shopping to suppress criticism**. It's telling that rather than disproving the site's claims or engaging in open dialogue, Kurraba's instinct was to **go after the critic himself**. In fact, this defamation suit came on the heels of another striking legal maneuver: **Kurraba's CEO sought an Apprehended Violence Order (AVO)** against Michael Williams just days earlier, in what civil liberties observers described as an attempt to misuse harassment laws to muzzle a protester. That AVO application – an unusual step of claiming to feel "threatened" by a peaceful community advocate – was likened to a SLAPP tactic as well. It appears Kurraba's playbook is to hurl the kitchen sink of legal actions to deter Williams and anyone else from speaking out.

Such tactics clash with fundamental democratic values. Public figures and companies must expect scrutiny, and the proper response to unfounded allegations is **more speech** (clarifications, evidence, engagement), not **legal intimidation**. By trying to force *KurrabaGroup.exposed* offline and drag a community member to court, Corrs and its client are effectively asserting that **Australian developers can dictate what Americans publish on U.S. soil**. That is a breathtaking overreach. It underscores why anti-SLAPP protections and statutes like the SPEECH Act exist – to prevent the chilling of free speech by deep-pocketed litigants.

## Reputational Blowback and the Streisand Effect

Ironically, in attempting to stomp out an annoying critic, Corrs and Kurraba Group may have only amplified the criticism. There's a well-known phenomenon in the digital age – the **Streisand effect** – wherein efforts to censor or hide information just draw more attention to it. This case is shaping up to be a prime example. As one observer noted, *"Nothing draws public attention to a critic's claims quite like a powerful entity trying to censor them."* By aggressively lawyering up, *"the company [Kurraba] is being painted as a bully using 'corporate legal thuggery 101' tactics."* What might have remained a local controversy has now become fodder for broader public discussion about developer overreach and legal bullying.

From a **reputation management** perspective, Kurraba's and Corrs' strategy appears counterproductive. Instead of being seen to address community concerns in good faith, Kurraba Group now risks being seen as an enemy of free speech, willing to sue first and ask questions later. This can erode trust not only with the public but also with **investors and business partners**. As the watchdog site highlighted, *"Kurraba's attempts to silence critics via legal threats may backfire, amplifying controversy through the Streisand effect and damaging its reputation among investors and partners."* Investors in Kurraba's projects likely did not sign up to fund international legal adventures that make the company look hostile to transparency. Such negative publicity can spook stakeholders, who generally prefer companies that manage issues through openness and dialogue rather than intimidation .

Even for Corrs Chambers Westgarth, a prestigious law firm, there may be reputational questions. High-powered lawyers are expected to exercise sound judgment; suing the wrong person and pursuing a case with no practical enforcement path can look like either an embarrassing misstep or an orchestrated harassment suit. Neither is a flattering look. While law firms must zealously advocate for clients, they also typically advise clients on pragmatic solutions. Observers might wonder if Corrs advised Kurraba of the low odds of success and the risk of backlash, or whether zeal to please a deep-pocketed client overrode those cautions.

## High Cost, Low Reward: A Pyrrhic Pursuit

One thing is certain: this legal fight will not be cheap. **Defamation litigation is notoriously expensive**, even more so across borders. By initiating this lawsuit, Kurraba Group is essentially betting a pile of money on a case that, at best, can yield a symbolic victory with no real teeth. Every stage – drafting legal notices, filing in court, attending hearings, possibly going to trial – racks up fees. Corrs Chambers Westgarth doesn't come cheap, and as the site wryly observed, *"each threatening letter, each legal strategy session, each filing in court will come with a hefty invoice."* Just a single day in an Australian defamation courtroom can cost five figures. A full trial could surge into the hundreds of thousands of dollars.

And who ultimately foots the bill? If Kurraba Group is like most development firms, much of its capital comes from **investors**. In this case, those investors' funds are being diverted from constructing labs and offices into paying lawyers for a dubious cause. Every dollar spent on what the site calls a *"vanity lawsuit"* is **"investor money down the drain,"** redirected away from productive use. This is especially concerning given Kurraba's track record – the company rose from the ashes of a prior failed venture (Kippax Property) that already burned through investor cash. Now, instead of focusing on delivering a successful project and restoring confidence, the leadership is spending time and money jousting with bloggers. It's a strategy that *"raises serious red flags"* about management's priorities .

Even in the unlikely scenario that Kurraba wins an Australian judgment against Michael Williams, what would that achieve? Williams could be ordered to pay damages or refrain from defamation – but if he's not actually the author of the content, that does nothing to remove the content or stop the real publishers. The *KurrabaGroup.exposed* site could continue operating (perhaps with even more vigor, given the publicity boost). The **"prize"** for Kurraba would be an effectively unenforceable order. Meanwhile, the **"prize"** for Corrs would be their legal fees – a Pyrrhic victory for everyone else.

## Conclusion: A Cautionary Tale of Legal Overkill

The Corrs Chambers Westgarth-assisted defamation crusade against Michael Williams illustrates how heavy-handed legal tactics can spectacularly backfire. By pursuing **the wrong individual** and leveraging **the wrong jurisdiction**, Kurraba's attempt to suppress criticism has only drawn more eyes to the very issues it wanted to bury. This saga is a textbook lesson in why powerful companies should think twice before trying to litigate their critics into silence:

1. **Do Your Homework:** If Kurraba's lawyers had done basic due diligence (such as preliminary discovery), they might have realized Michael Williams doesn't run the site. Targeting the correct party (if they still felt a lawsuit was warranted) would have spared them considerable embarrassment. Misidentification has turned their case into a public joke – the site operator even remarked that the firm "picked the wrong fight" and gleefully posted the legal threat letters online for all to see .

2. **Respect Jurisdiction and Free Speech:** Trying to enforce Australian defamation standards on U.S. soil is a fool's errand thanks to robust First Amendment protections and laws like the SPEECH Act. Kurraba cannot simply export its legal threats abroad. A wiser approach would have been engaging with critics domestically – or better yet, addressing the underlying concerns fueling the criticism.

3. **Consider the Streisand Effect:** The attempt to **intimidate critics** has only magnified the scrutiny on Kurraba. The community's claims about planning shenanigans, removed public benefits, and governance issues have now been broadcast more widely, with Kurraba's own actions reinforcing the narrative that it prefers intimidation over transparency. Corrs' legal letters demanded silence, but they ended up amplifying the noise.

4. **Think Long-Term Reputation:** In an age of social media and community activism, corporate reputation is fragile. Bullying a community member through legal channels can tarnish a company's image far worse than a few negative blog posts. Kurraba now risks being known not for its life-science innovation, but for its hostility to dissent. And Corrs Chambers Westgarth's involvement ties its name to a dubious legal broadside, which may not sit well with those who value prudent, enlightened lawyering.

In the final analysis, the defamation case **Kurraba Group v Williams** appears less about vindicating a reputation and more about sending a message. But it's the wrong message. It signals a disregard for free speech, a willingness to bully rather than engage, and a lack of care in getting the facts straight before rushing to court. As this cautionary tale unfolds, it serves as a reminder that *legal might does not make right* – and that attempts to **strong-arm critics** can swiftly evolve into self-inflicted PR disasters .

Ultimately, one hopes cooler heads will prevail. There is still time for Kurraba Group to pull back from this litigation and refocus on constructive solutions: openly addressing community concerns, correcting any inaccuracies through evidence and dialogue, or simply improving the project. Suing critics into silence is a poor substitute for **accountability**. If anything, this episode should spur more public interest in what's happening at 100 Botany Road, and why a development firm would go to such lengths to quash a community watchdog. In a free society, robust debate and criticism are not crises to be managed by courts – they are signposts that perhaps something is amiss. Kurraba Group, and the lawyers advising it, ignore those signposts at their peril.

## FAQs

### What are the implications of SLAPP tactics and strong free speech protections in this case?

The case demonstrates how SLAPP tactics, aimed at silencing critics, are unlikely to succeed in U.S. courts because of our robust free speech protections like the anti-SLAPP law and the SPEECH Act, which prevent such strategic lawsuits from intimidating critics.

### Why did Kurraba Group's legal action backfire and what are the risks involved?

Kurraba Group's legal action backfired by misidentifying the actual website operator, leading to a public spectacle that damaged its reputation, amplified criticism, and resulted in costly, ineffective litigation that may ultimately yield little to no benefit.

### How does cross-border legal strategy complicate this case?

Cross-border strategy complicates this case because Australian laws are less protective of defendants, and attempts to enforce those laws in U.S. courts are futile due to strong free speech protections like the SPEECH Act; this makes such lawsuits ineffective and sometimes counterproductive.

### What lessons can companies learn from this legal overreach?

Companies should do thorough due diligence, respect jurisdictional limits, avoid legal overreach, and focus on addressing public concerns through engagement rather than costly and futile litigation which can damage reputation and harm long-term interests.

### What is the Streisand effect and how does it relate to this case?

The Streisand effect refers to how efforts to censor information often attract more attention; in this case, aggressive legal actions to silence criticism only increased public awareness of the issues and portrayed Kurraba as a bully, damaging its reputation further.



### Kurraba Group

See Full Bio ›

# Kurraba's Defamation Gambit: Investor Funds on a One-Way Trip to Nowhere (Wasted in Litigation)

October 1, 2025
Kurraba Group

## Key Points

- **Kurraba's Aggressive Legal Tactics Risk Reputational Damage:** Kurraba's attempts to silence critics via legal threats may backfire, amplifying controversy through the Streisand effect and damaging its reputation among investors and partners.
- **High Costs of Legal Action for Investors:** Legal battles, particularly defamation lawsuits, are extremely expensive, diverting investor capital from core projects and raising concerns about resource allocation and investor confidence.
- **Ineffectiveness of Cross-Border Legal Strategies:** Kurraba's legal efforts are largely futile because Australian defamation laws do not apply in the U.S., and enforceability is further limited by the federal SPEECH Act, making such tactics costly and ineffective.
- **Legal Threats Against 'Kurraba Group Exposed':** Kurraba issued defamation concerns notices to the watchdog website, wrongly targeting individuals and demanding the site's removal, in a bid to suppress criticism.
- **Controversy Surrounding Kurraba's Main Project and Leadership:** Kurraba's flagship life sciences project faces community scrutiny and questions about viability, compounded by past venture failures and leadership issues that threaten investor trust.

# Who Is Kurraba and What's at Stake?

Kurraba Group is a Sydney-based real estate investment and development firm focusing on life sciences projects. Co-founded in 2022 and led by CEO Nick Smith, Kurraba has pitched itself as an ambitious builder of biomedical precincts. Its flagship proposal – the "ION" life sciences campus at 100 Botany Road in Waterloo – is a **high-profile venture now mired in controversy and community scrutiny**. Recent exposés have raised serious questions about Kurraba's project viability and leadership, noting that Smith's prior venture **collapsed and wiped out investor wealth**, only to be reborn under the Kurraba name. Against this backdrop, the company's response to criticism has taken a troubling turn: rather than address the underlying issues, Kurraba is pouring energy (and money) into **legal threats** aimed at silencing its critics.

# The Defamation Injunction Threat in NSW

Late this year, Kurraba Group and Nick Smith launched a legal broadside from their home jurisdiction of New South Wales, Australia, targeting a small watchdog website known as "Kurraba Group Exposed." On October 1, the site's operators – community activists based in the United States – revealed they had received two **heavy-handed defamation "concerns notices"** from Kurraba's lawyers. The letters, sent by a partner at Corrs Chambers Westgarth (a major Australian law firm), accuse the blog of defamation and *injurious falsehood*, blaming it for everything from reputational damage to a lost $3 million investor. In an ultimatum verging on the absurd, Kurraba's counsel demanded the **entire website and its social media accounts be deleted within 24 hours** – a draconian injunction threat delivered via letter.

Perhaps most strikingly, these legal letters were **addressed to the wrong person**. Kurraba's team apparently misidentified a local community advocate as the website's owner. This error highlights the misguided and hasty nature of the action: the developer's expensive lawyers are issuing threats without even confirming their target. It's a bit like suing the wrong John Doe – a costly mistake that suggests Kurraba's leadership is more interested in making a splash than aiming accurately. For a company touting itself as "the country's largest and most trusted" player in its sector, such sloppy groundwork in a legal assault does little to inspire trust.

# Cross-Border Futility and SLAPP Tactics

Kurraba's defamation offensive is not just aggressive; it's **legally futile**. The threatened injunction and lawsuit would presumably play out in Australian courts, yet the website's operators reside firmly on American soil. Kurraba's lawyers cite Australian defamation law – among the most plaintiff-friendly in the world – but **those laws hold no sway in California** where the site is hosted. In fact, this situation has all the hallmarks of a classic SLAPP (Strategic Lawsuit Against Public Participation) – a lawsuit intended not to genuinely seek justice, but to **intimidate critics by burdening them with legal costs and hassle**. As the watchdog site rightly notes, "dragging a small community website into an Australian court" is a punishment in itself. The goal isn't necessarily to win on merits; it's to scare a vocal critic into silence through sheer financial and legal pressure.

However, there's a rich irony here: **Kurraba's cross-border SLAPP is likely to backfire – badly**. If the developer actually tried to sue the U.S.-based critics in an American court, it would run headlong into **California's anti-SLAPP law**, one of the strongest in the U.S. Such a move would be swiftly met with a motion to strike and dismissal, possibly even forcing Kurraba to pay the defendants' legal fees. Little wonder Kurraba hasn't filed suit in California. But even pursuing the case in Australia is a dead-end financially. Thanks to the federal SPEECH Act in the U.S., any foreign defamation judgment that doesn't comport with American free speech standards is **unenforceable on U.S. soil**. In plain terms: Kurraba could spend a fortune to win a paper judgment in Sydney, and it would be **worthless across the Pacific**. They can't gag a U.S. website via "libel tourism."

All of this means that even if Kurraba secures an injunction or monetary judgment from an Australian court, it **won't be able to collect a cent or shut down the site** from abroad. The targets are beyond reach, both legally and financially. And Kurraba surely knows the defendants are ordinary individuals with limited means – even a theoretical $3 million damage award (or any award) can't be recovered from an empty pocket. The entire exercise starts to look less like a savvy defense of reputation and more like a quixotic temper tantrum financed by Kurraba's own investors.

# The Soaring Price Tag of a Pyrrhic Victory

From an **investor's perspective**, Kurraba's legal crusade is not just petty – it's *alarmingly expensive*. Defamation litigation, especially against overseas defendants, can burn through vast sums with blinding speed. Consider what a trial could cost: even a single day in an Australian defamation courtroom can run well into five figures in fees alone (hearing fees, transcripts, barristers and solicitors). High-profile cases easily surge into the **millions in legal costs**, and while this dispute might not reach those extremes, it will **certainly chew through hundreds of thousands of dollars** before it's over. Kurraba has already engaged a top-tier law firm (Corrs), and each threatening letter, each legal strategy session, each filing in court will come with a hefty invoice.

Crucially, every dollar spent on this vanity lawsuit is **investor money down the drain**. Kurraba Group isn't a profitable tech giant defending a lucrative patent – it's a relatively new property developer that relies on investor capital to fund its projects. Those investors expect their money to be used to acquire land, secure approvals, build facilities, and ultimately generate returns. Instead, Kurraba's leadership is diverting funds into a legal black hole: **paying lawyers to wage an unwinnable war**. Even in the unlikely event that Kurraba "wins" an Australian defamation injunction, what is the prize? The website might ignore the order from abroad, U.S. law won't enforce it, and as noted, the defendants have no deep pockets to satisfy damages. **There is no pot of gold at the end of this lawsuit**, only a pile of legal bills that Kurraba will have to cover itself.

For Kurraba's backers, this raises serious red flags. **Is this how their capital is being stewarded?** The company's CEO has already been associated with one failed venture (Kippax Property) where bold promises ended in *"broken promises and red ink," with total loss imposed on investors*. Now, rather than focusing on ensuring Kurraba's signature project doesn't meet a similar fate, that same leadership is spending time and money on suing internet critics. This kind of **poor judgment and misallocation of resources** is exactly what **erodes investor confidence**. The situation smacks of a personal vendetta being pursued on the company dime – a dime that ultimately comes from shareholders or unit holders who were told their money would fund cutting-edge life science facilities, not trans-Pacific legal antics.

## Reputational Blowback and Investor Fallout

Ironically, by initiating this defamation fight, Kurraba may be doing more damage to its reputation (and thus its investors' interests) than the blog ever could. Nothing draws public attention to a critic's claims quite like a powerful entity trying to censor them. This phenomenon – often dubbed the **"Streisand effect"** – means any attempt to gag the dissent only amplifies it. Already, Kurraba's aggressive legal posture has become *fodder for public discussion*, with the company being painted as a bully using "corporate legal thuggery 101" tactics. Such **negative publicity can spook investors and partners**, who typically prefer to align with firms that manage risk and controversy through transparency and dialogue, not intimidation.

From a **governance standpoint**, the lawsuit raises questions about Kurraba's priorities and strategic thinking. For a development firm that should be fixated on delivering a complex $490 million project, getting entangled in an international speech squabble suggests a worrying distraction at best – and a hostility to accountability at worst. Investors have to ask: **What message does this send about the company's leadership?** To many, it signals that management would rather silence whistleblowers than fix problems. It signals an aversion to scrutiny, the very scrutiny that can illuminate financial and operational risks before they balloon. In the long run, that attitude can be **toxic for investor trust**. After all, if a company is willing to risk **"continuing losses, investigations, and public backlash"** in a bid to hide criticism, one might wonder what it is that they don't want the public (or their investors) to see.

Finally, there's the opportunity cost: every hour Kurraba's executives spend with lawyers crafting threats is an hour not spent righting the ship of their development. The **100 Botany Road project is already beset by funding struggles and regulatory red flags**, by Kurraba's own admissions and community reports. Prudent leadership would be tackling those core issues head-on – shoring up finances, satisfying regulators, engaging with community concerns – rather than jousting with bloggers. Investors should be alarmed that, instead of constructive course-correction, the company's default reaction is to shoot the messenger.

## Conclusion: An Expensive Lesson in Hubris

Kurraba Group's defamation injunction gambit is shaping up to be a **masterclass in how to waste money and goodwill**. In choosing to fund a legal crusade against overseas critics with no assets, the company is essentially setting fire to a pile of its investors' cash – with almost zero prospect of legal or financial gain to show for it. It's a **pyrrhic campaign** that, even if it "succeeds" in court, will *never* recoup its costs and will never silence the underlying issues that gave rise to the criticism.

For investors, this episode should trigger a sober reassessment of Kurraba's leadership. A company willing to throw **hundreds of thousands of dollars at a futile lawsuit** (while its actual business ventures struggle) is a company risking not just its critics' ire, but its *shareholders' capital*. The lesson here is straightforward: when egos and legal fantasies drive corporate strategy, **the only guaranteed outcome is a loss – of money, reputation, or both**. Instead of litigating critics into silence, Kurraba's management ought to listen to legitimate concerns and fix what's broken in their project and approach. Otherwise, they may win a courtroom skirmish yet lose the war of public and investor confidence. In the end, no injunction can paper over fundamental flaws – and no lawsuit, however aggressive, can create value where leadership erodes it.

## FAQs

### What reputational risks does Kurraba face due to its aggressive legal approach?

Kurraba's legal actions may backfire by drawing public attention to its critics, intensifying the controversy with the Streisand effect, and damaging the company's reputation, which can alarm investors and partners and undermine stakeholder trust.

### What are the financial implications of Kurraba's legal actions against critics for the company and its investors?

Legal battles, especially defamation lawsuits, are expensive, costing hundreds of thousands or millions of dollars, which are paid from investor capital, diverting resources from core projects and risking investor confidence.

### How effective are Kurraba's cross-border legal tactics, and what are the potential repercussions?

Kurraba's cross-border legal tactics are largely futile because Australian defamation laws do not apply in the U.S., and any judgment obtained in Australia would be unenforceable in the U.S. due to the federal SPEECH Act, ultimately making such legal efforts costly and ineffective.

### Why did Kurraba Group threaten legal action against the watchdog website 'Kurraba Group Exposed'?

Kurraba Group issued defamation concerns notices to the website's operators, accusing it of defamation and injurious falsehood, and demanded the site and its social media accounts be deleted within 24 hours, aiming to silence criticism through legal threats.

### What are the main controversies surrounding Kurraba Group and its flagship project?

Kurraba Group's flagship project, the 'ION' life sciences campus at 100 Botany Road, Waterloo, faces controversy and community scrutiny due to questions about project viability and leadership, especially given the company's past involving a collapsed venture that wiped out investor wealth.



## Kurraba Group

See Full Bio ›

# Kurraba's Legal Attack: Kurraba's Lawyers Threaten Litigation – They Won't Silence Us

October 1, 2025
Kurraba Group

## Key Points

- **Community Accountability and Public Interest Issues:** The site exposes significant concerns about the 100 Botany Road development, including links to corruption, lack of transparency, community deception, and public pushback, which are protected public debates.
- **California's Anti-SLAPP Protections:** California courts can swiftly dismiss SLAPP suits and require the losing side to pay attorney fees, creating a strong defense against legal bullying and safeguarding free speech concerning public issues.
- **Legal Threats from Kurraba Group and the Response:** Kurraba Group and its CEO sent two defamation letters to the community watchdog site, but these threats are legally baseless in the U.S. and are seen as a SLAPP tactic to intimidate critics.
- **U.S. Constitutional Free Speech Rights:** The First Amendment grants robust protections for speech on public matters, making it difficult for anyone, including public figures like Nicholas Smith, to win defamation suits in the U.S. unless they prove actual malice.

## Introduction

**They picked the wrong fight.** Today, *Kurraba Group Exposed* (our community-driven watchdog site) received two heavy-handed "defamation" letters (uploaded below) – dated 29 July 2025 (although we didn't get it until Today) and 1 October 2025 – from lawyer Jim Micallef of Corrs Chambers Westgarth, acting on behalf of developer Kurraba Group and its CEO, **Nicholas Smith**. The funny part is they address the letters to the wrong person, another community activist who they think runs the website.

These letters are chock-full of bluster, accusing us of everything from libel to "injurious falsehood" and demanding that we **shut down our website and social media immediately, or else**. Let's be clear: these threats are **legally baseless** here in the United States. They're a textbook case of a SLAPP – a **Strategic Lawsuit Against Public Participation** – and we won't be intimidated. The letters are below then read further for our analysis.

**Letter 1**



2025-10-01 – Letter to Kurraba Exposed re Kurraba – 29 July 2025 – first concerns notice_Redacted    Download

**Letter 2**



2025-10-01 – Letter to Kurraba Exposed re Kurraba – 1 October 2025 – second concerns notice_Redacted    Download

# Baseless Bullying Under the Guise of Defamation

Kurraba's letters read like an attempt to bully critics into silence. They rant that by exposing the truth about Kurraba's controversial 100 Botany Road development, we have "seriously defamed" Mr. Smith and caused him *"serious harm"*. The lawyers huff and puff about our alleged "unlawful conduct" in speaking out, even claiming we owe them $3 million because an investor walked away after reading our posts. They cite Australian defamation law – which, by the way, does not apply to a website run in California by U.S.-based and domiciled citizens. Then, in an absurd ultimatum, they ordered us to delete our entire website and Twitter (X) account "by 5 pm *tomorrow"*.

This is corporate legal thuggery 101. **Threaten, intimidate, demand silence.** The clear message: *"Shut up, or we will bury you in lawsuits."* But here's the problem for Kurraba and Mr. Smith: their threats hold no water on this side of the Pacific. In America, we have robust free speech protections precisely to stop this kind of bullying.

# A Textbook SLAPP Tactic

SLAPP suits – **Strategic Lawsuits Against Public Participation** – are lawsuits (or threats of lawsuits) aimed at silencing critics by imposing substantial legal costs and instilling fear. The goal isn't necessarily to *win* in court, but to intimidate activists, whistleblowers, and community members into silence. **Intimidation lawsuits, defamation threats, excessive damage claims – sound familiar?** Kurraba's letters check every box.

> **SLAPP Definition:** *Strategic lawsuits against public participation are lawsuits intended to censor, intimidate, and silence critics by burdening them with the cost of a legal defense until they abandon their criticism or opposition .*

Kurraba's lawyers practically admit it's a SLAPP. They know dragging a small community website into an Australian court would be a nightmare – the *process* is the punishment. **In fact, sending threatening letters before actually suing is a classic SLAPP move.** They hope we'll panic and self-censor. But we see through it, and fortunately, so does California law.

# California's Anti-SLAPP Law: Our Shield

What Kurraba may not realize (or chooses to ignore) is that **California has one of the strongest anti-SLAPP laws in the U.S.**. Under California Code of Civil Procedure § 425.16, if they dared to sue us here, we could counter with an anti-SLAPP motion to strike immediately. The law explicitly protects any **"act… in furtherance of the person's right of petition or free speech… in connection with a public issue"**. That covers **exactly** what we're doing – speaking out on a matter of public concern (a massive urban development) and even petitioning government bodies (we spoke at a City planning meeting and filed objections).

California's anti-SLAPP statute spells it out: protected activities include **"any written or oral statement made before a legislative, executive, or judicial proceeding,"** and **"any statement made in a place open to the public or a public forum in connection with an issue of public interest."** . Guess what? Our actions fit the bill:

- **Speaking to the Government** – We made oral submissions to the Sydney Planning Committee regarding the 100 Botany Rd project, voicing community concerns. That is petitioning the government on a public issue, squarely protected by anti-SLAPP law.
- **Public Forum Speech** – We run a website and social media accounts discussing the project, which are public forums discussing an issue of broad public interest (urban development, transparency, potential corruption). This is core free speech on a public issue.

If Kurraba sued in a California court, the burden would be on **them** to show a probability of winning. Given the facts, they wouldn't stand a chance. California courts consider whether the speech is about something of public interest – e.g., is the subject in the public eye? Does it affect people beyond the immediate parties? Does it contribute to a public debate? . Here, we have a **significant Sydney development project**, a CEO who has made himself a public figure by championing it, and a community debate over potential corruption and transparency. **This is unquestionably a public concern**. Under California law, our speech would be **highly protected**.

### Anti-SLAPP = Fast Dismissal + Fee Penalties

The beauty of the anti-SLAPP law is that it provides an early exit from bogus suits. We wouldn't have to endure years of litigation; we could file a special motion to strike the moment they filed a complaint. The court would quickly assess whether the case targets our protected speech – which it clearly would – and if so, **the case would be dismissed unless Kurraba can show that they'd likely win on the merits**. Given U.S. free speech standards (more on that below), Kurraba's defamation claims would collapse.

And here's the kicker: if we win a SLAPP motion, **Kurraba pays our attorney's fees**. Anti-SLAPP laws are designed not only to dismiss these suits but also to deter **bullies** by hitting them in the wallet. Kurraba Group might want to think twice before trying to export its intimidation to California – they'd be footing a very expensive bill for our lawyers. (Ironically, California even lets a wrongfully sued defendant countersue for malicious prosecution of a SLAPP in some cases – a "SLAPPback" – but hopefully it won't come to that.)

# The First Amendment: You Can't Gag Free Speech in the U.S.

Beyond California's statute, **we have the U.S. Constitution on our side.** The First Amendment's free speech protections are far more robust than Australia's plaintiff-friendly defamation regime. Here, **speech on matters of public concern sits at the very heart of First Amendment protection**. The Supreme Court has repeatedly held that **even sharp, harsh criticism – including speech that some might call "outrageous" or hurtful – is protected when it concerns public issues**. And make no mistake: scrutinizing a significant development project and its proponents is a matter of public interest and public concern.

> **Highest Protection for Public Issues:** The U.S. Supreme Court affirms that *"speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection."* In other words, if it's about a subject of community concern (like a large-scale urban development), our right to discuss it is vigorously defended.

Mr. Smith and the Kurraba Group are injecting themselves into a public project worth hundreds of millions of dollars, which will impact a local community. By any standard, they are **limited public figures** in this context. Under U.S. defamation law, that means if they ever tried to sue us here, they'd have to prove we acted with **"actual malice"** – that we knowingly lied or showed reckless disregard for the truth. Good luck with that! We are confident in the truth of our reporting, which is backed by community testimony and public records.

### Anonymity and Criticism are Legal Rights

Kurraba's letters bristle at the fact that we run *Kurraba Group Exposed* anonymously (they even speculated we used pseudonyms and images for some personas on the site). Here in the U.S., **anonymous speech is a well-established right**. As the Electronic Frontier Foundation notes, *"In the United States, everyone – even people accused of offensive conduct – has the right to communicate anonymously, and that right should never be infringed without due process."* The Constitution guarantees the ability to speak without attaching your real name, especially if revealing it could invite retaliation. This principle traces back to the Federalist Papers and Thomas Paine – anonymity has protected dissidents and whistleblowers since the founding of America.

So if Kurraba's endgame is to unmask us and smear us, that won't fly easily here. U.S. courts require a would-be defamation plaintiff to meet rigorous tests before they can pry into an anonymous speaker's identity. They must demonstrate that their case has merit and that the identity is truly necessary – not just that they want to name and shame critics. Again, given the public interest nature of our speech, a fishing expedition to unmask us would face a very high bar.

# U.S. Law Trumps Foreign Libel Judgments (No Libel Tourism)

Let's entertain a hypothetical: suppose Kurraba Group actually sues in Australia (where defamation laws favor plaintiffs) and wins some absurd judgment against us. Could they then enforce it against us in the U.S.? **Nope**. The U.S. has a law called the SPEECH Act – a federal law enacted in 2010 specifically to prevent "libel tourism." The SPEECH Act **renders foreign defamation judgments unenforceable in U.S. courts unless the foreign law provides at least as much free speech protection as U.S. law, or the outcome would be the same under U.S. standards**. Australia's defamation laws are notoriously more restrictive (for example, no actual malice requirement for public figures, weaker protections for opinion, etc.), so it's virtually certain an Aussie judgment would fail that test. In plain terms: **Kurraba can't use an Australian court to gag a U.S. website.** Our courts wouldn't uphold it.

California even has its own statutes against such maneuvers, but the federal SPEECH Act is enough. It was passed unanimously by Congress to prevent precisely what Kurraba is attempting – using foreign courts to punish American speakers for speech that is protected in the United States. So any threat of "we'll sue you in Sydney and come after you" is an empty one. They could win a paper judgment abroad, and it would be worthless here.

# The Real Issue: Public Accountability for 100 Botany Road

Why is Kurraba Group so desperate to silence us? Because we are shining a light on their flagship project, **100 Botany Road (the "ION" project in Waterloo)**, and its many red flags. Our blog and tweets have detailed **serious allegations of corruption, secrecy, and harm to the community** surrounding this development. These aren't baseless jabs – they're matters of **public record and concern**. Let's recap what's at stake and why our speech is squarely in the public interest:

- **ICAC Referral:** The 100 Botany Rd project has drawn the attention of the Independent Commission Against Corruption (ICAC) in NSW. Public reports indicate the project was *"moving forward despite an ICAC referral and a pending legal challenge to the development approval."* In other words, there have been credible complaints about the integrity of this project's approval process severe enough to trigger an anti-corruption investigation. That alone makes it a matter of public importance. (Kurraba's letter absurdly claims it's defamatory to say Mr. Smith or Kurraba was referred to ICAC, but if there is in fact an ICAC case number or inquiry, reporting that is **fair game** – and frankly newsworthy.)
- **Lack of Transparency:** Through Freedom of Information (FOI) requests, we uncovered that the City of Sydney **approved the ION development despite unanswered questions about its "state significant" classification**. The State Significant Development (SSD) status fast-tracked the project, potentially sidestepping ordinary local scrutiny. The FOI records suggest that due process may have been *rushed or bypassed*, raising questions of transparency and oversight. We, along with other residents, have been asking: **Why the hurry? What wasn't disclosed?** These are legitimate queries in a democracy.
- **Alleged Community Deception:** Local residents have alleged that Kurraba representatives employed underhanded tactics to discourage opposition. At a public City Planning Committee meeting (Feb 2025), our co-author Michael Williams publicly stated that **Mr. Smith tore down community notice posters about the development and told locals they "don't need to submit a formal objection"** – supposedly to prevent the project from facing independent scrutiny. If true, that is a grave misconduct – effectively sabotaging community consultation. Kurraba's letter calls this accusation "seriously defamatory"; we call it **a matter of public ethics**. The proper response to such an allegation is to deny and disprove it with evidence, not sue the messenger.
- **Community Pushback:** Far from the narrative that "one troublemaker" is defaming poor Kurraba, there is **broad community concern** about the development. Many citizens lodged formal objections to the DA (Development Application) in late 2024. The local planning meeting where Mr. Williams spoke had **numerous members of the public present and watching**, reflecting widespread interest. There's even a **legal challenge** underway against the approval itself (likely by community groups or competitors). These facts show that **the public is engaged** and has serious reservations about Kurraba's project. Our website has simply become a focal point for gathering these concerns and reporting on them.
- **Kurraba's Broken Promises:** We have reported that, despite Nicholas Smith's grand promises of a cutting-edge life sciences hub, Kurraba has been quietly shopping the 100 Botany Road **site to investors and buyers**. In fact, by mid-2025, **Smith's firm was "tapping private investors in the hope of selling the 100 Botany Road development site"** – a direct contradiction of their public assurances that they would see the project through. We also revealed a bizarre attempt to raise $50 million via a Facebook crowdfunding campaign with a partner company, indicating a desperate move. Kurraba's letter claims it's false and defamatory to say they're seeking a buyer or that the project is shaky. But multiple reports and their own actions strongly support our account. If the CEO is overhyping a project and then trying to offload it, the public deserves to know.

In short, everything we've published is about **holding a powerful developer accountable** for issues that affect the community, including public process, integrity, and transparency in significant developments. This is **core political speech**. It's precisely the kind of speech the First Amendment and California's public participation laws seek to protect.

# Chilling Effect? Not Today

The most concerning aspect of Kurraba's aggressive legal threats is the **chilling effect** they are intended to create. How many ordinary citizens or small community groups, upon receiving a multi-page lawyer letter threatening ruinous lawsuits, would simply give up? Probably a lot. That's the real danger: these tactics scare people away from civic engagement. Folks might think, "I'd better not speak at the next council meeting, I might get sued," or "Maybe I shouldn't criticize that developer online, it's too risky." SLAPP threats like Kurraba's aim to drain the lifeblood of democracy, which is **active, vocal public participation**.

But we refuse to be chilled. If anything, these letters have strengthened our resolve to stand up for our community's right to speak. We know our rights, and we want **you – the public – to know you have these rights too**.

- **You have the right to object** to developments that affect your neighborhood, without being sued into silence.
- **You have the right to ask hard questions** about business dealings and demand transparency from those in power.
- **You have the right to publish and share information** that you believe the community should know, as long as it's not knowingly false.
- **You have the right to be anonymous** if you fear retaliation – and that anonymity is protected by law in the U.S..

When companies like Kurraba use legal muscle to scare critics, they betray their fear of accountability. They also show a gross disrespect for the principles of free speech. In America, we've chosen to "protect even hurtful speech on public issues to ensure that public debate is not stifled." We won't let Kurraba stifle the debate.

# Standing Up to the Bullies

Our message to Kurraba Group, Nicholas Smith, and their lawyers is simple: **we will not be silenced**. Not by Aussie defamation threats, not by legal jargon, not by a dollar figure with a lot of zeros. If you believe our statements are false, you're free to present evidence and correct the

record in the court of public opinion – we actually invite more transparency. But trying to strong-arm us into taking down our site only makes you look like you have something to hide.

We're also calling on our readers, community members, and advocates of free speech: **pay attention to this case**. It's a classic example of a powerful developer using SLAPP tactics against citizen watchdogs. Today it's us, tomorrow it could be your local activist group facing similar bullying. The best defense is knowledge and solidarity. Share this story. Let Kurraba know that these tactics will only backfire and draw **more public scrutiny** to their actions.

In California, we have a saying for situations like this: *"See you in court."* If Kurraba Group is foolish enough to bring their baseless case here, we'll be ready with anti-SLAPP motions, constitutional defenses, and a robust truth-based defense for any factual claims we've made. They will lose, and they will likely be responsible for our costs. But frankly, they shouldn't bother. The truth is not defamatory – and **our right to speak truth to power is not up for negotiation**.

In the meantime, *Kurraba Group Exposed* will continue to do what we do: exposing. We'll continue to shine a light on 100 Botany Road and any other project where public interest is at stake. We'll continue to stand with the community against intimidation. We sincerely thank all of you for your support – every resident who spoke up, every whistleblower who provided information, and every reader who shares our posts. This is how we uphold democratic accountability.

**Bottom line:** Kurraba's legal threats are **empty in the U.S. and emblematic of SLAPP tactics**. We're not shutting up, and we hope our stance empowers others to resist such bullying. Free speech is on our side, the law is on our side, and the public is on our side. Together, we won't let a wealthy developer from halfway around the world trample our rights.

**(No gag order will stop the truth.)**

## FAQs

### What legal protections does California offer against SLAPP lawsuits for online critics?

California provides robust anti-SLAPP laws under California Code of Civil Procedure § 425.16, which allows early dismissal of lawsuits aimed at chilling free speech on public issues and mandates that the losing side pays the defendant's legal fees.

### Why are the legal threats from Kurraba Group considered baseless in the U.S.?

The threats are considered baseless because they involve foreign defamation laws that do not apply in the U.S., and under U.S. law, free speech on matters of public concern is strongly protected by the First Amendment, making such lawsuits unlikely to succeed.

### How does U.S. law protect anonymous speakers and critics?

U.S. law recognizes the right to anonymous speech, and courts require a high standard of proof from plaintiffs to unmask anonymous critics, especially when the speech involves public issues or community concerns.

### Can foreign judgments be enforced in U.S. courts if they involve libel or defamation?

No, due to the SPEECH Act of 2010, foreign libel judgments are unenforceable in U.S. courts unless the foreign law provides at least the same level of free speech protection as U.S. law, which is often not the case.

### What is the main reason the community critic site is so focused on exposing the Kurraba Group's actions?

The site aims to hold Kurraba Group accountable for alleged corruption, lack of transparency, community deception, and negligent practices related to the 100 Botany Road development project, which are matters of public record and interest.



### Kurraba Group

[See Full Bio](#) ›

# The Failure of Kippax Property and Rebranding as Kurraba Group: Nick Smith's Troubled Venture

October 1, 2025
Kurraba Group

### Key Points

- **Collapse of Kippax and Investor Losses:** Kippax Property was deregistered in early 2023, resulting in total investor losses, with evidence showing minimal recoveries and concerns over ethical issues like company dissolutions to avoid liabilities.
- **Rebranding to Kurraba Group and Ongoing Controversies:** Nick Smith rebranded as Kurraba Group before the fall of Kippax, continuing similar risky practices, facing legal issues, financial instability, regulatory investigations, and community opposition in its new projects.
- **Rejection of the Rosehill Street Proposal:** Kippax's plan to redevelop Rosehill Street into a high-rise commercial building was rejected by Sydney City Council due to misrepresentations, non-compliance with design guidelines, and inadequate public benefits.
- **Kippax's Ambitious Development Plans and Challenges:** Despite large ambitions and partnerships with investors like Ariadne Australia, Kippax faced delays, planning issues, and lacked proven expertise, leading to stalled projects and strained investor confidence.
- **Background of Nick Smith and Kippax Property:** Nick Smith founded Kippax Property in late 2019, bringing claims of 15 years of real estate experience and targeting high-value development projects in Sydney, including mixed-use sites like Redfern.

## Background: Nick Smith and the Rise of Kippax Property

Kippax Property was a Sydney-based development venture co-founded and led by Nicholas "Nick" Smith, starting in late 2019. Smith, a property developer born in 1985, positioned himself as Executive Director of Kippax and touted 15 years of experience in real estate. Prior to launching Kippax, Smith had worked on major property deals (including an acquisition for Lendlease in London) and projects at firms like Dexus, giving the impression of strong credentials. Kippax Property set out with grand ambitions to develop high-value real estate in Sydney, with Smith at the helm, driving its strategy and investor relations.

From the outset, Kippax Property targeted an ambitious project pipeline. Notably, the company became involved in a significant development proposal in the Redfern area – a site at 44-78 Rosehill Street, Redfern, near the Australian Technology Park and Redfern Station. This site, which had seen a failed residential-focused planning proposal in 2018 under previous owners (Redfern Rosehill Pty Ltd), was acquired by Kippax around 2020 through its special purpose vehicle, Redfern Property SPV 1 Pty Ltd, where Smith served as director from 2020 to 2022. To finance such ventures, Kippax brought on outside investors and partners. In fact, filings show that a publicly listed investment firm, Ariadne Australia, acquired a 50% stake in a Kippax Property Unit Trust to co-fund projects in the area. This partnership signaled early confidence in Kippax: millions were invested in acquiring and planning the site.

However, despite Nick Smith's optimism, warning signs emerged quickly. Internally, Kippax lacked a proven track record as an organization, and Smith's own background, while broad in real estate, did not include specialized expertise in the evolving commercial or mixed-use developments that the Rosehill Street project would require. This gap in experience raised concerns about whether Kippax could deliver on its bold promises. Externally, progress on Kippax's developments stalled: rezoning and planning approvals for the Rosehill Street site proved more complex than anticipated, building on the site's history of rejections. By 2021–2022, delays and unmet milestones were straining investor patience.

## Kippax's Involvement in Redfern: The Rosehill Street Setback

Kippax's flagship effort centered on redeveloping 44-78 Rosehill Street into a sustainable commercial building, aligning with the broader Botany Road Precinct planning proposal. In June 2022, as the landowner, Kippax strongly objected to any reduction in the exhibited planning controls during the City of Sydney's post-exhibition review. They envisioned a high-quality, 11-storey commercial structure with significant public domain improvements, including a publicly accessible 'Town Hall' auditorium, tree planting, and a 6-star Green Star hybrid timber design. Kippax submitted multiple built form options to address concerns like wind impacts, solar access to nearby Gibbons Street Reserve, and setbacks to neighboring properties, emphasizing the site's strategic role in contributing to the Innovation Corridor and delivering up to 11,600 jobs across the precinct.

Despite these efforts, the proposal faced scathing criticism and ultimate rejection. The City of Sydney's assessment highlighted misrepresentations and inaccuracies in earlier submissions related to the site, including overstated alignments with regional plans, incorrect depictions of nearby developments (such as exaggerating the proximity and scale of the Waterloo Metro Quarter), and underestimating impacts like overshadowing and traffic congestion. The Design Advisory Panel called the approach "opportunistic" and premature, noting it failed to integrate with place-based strategies like the Central to Eveleigh Land Use and Infrastructure Implementation Plan (LUIIP). Key issues included non-compliance with the Apartment Design Guide for building separations, excessive height relative to the context (surrounding buildings mostly 1-5 storeys), severe wind impacts requiring unfeasible mitigations, inadequate public open space, and reliance on overcrowded infrastructure like Redfern Station without committed upgrades. The public benefit offer of 5-8% affordable housing was deemed insufficient, falling short of the City's 12% aspiration and the Region Plan's 5-10% target.

Transport, Heritage and Planning Committee                    10 September 2018

**Item 2.**

**Request to Prepare a Planning Proposal - 44-78 Rosehill Street, Redfern**

**File No:    X018231**

**Summary**

The City of Sydney has received a planning proposal request to change the height and floor space controls in Sydney Local Environmental Plan 2012 that apply to a single site located at 44-78 Rosehill Street, Redfern (the site) – near the Australian Technology Park (ATP) and Redfern Station.

The site currently consists of a two storey building with commercial tenancies and car parking at ground level. If progressed, the planning control changes will enable two predominantly residential towers of 18 and 30 storeys (up to 100 metres in height) containing over 26,000 square metres of floor space and 312 new residential apartments. A public benefit offer of five to eight per cent of residential floor space has been made in conjunction with the planning proposal request.

The Greater Sydney Region Plan - A Metropolis of Three Cities (Region Plan) identifies the importance of a place-based planning approach to provide good outcomes in a growing city. It places a strong emphasis on the need for a coordinated approach to strategic planning and the need for collaboration. By doing so, places are more liveable, productive and sustainable. Importantly, planning effectively for growth requires a methodical and sequenced approach, particularly the need to sequence infrastructure with growth.

Redfern Station is Sydney's sixth busiest station and remains one of the least accessible. The City of Sydney shares the concerns of the University of Sydney and the ATP that there are no funded plans or commitment from the NSW State government to improve the accessibility of Redfern Station and to address current demand and forthcoming growth.

The site is identified as being within the Harbour CBD and Innovation Corridor as defined in the Region Plan and Eastern City District Plan (District Plan). The focus of these areas is employment growth and innovative industries.

Given the predominantly residential floor space makeup, this proposal does not align with the NSW Government's strategic intent for the area in the Region Plan or the District Plan. The proposal has insufficient site-specific merit because it will result in an unacceptable overdevelopment for a site of its size and context, and will create significant wind impacts which cannot be managed effectively.

It is inappropriate to change planning controls for an individual site with such strategic importance in isolation of place-based planning strategies for the wider area that consider local context and infrastructure needs. For example, inappropriate height and bulk will lead to overshadowing impacts on surrounding sites which will limit their future development potential. A place based strategy will ensure development can be shared equitably across a wider range of land owners and future developers.

Such a strategy is being prepared by the Department of Planning and Environment by way of the Central to Eveleigh Land Use and Infrastructure Implementation Plan (LUIIP). The City of Sydney has advised that the site is located within the LUIIP investigation area.

1

[Request To Prepare A Planning Proposal – 44-78 Rosehill Street Redfern](#)    Download

As part of the Botany Road Precinct changes, incentive controls were removed from northern opportunity sites, including 44-78 Rosehill Street, due to community objections over resident displacement, amenity losses, and incompatibility with the area's character. This decision rendered Kippax's vision unviable, marking a major setback. The rejection echoed the site's 2018 denial and 2019 rezoning review failure, underscoring persistent strategic misalignments with NSW Government priorities for employment-focused growth in the Harbour CBD and Innovation Corridor, rather than isolated overdevelopments.

## Investor Ambitions and Early Missteps

Kippax Property pitched high returns and innovative projects to its backers, but execution fell short. Nick Smith enthusiastically promoted the Rosehill Street project as a catalyst for the Botany Road Precinct's transformation into a vibrant commercial hub. Such rhetoric helped attract investors seeking big opportunities.

Behind the scenes, however, Kippax struggled. Insiders describe a pattern of overhyping and underdelivering. For example, while Smith was publicly touting Kippax's grand plans, the company failed to secure firm commitments to actually build out the vision. No major construction was underway, and crucial partnerships were absent. By mid-2022, it became apparent that Kippax had not secured the necessary funding or approvals – a stark contrast to the lofty expectations set earlier.

Investor money was being burned through with little to show for it on the ground. Financial reports later revealed that Kippax had to continuously seek new funding just to stay afloat, a sign of distress. The Rosehill Street development, in particular, faced serious questions about its viability. Public records indicate that the City of Sydney Council was wary: they removed incentive controls amid "unanswered questions" about feasibility and alignment with precinct goals. Such lukewarm, conditional support for a flagship project did not inspire confidence.

Moreover, integrity issues started to cloud Kippax's projects. The scathing council feedback on misrepresentations in submissions prompted scrutiny of the company's processes. The combination of regulatory red flags and lack of tangible progress put Kippax Property in a precarious position by late 2022.

## Collapse of Kippax Property and Investor Losses

By early 2023, Kippax Property had effectively collapsed, leaving investors in a lurch. On 12 February 2023, both Kippax Property Pty Ltd and its holding company were formally deregistered – an abrupt end marking the failure of the venture. This dissolution was more than a procedural footnote; it had real financial consequences. According to reports, Kippax's investors ultimately lost their entire investment in the project. In other words, every dollar poured into Kippax evaporated – a total wipeout for equity holders and private backers.

Evidence of the financial wreckage comes from Ariadne, Kippax's onetime joint-venture partner. In its 2023 annual report, Ariadne disclosed that it had "exited its investment in the Kippax Property Trust" and restructured project ownership due to Kippax's failure. Ariadne assumed control of the project's holding entities to protect its interests, despite officially owning only 48% – a clear sign that Kippax's side of the partnership had crumbled. Notably, Ariadne reported receiving only a token repayment of A$126,855 from Kippax during this period, implying that the vast majority of the funds invested were not recovered. Essentially, the primary institutional investor recouped mere cents on the dollar, highlighting the depth of Kippax's losses.

Multiple sources concur that Kippax's demise left stakeholders empty-handed. A watchdog site focusing on Nick Smith's activities bluntly stated that "Kippax investors lose entire investment". This outcome has fueled anger and dismay among those who believed Smith's promises. Many private investors saw nothing in return – their money had funded planning consultants, marketing, and operational expenses for a project that never materialized.

The way Kippax folded also raises serious ethical questions. Rather than seeing the troubled project through or fully compensating investors, Nick Smith and his partners simply shut down the companies. Observers note this as part of a troubling pattern: developers dissolving entities to escape accountability for failures. In Kippax's case, once liabilities accumulated and the venture became untenable, the corporate shell was abandoned. This left creditors and investors with effectively no legal entity to pursue. The history of "shutting down companies to escape past failures" is a key criticism of Smith's approach at Kippax. It reflects a lack of accountability – using corporate technicalities to side-step the fallout of mismanaged projects. Indeed, community advocates later cited Kippax's collapse as a cautionary tale, warning that the same individuals were now pushing similar projects under a new guise.

In the aftermath of Kippax Property's failure, the Rosehill Street site was left undeveloped. Ariadne and other parties have been "exploring re-zoning" options for related lands to salvage value, but progress remains uncertain. What is clear is that Nick Smith's first independent venture ended in a costly fiasco, with millions of dollars in sunk investment and a flagship project stalled due to regulatory rejections. It's a prime example of how bold real estate schemes can implode – through over-leverage, unmet conditions, and overconfidence – leaving those who trusted the developer with significant losses.

## Rebranding as Kurraba Group – A Phoenix Rises

Even as Kippax Property was spiraling down, Nick Smith was already preparing its successor. In September 2022 – months before Kippax was formally closed – Smith and a few associates founded Kurraba Group Pty Ltd. This new company, based in North Sydney, was essentially Kippax 2.0 under a different name. Indeed, one of Kurraba's co-founders, Richard Campbell, had been involved with Kippax's projects as well. However, not all partners transitioned; feedback suggests a business partner walked away amid the collapse. The rebranding allowed Smith to pivot to a new site just a few hundred meters south, at 100 Botany Road in Waterloo, reimagining it as the "ION Life Sciences" precinct. The rebranding was so swift and convenient that even the name "Kurraba" itself has drawn controversy. Critics point out that Smith simply appropriated the existing geographical name "Kurraba" (as in Kurraba Point, an upscale Sydney locale) and appended "Group" to it, creating a new corporate identity with a veneer of established credibility. The only thing new was the name, while the people and ambitious plans remained largely the same, now focused on life sciences despite Smith's lack of expertise in the field.

Smith's move to rebrand has been viewed as an attempt to distance himself from the Kippax failure without addressing its causes. By shedding the tainted "Kippax" moniker, he could approach investors, government, and the market with a "fresh" brand unburdened by Kippax's bad press. However, the strategy has drawn scathing criticism. An exposé on the Kurraba Group notes that Smith effectively "stole the Kurraba name" to trade on someone else's positive associations, raising ethical questions about transparency and originality. There were even murmurs of potential legal issues – if any prior business held rights to the Kurraba name, Smith's appropriation could have constituted misleading conduct or raised trademark concerns. While no lawsuit has materialized on that front, the optics are poor: it appears to be a cynical rebranding to escape a troubled past.

More troubling is that Kurraba Group has replicated many of Kippax's questionable practices. The development at 100 Botany Road remains the centerpiece, and it continues to be plagued by problems. Under the Kurraba banner, Nick Smith has repeatedly announced progress – for instance, signing a construction partner and highlighting the project's importance – but behind the scenes, the project remains stalled and financially unstable. By mid-2025, Kurraba Group was desperately seeking buyers or investors for the Botany Road site, despite earlier promises that Kurraba would see it through. Reports confirmed that Smith's firm was "tapping private investors in the hope of selling" the site, essentially attempting a fire sale. In one almost farcical episode, Kurraba partnered with a medical non-profit to try raising $50 million via a Facebook crowdfunding campaign – a highly unorthodox and telling sign that conventional financing had dried up. These actions strongly suggest that Kurraba is, financially, a house of cards not unlike Kippax, propped up by continual fundraising attempts and optimistic press releases.

Regulatory and legal troubles have likewise carried over. In 2023, the Kurraba Group became entangled in an ICAC investigation related to how it acquired an affordable housing block for the Botany Road project. The deal – an off-market sale from City West Housing facilitated by an Aqualand executive on City West's board – raised serious probity concerns, enough for a referral to the anti-corruption commission. Backers like Aaron Tippett, a Sydney property developer associated with LIVstyle and involved in the transaction, transitioned with Smith from the broader Redfern area efforts to focus on Botany Road, now positioning the team as life sciences experts despite limited credentials. Separately, local residents and community groups lodged a legal challenge against the Botany Road development approval in the Land & Environment Court, arguing that the project approval was improperly granted and violated planning laws. This court case has delayed the project further and could potentially void Kurraba's development consent. In short, rebranding as Kurraba Group has not solved the underlying issues – the venture remains plagued by financial instability, community opposition, and now legal jeopardy. As one Sydney activist put it, "Why should we trust developers who refuse to play by the rules?" noting that Kurraba's SSD (State Significant Development) status is being used to bypass regular scrutiny, while the people behind it have a track record of dissolving companies to dodge responsibility.

## Continuing Controversies and Lessons Learned

Far from being a clean slate, Kurraba Group has become a continuation of Kippax's troubled legacy – and the saga offers several cautionary takeaways. Among the most glaring issues:

- Pattern of Corporate Evasion: Nick Smith and his partners have a history of shutting down companies to evade accountability for failures. Kippax Property was closed in the wake of its collapse, leaving investors high and dry. In response, the Kurraba Group was

formed to carry on business without acknowledging those past liabilities. This raises flags about governance and trustworthiness in any future endeavors they undertake.

- Overpromising, Underdelivering: The Kippax/Kurraba ventures have consistently overstated their prospects and underperformed in reality. Smith promised a cutting-edge commercial hub at Rosehill Street, but years on, there is no construction – only stalled plans and attempts to pivot to nearby sites. Such a disparity erodes credibility with investors, the community, and regulators alike.
- Financial Mismanagement: Both iterations of the company showed signs of financial instability. Kippax exhausted investor funds with little result, and Kurraba has resorted to unconventional fundraising (even a social media crowdfunding plea) to stay solvent. Continuous borrowing and "hope-someone-else-will-pay" tactics suggest poor financial planning and inadequate risk management. Indeed, observers warn that Kurraba is one delay away from insolvency, which could leave an "unfinished or repurposed project" in the community's midst.
- Regulatory and Ethical Red Flags: The ventures have repeatedly attempted to circumvent the system – from misrepresentations in submissions that drew scathing council rebukes, to using an inappropriate State Significant Development classification to bypass local controls, to questionable land deals now under ICAC scrutiny, to the opaque rebranding of a name for clout. These actions reflect a willingness to bend rules and a lack of transparency, which is alarming in an industry that requires public trust and regulatory compliance.
- Investor Confidence Shaken: Perhaps most striking is the breach of investor confidence. Those who funded Kippax saw 100% losses, and current Kurraba investors face uncertainty and potential dilution of their stakes. Meanwhile, Nick Smith's personal behavior has drawn criticism – his public persona of lavish partying (cigars, champagne, black-tie galas) "projects indulgence rather than discipline", which "clash[es] with the responsibilities of someone managing millions in investor-backed projects". While not illegal, this has created a perception that Smith prioritizes lifestyle over accountability, further undermining trust. As industry commentary notes, if project timelines slip while the CEO is seen reveling, it "risks eroding investor confidence" and looks "self-sabotaging".

In summary, the failure of Kippax Property and its subsequent rebirth as Kurraba Group serve as a stark warning to the property development sector. A combination of overambition, poor management, and dubious tactics led to Kippax's collapse – wiping out investor wealth and stalling a highly touted project. Rather than learning from those mistakes, Nick Smith appears to have repackaged the venture under a new label, continuing many of the same problematic behaviors. The result has been continuing losses, investigations, and public backlash.

## Conclusion

Kippax Property's trajectory – from hyped launch to disastrous collapse – exposes the dark side of speculative property development. Backed by Nick Smith's big talk and resume, Kippax took investor money and aimed for the stars, but delivered nothing but broken promises and red ink. Its downfall, and the total loss imposed on investors, is now part of Sydney's development lore. The transition to the Kurraba Group had little impact on the underlying dynamics. If anything, it showcases a cynical "rinse and repeat" strategy: discard the failed entity, rebrand, and continue pursuing similar projects nearby with new money. This tactic may temporarily shield the developer from past debts and reputational damage, but it rightly invites public skepticism and regulatory scrutiny.

The Kippax/Kurraba saga has become a cause célèbre among planning activists and concerned citizens in Sydney. They point out that allowing the 100 Botany Road project to proceed under these circumstances sets a dangerous precedent – essentially rewarding a developer who has left a trail of unpaid debts and misled stakeholders . Community members and even Council officials have been urged to halt the project until transparency and integrity are ensured. The message is clear: trust must be earned, not bought with a new name or grandiose claims.

Ultimately, Kippax Property's failure offers valuable lessons. It highlights the need for due diligence and caution when developers promise unprecedented projects. Investors burned by Kippax have become more vocal, warning others about flashy startups with thin track records. And as Kurraba Group's continued struggles demonstrate, rebranding cannot mask fundamental flaws. Unless Nick Smith and his team radically change course – prioritizing honest communication, sound governance, and realistic project management – it is likely that Kurraba Group will simply follow Kippax's footsteps toward disappointment or worse. As one columnist quipped, the situation is "a deceptive land grab… masquerading as public health," driven by a developer who "refuse[s] to play by the rules". Such scathing assessments underscore the significant decline in credibility.

Kippax Property now stands as a textbook example of a development venture gone wrong – and a caution that those who ignore the failures of the past are doomed to repeat them, even if they change the company logo. The hope among many observers is that regulators and investors will take heed, demanding better oversight and not being seduced by the next incarnation of promises. Until then, the story of Nick Smith's Kippax/Kurraba project remains a sobering reminder of how quickly a high-flying property scheme can crash and burn, leaving nothing but a rebranded shell and a trail of aggrieved investors.

## FAQs

### What caused the collapse of Kippax Property and what were the consequences for investors?

Kippax Property collapsed in early 2023 due to delays, planning issues, lack of proven expertise, and regulatory rejections. This resulted in the deregistration of the company and total investor losses, with reports indicating that investors lost their entire capital.

### How did Nick Smith respond after the failure of Kippax Property?

Nick Smith rebranded the company as Kurraba Group before the collapse of Kippax Property, attempting to distance himself from past failures. The new company has continued similar risky practices, facing legal issues, financial instability, and community opposition.

### What were the main reasons for the rejection of Kippax's Rosehill Street development proposal?

The Rosehill Street proposal was rejected due to misrepresentations, non-compliance with design guidelines, inadequate public benefits, excessive building height, wind and overshadowing impacts, and insufficient public open space, among other issues.

### What lessons can be learned from the Kippax/Kurraba saga?

Key lessons include the dangers of overpromising and underdelivering, poor financial management, practices of corporate evasion to avoid

accountability, reliance on rebranding to escape failure, and the importance of transparency and regulatory compliance in property development.

**What ongoing controversies surround Kurraba Group and its projects?**

Kurraba Group faces regulatory and legal issues, including an ICAC investigation over land deals and court challenges to its development approvals. Its financial stability remains uncertain, and it continues to struggle with delays, community opposition, and questions about transparency.



### Kurraba Group

[See Full Bio](#) ›

# Kurraba Group's ION Life Sciences Precinct: A Venture Riddled with Red Flags and Destined for Collapse

September 30, 2025
[Kurraba Group](#)

## Key Points

- **Financial and Legal Red Flags:** ION faces serious risks including lack of secure funding, failed fundraising efforts, ICAC investigations, approval process doubts, and unconfirmed high-profile features like the proton therapy facility, endangering its future.
- **Buildcorp's ECI Deal: Public Relations or Real Progress?:** The Early Contractor Involvement (ECI) with Buildcorp is likely a PR tactic to mask deeper issues like funding shortages and legal problems, as core project fundamentals remain unfulfilled.
- **A Troubled History: Kippax and Leadership Concerns:** Nick Smith's past with the failed Kippax Property, which resulted in investor losses, and his rebranding to Kurraba Group cast doubt on his leadership and the stability of the ION project.
- **The Illusion of Progress: ION's False Promises:** ION is marketed as a groundbreaking life sciences precinct in Sydney, but construction has not started, and the project appears to be in distress, with signs of marketing to potential buyers instead of real development.
- **Leadership Failures and Strategic Misalignment:** Nick Smith's limited experience in life sciences and his reactive management style contrast with established industry leaders, while the project's misalignment with national research priorities further undermines its credibility.

## Background

Kurraba Group's latest proclamation of triumph—announcing an Early Contractor Involvement (ECI) partnership with Buildcorp for the "ION" life sciences precinct—paints a picture of innovation and progress that might entice naive investors at first glance.



In a glowing LinkedIn post from CEO Nick Smith, the collaboration is hailed as revolutionary, emphasizing that "constructing a building like ION isn't business-as-usual" and spotlighting Buildcorp's expertise in tackling intricate developments. Smith exuberantly declares, "With ION, we're setting a new benchmark for life sciences in Australia… Appointing Buildcorp is about more than construction; it's about partnering with a team that understands the stakes, the complexity, and the opportunity this project represents." On the surface, this alliance appears to be the perfect synergy: a forward-thinking initiative backed by a reputable builder with a proven history in high-stakes projects. Yet, beneath this polished veneer lies a project fraught with insurmountable challenges, teetering precariously on the edge of outright failure. This in-depth exposé delves deeper into the ION precinct, unraveling the facade of the ECI deal with Buildcorp and revealing why it's little more than a Band-Aid on a hemorrhaging wound. Drawing from public records, investigative reports, and industry insights, we expose the systemic flaws that doom this venture.

## The Facade of Progress: Glossy Hype Concealing a Stagnant Reality

ION is marketed as Sydney's pioneering purpose-built commercial life sciences precinct, a sprawling A$490 million campus designed to "accelerate discovery" and bolster Australia's burgeoning $68 billion innovation economy.



Since its announcement in 2024, the promotional blitz has been relentless: Smith has positioned ION as a "property class with a cause," integral to the "fourth industrial revolution" that fuses real estate with scientific advancement. Renderings depict sleek, green-tinted buildings teeming with labs, collaboration spaces, and cutting-edge facilities, promising a hub for biotech startups, pharmaceutical giants, and researchers alike. However, over a year later, these lofty aspirations remain unfulfilled fantasies. As of late 2025, construction hasn't commenced; the site at 100 Botany Road in Waterloo remains dormant, a vacant lot symbolizing unkept promises rather than groundbreaking innovation. Instead of bustling activity, whispers in the industry suggest the project is being discreetly marketed to potential buyers, a clear indicator of distress. Kurraba's rhetoric of "long-term partnerships" has evaporated, with no confirmed major tenants or committed collaborators to breathe life into the vision.

The much-touted ECI with Buildcorp, while presented as a pivotal advancement, is likely a calculated public relations ploy to mask deeper woes. ECI involves pre-construction input on design, budgeting, and feasibility—valuable, but far from a commitment to actual building. Experienced contractors like Buildcorp can offer guidance, but they won't mobilize resources until core prerequisites are met: secure financing, regulatory clearances, and pre-leased spaces. For ION, these foundations are crumbling. Reports reveal Kurraba has been aggressively courting private investors to offload the 100 Botany Road site entirely, even as Smith publicly celebrates the Buildcorp tie-up. This duality reeks of desperation—a developer touting progress while simultaneously preparing an exit strategy, akin to a captain praising the ship's upgrades while scanning for lifeboats. Such contradictory behavior not only erodes trust but signals that ION is in critical condition, with the ECI serving as mere window dressing.

## A Legacy of Collapse: The Kippax Property Fiasco and Patterns of Evasion

To fully grasp ION's precarious position, one must examine Kurraba Group's origins and the checkered history of its leadership, particularly CEO Nick Smith.



Before launching Kurraba in 2022, Smith served as Executive Director of Kippax Property, a boutique development firm that met a catastrophic end. Kippax's flagship project imploded, resulting in total investor losses, and by early 2023, the company was deregistered and erased from corporate existence. ASIC records confirm Smith's directorship in Kippax Property Holdings Pty Limited (ACN 637 203 466), which was deregistered on February 12, 2023, following a string of failures. In a move that smacks of rebranding to escape accountability, Smith swiftly pivoted to Kurraba Group, appropriating the name "Kurraba"—an Aboriginal-derived Sydney place name associated with Kurraba Point—to lend an air of established prestige to his new entity. Critics on watchdog platforms allege this was a deliberate tactic: "Kippax rebrands as Kurraba," using a historic, respectable moniker to obscure past disasters.

This cycle of failure and reinvention is emblematic of broader concerns. Community advocates accuse Kurraba's principals of habitually dissolving entities to dodge repercussions, leaving investors destitute and locales burdened with unfinished eyesores. The Kippax debacle

serves as a stark precursor to ION's trajectory: overambitious promises unmet, financial shortfalls, and ultimate dissolution. Investors who backed Kippax "lost their entire investment," as documented in exposés, and warnings abound: "You do not want to invest with Nick Smith" given his track record of projects where backers "lost all their money." Even with Buildcorp's involvement, a new logo and fresh partnerships can't rewrite history. Smith's leadership hasn't shown growth from these missteps; instead, ION echoes the same pitfalls, amplified on a grander scale.

## Mounting Financial and Regulatory Hurdles: A Web of Instability

ION's troubles extend far beyond historical baggage, manifesting in a torrent of contemporary red flags that scream financial fragility and regulatory peril. Prudent investors would be wise to scrutinize these issues, which collectively undermine the project's viability:

- **Absence of Secure Funding and Exit Attempts:** Rather than locking in robust institutional support or anchor tenants, Kurraba has been in survival mode, quietly soliciting buyers for the 100 Botany Road site. This move betrays a profound lack of confidence from the developers themselves, forcing reliance on perpetual debt to tread water while hoping for a savior to assume the risks. Without committed capital, ION risks stalling indefinitely.
- **Unconventional and Failed Fundraising Tactics:** In a bizarre escalation, Smith collaborated with Proton Therapy Australia on a $50 million Facebook crowdfunding drive—an approach utterly incongruous with a project of this magnitude and purported sophistication. This social media plea underscores a rejection by traditional financiers, painting a portrait of desperation that has only amplified skepticism in the market.
- **ICAC Scrutiny and Legal Entanglements:** The project is shrouded in ethical shadows, with an active referral to the Independent Commission Against Corruption (ICAC) casting doubt on its dealings. Despite this, development pushed forward amid a pending court challenge to its approval. A separate ICAC probe involves Kurraba in a contentious affordable housing arrangement, highlighting a pattern of dubious practices. Ongoing litigation could nullify permissions, halting everything in its tracks.
- **Approval Anomalies and Governance Lapses:** Freedom of Information disclosures indicate the City of Sydney expedited ION as a State Significant Development (SSD) without clear rationale, with planners admitting confusion over the "Health and Technology" designation. Allegations of political influence or developer misrepresentation suggest procedural shortcuts, rendering approvals vulnerable to reversal and exposing the project to limbo.
- **Innovative Features Without Anchors:** Central to ION's allure is a proton therapy facility for advanced cancer treatment, yet no operator or partner has been secured, risking it becoming a $500 million "white elephant." Experts decry this as uncharted territory for private real estate, with the "life sciences" pitch appearing more as marketing fluff than a solid business model.

These intertwined problems depict a venture in disarray. Buildcorp's ECI input might refine costs or scale back ambitions through "value-engineering," but it addresses none of the root causes—insolvency, legal battles, and conceptual weaknesses. It's akin to polishing the brass on a vessel already taking on water.

## Leadership Deficiencies: From Visionary Claims to Operational Void

At the heart of ION's unraveling is a profound leadership shortfall, embodied by Nick Smith, whose self-portrayal as a trailblazer bridging science and property belies a resume thin on relevant expertise.

Kurraba Group CEO to speak at Life Sciences Real Estate Summit | Kurraba Group posted on the topic | LinkedIn

Kurraba Group CEO to speak at Life Sciences Real Estate Summit | Kurraba Group posted on the topic | LinkedIn

With 15 years in routine property dealings—valuations, acquisitions, and office builds—Smith lacks the specialized knowledge required for a life sciences precinct, which demands intricate ties to academia, healthcare, and long-horizon research. His proclamations about "enhancing human longevity through innovation" sound inspirational but lack substantive backing.

Under Smith's stewardship, ION has been directionless, failing to cultivate essential alliances with scientists, regulators, or communities from inception. Insiders critique the absence of steady strategy, leading to reactive pivots amid funding gaps and opposition. This isolation has left Kurraba without support networks, exacerbating crises. Moreover, Smith's judgment is questioned: he pursued an apprehended violence order (AVO) against a vocal critic, prioritizing suppression over dialogue. Such defensiveness diverts focus from salvation efforts.

Credibility is further eroded by contrasts with proven leaders like Alex Belcastro of Northwest Healthcare Properties REIT, Yue "Olivia" Geng of Altea Investments, and Neil Deacon of Health Advance Connect—figures with decades in life sciences real estate, delivering sustainable projects through evidence-based approaches and stakeholder engagement. Smith, a 40-year-old with a failed prior venture, pales in comparison, his "party animal" public image—featuring cigars and drinks—clashing with fiduciary duties. Even Kurraba's name choice draws fire for cultural appropriation, borrowing legitimacy without earning it. No builder partnership can mend this credibility chasm.

## Misalignment with National Priorities: A Commercial Gamble Masquerading as Public Good

Compounding these issues, ION fails to align with Australia's Draft National Health and Medical Research Strategy (2026–2036), which prioritizes equitable, collaborative research ecosystems. While Kurraba claims ION supports shared infrastructure and hub models, critics argue it's a profit-driven enclave, inaccessible to regional researchers and favoring high-rent tenants over broad equity. The removal of promised affordable housing from the site contradicts community benefits, and without university ties, it risks becoming a mere office park. Financial woes could force repurposing, betraying the strategy's vision and setting a precedent for exploiting health pretexts in planning.

## Final Warning: A Sinking Ship Investors Must Abandon

In conclusion, Kurraba's ION precinct represents a perilous investment, with Buildcorp's ECI offering illusory hope amid cascading failures. Competent as Buildcorp may be, they're tethered to a project lacking funds, tenants, legal stability, and adept leadership. Industry analyses warn of potential insolvency, yielding an incomplete or altered site. Echoing Kippax's investor wipeout, ION threatens history's repetition on a massive scale. Savvy stakeholders should demand rigorous due diligence, peering past hype to the glaring warnings. ION isn't the innovative

beacon advertised but a brewing disaster. Steering clear is the wisest course—unless radical reforms in transparency, funding, and management emerge, a prospect current evidence deems improbable. No amount of #innovationprecinct buzz can salvage this faltering endeavor.

## FAQs

### Why should investors be cautious about backing the ION project?

Investors should be wary because the project shows signs of insolvency, legal entanglements, leadership issues, and a significant risk of incomplete development or collapse, making it a potentially disastrous investment.

### What is the current status of the ION life sciences precinct project in Sydney?

Construction for the ION project has not yet started, and the site remains dormant, with industry whispers suggesting the project is being marketed to potential buyers instead of progressing as planned.

### Why is the ECI partnership with Buildcorp considered a facade rather than a genuine step forward?

The ECI partnership appears to be more of a public relations move to mask deeper issues like funding shortfalls and legal problems, as the project still lacks secure financing, tenants, and regulatory approvals.

### What is significant about Nick Smith's background, and how does it impact the ION project?

Nick Smith's past with Kippax Property ended in failure and investor losses, and his subsequent rebranding to Kurraba Group does not seem to have addressed these issues, casting doubt on his leadership and the project's stability.

### What financial and regulatory issues threaten the viability of the ION precinct?

The project faces multiple problems, including lack of secure funding, failed fundraising tactics, legal scrutiny from ICAC, approval process irregularities, and unconfirmed plans for flagship features like the proton therapy facility, all of which threaten its viability.



## Kurraba Group

[See Full Bio](#) ›

# Nick Smith's ION Project: A Point-by-Point Critical Review

September 29, 2025
Kurraba Group

## Key Points

- **Real Leadership in Life Sciences: Belcastro, Geng, and Deacon:** Industry leaders like Belcastro, Geng, and Deacon exemplify credible, experience-driven leadership in life sciences real estate, highlighting the importance of expertise and collaboration for project success.
- **Lack of Sector Expertise and Strategic Leadership:** Smith's background in general real estate development has contributed to a leadership void, as the complex needs of life sciences infrastructure require specialized knowledge and stakeholder engagement.
- **Overhyping Ambitions vs. Underdelivering Results:** Nick Smith's lofty promises for ION as Australia's first commercial life sciences precinct have not materialized, with the project now stalled and lacking committed long-term partners, undermining credibility.
- **Financial Troubles and Investor Exodus:** The ION project faces financial instability, with Kurraba Group desperately seeking investors and resorting to crowdfunding campaigns, indicating a loss of investor confidence.
- **Questionable Approvals and Integrity Issues:** Regulatory scrutiny and legal challenges, including ICAC attention and rushed approvals, suggest poor oversight and integrity issues associated with the ION development under Nick Smith's leadership.

## Background

Nick Smith, Co-Founder and CEO of Kurraba Group, has positioned the ION development (100 Botany Road in Waterloo) as a groundbreaking venture in Australia's life sciences sector. Billed as the nation's first commercial life sciences precinct with a planned A$490 million campus (Kurraba Group 2024a), ION was touted to bridge the gap between science and real estate. Smith's rhetoric portrayed ION as more than just another property play – he described it as a "property class with a cause," driven by a mission to enhance human longevity through innovation (Kurraba Group, 2024a). Just over a year since those bold claims, however, the project's trajectory tells a very different story. Below is a point-by-point critique of Nick Smith's performance on the ION project, comparing it to reality and the contributions of other key industry figures.

## Overhyping Ambitions vs. Underdelivering Results

From the outset, Nick Smith oversold ION's potential and his own ability to deliver it. In 2024, he proudly promoted ION as "Australia's first commercialised life sciences precinct" and spoke of big ambitions for Kurraba Group to spearhead this innovative hub (Kurraba Group 2024a). He framed the development as part of a "fourth industrial revolution" in which real estate would catalyze scientific progress (Kurraba Group 2024a). These promises set high expectations. Yet as of mid-2025, none of those promises have materialized. Instead of a thriving precinct under construction, the ION site is stalled and being quietly shopped around to buyers. Smith's "long term partnerships" approach – the very ethos on which he co-founded Kurraba (Kurraba Group n.d.) – seems to have fallen flat, as no stable long-term partner has committed to actually build out the vision. The stark contrast between a lofty vision and lackluster execution undermines Smith's credibility.

## Financial Troubles and Investor Exodus

One of the clearest indicators of underperformance is ION's troubled financial footing. Rather than securing strong backing, the Kurraba Group has been desperately seeking investors to take the project off its hands. Reports reveal that Smith's firm has been "tapping private investors in the hope of selling the 100 Botany Road development site" (Kurraba Group 2025a). This fire-sale mentality comes despite (or perhaps because of) serious red flags surrounding the project's viability. With no major investor willing to stick around, Kurraba has resorted to continuous borrowing just to keep the idea afloat, all while hoping someone else will shoulder the risk (Kurraba Group 2025a). The situation became so dire that Smith even partnered with Proton Therapy Australia in an attempt to raise $50 million via a Facebook campaign – an almost unheard-of move for a project of this scale (Kurraba Group 2025b). Such crowdfunding pleas for a complex development signaled to the market that conventional funding sources had lost confidence. In short, Smith's stewardship of ION has been characterized by financial instability and a decline in credible investor interest, casting serious doubt on the project's future.

## Questionable Approvals and Integrity Issues

Financial woes are only part of the story. The ION project has also been mired in regulatory and ethical concerns that reflect poorly on Nick Smith's oversight. Notably, Kurraba's dealings around ION have attracted the attention of the Independent Commission Against Corruption (ICAC). In fact, the 100 Botany Road development was moving forward despite an ICAC referral and a pending legal challenge to the development approval (Kurraba Group Exposed 2025a). This means authorities found sufficient reason to scrutinize how the project and related transactions were conducted, and at least one legal action is questioning whether the project's approval was obtained correctly. Public records obtained via Freedom of Information requests further suggest that the City of Sydney approved the ION development "despite unanswered questions on state significance" (Kurraba Group Exposed 2025a), implying that due process may have been rushed or sidestepped. Moreover, observers have flagged that ION's plan involves untested technology – for instance, a proton therapy facility – adding another layer of risk to an already shaky proposal (Kurraba Group Exposed 2025a). In aggregate, these issues suggest a pattern of questionable judgment and oversight on the part of Nick Smith. Rather than navigating the project through regulatory hurdles with transparency and care, Smith's approach has invited scrutiny and cast doubt on ION's legitimacy. This not only stalls progress but also erodes trust among investors, partners, and the public.

## Lack of Sector Expertise and Strategic Leadership

Why has Nick Smith struggled where others succeed? A significant factor is the gap in domain-specific expertise. Smith's background is in general real estate development and investment, with 15 years of experience in property valuations, transactions, and acquisitions (Kurraba

Group, n.d.). Although substantial, this experience does not automatically translate into success in the highly specialized life sciences real estate arena. Nick Smith is 40 years old, so much of his early experience is not directly relevant to his current pursuits. Delivering a complex science precinct requires more than generic development experience; it demands a deep understanding of research ecosystems, long-term scientific partnerships, and the technical requirements of facilities. Smith's grand statements ("it's much more about the science… a property class with a cause" (Kurraba Group 2024a)) ring hollow when not backed by strategic follow-through. In contrast, industry insiders have noted that ION lacked the steady strategic leadership and collaboration needed to navigate its challenges. The project's floundering suggests an insular approach that failed to fully engage the scientific community or public stakeholders from the outset. Authentic strategic leadership in this sector means aligning scientists, government bodies, and investors around a shared vision – something ION never quite achieved under Smith. Instead of fostering confidence, his handling of ION has been marked by uncertainty and course corrections, indicating a leadership void at the top.

## Real Leadership in Life Sciences: Belcastro, Geng, and Deacon

While Nick Smith's performance on ION has been disappointing, other figures in Australia's life sciences real estate scene exemplify the kind of expertise and credibility the sector needs. It's worth highlighting Alex Belcastro, Yue "Olivia" Geng, and Neil Deacon, who each bring proven leadership and insight:

- **Alex Belcastro – Senior VP of Development & Precincts at Northwest Healthcare Properties REIT**: Alex has nearly two decades of experience developing large-scale health and life science projects in both public and private sectors (Life Sciences Real Estate Summit 2025a). She leads precinct transactions, leasing, and development across Australia and New Zealand, and is known for her strategic acumen. Belcastro's long track record and membership in elite industry groups show a commitment to sustainable, well-planned growth rather than hype. Her involvement in a project lends instant credibility, as she has consistently delivered results in the past (Life Sciences Real Estate Summit 2025a).
- **Yue (Olivia) Geng – Executive Director of Strategic Partnerships & Innovation at Altea Investments**: Olivia brings deep international experience spanning Asia-Pacific and the U.S., bridging the gap between scientific innovation and investment (Life Sciences Real Estate Summit 2025b). At Altea, she drives pan-Asian life science infrastructure investments and has been instrumental in expanding co-working laboratory incubators into Australia (Life Sciences Real Estate Summit 2025b). Geng's rare combination of commercial savvy, scientific knowledge, and real estate expertise enables her to understand what researchers and start-ups need to thrive. Her pragmatic approach to building innovation ecosystems is exactly what a project like ION required, but lacked.
- **Neil Deacon – Founder & Managing Director of Health Advance Connect**: Neil's career spans pharmaceuticals, biotech start-ups, healthcare systems, and government, giving him a holistic view of the life sciences ecosystem (Life Sciences Real Estate Summit 2025c). He has been a strategy consultant worldwide and founded his firm to foster partnerships in health innovation (Life Sciences Real Estate Summit 2025). Deacon's strength is in building genuine collaborations across sectors and geographies – precisely the kind of partnership-driven strategy that could turn a life science precinct from concept into reality. His ability to connect stakeholders (from hospitals and universities to investors and government) stands in sharp contrast to the siloed approach seen with ION.

Each of these leaders has a proven capacity to marry the science and business aspects of life sciences developments. They focus on evidence-based planning, stakeholder engagement, and sustainable growth. Had the ION project been guided by the likes of Belcastro, Geng, or Deacon, it might have secured the stakeholder trust and funding it sorely missed. By praising these individuals, we underscore an essential point: the success of ambitious projects in this sector hinges on credible leadership and collaborative expertise. It's a reminder that bold ideas must be backed by people who can execute them with integrity and knowledge.

## Conclusion

Nick Smith set out to make ION a landmark achievement at the intersection of property and science, but the outcome thus far has been a catalogue of missteps. From overpromising and underdelivering, to scrambling for funds and facing regulatory scrutiny, Smith's stewardship of the ION project has drawn critical scrutiny – and rightly so. An initiative intended to champion innovation and resilience instead became mired in financial uncertainty and controversy (Kurraba Group Exposed, 2025a). The point-by-point failings detailed above highlight a pattern: grand vision unsupported by the necessary expertise, planning, and transparency. If the ION project is to be salvaged (or if future life science precincts are to avoid a similar fate), there is a clear lesson. The endeavor must be led by those with genuine domain experience and integrity – leaders who not only speak about "collaboration and cause" but also have a track record of delivering on those words. In the rapidly evolving life sciences real estate arena, credibility is everything. Unfortunately for Nick Smith, the ION saga has severely undermined his. It falls now to more capable hands and genuine collaboration to realize the promise that was so loudly proclaimed, and to rebuild trust in what could still be a transformative sector for Australia's future.

## FAQs

### Who are credible leaders in Australian life sciences real estate, and why are they important?

Leaders like Alex Belcastro, Yue Geng, and Neil Deacon exemplify credible leadership with proven experience in sustainable, stakeholder-focused projects, highlighting the importance of expertise and integrity in successful life sciences infrastructure development.

### What are the main shortcomings of the ION project led by Nick Smith?

The main shortcomings include overhyping ambitions without delivering results, financial instability with investor exodus, regulatory and integrity issues, lack of sector-specific expertise and strategic leadership, and failure to meet the project's lofty promises.

### How has Nick Smith's background affected the success of the ION development?

Nick Smith's background in general real estate development lacks the specialized knowledge necessary for life sciences infrastructure, which has contributed to strategic missteps and the project's difficulties.

### What financial issues has the ION project faced under Nick Smith's leadership?

The ION project has experienced serious financial instability, with Kurraba Group seeking investors through sales and crowdfunding campaigns, indicating a loss of investor confidence and reliance on continuous borrowing.

### What regulatory and ethical concerns have been associated with the ION project?

The project has attracted scrutiny from ICAC, faced legal challenges, and been approved despite unanswered questions on its significance, suggesting rushed approvals and oversight issues.

## Sources:

Kurraba Group. 2024a. "Nurturing the Next Scientific Breakthroughs." Forbes Australia feature. https://www.kurrabagroup.com/insights/47/nurturing-the-next-scientific-breakthroughs

Kurraba Group. n.d. "Our Company." Company profile. https://kurrabagroup.com/company/

Kurraba Group Exposed. 2025a. "Despite promises Kurraba seeks buyer for 100 Botany Road development site." May 2025. https://www.kurrabagroup.exposed/despite-promises-kurraba-seeks-buyer-for-100-botany-road-development-site/

Kurraba Group Exposed. 2025b. "Nick Smith and Proton Therapy Australia try and raise $50m.. on Facebook." April 2025. https://www.kurrabagroup.exposed/nick-smith-and-proton-therapy-australia-try-and-raise-50m-on-facebook/

Life Sciences Real Estate Summit. 2025a. "Alex Belcastro – Speaker Bio." https://lifesciencesrealestatesummit.com/speaker/alex-belcastro/

Life Sciences Real Estate Summit. 2025b. "Yue (Olivia) Geng – Speaker Bio." https://lifesciencesrealestatesummit.com/speaker/yue-olivia-geng/

Life Sciences Real Estate Summit. 2025c. "Neil Deacon – Speaker Bio." https://lifesciencesrealestatesummit.com/speaker/neil-deacon/



### Kurraba Group

[See Full Bio](#) ›

# Exposing the Gaps: Kurraba's ION vs. Australia's Health Research Strategy

September 29, 2025
Kurraba Group

## Key Points

- **Risks and Uncertainties Undermining the Future-Readiness of ION:** Financial instability, legal disputes, broken promises, and potential project abandonment threaten ION's ability to serve as a sustainable, future-proof research infrastructure.
- **Limited Collaboration and Impact on Regional Research Networks:** Despite claims of being a collaborative hub, ION lacks formal partnerships with public research institutions and does little to integrate broader national or regional networks.
- **Uncertain Clinical Infrastructure and Lack of Inclusivity:** Key clinical features like the proton therapy center are unconfirmed, and the focus on Sydney sidelines regional and rural areas, contradicting Australia's strategy for equitable health research access.
- **Questionable Legitimacy and Profit Motives of Kurraba:** Kurraba's history of aggressive planning tactics, unverified claims, financial struggles, and legal issues cast doubt on its credibility and intentions for the ION project.
- **Kurraba's Claims vs. Reality in Infrastructure Sharing:** Although ION is marketed as a shared infrastructure hub aligned with Australia's research strategy, it is a private development with exclusive access, limiting its benefit to broader Australia.

## Introduction

Kurraba Group's recent post "Building the Infrastructure for Discovery: How ION Aligns with Australia's National Health & Medical Research Strategy" (16 September 2025) paints a rosy picture of their proposed ION life sciences precinct (Kurraba Group 2025). The article claims that ION – a $490 million commercial life sciences campus planned for inner Sydney – perfectly embodies the Federal Government's draft National Health and Medical Research Strategy (2026–2036) (Australian Government n.d.; Kurraba Group 2025). We fully agree with the National Strategy's vision for a world-class, equitable research ecosystem (Australian Government n.d.). However, a closer look reveals that Kurraba's promises ring hollow. The ION development, as promoted by Kurraba, is rife with misleading claims and commercial self-interest, and it falls short of meeting the Strategy's goals in reality. In this exposé-style response, we reference Kurraba's claims and tear them apart – explaining why Kurraba Group is wrong and how ION, as currently conceived, does not truly align with Australia's national health research priorities.

## Strategy vs. Reality: Shared Infrastructure or Private Profit?

Kurraba's article emphasizes the Strategy's call to use "existing and plan new infrastructure, platforms, and networks as shared resources" to reduce duplication (Kurraba Group 2025). On paper, ION is said to be "designed around this principle", offering flexible labs and offices so researchers can share high-spec facilities without each institution building their own (Kurraba Group 2025). In reality, ION is a private commercial development – not a public research facility. Access to this "shared" infrastructure will be limited to those who can pay commercial rents as tenants, raising the question of how inclusive or truly cost-saving this model is. The National Strategy envisions a sustainable, equitable system where every Australian benefits (Australian Government n.d.), including researchers outside major cities. A single Sydney precinct owned by a private developer does little to help researchers in other regions or smaller organizations that can't afford premium lab space. The draft Strategy explicitly stresses "equitable access to clinical trials, regardless of demography or geography" (Australian Government n.d.) – a principle that goes beyond building one hub in Waterloo. Concentrating infrastructure in an expensive city campus may actually reinforce duplication elsewhere, as regional and suburban centers still lack facilities.

Crucially, Kurraba's track record suggests profit is the priority. Community watchdogs have accused Kurraba of leveraging "false promises of medical research to justify their overreach" on this development (Kurraba Group Exposed n.d.). In fact, Kurraba sought special fast-track planning approval by classifying 100 Botany Road as a State Significant Development (SSD) due to its purported health research merits (Kurraba Group Exposed n.d.). Yet concerned citizens point out that this designation is "fraudulent", arguing the project offers "no proven public health benefit" – essentially a private commercial office/lab complex wrapped in research buzzwords (Kurraba Group Exposed n.d.). The disconnect between Kurraba's marketing and the genuine public interest is glaring. Even basic community benefits have been eroded: previously approved affordable housing on this site was quietly removed from the plan, reducing benefits for locals (Kurraba Group Exposed n.d.). This undermines Kurraba's claim of supporting the public good and certainly doesn't align with the Strategy's equity goals.

## Collaboration and Translation: Hub or Hype?

The National Strategy calls for stronger networks connecting universities, hospitals, and industry – "hub-and-spoke" models and Research Translation Centres to accelerate turning discoveries into health outcomes (Kurraba Group 2025). Kurraba seizes on this language, touting ION's location "within Sydney's Tech Central… surrounded by world-class hospitals and universities" as making it a "collaborative hub" for researchers, clinicians, and industry (Kurraba Group 2025). But simply being near hospitals and universities is not the same as being integrated with them. To date, Kurraba has announced no formal partnerships with any university or hospital for the ION precinct – only that it is "opposite the new Waterloo Metro Station" and close to major institutions (Gensler 2024). Proximity alone does not guarantee collaboration. Without established research programs or governance that includes those public institutions, ION could easily become just a biotech office park, not a genuine translation hub.

It's telling that Kurraba's own press releases focus on real estate superlatives (Australia's "first-ever commercial life sciences precinct") and industry tenants, rather than any academic or clinical stakeholders backing the project (Gensler 2024). The company's CEO Nick Smith boasts that the campus will let tenants "connect and collaborate… within one ecosystem" (Gensler 2024) – yet this vision comes from a developer, not a research institute. True translation centers in Australia (like those attached to major hospitals or universities) are typically run by consortia of healthcare, academic, and government entities. Kurraba's ION has no such pedigree. In fact, local community representatives have derided the project as "a deceptive land grab, exploiting a so-called medical research facility to bypass planning controls while secretly benefiting their

adjacent commercial property" (Kurraba Group Exposed n.d.). In other words, the "infrastructure for discovery" narrative may be a convenient façade for a real estate play.

Moreover, the Strategy's collaboration ethos isn't just about one flashy campus – it's about networks across the country. The draft Strategy talks about collaborative platforms and networks that are nationally coordinated, bringing together stakeholders across all regions (Australian Government n.d.). Kurraba's ION, by contrast, is a single location in inner-city Sydney that does nothing to link, say, a university researcher in Brisbane with a biotech startup in Melbourne or a clinical trial site in rural NSW. By overhyping ION's role, Kurraba not only overstates its alignment with the Strategy, but also risks diverting attention from more inclusive, public-led infrastructure initiatives. A true "hub" should be defined by programs and people, not just by a building with nice labs for rent.

## Clinical Trials and Equity: Missing in ION

Australia's draft Strategy highlights the need to strengthen clinical trial infrastructure – including logistics, data management, and patient recruitment – across both metropolitan and regional areas (Kurraba Group 2025). Kurraba's article concedes that "regional access is critical" but insists that a metropolitan precinct like ION is an "essential anchor" for trial networks, helping coordinate and scale trials while keeping Sydney competitive for global research investment (Kurraba Group 2025). It's true that Sydney is a major hub for medical research, but the Strategy's vision for clinical trials is fundamentally about expanding access and capacity beyond the usual urban centers (Australian Government n.d.). Declaring ION as a "catalyst" for trial accessibility in Sydney misses the point – Sydney already attracts trials; the real challenge is supporting trials in underserved areas and integrating them into a national network (Australian Government n.d.).

More importantly, what unique trial-supporting infrastructure will ION actually provide? Thus far, Kurraba's selling points include generic features like "purpose-built laboratory and data infrastructure" (Kurraba Group 2025) – things that many existing research facilities already have. The one truly distinctive element Kurraba has touted is a Proton Beam Therapy Center for cancer treatment, which would indeed be a significant clinical asset (and the first of its kind in NSW). Kurraba's CEO claimed "the campus is set to become the State's first Proton Cancer Therapy Centre, backed by IBA worldwide" (Gensler 2024). However, this promise appears to be on shaky ground. As of now there is "no confirmed operator for the proposed proton therapy center, raising doubts about whether it will ever be built" (Kurraba Group Exposed n.d.). In other words, the crown jewel of ION's clinical infrastructure could very well be vaporware – a carrot to impress planners and investors, rather than a guaranteed deliverable. Proton therapy is extremely costly and typically requires government or major hospital involvement, none of which Kurraba has secured. If that falls through, ION's contribution to Australia's clinical trial capability diminishes to virtually zero. It would be just another private lab building, indistinguishable from an office tower in terms of national trial networks.

Equity is another pillar of the Strategy: ensuring "every Australian, regardless of background or postcode, benefits from health and medical research" (Australian Government n.d.). ION does nothing for patients or researchers outside Sydney's inner city. In fact, by focusing on a glossy metro precinct, Kurraba could inadvertently draw resources and attention away from developing infrastructure in regional Australia. The Strategy calls for ideas like mobile research units and better trial site support in rural areas (Australian Government n.d.) – far removed from what ION offers. In sum, Kurraba's boast that ION supports clinical trials is superficial. You can't solve national shortcomings in trial capacity just by clustering biotech companies next to each other in one city. Real progress requires broad investment and coordination – something a private development driven by profit motives is ill-equipped to deliver.

## "Future-Ready" Facilities vs. Present-Day Uncertainties

The Kurraba article invokes buzzwords about future technologies – from AI to precision medicine – and assures that ION's modular design will adapt to emerging scientific needs over the next 10+ years (Kurraba Group 2025). We certainly hope that any new lab building in 2025 would be designed with flexibility in mind. But calling ION "future-proof" is premature when the project's present reality is so precarious. To put it bluntly: Will ION even be built on time – or at all – as advertised? Kurraba is projecting completion by 2028, with leasing now open for tenants. Yet behind the scenes, the signs are far from encouraging:

• **Funding and Ownership Doubts**: Despite public promises, Kurraba has been "desperately tapping private investors" and even looking to sell off the 100 Botany Road site to someone else (Kurraba Group Exposed 2025a). In April–May 2025, reports emerged that Kurraba was courting buyers to take over the project, "despite [a referral to] ICAC and a pending legal challenge to the development approval" (Kurraba Group Exposed 2025a). This implies that Kurraba itself may lack the capital or confidence to carry ION to completion. Indeed, without a major investor, Kurraba has been piling on debt in hopes of offloading the risk "of questionable approvals and untested technology" to someone else (Kurraba Group Exposed 2025a). These are hardly the actions of a developer with a rock-solid, future-ready plan.

• **Legal and Regulatory Troubles**: The legal challenge mentioned above refers to community and possibly council pushback against the project's approval. Kurraba sought fast-track approval by the NSW state government (as an SSD), sidestepping some of the usual City of Sydney planning controls (Kurraba Group Exposed n.d.). Freedom of Information requests indicate the City had unanswered questions about whether the project truly met "state significance" criteria, yet it was green-lit regardless (Kurraba Group Exposed 2025a). Now, that decision is under dispute. Furthermore, the matter of the affordable housing "sale" and removal has been serious enough to be referred to ICAC (the state's anti-corruption body) for investigation (Kurraba Group Exposed 2025a). This casts a long shadow over ION's legitimacy. A development entangled in legal challenges and integrity probes is not a stable platform for the future of Australian science.

• **Broken Promises and Flexibility Concerns**: As noted, the flagship Proton Therapy Center is not secured – a major broken promise if it falls through. Additionally, local opponents worry that even if approved, "nothing prevents the developer from modifying the project to increase commercial use at the expense of public benefit" later on (Kurraba Group Exposed n.d.). In other words, once the fanfare dies down, Kurraba could quietly pivot ION away from labs and research and toward more immediately lucrative uses (e.g. tech offices or corporate headquarters), especially if the specialized lab demand doesn't materialize. That kind of bait-and-switch would betray the Strategy's vision entirely. The Strategy emphasizes long-term adaptability of infrastructure for evolving research needs (Kurraba Group 2025) – not adaptability of the business plan to dump research space in favor of generic offices. Kurraba's financial instability raises this concern: observers note the company "is in financial difficulty, and delays could lead to insolvency, leaving an unfinished or repurposed project" (Kurraba Group Exposed n.d.). A half-built construction site or a repurposed commercial office is certainly not the cutting-edge science incubator Kurraba is advertising.

In light of these issues, any claims about ION being "future-ready" sound absurdly ironic. The truly future-ready approach for Australia's research infrastructure would be to ensure robust funding, transparent governance, and contingency plans – none of which Kurraba demonstrates. The National Strategy calls for co-investment and shared responsibility in research infrastructure (Kurraba Group 2025);

Kurraba instead offers a risky private venture with minimal accountability (remember, this is the same group with a history of dissolving companies to avoid past liabilities (Kurraba Group Exposed n.d.)). Betting Australia's biomedical future on such a foundation is a gamble we need not take.

## Kurraba's Credibility Problem

Beyond the specifics of ION's misalignment with strategy, there is a broader issue: Can Kurraba Group be trusted to deliver anything it promises for the public good? The patterns of behavior and red flags associated with this developer suggest not. Here are some of the major concerns, as documented by community watchdogs and local stakeholders:

• **Planning Loopholes and Misleading Classification**: Kurraba pushed the ION development through under a State Significant Development banner, a move critics call "a blatant attempt to sidestep proper planning processes" (Kurraba Group Exposed n.d.). By labeling a private commercial venture as a vital medical research facility, they bypassed local council oversight. Experts question the legitimacy of this classification, noting it sets a "dangerous precedent" for other developers to exploit loopholes by masquerading commercial projects as public health infrastructure (Kurraba Group Exposed n.d.).

• **False or Unverified Claims**: The company heavily advertises ION as a boon to medical research (using terms like "Centre of Excellence" and highlighting the proton therapy center) (Gensler 2024). Yet key claims remain unverified or outright dubious. There is no signed agreement to operate the proton therapy facility, nor any guarantee of delivering the touted "world-class" labs beyond what any new building would have (Kurraba Group Exposed n.d.). Community members have urged authorities to demand "ironclad guarantees of [the project's] true purpose" before granting approvals (Kurraba Group Exposed n.d.) – guarantees Kurraba has not provided.

• **Track Record of Company Maneuvers**: Kurraba Group and its associates have a history of opaque corporate practices. They have been accused of "dissolving companies to escape accountability" for past projects and failures (Kurraba Group Exposed n.d.). Such behavior suggests that if ION underperforms or runs into trouble, the responsible parties might simply vanish into a new shell company, leaving the mess behind. This is hardly the kind of stable, accountable stewardship one would want for critical research infrastructure.

• **Conflict of Interest and Consultation Concerns**: According to local reports, public consultation was manipulated during the planning stages – with critical notices removed and objections downplayed (Kurraba Group Exposed n.d.). Even more alarming, a City of Sydney planner who helped approve the development previously worked for Urbis, the very consulting firm that advised Kurraba on navigating regulations (Kurraba Group Exposed n.d.). This raises serious conflict of interest questions about how ION got its approvals. The appearance of "backroom deals and manipulated approvals" is exactly what erodes public trust (Kurraba Group Exposed n.d.).

• **Community Benefits Sacrificed**: Initially, the redevelopment of the Botany Road site was expected to include affordable housing units to benefit the community. Kurraba's revised plan eliminated those, as noted above, effectively prioritizing higher-profit uses with zero direct benefit for local residents (Kurraba Group Exposed n.d.). This has not gone unnoticed – it prompted inquiries and even an ICAC referral regarding the off-market sale of those affordable housing obligations (Kurraba Group Exposed 2025a). When a developer shows willingness to cut promised community benefits early on, it casts doubt on any "we're doing this for society" narratives.

• **Financial Instability**: Finally, Kurraba's finances appear troubled. Taking on a $490 million project with insufficient funding, the firm is now scrambling for buyers or partners (Kurraba Group Exposed 2025a). If Kurraba cannot raise the money or ends up selling the project, who will ensure the research vision is upheld? A new investor might turn ION into something very different (or simply sit on the site until conditions improve). The risk of an incomplete or repurposed development – highlighted by observers if Kurraba faces insolvency (Kurraba Group Exposed n.d.) – means the supposed strategic infrastructure may never fully materialize as promised.

Each of the points above is backed by sources and local testimony. Taken together, they portray Kurraba Group as an entity long on grandiose claims but short on integrity and reliability. This credibility gap is essential to consider because Australia's National Health & Medical Research Strategy will rely on trustworthy partners to execute it. The Strategy calls for partnerships across government, academia, industry, and communities; it does not call for giving carte blanche to profit-driven developers with patchy records. In the case of ION, Kurraba's involvement may be more of a liability than an asset to the Strategy's goals.

## Conclusion: National Vision, Wrong Messenger

Australia's draft National Health & Medical Research Strategy (2026–2036) sets an ambitious and laudable vision. It seeks to boost investment in innovation, improve health outcomes, ensure no one is left behind, and make our research system globally competitive and sustainable (Australian Government n.d.). Achieving this will indeed require modern infrastructure, collaborative hubs, and effective commercialization pathways. On the surface, Kurraba Group's ION precinct purports to tick those boxes. However, as we have shown, there is a vast chasm between Kurraba's marketing rhetoric and the reality of what ION represents.

Rather than being a shining example of the Strategy in action, ION is shaping up to be a case study in how not to build research infrastructure. It exemplifies a commercialization-first mindset that treats labs and scientists as lures for real estate investment, rather than treating investment as a means to support science. It concentrates resources in one developer-controlled location, ignoring the Strategy's emphasis on equity and broad accessibility (Australian Government n.d.). It has been advanced through questionable methods, calling into question its legitimacy as a project of "national significance." And perhaps most damningly, it carries a high risk of underdelivering on its promises – from a missing proton therapy center to the potential of an empty or repurposed building if the developer fails (Kurraba Group Exposed n.d.).

We, as supporters of Australia's health and medical research community, do want to see new infrastructure and innovation precincts – but not like this. The national strategy is correct to identify shared, future-ready infrastructure as critical (Australian Government n.d.). However, it matters who builds and runs that infrastructure. The Kurraba approach (private, opaque, and arguably opportunistic) is misaligned with the Strategy's core values of transparency, accountability, and inclusiveness (Kurraba Group Exposed n.d.). Sydney – and Australia – deserve better than backroom deals dressed up as visionary science hubs.

Moving forward, it's crucial that policymakers and research leaders scrutinize ventures like ION. Alignment with the National Strategy should be earned, not declared by PR fiat. Kurraba's article trumpets that ION shows "how policy and place can align" (Kurraba Group 2025), but we've illustrated that it's more of a cautionary tale than a model. The real alignment with policy will come from initiatives that genuinely prioritize public benefit, long-term research needs, and equitable access – whether that means public-private partnerships with strict safeguards,

or publicly funded facilities, or truly collaborative networks that aren't controlled by a single profit-seeker.

In conclusion, we applaud the vision of Australia's Health & Medical Research Strategy, and we embrace its goals of shared infrastructure, collaboration, and innovation. But Kurraba Group's ION project, as it stands, does not meet the mark. Shiny buildings and bold claims cannot substitute for integrity and substance. Before Kurraba builds "the infrastructure for discovery," it needs to build trust – and so far, it's been doing the opposite (Kurraba Group Exposed n.d.). We urge the research community, government officials, and the public to view Kurraba's grand promises with skepticism and to demand better. Achieving our national health research goals will require infrastructure – but it must be infrastructure that is delivered with honesty, expert oversight, and a commitment to all Australians, not just a developer's bottom line.

## FAQs

### What are the main risks and uncertainties threatening the ION project?

The main risks include financial instability, legal disputes, broken promises, and the potential for project abandonment, all of which threaten ION's ability to serve as a sustainable, future-proof research infrastructure.

### Does ION truly promote collaboration among regional research networks?

Despite claims of being a collaborative hub, ION lacks formal partnerships with public research institutions and offers little integration with broader regional or national networks, limiting its collaborative impact.

### Is Kurraba Group credible and what are their motives for the ION project?

Kurraba's history of aggressive planning tactics, unverified claims, financial struggles, and legal issues cast doubt on its credibility and suggest profit motives may be prioritized over public benefit.

### What are the concerns regarding the clinical infrastructure and inclusivity of ION?

Key clinical features like the proton therapy center are unconfirmed, and the focus on Sydney sidelines regional and rural areas, contradicting Australia's strategy for equitable health research access.

### How does Kurraba's claim of infrastructure sharing compare with the reality?

Although marketed as a shared infrastructure hub aligned with Australia's research strategy, ION is a private development with exclusive access, limiting its broader benefits and contradicting the principle of equitable resource sharing.

## Sources:

Australian Government. n.d. "Draft National Health and Medical Research Strategy 2026–2036 (Consultation Draft)." https://consultations.health.gov.au/health-economics-and-research-division/draft-national-health-and-medical-research-strateg/supporting_documents/draft-national-health-and-medical-research-strategy-for-consultationpdf

City of Sydney. 2025. "Central Planning Committee Meeting Papers." February 2025. https://meetings.cityofsydney.nsw.gov.au/documents/s91189/Development%20Application%20100%20Botany%20Road%20Alexandria%20-%20D2024937.pdf

Gensler. 2024. "Kurraba Launches Australia's First Commercial Life Sciences Campus." Press Release, June 20, 2024. https://www.gensler.com/press-releases/kurraba-australias-first-commercial-life-sciences-campus

Kurraba Group. 2025. "Building the Infrastructure for Discovery: How ION Aligns with Australia's National Health & Medical Research Strategy." September 16, 2025. https://www.kurrabagroup.com/insights/50/building-the-infrastructure-for-discovery-how-ion-aligns-with-australia%E2%80%99s-national-health-and-medical-research-strategy

Kurraba Group Exposed. n.d. "Home – Kurraba Group Exposed." Community documentation site. https://www.kurrabagroup.exposed/

Kurraba Group Exposed. 2025a. "Despite promises Kurraba seeks buyer for 100 Botany Road development site." April-May 2025. https://www.kurrabagroup.exposed/despite-promises-kurraba-seeks-buyer-for-100-botany-road-development-site/

RealEstateSource. 2025. "Life science developer settles on Alexandria amalgamation." April 29, 2025. https://www.realestatesource.com.au/life-science-developer-settles-on-alexandria-amalgamation/



### Kurraba Group

See Full Bio >

# Kurraba Group's CEO Nicholas Smith Files Legal Action Seeking Apprehended Violence Order to Silence Community Critic

September 25, 2025
Kurraba Group

## Key Points

- **Williams – A Vocal Advocate Against Developer Overreach:** Michael Williams is a prominent community activist campaigning against the development, highlighting planning law breaches and loss of affordable housing, making him a target for scrutiny and legal pressure.
- **Controversy Over 100 Botany Road Development:** The proposed development has faced community opposition due to alleged misconduct, misleading claims, and bypassed planning processes, with legal challenges threatening the project's legitimacy and transparency.
- **Legal Move to Silence Critics: Nicholas Smith Files AVO:** Kurraba Group's Nicholas Smith seeks an Apprehended Violence Order against activist Michael Williams, allegedly to suppress criticism over a controversial development project, raising concerns about free speech and strategic legal intimidation.
- **Court Proceedings and Context of the AVO:** The AVO hearing scheduled for October 1 will examine whether Smith can justify a fear of violence from Williams, with potential implications for free speech if used improperly to suppress legitimate activism.
- **SLAPP Allegations and Implications for Public Participation:** The AVO application is viewed by critics as a SLAPP tactic, aiming to intimidate Williams and discourage civic activism, which could set a dangerous precedent if used to suppress legitimate public criticism.

## Introduction

In a move that has alarmed free speech advocates, property developer **Nicholas Mark Smith, co-founder of the Kurraba Group,** has pursued an **Apprehended Violence Order (AVO)** against community activist **Michael Williams**. Smith's AVO application, filed via NSW Police detective Heather Noble, comes after Williams publicly raised issues about the Kurraba Group's controversial development project in inner Sydney. Critics argue this AVO is not about genuine safety concerns but an attempt to **silence a vocal opponent**, likening it to a SLAPP (Strategic Lawsuit Against Public Participation) tactic intended to chill free speech. The case (No. 2025/00366156) is listed for mention on **1 October 2025 at 9:30 AM** in the Downing Centre Local Court, Sydney (Court 5.2), where Smith will need to justify his claims of fear or intimidation. *As of the publication date, Mr. Williams has not been reached for comment on the application.*

## Background: Controversy Over Kurraba's 100 Botany Road Development

Kurraba Group's planned development at **100 Botany Road** in the Waterloo/Alexandria area has been mired in community opposition and legal doubt. Billed as a life-sciences research campus, the project has drawn **accusations of misconduct, misleading claims, and attempts to sidestep proper planning processes**. Local residents and independent analysts have raised serious issues about the development's legitimacy and impact:

- **State Significant Development (SSD) Concerns:** The project was classified as a *State Significant Development* – a designation usually reserved for projects of genuine public importance – despite unanswered questions about its actual public benefit. **Critics allege that Kurraba obtained this SSD status fraudulently to bypass regular council oversight**, allowing the developer to "**exploit planning loopholes for financial gain at the community's expense.**"
- **"One Scheme, Two Addresses":** Evidence emerged that the Kurraba Group linked the leading site (100 Botany Rd) with an adjacent property (78–82 Wyndham St) as one combined scheme, yet sought approval as if they were separate projects. By splitting the development into two applications, the developer could conceal the full cumulative impact, such as shared basements and parking, from planning authorities. This tactic prompted a major law firm to issue a warning that any approval without assessing the **combined impacts would be legally unsound**. Gilbert + Tobin's legal advice highlighted that approving the "Health Facility" project without evaluating the linked commercial component risks a judicial review and could be declared void by the Land and Environment Court.



- **Loss of Promised Affordable Housing:** The community was further incensed when **previously approved affordable housing components were quietly removed from the plan**. Local advocates argue that this **"erosion of affordable housing commitments"** undermines earlier assurances and casts doubt on the project's social value, thereby eroding public benefit.
- **Governance and Accountability Issues:** Kurraba Group's integrity has also been questioned. The firm **has a track record of dissolving corporate entities to avoid accountability**, according to its opponents. Moreover, in May 2025, the project was drawn into a probity investigation by the NSW Independent Commission Against Corruption (ICAC). An ICAC referral centered on an off-market affordable housing site sale tied to the development – while no findings have been made public, the fact that ICAC scrutiny was triggered raised "questions about [Kurraba's] governance standards, transparency, and ethical culture".

These issues culminated in **intense community backlash**. By early September 2025, multiple residents signaled plans to **mount legal challenges against the development**. Reports confirm that community members are preparing court proceedings in both the NSW Land and Environment Court and the Supreme Court, aiming to challenge the lawfulness of the project's approvals. Allegations include failures to comply with mandatory planning processes – if proven, the development consent could indeed be ruled invalid. This fraught context sets the stage for the personal conflict between Nicholas Smith and Michael Williams.

## Michael Williams – Vocal Community Advocate vs. Kurraba Group

**Michael Williams** has emerged as one of the most outspoken community advocates opposing the Kurraba Group's proposal for 100 Botany Road. A local resident and activist, Williams has persistently campaigned to **hold Kurraba accountable and expose potential legal flaws** in the project. He has engaged in public forums and official channels to voice his concerns. Notably, **Williams was among the citizens who addressed the Central Sydney Planning Committee in February 2025, raising objections to Kurraba's development plans**. Alongside other concerned residents, he highlighted issues such as planning law breaches, inadequate community consultation, and the loss of promised amenities.

Williams has not limited his activism to formal meetings. He is believed to be involved with or supported by the "Kurraba Group Exposed" initiative – a campaign dedicated to scrutinizing the developer's actions. The campaign's website regularly publishes investigative pieces and analysis on Kurraba's project, reflecting many of the same points Williams and others have raised. For example, the site's reports highlight how local residents allege breaches of planning laws and inadequate consultation, which fuels significant hostility toward the Waterloo life sciences campus. Community members, including Williams, see themselves as fighting not just a single development, but a principled battle against developer overreach and opaque practices that could set a dangerous precedent in Sydney's planning system.

Against this backdrop of civic activism, Nicholas Smith's response has been striking. Rather than address the substantive issues raised, Smith has turned to the courts – **targeting Williams personally with an AVO application**. This move has raised eyebrows and drawn criticism from free speech advocates, who note that **Williams's known activities consist of public advocacy and legal protest, not threats or violence**. There is **no public evidence to suggest that Williams ever stalked, harassed, or endangered Smith**; his opposition has been expressed through petitions, meetings, and online forums, focusing on the development's legality and impact. **That disconnect** has led many to question Smith's true motive in seeking an AVO, as discussed below.

## Nicholas Smith's AVO Application and Court Listing

**Nicholas "Nick" Smith**, as CEO of Kurraba Group, escalated the dispute by filing for an **Apprehended Personal Violence Order (APVO)** against Michael Williams in mid-2025. Unusually, this is not a private lawsuit but a **police-backed AVO** – Detective Heather Noble of the NSW Police is listed as the applicant on Smith's behalf, indicating that the police agreed to seek the order in court. The AVO application, titled *"DET HEATHER NOBLE for Nicholas Mark SMITH v Michael [] WILLIAMS"*, is scheduled for its first mention on **1 October 2025** at Sydney's Downing Centre Local Court (Criminal jurisdiction). The case will be heard in **Courtroom 5.2** of the Downing Centre, with a mention (preliminary hearing) at **9:30 AM** on that date. At this mention, Williams can indicate whether he will **consent to or contest the AVO**, and if contesting, the court may set a timetable for a full hearing.

Smith's exact allegations have not been aired publicly, but by applying for an AVO, he is effectively claiming that he fears violence, harassment, or intimidation from Williams. An **Apprehended Violence Order** is typically a protective order intended to safeguard a person from someone who poses a genuine risk to their safety. If granted, an AVO could impose strict conditions on Williams – for example, prohibiting him from approaching or contacting Smith, or from publishing content that amounts to personal harassment. Breaching an AVO is a criminal offense, carrying fines or even imprisonment, so such an order can have a profound deterrent effect.

**Observers note the highly unusual nature of this AVO request**. Williams is not an ex-partner or neighbor of Smith (the more common

contexts for AVOs), but rather a community critic of Smith's business project. The dispute between them centers on public interest issues – planning approval, community rights, and alleged developer misconduct – rather than private matters. By invoking a legal mechanism designed to prevent violence or stalking, Smith appears to be **conflating outspoken public criticism with personal threat**. Williams's supporters argue that this is a **deliberate overreach**, intended to **deter Williams (and by extension other critics) from continuing to speak out** against the 100 Botany Road development. The timing is notable as well: the AVO application comes as Kurraba Group faces mounting legal challenges and public scrutiny, suggesting that **Smith's move may be retaliatory** – using the courts to pressure an inconvenient opponent.

## Legal Context: What an AVO Requires in NSW

To understand why Smith's AVO bid is seen as contentious, it's essential to know the **legal threshold for AVOs in New South Wales**. An Apprehended Violence Order is **not simply granted on request** – the applicant must convince the court that protection is necessary. **At a defended AVO hearing, the protected person (or police on their behalf) must prove certain key elements on the balance of probabilities**:

1. **Reasonable grounds for fear:** The applicant must show they have reasonable grounds to fear that the defendant will commit a personal violence offense against them, or engage in stalking or intimidation. In other words, a reasonable person in their position would share this fear.
2. **Actual fear:** The applicant must actually hold that fear genuinely (unless they are a child, where only objective reasonableness is required). It's not enough to claim fear if they, in fact, feel safe – the fear must be real and ongoing.
3. **Severity of conduct:** The conduct complained of must be severe enough to warrant an AVO. Trivial annoyances or vexatious complaints should not justify an order. The court will assess whether the alleged harassment or intimidation, if proven, **"is sufficient to justify the making of an AVO"** – i.e., that an order is needed for safety.

An AVO is a civil order, but breaching it is a criminal offense. Typical scenarios for AVOs include domestic violence situations or stalking by an acquaintance. Courts are mindful that AVOs **"are not supposed to be used vexatiously"** or as a weapon in unrelated disputes. If an application appears to be an abuse of process – for example, filed in bad faith to gain a tactical advantage – a magistrate can dismiss it and even order costs against the applicant.

In Smith's case, **meeting these criteria could be challenging**. He would need to persuade the court that a community advocate (Michael Williams) poses a credible threat of violence or unlawful intimidation to him. Any evidence of Williams's behavior will come under scrutiny: Has Williams threatened Smith with harm? Has he stalked Smith's home or office? Or is Smith basing his "fear" on the fact that Williams has spoken out against his development online and in council meetings? Unless there are genuine incidents of menacing conduct (which have not been made public), **Smith may struggle to establish a reasonable, genuine fear**. Williams's critical commentary on a development – even if sharp-tongued – would generally not qualify as intimidation in the legal sense needed for an AVO. As one legal guide notes, **the court requires both a subjective fear and objective grounds, and will only issue an order if it finds that the situation justifies it**.

## AVO Seen as a SLAPP Tactic to Silence Dissent

Smith's AVO application has drawn comparisons to a **SLAPP suit** – a *Strategic Lawsuit Against Public Participation*. SLAPPs are lawsuits (often defamation or nuisance suits) used by influential individuals or companies to censor, intimidate, or silence critics by burdening them with legal defense costs and the fear of liability. While an AVO is not a lawsuit for damages, observers argue that its effect in this context is similar: to burden Michael Williams with legal proceedings and restraining orders, thereby discouraging **his advocacy**. The term "SLAPP" is being used by community members who view this as a direct attack on public participation in matters of civic importance.

Several aspects of the case fuel the **SLAPP allegations**:

- **Disproportionate Response:** Williams's activities consist of public advocacy – attending meetings, lodging objections, posting on social media – actions ordinarily protected as free expression on community affairs. Responding to this with an AVO (generally reserved for threats of physical harm) is seen as legally overreaching and punitive. It sends a message that criticizing the Kurraba Group could land a person in court, facing the threat of restraining orders. This **inherently chills free speech**, as others may now hesitate to speak out for fear of similar personal legal action.
- **Retaliatory Motive:** The timing suggests a retaliatory motive. Only after Williams helped spotlight potentially **"void" planning approvals and corruption referrals** did Smith pursue an AVO. Supporters of Williams call it a **brazen attempt to flip the narrative**: painting the whistleblower as a "violent threat" to shift attention away from the developer's own legal troubles. Such timing is a hallmark of SLAPP tactics – using legal complaints not to remedy wrongdoing, but to punish those who reveal it.
- **Imbalance of Power:** Smith, as a developer with significant resources, can presumably afford legal counsel and is leveraging the police and court system. Williams, a private citizen, must either fight the order in court (incurring stress and expense) or consent to it (which could muzzle him effectively). This **imbalance – a wealthy figure dragging an activist into legal proceedings – is precisely** the power dynamic that SLAPP terminology encapsulates. Even if Williams ultimately wins and the AVO is dismissed, the process itself might serve Smith's goal by exhausting Williams and warning others.

Free speech advocates in Australia note that the country **lacks dedicated anti-SLAPP laws** in most jurisdictions, leaving activists relatively unprotected from such actions. In the United States, many states have Anti-SLAPP statutes that allow for the early dismissal of cases targeting public participation; however, NSW has no specific equivalent for an AVO scenario. Nonetheless, the court has the discretion to dismiss an AVO application if it finds it to be **frivolous or an abuse of process**. Williams's legal team (if he engages counsel) will likely argue that Smith's claims are vexatious – essentially that this is a personal vendetta to shut down legitimate criticism, not a bona fide matter of personal safety.

## Outlook and Implications

The upcoming mention on October 1 will be the first test of **Nicholas Smith's resolve and evidence**. If Michael Williams chooses to contest the AVO, which he most certainly will, the case may proceed to a hearing where both parties present evidence. The court may press Smith (and Detective Noble, acting as the applicant) to outline the factual basis of the fear claim. **Given the public interest backdrop, any flimsy or purely speculative allegations may not be sufficient to satisfy the magistrate**. On the other hand, if an interim AVO were to be granted pending a full hearing, it could immediately gag Williams from approaching or contacting Smith, which might complicate Williams's activism

if, for instance, he is barred from attending meetings where Smith is present or prohibited from referencing Smith directly in a harassing manner.

The broader community will be watching closely, as the case touches on more than just these two individuals. **At stake is the principle of community members being able to challenge powerful developers without fear of personal legal reprisals.** If Smith's AVO bid succeeds on scant evidence, it could set a worrying precedent, encouraging other developers or public figures to use AVOs (or similar legal tools) to stifle dissent. This would effectively end-run around the normal debate and protest that accompany contentious developments.

On the flip side, if the court finds the application unwarranted, it **may serve as a rebuke to using AVOs as SLAPP instruments**, reaffirming that the justice system should not be misused to curb legitimate public participation. Williams's case could even prompt calls for more straightforward guidelines or legislation in NSW to prevent AVO misuse in the public interest. Lawyers point out that while **AVOs are essential for genuine protection**, they must not be used as **a tactic for "vexatious" litigation** aimed at silencing critics.

For now, Michael Williams remains under the cloud of this legal action. Community supporters have rallied around him, characterizing him as **"a staunch public advocate" facing intimidation for simply doing the right thing.** The phrase "likely illegal development" has been used to describe Kurraba's project – a reminder that the core issues **Williams raised about 100 Botany Road will eventually be litigated in court, regardless of side skirmishes like the AVO.** In that sense, Smith's attempt to change the conversation to personal safety may be seen as a sign of weakness in defending the project on its merits.

**Ultimately, the AVO application against Michael Williams is a litmus test for the boundary between personal protection orders and public interest advocacy.** The coming weeks will reveal whether the courts view Smith as a frightened individual entitled to protection, or as a developer cynically abusing legal processes to muzzle a critic. Observers have likened the case to **David vs. Goliath**, and its outcome could influence how boldly citizens are willing to speak out against development misconduct in New South Wales going forward. The community – and likely other developers – will surely take note of what happens next.

**(No comment was available from Mr. Williams at the time of writing. Nicholas Smith, through Kurraba Group, has also not issued any public statement regarding the AVO.)\***

## FAQs

### What are the potential consequences if the court finds Smith's AVO application to be frivolous or a misuse of legal processes?

If the court deems Smith's AVO application to be frivolous or an abuse of process, it could dismiss the case, reinforce the importance of protecting free speech, and prevent the misuse of AVOS as tools to silence legitimate community criticism.

### How might Smith's AVO application impact free speech and community activism?

If granted, Smith's AVO could serve as a deterrent to public criticism and activism, as it might be used to silence or intimidate critics and limit community participation, raising fears of misuse as a SLAPP tactic.

### What are the main concerns related to the proposed 100 Botany Road development by Kurraba Group?

The main concerns include allegations of misuse of planning law, sidestepping proper approval processes, loss of affordable housing commitments, potential links to misconduct, and the project's classification as a State Significant Development to bypass normal oversight.

### Why is Michael Williams considered a whistleblower and community advocate in this case?

Michael Williams is regarded as a community advocate and whistleblower because he publicly raised concerns about legal breaches, misconduct, and the impact of the Kurraba Group's development project at 100 Botany Road, aiming to hold the developer accountable and protect public interests.

### What is the legal basis for Nicholas Smith's application for an AVO against Michael Williams?

Nicholas Smith's application for an Apprehended Violence Order (AVO) is based on claims that he fears violence, harassment, or intimidation from Michael Williams, although the legitimacy of these fears is contested, as Williams's activism has not included threats or violence.



## Kurraba Group

[See Full Bio](#) ›

# Nick Smith of Kurraba: Lavish Lifestyle Raises Investor Concerns

September 19, 2025
Kurraba Group

# Nick Smith of Kurraba: Lavish Lifestyle Raises Investor Concerns

## TLDR

Nick Smith of Kurraba is increasingly raising red flags among investors as his public image projects indulgence rather than discipline, with repeated photographs showing him drinking, smoking cigars, and embracing a "party animal" persona. While not inherently scandalous, these optics clash with the responsibilities of someone managing millions in investor-backed projects, especially amid construction delays and legal setbacks. The perception that lifestyle may be prioritised over delivery risks eroding investor confidence, creating governance concerns and undermining trust in Kurraba's leadership unless greater transparency and tangible project progress are demonstrated.

## Introduction

When investors entrust their money to a property development company, they expect discipline, prudence, and transparency. Yet in the case of Nick Smith of Kurraba, the public image increasingly projects something else: cigars, drinks in hand, and the unmistakable look of a man thoroughly enjoying the party.



Nick looking like he wants to be a party animal.

## A Public Image of Excess

Across a string of photographs, Smith is seen not simply socialising but leaning fully into the persona of a "party animal." He appears at weddings with champagne, at black-tie events with cocktails, and in casual gatherings with cigars. At times his flushed face, half-loosened bow tie, and exaggerated facial expressions project the image of someone far more at home in the early hours of the dance floor than at a boardroom table.

# Legal Challenge Delays Kurraba Group's Alexandria Health Research Project – Investor Implications

September 19, 2025

[Kurraba Group](#)

## Legal Challenge Delays Kurraba Group's Alexandria Health Research Project – Investor Implications

**Executive Summary:**

- **Judicial Review Launched:** On 19 September 2025, community claimants issued a formal notice of intention to commence **Class 4 judicial review** proceedings in the NSW Land and Environment Court, challenging the development consent granted on 9 September 2025. A summons is expected to be filed by late November 2025 within the statutory limit for validity challenges.

- **Project Already Behind Schedule:** Kurraba Group initially projected construction to commence in **early 2025** for this life sciences campus, but that timeline has already slipped. Even after securing consent, the developer's updated plan to start building by late 2025 is now threatened by the court challenge.

- **Court Proceedings Timeline:** Class 4 judicial review cases in the Land and Environment Court typically take **several months to over a year** from filing to judgment. In 2023, a live architecture case was resolved within 16 months (median – 332 days). If the summons is filed in November 2025, a final hearing and judgment might not occur until mid-to-late 2026 under normal timelines.

- **Appeal Risks:** The claimants have signaled they may appeal an unfavorable outcome. An appeal to the NSW Court of Appeal must be lodged within ~28 days of judgment and could add roughly another **12 months** before a definitive result. Notably, 90% of civil appeals relate to commencement. This means a final resolution might not arrive until **late 2027** if appeals are pursued, with further delay if a rare High Court appeal occurs.

- **Investor Impact – Delays and Uncertainty:** The legal challenge can likely to significantly delay construction, pushing revenue-generating timelines further out. Investors may see delayed returns as prolonged capital lock-up, and potential cost escalations. Revenue streams from leasing the facility (envisioned as a cutting-edge life sciences hub) will be deferred, straining projected returns.

- **Heightened Risk Profile of Developer:** The situation is compounded by reported **reputational and financial issues** at Kurraba Group. Community reports allege the developer has a history of dissolving project companies to avoid accountability and may be under **ICAC investigation** related to an off-market affordable housing deal. **Financial stability concerns** have been raised – critics claim Kurraba is in difficulty and may struggle to absorb delay costs or raise additional capital if needed.

## A Governance Question

The life sciences hub is not being built in isolation. The site was originally earmarked for affordable housing, but that later shifted. Investors will focus on the unwarranted — but the court battle exposes a right timeline that is not unexpected.

## The Cost of Perception

Perception in business is currency. Kurraba Group initially projected construction to commence rather than bricks and mortar, construct in the company factors. This is especially true when timelines slip. If a project is delayed and the public record shows the CEO at yet another Gala, the optics become almost self-sabotaging.

## Drinking, Smoking, and Investor Optics

Drinking and cigars are not scandals in themselves. But when they become recurring motifs in the public-facing record of a business leader, investors naturally wonder:

- Does the leadership reflect a pattern of prioritising consumption and excess?

While there is nothing inherently wrong with unwinding, optics matter. For an individual responsible for enabling millions of dollars in infrastructure projects, a settled approach to their public image is not unwarranted. These are the actions that can legitimately shake confidence.

## Conclusion: Party Image vs. Investor Confidence

Nick Smith may embrace the "party animal" label, but for a leader of a company set to deliver high-stakes developments, the risks of projecting excess are real. Investors deserve reassurance that their funds are directed at progress, not appearances. Until that balance is clarified, each photo of a cigar, each drink in hand, and each late-night grin will chip away at the confidence required to keep capital flowing.







Fwd: Notice of Intention to Commence Class 4 Judicial Review Proceedings



Kurraba Group Intention to File Class 4 Proceedings     Download

**Originally anticipated timeline:** Kurraba Group and its partners (including architecture firm Gensler) moved quickly through design competitions and lodged the development application in late 2024. At the project's launch, the developer optimistically stated that, **"contingent on planning approvals, construction could commence in early 2025."** This would have seen initial works underway by Q1 2025. Indeed, the City of Sydney's assessment report noted that, subject to approval, **"construction of the project is proposed to commence in 2025 and be completed by 2027."**

However, the approval process extended longer than hoped – consent was only secured in September 2025. By then, the **early-2025 start date had long passed**, and Kurraba's public messaging shifted to a later schedule. In an August 2025 press release, the company indicated it had "received planning approvals" and that **construction was scheduled to commence in late 2025**, with practical completion projected for Q1 2028. This revised timeline already represented a delay of roughly a year from initial expectations.

Now, the newly initiated legal challenge threatens to derail even the late-2025 groundbreaking plan. Public notification of the consent outcome occurred on 11 September 2025. Within the same month, on 19 September, opponents of the development issued a formal **Notice of Intention to Commence Proceedings**, foreshadowing a Class 4 judicial review action to **invalidate the development consent**. The notice (from a representative on behalf of himself and others) puts all parties on alert that court proceedings will be launched, and it even urges the Council to inform Kurraba's team and financiers of the looming legal risk.

In essence, what was meant to be a signature project leading Sydney's "life sciences boom" has entered a period of legal limbo. Investors and stakeholders must now grapple with what the Class 4 judicial review means for the project's timeline and viability.




limited window (generally **within 3 months of the decision or public notice** of the consent). By targeting a filing roughly 70 days after public notification, the opponents are ensuring they remain well inside the deadline. (In fact, the **Land and Environment Court Rules** specify that Class 4 judicial review proceedings should be started within **60 days** of notice of the decision, though the EP&A Act provides an outside limit of 3 months in most cases. The claimants' timeline appears to align with these requirements, preserving their right to sue.)



not at all). Even if the challenge is unsuccessful, the mere process of litigation introduces delays and uncertainty, which carry significant implications for project financing and delivery, as discussed below.

## Class 4 Judicial Review Process: Expected Duration and Milestones

From an investor's viewpoint, a critical question is **"How long will the court process take?"** Delays cost money, so estimating the timeline of the judicial review (and any appeal) is key to projecting when construction might realistically begin.

**Typical duration in LEC:** The NSW Land and Environment Court strives to resolve Class 4 matters expeditiously. Recent statistics show that in 2022, **83% of Class 4 cases were finalised within 16 months** of commencement, and the **median time to completion was 232 days** (roughly 7.5 months) . Many cases are resolved even sooner, especially if they involve narrow legal issues. Furthermore, a majority of Class 4 disputes (over 70%) end in negotiated settlement or alternative dispute resolution without a full court hearing – though it would be imprudent for investors to bank on an out-of-court settlement here, given that community objectors may be seeking to stop the project outright rather than negotiate modifications.

For planning-related judicial reviews like this, past experience suggests a timeline on the order of **6–12 months in the Land and Environment Court**. The process can be outlined in several phases:

- **Summons Filing (late 2025):** The case formally commences with the summons and is entered into the Court's docket. (As noted, the claimants plan to file by 20 Nov 2025.) The Court will set down a schedule and a first directions hearing about 5 weeks later, in January 2026.
- **Directions Hearings and Preparation (Q1 2026):** At one or more directions hearings (often on Fridays in the Class 4 List ), the judge will order the exchange of pleadings and evidence. For example:
  - Applicants file their **Points of Claim** detailing each legal ground of challenge.
  - Respondents (Council and Kurraba) file **Points of Defense/Contentions** replying to those grounds.
  - Evidence (usually affidavit statements, since judicial review typically relies on affidavit and documentary evidence rather than live witnesses) is prepared. Expert evidence is less common in pure legal challenges unless a factual dispute arises over, say, what information was available to the consent authority.
  - The Court may also encourage or require the parties to confer or consider an alternative resolution if appropriate. However, in validity cases, the matter proceeds to a hearing unless the developer opts to concede and redo the process (which is unlikely here, given the high stakes and Kurraba's investment).
- **Final Hearing (mid 2026?):** Once documents are in order, the Court will set a **final hearing date** (trial). In Class 4, the **hearing is before a single judge** of the Land and Environment Court. The hearing could range from 1–2 days (if only legal arguments on an agreed record) to a week or more (if extensive evidence or multiple issues). Given this is a significant development consent, one can anticipate a multi-day hearing, perhaps in **mid-2026**. For instance, if the case is ready by May/June 2026, the hearing could occur in the **mid-2026** timeframe.

- **Judgment Delivery (late 2026):** After the hearing, the judge may reserve judgment to consider the arguments. In straightforward cases, a decision might be handed down in a matter of weeks; complex cases can take a few months for a written judgment. Based on median timelines, one might expect a **judgment in the second half of 2026** (if the hearing is mid-year). It's worth noting that judges are mindful of development cases and sometimes prioritize prompt rulings to reduce uncertainty for all parties – but there is no fixed timeframe for a decision.

In summary, under a **typical** scenario (with no significant **delays**), the Class 4 judicial review could conclude roughly **9–12 months from its initiation**. That implies a likely resolution by around **Q3 or Q4 2026**. This aligns with the statistical median (~7–8 months) plus some buffer for complexity. Indeed, the court's own goal is often to handle matters within a year if possible. However, it cannot be overstated that this is an **estimate**; unforeseen procedural disputes (e.g. over evidence or amendments), or court scheduling constraints, could push the timeline out. The Court's statistic that **16 months covers 83% of cases** suggests that a small fraction of cases drag beyond 1–1.5 years.

Notably, during this period, the **development consent remains in force unless the Court grants a stay or injunction**. The claimants explicitly reserved the right to seek interlocutory relief if Kurraba attempts to act on the consent prior to the case being heard. In practice, for a project of this scale, developers typically **hold off on irreversible work** (like demolition or major construction) until legal challenges are resolved, especially once formally notified of court proceedings. Starting construction with a cloud over the consent would be risky – if the consent is later nullified, any work done could be deemed illegal. Additionally, project lenders or equity partners often require legal challenges to be cleared or indemnified before funding can be fully drawn. We can reasonably assume that **meaningful construction activity will not commence in earnest while the Class 4 case is underway**, unless Kurraba is extremely confident of victory and is willing to proceed at its own risk (an unlikely stance given fiduciary duties to investors).

Thus, from a timeline perspective, **the project is effectively on pause** from late 2025 through to late 2026 pending the Court's ruling. This one-year (or more) pause is a direct loss against the original timeline. Kurraba's plan of late-2025 commencement now appears unattainable; even an optimistic scenario would see groundwork potentially pushed into 2026 after a court win. Next, we consider what happens if the court outcome itself is contested further.

## Potential Appeals: Adding Another Year (or More) of Delay

If the Land and Environment Court's judgment (expected 2026) does not fully resolve the dispute to the claimants' satisfaction – or conceivably if it goes against the Council/Developer – there remains the avenue of appeal. The notice letter hints that the community **"may appeal if the ruling is unfavorable."** In the NSW court hierarchy, appeals from the Land and Environment Court's final decisions on judicial review go to the **NSW Court of Appeal** (which is a division of the NSW Supreme Court).

**Appeal process overview:** An appeal is not automatic; it must be lodged promptly and might require leave depending on the nature of the case. For a judicial review matter, an appeal would typically contend that the LEC judge made an error of law. The window to appeal is short – generally, a **Notice of Appeal must be filed within 28 days of the judgment** (unless a party seeks special leave to file out of time). So if, hypothetically, the LEC judgment comes in September 2026, any appeal would need to be initiated by October 2026.

Once an appeal is lodged, the timeline then falls under the Court of Appeal's processes:

- **Preparation:** The appellant (losing party from LEC) must prepare a formal **appeal book**, compile transcripts, and file written submissions. The respondent(s) file reply submissions. This administrative phase can take a few months, especially if transcripts of the trial need to be prepared and the court schedule is busy.
- **Hearing in the** Court of Appeal: Appeals are typically heard by a panel of three judges. The hearing might occur a number of months after the appeal is filed – often within 6 to 9 months post-filing, depending on priority. Given the public interest in significant developments, the appeal could be expedited, but one should not count on a hearing much faster than the usual pace.
- **Judgment on Appeal:** After the appellate hearing (which could be one long day or several days of legal argument), the Court of Appeal will deliver its judgment. As with any court, there could be an immediate decision or a reserved judgment taking additional time (often a few months for complex cases).

**Typical duration of appeal:** The Supreme Court's annual reviews indicate that the **Court of Appeal moves relatively swiftly** by national standards. In 2022, **90% of cases in the NSW Court of Appeal were finalised within 12 months** of commencement, meeting its timeliness benchmark. Many appeals are resolved well under a year. It's not uncommon for a civil appeal to take on the order of **6–9 months** from notice of appeal to judgment. For instance, an appeal filed late 2026 might conclude by mid or late 2027.

For planning cases, an appeal could potentially be heard within, say, 4–6 months, and a judgment a month or two later, if treated urgently. However, for investors, prudence would be to assume roughly **an additional year of uncertainty** if an appeal is pursued. That would shift the final resolution to approximately **Q3 or Q4 of 2027**.

During an appeal, the original consent would still remain stayed only if it was quashed at trial or if specific orders are in place. If Kurraba prevails in the LEC (meaning the consent is upheld) and the community appeals, Kurraba might face a decision: attempt to proceed with the project in 2027 despite the pending appeal, or wait out the appeal. Often, developers still wait – because if the Court of Appeal overturns the decision and invalidates the consent, any work done in the interim could be wasted. However, in some cases, if the appeal looks tenuous, a developer might decide to start some preliminary works to save time. It's a risk-return calculation.

**Worst-case scenarios:** In the event the judicial review succeeds (i.e, the consent is invalidated by the LEC judge), Kurraba Group would have to consider appealing that loss, since the project cannot legally proceed without a valid consent. An appeal in that scenario is almost certain (given the investment at stake). If Kurraba were to lose again on appeal, the ultimate fallback would be to either redesign and submit a new development application addressing the legal issues (starting the approvals process over, which could take another year or more), or abandon the project. Conversely, if the community loses in LEC and loses again on appeal, the legal avenue is largely exhausted (barring an extremely unlikely High Court special leave application on a point of national significance).

For practical planning, investors should brace for **potential project dormancy through most of 2027** if appeals happen. By the end of 2027, in a hopeful scenario, the project emerges with a confirmed green light (assuming the consent survives) – albeit two years behind the original schedule. In a less favorable scenario, the project could be back to square one, seeking a fresh consent, or tied up even longer if further legal skirmishes occur. Each layer of appeal adds complexity and delay, which directly impacts the project's financial timeline.

**Appeal outcome finality:** The Court of Appeal's decision would be final for the vast majority of cases. Only with special leave could it go to the High Court of Australia, which is rare and would introduce another 1+ year delay if ever pursued. It's unlikely investors would want to contemplate a High Court stage; typically by the Court of Appeal stage, one has a firm outcome on the consent's fate.

In summary, **adding an appeal can easily extend the total legal process to 2+ years** from now (late 2025). So the once-expected 2025 construction start might become a **2027 or 2028 start** in the worst case. Next, we discuss what these shifting timelines mean from an investor's perspective in terms of financial returns and risk exposure.

## Impacts on Timeline, Returns, and Risk for Investors

The initiation of Class 4 proceedings and any subsequent appeals fundamentally alter the risk profile and timing of the Alexandria Health Research project. Investors – whether equity partners, fund investors, or lenders – now face a period of **prolonged uncertainty and potential financial repercussions**. Key implications include:

- **Construction Delays and Cost Inflation:** Every month of delay pushes out the construction schedule and likely increases costs. The project was supposed to be underway by now (2025) and deliver a completed campus by 2027. With the legal hold, even an optimistic timeline has construction starting perhaps in **late 2026 or 2027**, meaning completion could slip to **2028–2029**. This delay not only defers the project's revenue generation but also exposes it to **construction cost inflation**. In the current high-inflation environment, building costs (materials, labor) tend to rise over time – a budget estimated in 2023/24 might be significantly outdated by 2027. Prolonged pre-construction periods can necessitate **re-pricing of contractor bids** and potentially lead to a higher total development cost, squeezing project margins.
- **Deferred Rental Income and Cashflow:** For an income-generating asset like a life sciences campus, delayed delivery means delayed lease-up and cashflow. Kurraba's plan had tenants moving in by 2028 under the late-2025 start scenario. Now, tenants might not occupy until 2029 or later. Investors counting on rental income or a **stabilized yield by 2028** will have to push those projections out. This has knock-on effects: the **Internal Rate of Return (IRR)** for the project will deteriorate as the holding period extends and cash inflows are pushed further into the future (time value of money). If investors had targeted, say, a 5-year horizon, they may now be looking at 7+ years.
- **Financing and Holding Costs:** Many developments rely on debt financing or have preferred equity with time-sensitive terms. With the project in limbo, **interest carries and holding costs** accumulate without corresponding progress. Lenders might charge extension fees or higher interest if the loan facility needs to be extended due to delays. There's also the opportunity cost of tied-up capital – investors' funds remain locked in the project instead of being deployed elsewhere. For those using project finance, the loan may not be drawn until legal issues are cleared, requiring the developer to potentially inject more equity in the interim or arrange bridge financing for any critical early works or land holding costs. All these factors can erode the profit margins.
- **Uncertain Outcome – Binary Risk:** Perhaps most significantly, a judicial review carries a **binary risk**: the possibility (however remote or not) that the development consent is overturned. If the consent were declared invalid, the project could not proceed as currently approved. That would be a severe setback: Kurraba Group might need to go back to the drawing board to rectify issues and re-lodge a development application or convert the project to a State Significant Development with a fresh assessment. That process could add **years** or even kill the project if the planning context changes or the approval is no longer attainable. For investors, this scenario is the worst-case – it could mean substantial loss of time and money spent with no viable project at the end, or at least a need to reinvest in a lengthy re-approval process. While Kurraba would presumably fight tooth and nail to avoid this outcome (including appealing any adverse decision), the mere possibility means investors must **factor in a higher risk premium**. It may also trigger clauses in partnership agreements or loan terms (for example, an adverse legal outcome might allow certain investors to withdraw or loans to be reconsidered, depending on agreements).
- **Exit Strategy Delays:** Some investors might have planned an **exit on completion** (for instance, selling the developed asset to a REIT or long-term holder in 2028). Now that the timeline is pushed out. The market conditions in 2029 could be very different from those assumed for 2027. There is a risk that the favorable market window (high demand for lab space, low cap rates, etc.) could shift. Thus, the uncertainty might affect the eventual **exit cap rate or valuation**. In the life sciences real estate sector, momentum and first-mover advantage matter – delays could allow competing projects to come online first, potentially softening rental rates or absorption for Kurraba's project.
- **Interim Mitigation:** In response to these challenges, Kurraba Group might explore interim measures: e.g., redesigning certain elements to address community concerns (in hopes of a settlement), or phasing the project differently. However, any substantial change might itself require further approvals or complicate the legal case. From an investor standpoint, one positive is that the site's fundamental value (a large parcel in a rezoned innovation precinct) remains – the delay doesn't erase the longer-term opportunity, assuming it eventually proceeds. But investors must be ready to **hold their nerve (and capital) for longer** than planned.
- **Risk of Investor Commitments Changing:** The investor mix itself could come under strain. If there are joint venture partners or fund investors with specific return timelines, some may reconsider or try to invoke "force majeure" or material adverse change clauses if available. New investors might demand better terms to come on board, given the elevated risk. Overall, the cost of capital for the project could increase to reflect the legal and delay risk.

In essence, the judicial review injects a **significant delay and risk premium** into what was pitched as a cutting-edge development. The project shifts from a relatively straightforward development play into a special situation requiring active risk management. For existing investors, it may mean allocating additional contingency funds and adjusting return expectations. Prospective investors will likely be more cautious, performing enhanced due diligence on the legal case merits and perhaps structuring investments with protections (such as escrow of funds until legal clearance, or higher preferred returns to compensate for uncertainty).

## Developer Risk Factors: Kurraba Group's Reputational and Financial Issues

Another layer of concern for investors comes from the **profile of the developer, Kurraba Group**, and how it might weather this storm. While Kurraba is positioning itself as a pioneer in life-science property, there have been **red flags raised about the company's track record and practices** that could amplify the risks in this project's delay. Key issues include:

- **Financial Stability and History:** Community reports suggest that **Kurraba Group may be in a precarious financial position**. The local opposition group "Kurraba Group Exposed" alleges that the developer "is in financial difficulty, and delays could lead to insolvency, leaving an unfinished or repurposed project." This is a stark warning: if true, it means the very delays caused by the legal challenge could threaten Kurraba's ability to continue the project. From an investor's perspective, a financially weak sponsor increases the likelihood that the project could falter (for example, the developer might run out of funds to service debt or meet project expenses during the hold). It could necessitate a recapitalization or forced asset sale. Indeed, there was a report in May 2025 that **Kurraba had quietly started seeking a buyer for the 100 Botany Road site** despite prior assurances that they would develop it themselves. Such an attempt to sell (if accurate) might indicate liquidity pressures or a change in strategy when faced with hurdles.
- **Reputation and Integrity Concerns:** The same community sources have levied serious allegations of **misconduct** against Kurraba. Notably, it's claimed that Kurraba (along with another developer and a housing agency) was **referred to the NSW ICAC (Independent Commission Against Corruption)** over an "off-market sale of affordable housing for commercial development". While details are scant in the public domain, this implies suspicion around how Kurraba may have acquired or dealt with an affordable housing component related to their developments. ICAC referrals are no small matter – even if nothing is proven, the mere association can tarnish a developer's reputation among institutional investors and government stakeholders. Additionally, Kurraba is accused of manipulating planning processes – for instance, leveraging a State Significant Development (SSD) classification under possibly false pretenses (claiming public health benefits to gain favor), and splitting the project into multiple addresses to avoid scrutiny on linked components. The group also accuses Kurraba of **dissolving companies to evade accountability** for past projects . If even partially true, these practices suggest a pattern that could undermine trust.

For investors, these reputational issues translate to risk in several ways. Firstly, they hint at potential future **operational pitfalls** – for example, if Kurraba cuts corners or antagonizes regulators/community, there could be delays in obtaining other approvals (such as construction certificates and occupation certificates) or greater scrutiny on compliance as the project proceeds. It also raises questions about governance: a developer willing to "game the system" might also take aggressive financial risks.

Secondly, if Kurraba were indeed to **become insolvent or step away**, investors might have to take over the project or find a new development partner, which is a complex process. Even short of insolvency, financial distress could force Kurraba to seek additional capital on unfavorable terms, diluting existing investors. In a scenario where the project is stalled and Kurraba cannot continue funding the fight or the holding costs, the asset (the site and plans) might be sold off – potentially at a discount – meaning investors may not realize the full envisioned value.

On the flip side, being aware of these issues allows investors to **proactively manage risk**. They might insist on stronger oversight of project finances or require Kurraba Group to provide guarantees or collateral. Some investors might have step-in rights to assume control if certain covenants (like minimum net worth or liquidity of the developer) aren't met. The reputational cloud could also spur investors to engage more with the community and authorities to ensure greater transparency going forward, perhaps helping rehabilitate the project's public image as part of a settlement.

In summary, **Kurraba Group's troubles – from an ICAC referral to alleged financial strain – mean the project carries sponsor risk on top of the planning risk**. Investors should factor in the possibility that **additional capital** might be needed (either to support Kurraba or replace them), and that the developer's reputation issues could affect things like tenant pre-leasing (tenants may be wary if they doubt the project's deliverability), or even the willingness of authorities to deal leniently with any modifications.

# Outlook and Conclusion

For existing and potential investors in Kurraba Group's Alexandria Health Research Campus, the events of late 2025 mark a clear inflection point. The **judicial review proceedings and any ensuing appeals have introduced a one-two punch of delay and uncertainty** that will test the project's resilience. What was slated to be a pioneering life sciences development is now as much a legal battle as a construction project.

From a **financial perspective**, investors should prepare for **longer timelines and potentially lower short-term returns**. The optimistic scenario – that Kurraba Group prevails in court by late 2026 and swiftly proceeds – still means about a year of lost time. A less favorable scenario with appeals stretches that to late 2027 or beyond, with compounding carry costs. Prudent investors will update their models to reflect a later completion and cashflow schedule (perhaps 2029 completion instead of 2027) and evaluate the impact on IRR and NPV. Additional contingency budgeting is warranted for legal expenses and construction cost escalation.

Risk management strategies might include exploring **insurance** (though political/legal risk insurance for development consents is not standard, some may consider it), or negotiating adjustments in joint venture terms (e.g., extending fund life, or securing rights to replace the developer if milestones aren't met). Communication with stakeholders is also key – for instance, keeping project lenders informed and seeking their accommodation to extend loan availability periods can avoid a scenario where financing commitments lapse due to the delays.

On the **positive side**, if the project eventually clears the legal hurdles, it still stands on solid fundamentals: demand for high-quality lab space in Sydney is strong, and the site's strategic location remains attractive. The macro trend of life science investment is robust. Thus, the long-term value proposition might remain intact, albeit pushed further out. Some investors with a long horizon may even find an opportunity – for example, if any partner decides to exit due to the legal uncertainty, others might increase their stake at a negotiated valuation, potentially benefiting from a lower entry point if they are confident in ultimate success.

However, one cannot ignore the **heightened risk profile**. The intersection of a contentious planning process, a potentially shaky sponsor, and a complex development means investors are exposed to multifaceted risk: legal, construction, market, and counterparty risk. Each of these needs to be monitored. The coming 6–12 months (the initial court case) will be telling. Investors should closely track the judicial review's progress – key dates like the filing of grounds, the evidence put forward, and the tone of any preliminary judicial comments – as these can indicate the likely outcome. If signs point to a protracted fight or adverse outcome, contingency plans (like project redesign or even exit strategies) should be on the table.

In conclusion, **the Class 4 judicial review has cast a long shadow over Kurraba Group's Health Research Building project**. It underscores why regulatory and execution risks are just as critical as market risks in real estate development. For investors, the situation mandates caution and active engagement: recalibrating expectations, reinforcing risk mitigations, and perhaps renegotiating elements of the investment to ensure alignment in this changed context. While the project still holds promise as a transformative life sciences hub, the road to realization is now uncertain and extended. By staying informed (e.g., via court updates) and being ready to adapt strategies, investors can better

navigate this challenging period. Ultimately, those with patience and strong risk management may still see the project through to its envisioned completion – but the journey will test the resilience of all parties involved.

Sources:

- Land and Environment Court of NSW – Notice of Intention to Commence Class 4 Proceedings (19 Sep 2025)
- *Australian Property Journal* (Green Street) – *"Kurraba bringing biomed building to life"* (20 June 2024) – initial timeline and project details
- *The Urban Developer* – *"Plans Filed for $490m Life Sciences Campus at Alexandria"* (3 Nov 2024) – development scope, cost, and projected schedule
- City of Sydney Council Assessment Report – *Health Research Facility SSD-63067454* (Central Sydney Planning Committee, 2025) – project approval summary, jobs, and timeline
- Gensler Press Release – *"Kurraba Launches Australia's First Commercial Life Sciences Campus"* (2025) – developer statements on early 2025 start
- Kurraba Group Website – *Project Update ("ION" Life Sciences Precinct)* (1 Aug 2025) – revised timeline (late 2025 start, Q1 2028 completion)
- NSW Land & Environment Court – *"Class 4 – Judicial Review and Civil Enforcement"* (2023) – statistics on case duration and resolution rates
- NSW Land & Environment Court – Practice Note and Procedural Guide for Class 4 Proceedings – filing timelines and process (e.g., 60-day limit, first directions ~5 weeks)
- Lindsay Taylor Lawyers – *"Challenging the validity of a development consent – the sooner, the better!"* (Blog, 2020) – explains the 3-month time limit in the EPA Act andthe need to file promptly
- Supreme Court of NSW Annual Review 2022 – Court of Appeal performance (90% of appeals finalised <12 months)
- Newsouth Lawyers – *"How to Appeal a Decision in NSW Supreme Court"* (Guide, 2023) – appeal filing deadline ~28 days
- Kurraba Group Exposed (community website, 2025) – allegations regarding Kurraba's practices and finances (Claims of company dissolution history, financial difficulty, ICAC referral, etc.)
- Freedom of Information documentation, as cited by Kurraba Group Exposed, suggests City West Housing, Aqualand, and Kurraba referred to ICAC over an affordable housing sale . (Indicative of reputational issues affecting Kurraba Group.)



## Kurraba Group

See Full Bio >

# How Nick Smith Appropriated the "Kurraba" Name and Rebranded It as "Kurraba Group"

September 19, 2025
Kurraba Group

## Introduction

In the competitive property development sector, brand identity is a critical asset. Recently, controversy has emerged surrounding the name *Kurraba* and its subsequent use by Nick Smith under the rebranded entity *Kurraba Group*. Allegations have been raised that the name was not originally conceived by Smith but instead appropriated, raising questions about intellectual property rights, fair dealing, and professional conduct.

## Background on the "Kurraba" Name

The name *Kurraba* carries significant geographical and cultural resonance in Sydney, most notably through "Kurraba Point" on Sydney Harbour. It has been associated with projects, proposals, and initiatives well before the incorporation of *Kurraba Group*.

Documents and records suggest that *Kurraba* had already been used in commercial and professional contexts prior to Smith's adoption. This makes the subsequent registration and branding of *Kurraba Group* appear less like the development of an original identity and more like a calculated move to capture an existing reputation.

## The Emergence of "Kurraba Group"

According to corporate filings, *Kurraba Group* was co-founded by Nick Smith in 2022. The company quickly positioned itself as a multi-million-dollar development enterprise, promoting ambitious projects in Sydney. Yet the similarity of the name to pre-existing *Kurraba* references is striking: the addition of "Group" is the only distinguishing element.

Critics argue that this amounts to little more than appropriation. By inserting "Group" at the end of *Kurraba*, Smith created a corporate identity that appears established and authoritative, while arguably piggybacking off the goodwill or recognition of the earlier *Kurraba* name.

## Legal and Ethical Considerations

Under Australian law, questions of brand appropriation can fall under:

- **Australian Consumer Law (ACL)** – prohibiting misleading and deceptive conduct (Competition and Consumer Act 2010 (Cth), Sch 2, ss 18–29). If the use of *Kurraba Group* misleads stakeholders into believing it is connected with prior *Kurraba* ventures, a potential ACL breach may be arguable.
- **Trade Marks Act 1995 (Cth)** – preventing registration or use of marks that are substantially identical or deceptively similar to prior marks.
- **Common law passing off** – protecting established reputation from misrepresentation.

While no court has yet ruled on whether Smith's use of *Kurraba Group* crosses these lines, the ethical implications remain: leveraging an existing name without originality risks undermining trust in the development industry.

## Reactions and Implications

Observers within Sydney's property sector have questioned the credibility of a company founded on what appears to be a borrowed identity. Critics suggest that the strategy reflects a pattern of overstatement and reliance on external perception rather than substance.

If legal action is pursued, the outcome could establish an important precedent regarding how far developers can go in appropriating geographic or cultural names for commercial advantage.

## Conclusion

The controversy surrounding *Kurraba Group* highlights the critical role of integrity in corporate branding. While Nick Smith has promoted the company as a serious player in the development industry, the origins of the name cast a shadow. Whether the matter evolves into a legal dispute remains to be seen, but the allegation that Smith "stole" the *Kurraba* name and merely added "Group" underscores ongoing concerns about transparency and originality in the sector.



**Kurraba Group**

[See Full Bio](#) ›

# Nicholas "Nick" Mark Smith – Kurraba – ASIC Personal Name Extract — Current & Historical

September 18, 2025

## ASIC Personal Name Extract — Current & Historical

**Source:** InfoTrack / ASIC database export (see PDF). *This web version re-formats the original for readability; the underlying data is unchanged.*

**Extraction time (from cover):** 18 September 2025, 11:15 (AEST)

## Contents

1. 1. NICHOLAS SMITH
   1. 1.1 Summary
   2. 1.2 Identity Profile
   3. 1.3 Roles Held
      1. 1.3.1 Current roles
      2. 1.3.2 Ceased / former roles
   4. 1.4 Shareholdings
      1. 1.4.1 Current
      2. 1.4.2 Ceased / former
      3. 1.4.3 Status not stated in extract
2. 2. NICHOLAS MARK SMITH
   1. 2.1 Summary
   2. 2.2 Identity Profile
   3. 2.3 Roles Held
      1. 2.3.1 Current roles
      2. 2.3.2 Ceased / former roles
   4. 2.4 Shareholdings
3. 3. NICK SMITH
   1. 3.1 Summary
   2. 3.2 Identity Profile
   3. 3.3 Roles Held
   4. 3.4 Shareholdings
      1. 3.4.1 Current
      2. 3.4.2 Ceased / former
4. 4. Appendix: verbatim duplicate block in PDF
5. 5. Notes & End of Extract

## 1. NICHOLAS SMITH

### 1.1 Summary

- **Extract type:** Personal Name Extract — Current & Historical (cover, p.1).
- **Names on record:** NICHOLAS SMITH (cover) with *former name* listed as NICK SMITH (cover, p.1).
- **Scope:** Roles and shareholdings recorded against this name string in ASIC.

Back to top

### 1.2 Identity Profile

| Field | Value | Page(s) |
|---|---|---|
| **Name as shown** | NICHOLAS SMITH | p.1, p.12 |
| **Birth details** | Cover shows "Place Unknown"; roles page shows 23/05/1985, SYDNEY NSW. | p.1, p.12 |
| **Former name** | NICK SMITH | p.1 |

Back to top

### 1.3 Roles Held

Entries below appear under the "NICHOLAS SMITH" heading in the PDF (roles page).

#### 1.3.1 Current roles

## Legal Entity Information

| Company (ACN) | Sta... | Role | Ap...date | September 18, 2025 | Registered address (as shown) | Document No. | Page |
|---|---|---|---|---|---|---|---|
| NSLM NO.1 PTY LTD (637 087 211) | Registered | Director | 28/10/2019 | | 40 CURTIS ROAD, BALMAIN NSW 2041 | 6EJZH2673 | p.12 |
| NSLM NO.1 PTY LTD (637 087 211) | Registered | Secretary | 28/10/2019 | | 40 CURTIS ROAD, BALMAIN NSW 2041 | 6EJZH2673 | p.12 |

### 1.3.2 Ceased / former roles

| Company (ACN) | Company status | Role | Appointment | Ceased | Registered address (as shown) | Document No. | Page |
|---|---|---|---|---|---|---|---|
| KIPPAX PROPERTY HOLDINGS PTY LIMITED (637 203 466) | Deregistered | Director | 01/11/2019 | 12/02/2023 | UNIT 308C, 124 TERRY STREET, ROZELLE NSW 2039 | 0EWW19449 | p.12 |
| REDFERN PROPERTY SPV 1 PTY LTD (640 609 490) | Deregistered | Director | 30/04/2020 | 06/09/2022 | UNIT 308C, 124 TERRY STREET, ROZELLE NSW 2039 | 1EIE40493 | p.12 |

Back to top

### 1.4 Shareholdings

Holdings listed beneath "NICHOLAS SMITH" in the PDF (pp.1–11). Where the PDF labels a block as *Current* or *Ceased/Former*, that status is preserved; otherwise status is shown as "not stated".

### 1.4.1 Current

| Company | ACN | ABN (if shown) | Address (as shown) | Class | No. held | Beneficial? | Fully paid? | Document No. | Page |
|---|---|---|---|---|---|---|---|---|---|
| PERFORMANCE MARKETERS PTY LTD | 144 859 549 | 24 144 859 549 | 279 YOUNG STREET, ANNANDALE NSW 2038 | ORD | 100 | Yes | Yes | 5E2404307 | p.1 |
| HIS NAME IS WALID ENTERPRISES PTY LIMITED | 165 977 391 | — | 35 O'BRIENS ROAD, HURSTVILLE NSW 2220 | ORD | 100 | Yes | Yes | 1E9821126 | p.2 |
| 3D GROUP PTY LTD | 168 587 531 | 86 168 587 531 | 49A UPTON ROAD, WINDSOR VIC 3181 | ORD | 1 | Yes | Yes | 2E1181226 | p.3 |
| 333D HOLDINGS PTY LTD | 603 584 069 | 47 603 584 069 | 49A UPTON ROAD, WINDSOR VIC 3181 | ORD | 1 | Yes | Yes | 7E6859210 | p.3 |
| 5SMITHS INVESTMENTS PTY LTD | 606 940 489 | — | 1 TELOWIE COURT, DURAL NSW 2158 | ORD | 1 | Yes | Yes | 5E4276786 | p.4 |
| NTF INDUSTRIES PTY LTD | 628 409 978 | 79 628 409 978 | UNIT 44, 25 FAWKNER STREET, BRADDON ACT 2612 | ORD | 100 | No | Yes | 0EFF24889 | p.4 |
| HAPPY HAVEN OSHC STAFFING PTY LTD | 629 706 510 | 42 629 706 510 | 32 MANCHESTER CIRCUIT, CRAIGMORE SA 5114 | ORD | 2 | No | Yes | 1EJV14644 | p.6 |
| SMARTFLAME AUSTRALIA PTY LTD | 671 573 765 | 21 671 573 765 | 20 THE AVENUE, MALVERN EAST VIC 3145 | ORD | 75 | No | Yes | 6EYU07820 | p.8 |
| OCEANLAB SYSTEMS PTY LTD | 675 449 144 | 11 675 449 144 | UNIT 4, 38 RIVERSIDE ROAD, EAST FREMANTLE WA 6158 | ORD | 10 | Yes | Yes | 6EBPP0247 | p.9 |
| TEQNYK PTY LTD | 678 916 955 | 39 678 916 955 | 14 GREENHAVEN DRIVE, UMINA BEACH NSW 2257 | ORD | 100 | Yes | Yes | 6EGAB4667 | p.9 |

### 1.4.2 Ceased / former

# Legal Entity Information – Botany Road Development Pty Ltd (ACN 667 402 397)

| Company | ACN (as shown) | ACN (variously shown) | Address (variously) | Class | Nbr held | Beneficial? | Fully paid? | Doc nt No. | ge |
|---|---|---|---|---|---|---|---|---|---|
| WHISPA PTY LTD | 093 78 4 831 | 85 093 78 4 831 | 4 CORRIEDALE COURT, BELMONT VIC 3216 | OR D | 3 | Yes | Yes | 1E06671 25 | p.1 |
| NL SMITH MANAGEMENT SERVICES PTY LTD | 160 77 2 798 | — | 15 WUNBURA CIRCLE, PACIFIC PINES QLD 4211 | OR D | 10 | Yes | Yes | 5E31361 82 | p.2 |
| ... PTY LTD | ... 358 | 66 ... 1 358 | CAMELOT DRIVE, BLAKEVIEW SA 5114 | OR D | 1 | Yes | Yes | 1E99589 17 | p.2 |
| MODERN ICS PTY LIMITED | ... 1 720 | — | ... AWK NERT STREET, BRADDON ACT 2612 | OR D | 50,00 0 | Yes | Yes | 2E16708 36 | p.3 |
| FOLIAGE TREE SERVICES PTY LTD | 163 14 8 454 | 23 163 14 8 454 | UNIT 1, 24 BIRRERIK ROAD, WAMBERAL NSW 2260 | OR D | 1 | Yes | Yes | 2E21060 86 | p.3 |
| PPG PROJECTS PTY LIMITED | 161 21 4 660 | 53 161 21 4 660 | 177 WARDELL ROAD, EARLWOOD NSW 2206 | OR D | 12 | Yes | Yes | 7EAJ54 833 | p.5 |
| MARKKO Builders and Other Roles INVESTMENTS PTY LTD | 633 19 6 335 | 24 633 19 6 335 | 177 WARDELL ROAD, EARLWOOD NSW 2206 | A | 1,000 | Yes | Yes | 4EAC42 527 | p.8 |
| MLBJ HOLDINGS PTY LTD | 654 29 8 674 | 56 654 29 8 674 | 32 MANCHESTER CIRCUIT, CRAIGMORE SA 5114 | OR D | 50,00 0 | Yes | Yes | 5EJC635 90 | p.8 |
| EOJN PTY LTD | 677 00 1 446 | — | 177 WARDELL ROAD, EARLWOOD NSW 2206 | OR D | 1,000 | No | Yes | 4EAD04 316 | p.9 |

Current & Historical Company Extract: BOTANY ROAD DEVELOPMENT PTY LTD

ACN: 667 402 397    Extract date/time: 18 September 2025, 11:02:02 AWCNET

*This extract contains information derived from the Australian Securities and Investments Commission (ASIC) database under section 1274A of the Corporations Act 2001. Please advise ASIC of any error or omission which you may identify.*

## Contents

1. Organisation Details
2. Address Details
... Roles
... Share Information
5. Documents

## 1) Organisation Details

**1.4.3 Status not stated in extract**

| Company name | BOTANY ROAD DEVELOPMENT PTY LTD |
|---|---|
| ACN | 667 402 397 |
| Registered in | New South Wales |
| Registration date | 20/04/2023 |
| Next review date | 20/04/2026 |
| Name start date | 20/04/2023 |
| Status | Registered |
| Company type | Australian Proprietary Company |
| Class | Limited By Shares |
| Subclass | Proprietary Company |
| Document number (current org details) | 3EZE91367 |

## 2) Address Details

**Registered address (current)**

| Address | Level 15, 124 Walker Street, NORTH SYDNEY NSW 2060 |
|---|---|
| Start date | 20/04/2023 |
| Document number | 3EZE91367 |

**Principal place of business (current)**

| Address | Level 15, 124 Walker Street, NORTH SYDNEY NSW 2060 |
|---|---|
| Start date | 20/04/2023 |
| Document number | 3EZE91367 |

**Contact address**

*Section 146A of the Corporations Act 2001: "A contact address is the address to which communications and notices are sent*

# Legal Entity Information – Kurraba Group Pty Ltd (ACN 662 323 695)

## Current & Historical Company Extract: KURRABA GROUP PTY LTD

**ACN: 662 323 695** | Extract date/time 03 05

This extract contains information derived from the Australian Securities and Investments Commission (ASIC) database under section 1274A of the Corporations Act 2001. Please advise ASIC of any error or omission which you may identify.

## Contents

3) Officeholders and Other Roles
4. Share Information
5. Documents

### 1) Organisation Details

| Company name | KURRABA GROUP PTY LTD |
| --- | --- |
| ACN | 662 323 695 |
| ABN | 36662323695 |
| Registered in | New South Wales |
| Registration date | 09/04/2023 |
| Next review date | 09/04/2026 |
| Name start date | 09/04/2023 |
| Status | Registered |
| Type | Australian Proprietary Company |
| Class | Limited By Shares |
| Subclass | Proprietary Company |

### 2) Address Details

**Registered address (current)**

177 WARDELL ROAD, EARLWOOD NSW 2206

**Principal place of business (current)**

Level 15, 124 Walker Street, NORTH SYDNEY NSW 2060

**Contact address**

177 WARDELL ROAD, EARLWOOD NSW 2206

### 3) Officeholders and Other Roles

**Director (current)**

| Name | Address | Born | Appointment date |
| --- | --- | --- | --- |
| NICHOLAS MARK SMITH | 40 Curtis Road, BALMAIN NSW | 23/05/1985, SYDNEY | 20/04/2023 |

**Secretary (current)**

**Previous Secretary**

### 4) Share Information

**Share structure**

| Class | Description | Number issued | Total amount paid | Total amount unpaid |
| --- | --- | --- | --- | --- |
| ORD | ORDINARY SHARES | 10 | 10.00 | 0.00 |

**Members**

ASIC records the top twenty members based on shareholdings for each class. Historical records may show when a member ceased to be ranked among the top twenty.

### 5) Documents

| Date entered | Current Company | ACN | ABN (if shown) | Form type | Address (as shown) | Date processed | CIN Class | Number page | Benef icial? | Effect date? | Fully paid? | Document Number | Doc en | Pa erge |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20/04/202 | HANDLIN 161C — Application For Registration | 632 6 307 07 | | 76 SWAINE AVENUE, TOORAK | 20/04/2024 | GROUP | STREET QLD | Yes | 30/04/202 3 | | 6EZA61367 | p 1 | |
| ADELAIDE PTY LTD | | Start date | | 76 SWAINE AVENUE, TOORAK GARDENS SA 5065 | 07/08/2025 | | 160 | Yes 3 | | Yes | | 6977 | 0 | |
| 27/11/202 3 | 484E — Change To Company Details (Appointment Or Cessation Of A Company Officeholder) | 35 47 | | 76 SWAINE AVENUE, TOORAK GARDENS SA 5065 | 27/11/2023 | 2 OR D | 100 | Yes | 24/11/202 3 Yes | | 6ERU16872 5EKS4 2373 | p 1 0 | |
| 11/11/202 4 | 484 — Change To Company Details | | | | 12/11/2024 | 2 | | Yes | 08/11/202 | | 6EHTS5989 | | |
| NIX PROPERTY 484A1 — Change Officeholder Name Or Address SERVICES QLD PTY 484A2 — Change Officeholder Name Or Address LTD | | Start date | | PO BOX 215, NORTH SYDNEY NSW 2059 1 CORONET DRIVE, BRAY PARK QLD 4500 | 15/09/2022 | OR D | 10 | Yes | Yes | | 6EJZH 2673 | p 1 0 | |
| 20/08/202 5 | 484 — Change To Company Details 484A1 — Change Officeholder Name Or Address | 15 95 15 953 | | | | 2 | | | 14/08/202 5 | | 5EKX82261 | | |
| | | Cease date | | | 01/08/2025 | | | | | | | | | |

**End of Extract:** 3 pages.

Back to top

## 2) NICHOLAS MARK SMITH

### Roles

Entries below appear beneath the "NICHOLAS MARK SMITH" heading.

- Extract type: Personal Name Extract — Current & Historical
- Scope in PDF: Roles (no shareholdings pages under this exact name string)

### Directors (current)

| Name | Address | Born | Appointment date | Document number |
|---|---|---|---|---|
| STEPHEN PATRICK RYAN | 113 Evans Street, ROZELLE NSW 2039 | 09/07/1985, SYDNEY, NSW | 09/09/2022 | 6EHTS6000 |
| NICHOLAS MARK SMITH | 40 Curtis Road, BALMAIN NSW 2041 | 23/05/1985, SYDNEY, NSW | 09/09/2022 | 5EKX82263 |

### Secretary (current)

| Name | Address | Birth details | Appointment date | Document number |
|---|---|---|---|---|
| ALEXEI SMITH FITZ-KIRK | 27 Ellalong Road, CREMORNE NSW 2090 | 14/12/1984, CAPE TOWN, SOUTH AFRICA | 07/08/2025 | 6EJZW6560 |

### 2.2 Identity Profile

| Field | Value | Page(s) |
|---|---|---|
| Name as shown | NICHOLAS MARK SMITH | p.13 |
| Birth details | 23/05/1985, SYDNEY NSW | |

### 2.3 Roles Held

#### 2.3.1 Current roles

| Name Company (ACN) | Address | Status Role | Born Appointment date | Appointment date ABN (if shown) | Cease date Registered address (as shown) | Document number Doc No. | Pa ge |
|---|---|---|---|---|---|---|---|
| RICHARD JAMES SULLIVAN BOTANY ROAD DEVELOPMENT PTY LTD (667 402 397) | 3 Norfolk Road, LONGUEVILLE NSW 2066 | Registered Director | 28/03/1980, SYDNEY NSW 20/04/20 | 09/09/2022 — | 07/08/2025 40 CURTIS ROAD, BALMAIN NSW 2041 | 3EWX86308 5EKX82 261 | p.1 3 |
| HANDLING GROUP PTY LTD (670 148 240) | | Registered Director | 01/08/2023 | 58 670 148 240 | 40 CURTIS ROAD, BALMAIN NSW 2041 | 5EKX82 256 | p.1 4 |
| KENET LOGISTICS PTY LTD (683 929 428) | | Registered Director | 23/01/2025 | 79 683 929 428 | 40 CURTIS ROAD, BALMAIN NSW 2041 | 5EKX82 2374 | p.1 4 |
| RICHARD JAMES KURRABA DEVELOPMENT (676 935 592) | 3 Norfolk Road, LONGUEVILLE NSW 2066 | Registered Director | 28/03/1980, SYDNEY NSW 30/04/2024 | 09/09/2022 676 957 592 | 40 CURTIS ROAD, BALMAIN NSW 2041 | 3EWX86308 6EJYR6 594 | p.1 4 |
| KURRABA GROUP PTY LTD | | Registered Director | 09/09/2022 | 56 662 323 695 | 40 CURTIS ROAD, BALMAIN NSW 2041 | 5EKX82 263 | p.1 4 |
| KURRABA MANAGEMENT PTY LTD (676 945 234) | | Registered Director | 29/04/2024 | 13 676 945 234 | 40 CURTIS ROAD, BALMAIN NSW 2041 | 6EJYR6 595 | p.1 5 |
| KURRABA PROPERTY PTY LTD (658 575 332) | | Registered Director | 09/09/2022 | 35 658 575 332 | 40 CURTIS ROAD, BALMAIN NSW 2041 | 6EJYR6 598 | p.1 5 |
| URBAN MANDALAY INVESTMENTS PTY LTD (683 674 786) | | Registered Director | 14/01/2025 | — | 40 CURTIS ROAD, BALMAIN NSW 2041 | 3EIU1S42 674 | p.1 5 |

**Previous Director**

**Previous Secretary**

### 3) Share Information

#### Share Structure

| Description | Number issued | Total amount paid | Document number |
|---|---|---|---|
| ORD | 300.00 | 300.00 | |

### 4) Share Information

#### Share structure

| Description | Number issued | Total amount paid | Document number |
|---|---|---|---|

**Members**

#### 2.3.2 Ceased / former roles

*ASIC records the top twenty members by shareholdings for each class. Historical records may show when a member ceased to be ranked among the top twenty.*

| Member/Company (ACN) | Company Address status | Role/Class | Appointment | Number held | Beneficially Registered address (as shown) | Document Doc No./Page number |
|---|---|---|---|---|---|---|
| ATP TOWER PTY LTD R & K (638 828 743) CAMPBELL | Level 21, Walker Street, NORTH SYDNEY NSW 2060 | Director or ORD | 15/07/20 20 | 06/09/2 022 100 | UNIT 308C, 124 TERRY STREET, ROZELLE NSW 2039 no | 7EAY5 7789 p.1 3 |
| PTY 621 863 536 BONDI AND WELLINGTON LIMITED PTY LTD (658 083 777) | Registered SYDNEY NSW 2060 | Director or ORD | 16/03/20 22 | 31/08/2 022 | UNIT 308C, 124 TERRY STREET, ROZELLE NSW 2039 | 3EIU37756 2EXB4 7170 p.1 3 |
| BONDI AND WELLINGTON LIMITED PTY LTD (658 083 777) 159 159 930 PTY | 1 3 Evans Street, Registered ROZELLE NSW 2041 | Secret ary ORD | 16/03/20 22 | 31/08/2 022 100 | UNIT 308C, 124 TERRY STREET, ROZELLE NSW 2039 no FULLY | 2EXB4 7170 6EHTS6000 p.1 3 |
| KHPAX PROPERTY PTY LTD (637 794 962) | Registered | Director or | 02/12/20 19 | 12/02/2 023 | UNIT 308C, 124 TERRY STREET, ROZELLE NSW 2039 | 4EAA3 9645 p.1 4 |
| 2NSM NO 1 PTY LTD Holdings 387 211 | 40 Curtis Road, BALMAIN NSW 2041 | ORD | | 100 | no FULLY | 6EJYW2369 |

No shareholdings are listed under the "NICHOLAS MARK SMITH" heading in the PDF.

## 5) Documents

## 3. NICK SMITH

*Note: Where no "Date processed" is shown, the document has not been processed. Where a "Date processed" is shown but "0" pages, the document has been processed but a copy is not yet available.*

### 3.1 Summary

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---|---|---|---|---|---|
| • Scope in PDF: Shareholdings (entries listed under this exact name string). | For Registration As A Proprietary Company | 09/09/2022 | 3 | 09/09/2022 | 3EIU37756 |
| 20/03/2023 | 484A1 — Change To Company Details (Change Officeholder Name Or Address) | 20/03/2023 | 2 | 17/03/2023 | 3EWX86308 |
| 11/11/2024 | 484 — Change To Company Details 484A1 — Change Officeholder Name or Address 484A2 — Change Member Name Or Address | 12/11/2024 | 3 | 08/11/2024 | 6EHTS6000 |

Field | Value | Page(s)
Name as shown | NICK SMITH | p.16
Birth details | Place unknown (as printed) | p.16

### 3.2 Identity Profile

### 3.3 Roles Held

No roles are listed under the "NICK SMITH" heading in the PDF.

### 3.4 Shareholdings

#### 3.4.1 Current

| Company | ABN (if shown) | Address (as shown) | Class | No. held | Benefic ial? | Fully paid? | Document No. | Page |
|---|---|---|---|---|---|---|---|---|
| | 484A1 — Change To Company Details (Change Officeholder Name Or Address) | 14/08/2025 | 2 | 14/08/2025 | | | 5EKX82262 | |
| SMITH SUPERSTAKE PTY LTD 13/08/2025 | 484A1 — Change To Company Details (Change Member Name Or Address) | 9 FAIRWAYS DRIVE, SHELL COVE NSW 2529 15/08/2025 | OR D | 1 | Yes 15/08/2025 | Yes | 4EAB377 06 6EJYW2369 | p.1 6 |

#### 3.4.2 Ceased / former

| Company | ACN | ABN (if shown) | Address (as shown) | Cla ss | No. held | Benefi cial? | Fully paid? | Docume nt No. | Pa ge |
|---|---|---|---|---|---|---|---|---|---|
| | 484E — Change To Company Details (Appointment Or Cessation Of A Company Officeholder) | 21/08/2025 | | | 19/08/2025 | | | 6EJZW6560 | |
| WINDMILL EDUCATIONAL TOYS & EQUIPMENT PTY LTD | 100 78 9 991 | 55 100 7 89 991 | 23 LESLIE STREET, DONVALE VIC 3111 | EM P | 700 | Yes | Yes | 0226670 65 | p.1 6 |
| PERPETUAL END PRODUCTIONS PTY. LTD. | 151 46 2 001 | 95 151 4 62 001 | 42 TOM ROBERTS AVENUE, CONDER ACT 2906 | OR D | 20 | Yes | Yes | 1E7466 720 | p.1 6 |

End of Extract: 3 pages.

Back to top

## 4. Appendix: verbatim duplicate block in PDF

Pages 17–26 of the PDF repeat the same "NICHOLAS SMITH" and "NICK SMITH" shareholding entries already captured above (pp.1–11

# Critical Assessment of Nick Smith and the Kurraba Group

Back to top

September 17, 2025
Kurraba Group

## 5. Notes & End of Extract

# Leadership and Experience Deficiencies

- Headings, contract names, ACN/ABNs, dates, numbers held, and document numbers are taken verbatim from the PDF pages cited inline.
- "Status not stated" indicates the PDF did not label a holding block as either *Current* or *Ceased/Former.*
- Rate references align strictly to each filing's organisation.
- Where page-bound PDF displays a vertical bar.

Nick Smith positions himself as a leader in property development, yet closer examination reveals a **thin record of direct delivery**. Kurraba Group, though led by Smith, has only recently begun positioning itself as a billion-dollar developer despite **having no proven track record of delivering projects of this magnitude**. Smith points to involvement in major deals through previous employers, but these were essentially team efforts where his individual role remains unclear. The absence of demonstrable end-to-end project leadership undermines his credibility when promising to deliver a $490 million life sciences campus.

## Financial Instability and High-Risk Funding Models

Under Smith's leadership, Kurraba Group is heavily reliant on **external finance, speculative borrowing, and constant capital raising**. Reports confirm that the group was **actively trying to sell or syndicate its flagship Waterloo site** even while promoting it as a long-term pillar of Australian innovation. This indicates a lack of financial resilience.

- Attempts to raise $50 million through **social media fundraising campaigns** highlight the group's unconventional and arguably desperate approach to finance.
- The reliance on untested funding pathways signals financial fragility, making Kurraba and its leadership vulnerable to sudden cash-flow shortfalls and reputational damage.

## Regulatory Scrutiny and Integrity Risks

Kurraba Group has already been drawn into **probity concerns referred to the NSW Independent Commission Against Corruption (ICAC)**. The referral related to an off-market affordable housing sale tied to the Waterloo project. While no findings of corruption were made, the very fact that ICAC scrutiny was triggered raises questions about **governance standards, transparency, and ethical culture** within the group. For a start-up developer seeking to secure investor trust, this represents a substantial red flag.

## Community Opposition and Legal Exposure

The Waterloo life sciences campus has become a lightning rod for **community hostility**.

- Local residents allege breaches of planning laws, inadequate consultation, and erosion of affordable housing commitments.
- As of 2025, community groups were preparing **litigation in both the Land and Environment Court and the Supreme Court of New South Wales**.

Such entrenched opposition creates uncertainty, potential injunctions, and years of legal risk. It also exposes Smith personally to **reputational damage** as the public face of the project.

## Questionable Partnerships and Reputational Judgement

Smith has made decisions that raise serious concerns about his judgment. For instance, Kurraba engaged global firm **JLL** as its leasing partner at a time when JLL's Australian operations were tainted by a high-profile workplace misconduct scandal. This alignment with a partner already suffering reputational harm suggests a **failure to adequately assess reputational risk** or a disregard for stakeholder perception.

## Overall Risk Profile

Nick Smith and the Kurraba Group carry a high-risk profile marked by:

1. **Unproven delivery capability** at the scale being claimed.
2. **Financial precariousness**, evidenced by unconventional fundraising and willingness to sell core assets.
3. **Regulatory shadows**, including ICAC referrals.
4. **Intense community opposition** with looming litigation.
5. **Poor strategic judgement** in partner selection.

Taken together, these factors suggest that Nick Smith's leadership is characterised by **grandiose vision but fragile execution capacity**, leaving potential investors, partners, and employees exposed to material financial, legal, and reputational risk.



### Kurraba Group

[See Full Bio](#) ›

# Multiple Citizens Plan to Sue to Block 100 Botany Road / Kurraba Group

September 11, 2025
Kurraba Group

Reports have emerged that a number of community members are preparing to commence legal proceedings in both the NSW **Land and Environment Court** and the **Supreme Court of New South Wales** in relation to the proposed development by Kurraba Group at 100 Botany Road, Waterloo. This includes their investment vehicles Botany Road Development Pty Ltd (ACN 667 402 397) / The Trustee for Botany Road Development Trust Fund (ABN 31 744 075 878).

According to these reports, citizens intend to rely on several avenues of legal challenge available under New South Wales law, including:

- **Judicial review proceedings (Class 4, Land and Environment Court)** to test the lawfulness of any consent, particularly in relation to compliance with the *Environmental Planning and Assessment Act 1979 (NSW)* and relevant planning instruments.

- **Civil enforcement proceedings (Class 4, Land and Environment Court)** seeking injunctions to restrain any development alleged to be inconsistent with statutory requirements or planning controls.

- **Public interest litigation**, where community members may bring claims to protect environmental or amenity interests affected by the proposal.

- **Applications for declaratory or injunctive relief in the Supreme Court of NSW**, raising broader issues of statutory compliance and procedural fairness.

It is alleged that the development did not fully comply with mandatory statutory processes, including requirements for assessment, consultation, and adherence to environmental planning provisions.



### Kurraba Group

See Full Bio ›

# Kurraba Group, which is being investigated by ICAC, engaged troubled JLL to run the leasing of its development

September 11, 2025
Kurraba Group

Kurraba Group, which is being investigated by ICAC, engaged JLL to run the leasing of its development.

JLL's chief executive was sacked amid a cultural reckoning. Ironically, a poor firm like Kurraba Group would engage another equally poor firm to sell its development. Hope Nick Smith is sacked next.

Stay away from the Kurraba Group and protect affordable housing!

There is no suggestion that employees of the Kurraba group or the Kurraba group itself are corrupt, only that a referral has been made to the Independent Commission Against Corruption.

## JLL chief executive sacked amid cultural reckoning

In news that felt inevitable but still a bit sudden, JLL has sacked its Australian CEO — a full week after a culture of harassment surfaced at the firm.
Yoni Bashan

@yoni_bashan

3 min read

August 26, 2025 – 9:43PM
JLL Australia CEO Dan Kernaghan has been sacked.

*JLL Australia CEO Dan Kernaghan has been sacked.*

In news that felt inevitable but still a bit sudden, global real estate giant JLL announced on Tuesday that it had sacked its Australian CEO **Dan Kernaghan** a full week after a culture of harassment surfaced at the firm, along with the mismanagement of these claims and, unexpectedly, a predilection among some of the bosses to unwind at a strip club named Kittens.
"We regret to inform you that after 20 years with JLL, Dan Kernaghan is leaving the firm," said a statement signed by JLL's capital markets CEO **Richard Bloxam** and its head of HR **Laura Adams**, both of whom sit on the company's global management board.
Conspicuously absent from the statement was JLL global CEO **Christian Ulbrich** who presumably wants this embarrassment gone in time for Davos in January.
A Margin Call investigation revealed incidents within JLL, linked to Melbourne's Kittens gentlemen's club.

*A Margin Call investigation revealed incidents within JLL, linked to Melbourne's Kittens gentlemen's club.*

Announced at the same time was an "independent investigation" to be led by legal firm Clyde and Co into "recent employment matters", which we guessed was the company's polite way of describing the debaucherous strip club nights and all that talk of "nutting" on strippers, or into handbags, and other seamy conduct.
None of which involved Kernaghan himself, but it fell upon him, as CEO, to manage the complaints about this behaviour. And manage them badly he certainly did.
So badly, in fact, that Ulbrich had to forcibly stop Kernaghan this month from reinstating a Victorian manager who'd sexually harassed a female worker on his team in the Melbourne office.
A two-month inquiry substantiated the allegations against this chap, but Kernaghan wanted to keep him anyway, and keep him working in the same office as the woman who lodged the complaint.
At that time, Ulbrich may or may not have even known that Kernaghan had sat on an entirely separate complaint, from 2022, concerning two of JLL's national managers who'd spoken of "nutting off" on a stripper's back in a JLL group chat.
One of them threatened to "nut" in the handbag of a female colleague after she took umbrage with the language they were using.
JLL Global CEO Christian Ulbrich. Picture: John Feder

*JLL Global CEO Christian Ulbrich. Picture: John Feder*

But, instead of firing them, or doing anything, Kernaghan, fearing a revenue risk to the business if they were terminated, didn't act on the complaint. Nothing happened. And both of those men appeared to be entirely unaffected on Tuesday, even as JLL announced much sweeping cultural change to come and an independent inquiry into all this behaviour (an inquiry it resisted calling, for days, fearing the litigation that could arise out of it).
And so, it was all for nothing, wasn't it? All that talk of championing values and women and inclusivity, and the ridiculous claim of being one of the "most ethical companies" on the planet for the past 18 years. More ethical than whom, exactly? Monsanto? James Hardie? Who was JLL being measured against? It's not hard to look ethical when your nearest competition is British American Tobacco or Wilson Parking.
And that vaunted "zero tolerance" policy on harassment turned out to be very accommodating of harassment indeed, so long as the person doing it was good at making money.
Because the money is what really mattered, in the end; the money and the brand, which JLL's leaders have entrusted with the rank amateurs at global comms agency Burson, whose people didn't lift a finger all week. As their client felt a cataract of headlines and humiliation, Burson's people sat around chewing gum and tossing a tennis ball at a brick wall wondering what to buy on ASOS. Easiest money they've ever made, these past few days, telling JLL not to bother dealing with the press.
And it explains why Kernaghan himself hasn't said much at all throughout this saga, even if the most extravagant of mea culpas probably wouldn't have helped him.
But, he might have said something, perhaps simply that he did everything his advisers told him to do. Are we so wrong to suspect a legal

challenge out of all this?



### Kurraba Group

See Full Bio ›

# ThemeNcode PDF Viewer [Do not Delete]

July 17, 2025

This page is used for Viewing PDF.

# ThemeNcode PDF Viewer SC [Do not Delete]

July 17, 2025

This page is used for Viewing PDF.

# Reading Room

July 17, 2025



# Freedom of Information documents show City of Sydney approved Kurraba development despite unanswered questions on state significance.

May 12, 2025
Kurraba Group

City of Sydney planners recommended development for state significance despite not knowing what a Health Service Building actually was, with the planners acknowledging that there was no guarantee that the nuclear facility underpinning the application would ever be built.



### Kurraba Group

See Full Bio ›

# City West Housing, Aqualand, Kurraba referred to ICAC over Affordable Housing Sale

**May 12, 2025**
Kurraba Group

Kurraba Group, City West Housing and Aqualand have been referred to ICAC over the off market sale of Affordable Housing for commercial development.

Related party transactions involving City West Housing Board Member and Aqualand CEO John Carfi, Aaron Tippet and Kurraba Group cast serious doubts over probity of sale of affordable housing to Kurraba group for 100 Botany Road Development.



### Kurraba Group

See Full Bio ›

# Despite promises Kurraba seeks buyer for 100 Botany Road development site.

May 12, 2025
Kurraba Group

Nick Smith's Kurraba group has been desperately tapping private investors in the hope of selling the 100 Botany Road development site despite ICAC referral and a pending legal challenge to the development approval.

Without a serious major investor for the project Kurraba have continued to borrow money with a hope of finding a buyer prepared to take on the risk of questionable approvals and untested technology



## Kurraba Group

See Full Bio ›

# Nick Smith and Proton Therapy Australia try and raise $50m.. on Facebook

**April 30, 2025**
Kurraba Group



*IMG 1832*



**Kurraba Group**

See Full Bio >

# Major law firm says Kurraba DA likely void – Investors at Risk

April 30, 2025
Kurraba Group



> eplanning.cityofsydney.nsw.gov.au
>
> **G** Gilbert
>    +Tobin
>
> · section 3.5.2 of the EIS notes the new Substation Project is required to supply the Health Facility Project based on the proposed electrical demand of that Project.
>
> Neither the EIS or SEE considers the cumulative impacts of the Health Facility Project, Commercial Office Project and Substation Project – despite those Projects being clearly linked and related development for the reasons set out above.
>
> In the absence of that assessment, the consent authority and members of the public are not able to understand the combined impacts of those Projects (including without limitation construction traffic and noise impacts) and whether those impacts will be mitigated to acceptable levels.
>
> It is our view that:
>
> · section 4.15(1)(b) of the *Environmental Planning and Assessment Act 1979* (**EP&A Act**) requires the consent authority to consider the likely impacts of the Project which includes (among other matters) the cumulative impacts of the Health Facility Project, Commercial Office Project and Substation Project (see *Hoxton Park Residents Action Group Inc v Liverpool City Council* [2011] NSWCA 349 and *Bingman Catchment Landcare Group Incorporated v Bowdens Silver Pty Ltd* [2024] NSWCA 205);
>
> · the consent authority is not able to satisfy that mandatory consideration absent any assessment of the cumulative impacts of the Health Facility Project, Commercial Office Project and Substation Project in the EIS; and
>
> · any decision by the consent authority to approve the Health Facility Project in the above circumstances would expose that decision to a risk of judicial review challenge, and being declared void and of no effect by the Land and Environment Court of NSW.
>
> In order to address that issue, the SSD Application for the Health Research Facility Project should be amended to include the Commercial Office Project, and for an updated EIS to be prepared to assess the combined or total impacts of the Health Research Facility Project, Commercial Office Project and Substation Project. The amended SSD Application and updated EIS should be re-exhibited to comply with the requirements of the EP&A Act (and associated Regulations).
>
> Please call if you would like to discuss any aspect of this advice.
>
> Yours faithfully
> **Gilbert + Tobin**
>
> **Ben Fuller**
>
> page | 2

*IMG 1851*



### Kurraba Group

See Full Bio ›

# Australia's first proton therapy facility a $500,000,000 white elephant

**April 30, 2025**
Kurraba Group

## Australia's first proton therapy cancer treatment facility in disarray

Story by Ollie Haig · 3mo · ⏱ 2 min read

The future of Australia's first proton therapy unit is under a cloud after the South Australian government abandoned a contract to buy the machine, amid fears it wouldn't be delivered.

The South Australian Health and Medical Research Institute (SAHMRI) has officially terminated its agreement with ProTom International, the American supplier of the cancer therapy unit, following months of negotiations and concerns about the delivery of the equipment.

More than $50 million in Commonwealth grants have already been paid to ProTom International and its suppliers.



**Kurraba Group**

See Full Bio ›

# Nick Smith and Proton Therapy Australia try to raise $50,000,000 on Facebook

**April 30, 2025**
**Kurraba Group**





### Kurraba Group

See Full Bio ›

# Kippax investors lose entire investment

April 30, 2025
Kurraba Group

Kippex rebrands as Kurraba

**Kippax Property ("Kippax")**

For the past 2 years, Kippax has been pursuing a planning approval for a site in Redfern ("the Redfern site"), located in the Botany Road Precinct, over which Kippax holds an option to purchase. The NSW State Government's objective for the Botany Road Precinct is to activate State Government infrastructure investment and attract technology and other knowledge-based businesses to Sydney's Innovation Corridor.

In August 2021 Council reported its planning proposal ("PP") which included changing the planning controls for the Redfern site to a floor space ratio ("FSR") of 8.5:1 and 17-storeys. The PP then received a Gateway Determination from the NSW State Government and went on public exhibition in November 2021, ahead of the City of Sydney Council ("Council") election. During the public exhibition there were a small number of public submissions relating to the Redfern end of the Botany Road Precinct which raised some concern with the proposed changes in the immediate area around the site. Notwithstanding these concerns Council advised Kippax that the benefits of the PP outweighed the impact predicated on the future condition they would be creating in the area.

Kippax continued to work closely with the Council to respond to public comments and included ways the scheme could be adjusted to address matters raised in the submissions. The Council also advised that three key issues needed to be addressed and Kippax submitted a revised scheme with a reduced maximum height from 17-storeys to 11-storeys and an FSR of 7.3:1 which addressed these issues.

However, Council advised in late May that the Redfern site and neighbouring properties would be excluded from the Botany Road Precinct and the controls were to remain as they are today. Thereafter, at a Council meeting in June the Council voted to remove the Redfern site and certain other properties from the Council's PP. This was on the basis of a small number of objectors (c.1% out of over 5,000 residents and community groups who were emailed the PP).

While there is a potential pathway for the Redfern site to still receive a planning uplift, it is too early to determine the likely prospects of success. As a result Ariadne has impaired its $8.4 million loan receivable to nil value at balance date.

Subsequent to balance date, Ariadne has also reviewed its investment in Kippax and has decided to exit this joint venture. Ariadne will take control of the option over the Redfern site and explore all pathways to recover value.

4                        ARIADNE AUSTRALIA LIMITED                        ARIADNE

*IMG 1984*



**Kurraba Group**

See Full Bio ›

# Macquarie University has no record of multiple degrees

April 30, 2025
Kurraba Group

 ## Education



**Macquarie University**
Bachelor of International Business, Economics,
International Politics
2005 – 2009



**Kaplan**
Master of Applied Finance, Applied Finance
2013 – 2015



**Macquarie University**
Bachelor of Arts, Economics, International Politics
2005 – 2008





### Kurraba Group

See Full Bio ›

# No evidence to support Kurraba Track records – Ghost Projects never built.

April 30, 2025
Kurraba Group







## Kurraba is an established real estate investment and development firm led by a highly experienced team of experts in institutional property and complex development.

Kurraba is the country's largest and most trusted commercial developer for the life sciences and biomedical industry, led by a highly experienced team of experts in institutional property and complex development.

*IMG 1884*



**Kurraba Group**

See Full Bio ›

# News

February 28, 2020

Kurraba Group In Uncategorized

## Questions Raised Over Ashurst's Role in Managing Online Rep and Nick Smith



*Key Points Details Recent developments have drawn public attention to the relationship between Kurraba Group, its direct compliance division of Ashurst, one of Australia's major law firms. According to emails provided by a whistleblower, Ashu regulatory communications on behalf of property-development clients […]*

Read More
Kurraba Group In Uncategorized

## Open Letter to AusBiotech Attendees – The 100 Botany Road Kurraba Campus May Never Materialize

*Nick Smith of Kurraba Group is promoting a vision of a gleaming life sciences campus (concept art shown above) at 100 B record suggests the flashy model at his AusBiotech booth might be the only "building" this project ever produces. Attende*

Read More
Kurraba Group In Kurraba Group

## Independent Watchdogs Emerge After Nick Smith's & Kurraba New Sites Investigate Nick Smith's Development Network



## Protecting Sydney from Kurraba Group

Through steady action, we will ensure a bright future for Sydney by rejecting Kurraba's problematic developments.

*Key Points Int*
*independent w*
*alleged geo-re:*

Read More
Kurraba Group In Kurraba Group

## Kurraba Group' Estate) Amid Fu

*Sydney, Austra*
*Dincer, even a:*
*name to lure o*

Read More
Kurraba Group In Kurraba Group

## Intimidation, De Redfern Development Scandal

## Recent News Articles

*By Investigative Report – October 17, 2025 An investigative look into the failed "44-78 Rosehill St, Redfern" development*
*...developer Nicholas "Nick" Smith, his firm Kippax Property (now rebranded as Kurraba Group), and his lie...*
*from 2022 show how Smith orchestrated intimidation […]*

Read More
Kurraba Group In Kurraba Group

**VIEW ALL POSTS**

## Internal Emails Reveith Instructed Staff to Financially

**Filter**

AllKurraba GroupUncategorized

*A New Era on Exposing Kurraba Group, Kippax, and Nick Smith We've received hundreds of gigabytes of data, including ...*

Read...
Kur...

## Kuou Co...

*...ny p...*
*...proj...*

Read...
Kur...

## Frm En...

*...evelo...*
*...x P...*

Read More
Kurr...

**Questions Raised Over Ashurst's Role in Managing Online Reputation for Kurraba Group and Nick Smith**

## Kurraba's Insider Deals Flip Affordable Housing into Private G Aqualand Scandal

**Over 100 to Lucas for Attendees – The 100 Botany Road Mirage: Why Nick Smith's Kurraba Campus May Never Materialize**

October 21, 2025

*Key Points: From Affordable Homes to a Life-Science Campus An aerial view of the Alexandria site (outlined in orange) a...*
*Street. Originally earmarked for affordable housing, this land was quietly sold off to a private developer. In Alexandria (in...*
*destined for affordable […]*

Read More
Kurraba Group In Kurraba Group

## Kurraba Group and Nick Smith's Legal Campaign to Silence a

*Key Points Background: Developer Controversy and a Vocal Community Critic Kurraba Group is a Sydney-based real este...*
*"Nick" Smith. The company's flagship project – a proposed life-sciences campus at 100 Botany Road in the Waterloo/Alex...*
*opposition and legal doubt. Critics, including local […]*

Read More
Kurraba Group In Kurraba Group

## Kurraba's Sydney Affordable Housing Scandal: How Insider D Private Gain



**Independent Watchdogs Emerge After Nick Smith's & Kurraba Group's Censorship: Two New Sites Investigate Nick Smith's Development Network**

October 21, 2025

*Key Points A Perfect Storm of Conflict and Greed In a stunning breach of public trust, a prime development site in inner-ci desperately needed affordable housing – was quietly diverted into private hands through insider deals. At the center of this who sat […]*

**Kurraba Group's Nick Smith Smears Investor Ty Dincer & MEC Global Partners (Mitsubishi Estate) Amid Funding Debacle**

October 20, 2025

**Open Letter to Trent Murno & Sydney Life Sciences Community**

**Intimidation, Deception, and Exploitation: Exposing Nick Smith's 44-78 Rosehill St, Redfern Development Scandal**

October 18, 2025

*Dear Trent, as a respected scientist, you may not be aware of the troubling history and ongoing issues surrounding Nichola and his development ventures. Below is a compilation of investigative articles from Kurraba Group Exposed highlighting s*

**Internal Emails Reveal Kurraba's Nick Smith Instructed Staff to Lie as Kippax Collapsed Financially**

Read More
October 16, 2025
Kurraba Group In Uncategorized

**Kurraba Group Exposed Issues Media Inquiry to Kurraba Group Regarding Allegations Concerning 100 Botany Road Project**

October 15, 2025

**From Ambition to Ashes: How Nick Smith's Kippax Venture Imploded and Left Investors Empty-Handed**

**Investors and Leasing Agents Are Stepping Back from Kurraba Project — What That Means for Those Who Stay**

October 10, 2025

**Kurraba's Insider Deals Flip Affordable Housing into Private Gain: The Carfi–Kurraba–Aqualand Scandal**

*Key Points: Summary: Kurraba's own sworn affidavit (Corrs Chambers Westgarth, partner Jim Micallef) records that a pr... Denning Partners is reassessing its lending exposure, JLL and CBRE leasing agents are reluctant to take the opportunity to... and current financier) has raised concerns after learning [...]*

October 10, 2025

**Kurraba Group and Nick Smith's Legal Campaign to Silence a Community Critic**

Kurraba Group In Uncategorized

October 10, 2025

**Kurraba G... ...again): Ji... Knowingl...**



...s Chambers Westgarth...
...ched them—not becau...

Read More
Kurraba Group In Ku...

**Judicial R... ...ad Projec...**

...bitious vision now face...
...o ION Life Sciences P...

Read More
Kurraba Group In Ku...

**Kurraba's ... ...Game Ex...**

...annals of Sydney's de...
...Precinct in Alexandria...

Read More
Kurraba Group In Ku...

**New Heal... ...and Enviro...**

...Development (SSD) app...
*Health Research Facility" at 100 Botany Road, Alexandria. This proposed life sciences precinct — marketed as the "ION"*
*structures and construction of two large research/lab buildings [...]*

**Kurraba's Sydney Affordable Housing Scandal: How Insider Deals Flipped Public Land for Private Gain**

Read More
October 10, 2025 In Kurraba Group

**Open Letter to Trent Murno & Sydney Life Sciences Community – What You Should Know About Nick Smith & Kurraba Group**

**Troubled Waters for ION's Perspective Tenants: The Mounting Group's Flagship Life Sciences Development**

October 9, 2025

### Recent Posts

*Key Points A $490 Million Promise Built on Shaky Foundations Sydney's ION Life Sciences precinct at 100 Botany Road, [...] fanfare in June 2024 as Australia's first commercial life sciences campus—a A$490 million development promising to revo Developed by the relatively new Kurraba Group, ION was marketed [...]*



**Kurraba Group Exposed** ✔    Follow

Kurraba Group In Kurraba Group

Exposing corruption, deceit, and manipulation by Nick Smith and Kurraba Group. Demanding transparency, accountability, and justice for those they've harmed.

## Kurraba Group's Connection to Tactical Group: A Red Flag for

🔁 Kurraba Group Exposed Retweeted

**Kurraba Group Exposed**

*Key Points Introduction Kurraba Group is a Sydney-based real estate investment and development firm specializing in lu an experienced leadership team and ambitious projects. However, a closer look reveals a concerning connection with Tacti Investigation Two of Kurraba's co-founders – Stephen "Steve" Patrick [...]*

Questions are being raised over @ashurst's governance & compliance role in managing the online reputation of Kurraba Group and Nick Smith — following a series of website restrictions and takedown actions.

Read More   Kurraba Group In Kurraba Group

Read more https://www.kurrabagroup.exposed/questions-raised-over-ashur...

## Corrs Chambers Westgarth's Defamation Gambit: Suing the W Kurraba Group Critics

**Kurraba Group Exposed** ✔ @kurrabagroup · 21h ✖

*Key Points Introduction In a startling move, Australian law firm Corrs Chambers Westgarth has filed a defamation lawsui* 🔥 New Investigation *against community activist Michael Williams – a man they believe is behind a critical website. The twist? Williams isn't act*

Questions *has being raised over @ashurst's* governance & compliance role in managing the online reputation of Kurraba Group and Nick Smith — following a series of website restrictions and takedown actions.

Read More

Read more https://www.kurrabagroup.exposed/questions-raised-over-ashur... 🖼

- 💬   🔁 1   ♡ 1   𝕏

                                                           1
                                                          2
                                                          3
Next »

**Kurraba Group Exposed** ✔ @kurrabagroup · 21 Oct      𝕏

Open Letter to @AusBiotech Attendees - The 100 Botany Road Mirage: Why Nick Smith's Kurraba Campus May Never Materialize

💬   🔁   ♡   𝕏

**Kurraba Group Exposed** ✔ @kurrabagroup · 21 Oct      𝕏

Independent Watchdogs Rise After Alleged Censorship: New Sites Scrutinize Nick Smith and Kurraba Group

After the Nick Smith's forced geo-restriction of http://KurrabaGroup.Exposed from Australian search results—reportedly following pressure from Nick Smith and Kurraba Group—two...   2 🖼

💬   🔁   ♡   𝕏

Load More

## Kurraba Group Exposed

**The City of Sydney must take a stand against Kurraba Group's 100 Botany Road development, a project shrouded in misconduct, misleading claims, and a blatant attempt to sidestep proper planning processes. The developers have a history of dissolving companies to escape accountability, manipulating public consultation processes, and leveraging false promises of medical research to justify their overreach.**

**Approving this project as an SSD without ironclad guarantees of its true purpose would set a dangerous precedent, allowing developers to exploit planning loopholes for financial gain at the community's expense. I urge the Council to defer and re-exhibit this proposal, demand an independent review, and ensure that 100 Botany Road is not used as a vehicle for commercial interests masquerading as public health benefits.**

**Read More**



### 100 Botany Road and 78-82 Wyndham: One Scheme, Two Addresses

Kurraba Group is attempting to push through the 100 Botany Road development while secretly tying it to 78-82 Wyndham Street, increasing the value of their adjacent commercial property without proper scrutiny. These projects must be assessed together, as the developers plan to link basements and share parking, exposing a clear financial scheme that undermines transparent planning processes.

**Watch Our Video** 

### Demand Transparency: Stop the 100 Botany Road Development Now



This development is nothing more than a deceptive land grab, exploiting a so-called medical research facility to bypass planning controls while secretly benefiting their adjacent commercial property—Sydney deserves better than backroom deals and manipulated approvals.

Jane Smith
Concerned Citizen



Kurraba Group has a track record of dissolving companies to avoid accountability, and now they're using a fraudulent SSD classification to push through a project with no proven public health benefit—why should we trust developers who refuse to play by the rules?

Alexandra Gerard
Concerned Citizen

### False SSD Classification

Kurraba Group is using a misleading State Significant Development (SSD) designation to bypass proper planning scrutiny and public accountability.

### Linked Developments Scheme

100 Botany Road and 78-82 Wyndham Street are financially and structurally connected, yet being assessed separately to conceal their true impact.

### Dissolving Companies to Evade Accountability

The developers have a history of shutting down companies to escape past failures and community pushback.

## Manipulated Public Consultation

Critical notices were removed, misleading information was given to residents, and objections were suppressed to prevent independent review.

## No Guaranteed Medical Facility

There is no confirmed operator for the proposed proton therapy center, raising doubts about whether it will ever be built.

**Affordable Housing Removal**

Previously approved affordable housing lots have been quietly removed from the development, reducing community benefits.

**Financial Instability of Developer**

Kurraba Group is in financial difficulty, and delays could lead to insolvency, leaving an unfinished or repurposed project.

**Potential Future Planning Modifications**

Once approved, nothing prevents the developer from modifying the project to increase commercial use at

the expense of public benefit.

### Conflict of Interest Concerns

A City of Sydney planner approving the DA previously worked for Urbis, the consulting firm that advised Kurraba on how to bypass council regulations.

**Unverified medical claims, hidden financial motives—Sydney must demand transparency and stop this reckless development before it's too late.**

If this development is truly about public health, then Kurraba Group must be held to the highest standards of transparency and accountability—not allowed to exploit planning loopholes for financial gain. The City of Sydney must step in, re-exhibit the proposal, and ensure an independent review before irreversible damage is done to our community.

**Make a Donation**

**Volunteer**